No. 19-60662

# United States Court of Appeals
## for the
## Fifth Circuit

◆❚◆

DENNIS HOPKINS, individually and on behalf of a class of all others similarly situated; HERMAN PARKER, JR., individually and on behalf of a class of all others similarly situated; WALTER WAYNE KUHN, JR., individually and on behalf of a class of all others similarly situated; BYRON DEMOND COLEMAN, individually and on behalf of a class of all others similarly situated; JON O'NEAL, individually and on behalf of a class of all others similarly situated; EARNEST WILLHITE, individually and on behalf of a class of all others similarly situated,

*Plaintiffs-Appellees,*

– v. –

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

*Defendant-Appellant.*

*(For Continuation of Caption See Reverse Side of Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI, NORTHERN DIVISION
DISTRICT COURT CASE NO. 3:18-CV-188-DPJ-FKB

## PLAINTIFFS-APPELLEES CROSS-APPELLANTS'
## EXCERPTS OF RECORD

PALOMA WU
SOUTHERN POVERTY LAW CENTER
111 East Capitol Street, Suite 280
Jackson, Mississippi 39201
(601) 948-8882
paloma.wu@splcenter.org

LISA GRAYBILL
SOUTHERN POVERTY LAW CENTER
1055 St. Charles Avenue
New Orleans, Louisiana 70130
(504) 486-8982
lisa.graybill@splcenter.org

NANCY G. ABUDU
CAREN E. SHORT
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, Georgia 30031
(404) 521-6700
nancy.abudu@splcenter.org
caren.short@splcenter.org

JONATHAN K. YOUNGWOOD
JANET A. GOCHMAN
ISAAC M. RETHY
NIHARA K. CHOUDHRI
TYLER ANGER
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
tyler.anger@stblaw.com

*Attorneys for Plaintiffs-Appellees Cross-Appellants*

**Consolidated with 19-60678**

DENNIS HOPKINS, individually and on behalf of a class of all others similarly situated;
HERMAN PARKER, JR., individually and on behalf of a class of all others similarly
situated; WALTER WAYNE KUHN, JR., individually and on behalf of a class of all
others similarly situated; JON O'NEAL, individually and on behalf of a class of all
others similarly situated; EARNEST WILLHITE, individually and on behalf of a class
of all others similarly situated; BYRON DEMOND COLEMAN, individually
and on behalf of a class of all others similarly situated,

*Plaintiffs-Appellees Cross-Appellants,*

– v. –

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

*Defendant-Appellant Cross-Appellee.*

i

# Table of Contents

Tab 1     Mississippi Mail-In Voter     ROA.19-60662.3688-3689
Registration Application

Tab 2     Mississippi Voter Information Guide     ROA.19-60662.2018-2019

Tab 3     Election Commissioner Training     ROA.19-60662.3870,
ROA.19-60662.3880

Tab 4     Circuit Clerk Training     ROA.19-60662.3915,
ROA.19-60662.3920

Tab 5     Excerpts of Report of Dorothy O.     ROA.19-60662.1790,
Pratt, Ph.D., Dated August 1, 2018     ROA.19-60662.1792-1794
ROA.19-60662.1801-1826

Tab 6     Excerpts of Secretary Hosemann's     ROA.19-60662.1982
Responses to the *Hopkins* Plaintiffs'     ROA.19-60662.1992
First Set of Requests for Admissions

Certificate of Service

**1**

# MISSISSIPPI MAIL-IN VOTER REGISTRATION APPLICATION

- You can use this form to: register to vote in Mississippi or change your name and/or address.
- If you are registering for the first time in Mississippi and DO NOT have a Mississippi driver's license or social security number, you must send with this application a copy of a current and valid photo ID or a copy of a current utility bill, bank statement, government check, paycheck or other government document that shows your name and address in this county.
- An application for voter registration must be postmarked or hand delivered to the Circuit Clerk's Office located in the county of your voting residence no later than 30 days before an election.
- You may not register to vote if you have been convicted in a Mississippi state court of any of the following crimes: voter fraud, murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement, bigamy, armed robbery, extortion, felony bad check, felony shoplifting, larceny, receiving stolen property, robbery, timber larceny, unlawful taking of a motor vehicle, statutory rape, carjacking or larceny under lease or rental agreement.
- If you live in an area without house numbers or street names, please include a drawing of your location to enable us to identify your appropriate voting precinct.
- <u>Photo ID Required to Vote:</u> You will be required to present an acceptable form of photo identification when you vote at your polling place on Election Day or by absentee ballot in your Circuit Clerk's Office, unless exempted by law. For more information, go to www.MSVoterID.ms.gov or call (844) 678-6837.

| **Check One:** <br> □ New Registration <br> □ Change of Information | Are you a citizen of the United States of America?   Yes □  No □ |||||
| | Will you be 18 years of age or on before Election Day?   Yes □  No □ |||||
| | _NOTE: If you checked 'No' in response to either of these questions, DO NOT complete this form._ |||||
| | Would you like to serve as an Election Day poll worker?   Yes □  No □ |||||
| **Name** | Last Name | First Name | MI | Suffix | |
| **Physical Home Address (Where you live)** | Number and Street/Road/Dorm/Apt # |||||
| | City | County | State: MS | Zip ||
| **Mailing Address (If different from above)** | Street or Post Office Box |||||
| | City | County | State: | Zip ||
| **Date of Birth** | Month | Day | Year | MS Driver's License Number or Last 4 Digits of your Social Security Number | _____ or __ __ __ __ |
| **Phone #** | Home ( ) | Work ( ) | | | |
| **Previous Registration** | Name | | Address | ||
| | City | County | State: | Zip ||

## VOTER DECLARATION- Read and Sign

I swear/affirm, under penalty of perjury, that:

- I am a U.S. citizen.
- I will be 18 years of age on or before the next general Election Day.
- I am a resident of Mississippi, this county and this city for at least 30 days.
- I have not been adjudicated as mentally incompetent.
- I have never been convicted of voter fraud or any other disenfranchising crime OR, if convicted, I have had my voting rights restored as required by law.
- The address listed above is my legal place of residence.

WARNING: Giving false information to register to vote is a felony punishable by a fine of not more than $5,000 or imprisonment for not more than 5 years, or both.  Miss. Code Ann. § 23-15-17.

X _____  Date: _____
   Signature (or mark) of applicant

X _____  Date: _____
   If applicant is unable to sign, the person who assisted the applicant

_____
   Address

19-60662-3688

Postage Required Post Office will not deliver without proper postage.

FROM: _____

_____

_____

## TO: County Circuit Clerk

_____

_____

_____

**ADAMS COUNTY**
115 S. Wall Street
Natchez, MS 39120

**ALCORN COUNTY**
P.O. Box 430
Corinth, MS 38835

**AMITE COUNTY**
P.O. Box 312
Liberty, MS 39645

**ATTALA COUNTY**
100 Courthouse, Ste. 1
Kosciusko, MS 39090

**BENTON COUNTY**
P.O. Box 262
Ashland, MS 38603

**BOLIVAR COUNTY**
P.O. Box 6
Cleveland, MS 38732

**CALHOUN COUNTY**
P.O. Box 25
Pittsboro, MS 38951

**CARROLL COUNTY**
P.O. Box 6
Vaiden, MS 39176

**CHICKASAW COUNTY**
1 Pinson Square, Rm. 2
Houston, MS 38851

**CHOCTAW COUNTY**
P.O. Box 34
Ackerman, MS 39735

**CLAIBORNE COUNTY**
P.O. Box 549
Port Gibson, MS 39150

**CLARKE COUNTY**
P.O. Box 216
Quitman, MS 39355

**CLAY COUNTY**
P.O. Box 364
West Point, MS 39773

**COAHOMA COUNTY**
P.O. Drawer 849
Clarksdale, MS 38614

**COPIAH COUNTY**
P.O. Box 467
Hazlehurst, MS 39083

**COVINGTON COUNTY**
P.O. Box 667
Collins, MS 39428

**DESOTO COUNTY**
2535 Hwy. 51 S., Rm. 201
Hernando, MS 38632

**FORREST COUNTY**
P.O. Box 992
Hattiesburg, MS 39403

**FRANKLIN COUNTY**
P.O. Box 267
Meadville, MS 39653

**GEORGE COUNTY**
355 Cox Street, Ste. C
Lucedale, MS 39452

**GREENE COUNTY**
P.O. Box 310
Leakesville, MS 39451

**GRENADA COUNTY**
P.O. Box 1517
Grenada, MS 38902

**HANCOCK COUNTY**
152 Main Street, Ste. B
Bay St. Louis, MS 39520

**HARRISON COUNTY**
P.O. Box 998
Gulfport, MS 39502

**HINDS COUNTY**
P.O. Box 327
Jackson, MS 39205

**HOLMES COUNTY**
P.O. Box 718
Lexington, MS 39095

**HUMPHREYS COUNTY**
P.O. Box 696
Belzoni, MS 39038

**ISSAQUENA COUNTY**
P.O. Box 27
Mayersville, MS 39113

**ITAWAMBA COUNTY**
201 W. Main Street
Fulton, MS 38843

**JACKSON COUNTY**
P.O. Box 998
Pascagoula, MS 39568

**JASPER COUNTY**
P.O. Box 447
Bay Springs, MS 39422

**JEFFERSON COUNTY**
P.O. Box 305
Fayette, MS 39069

**JEFFERSON DAVIS COUNTY**
P.O. Box 1090
Prentiss, MS 39474

**JONES COUNTY**
P.O. Box 1336
Laurel, MS 39441

**KEMPER COUNTY**
P.O. Box 130
De Kalb, MS 39328

**LAFAYETTE COUNTY**
1 Courthouse Sq., Ste. 101
Oxford, MS 38655

**LAMAR COUNTY**
P.O. Box 369
Purvis, MS 39475

**LAUDERDALE COUNTY**
P.O. Box 1005
Meridian, MS 39302

**LAWRENCE COUNTY**
P.O. Box 1249
Monticello, MS 39654

**LEAKE COUNTY**
P.O. Box 67
Carthage, MS 39051

**LEE COUNTY**
P.O. Box 762
Tupelo, MS 38802

**LEFLORE COUNTY**
P.O. Box 1953
Greenwood, MS 38935

**LINCOLN COUNTY**
301 S. First Street, Rm. 205
Brookhaven, MS 39601

**LOWNDES COUNTY**
P.O. Box 31
Columbus, MS 39703

**MADISON COUNTY**
P.O. Box 1626
Canton, MS 39046

**MARION COUNTY**
250 Broad Street, Ste. 2
Columbia, MS 39429

**MARSHALL COUNTY**
P.O. Box 459
Holly Springs, MS 38635

**MONROE COUNTY**
P.O. Box 843
Aberdeen, MS 39730

**MONTGOMERY COUNTY**
P.O. Box 765
Winona, MS 38967

**NESHOBA COUNTY**
401 E. Beacon Street, Ste. 110
Philadelphia, MS 39350

**NEWTON COUNTY**
P.O. Box 447
Decatur, MS 39327

**NOXUBEE COUNTY**
P.O. Box 431
Macon, MS 39341

**OKTIBBEHA COUNTY**
108 W. Main Street
Starkville, MS 39759

**PANOLA COUNTY**
P.O. Box 346
Batesville, MS 38606

**PEARL RIVER COUNTY**
P.O. Box 530
Poplarville, MS 39470

**PERRY COUNTY**
P.O. Box 198
New Augusta, MS 39462

**PIKE COUNTY**
P.O. Drawer 31
Magnolia, MS 39652

**PONTOTOC COUNTY**
P.O. Box 428
Pontotoc, MS 38863

**PRENTISS COUNTY**
P.O. Box 727
Booneville, MS 38829

**QUITMAN COUNTY**
220 Chestnut Street, Ste. 4
Marks, MS 38646

**RANKIN COUNTY**
P.O. Box 1599
Brandon, MS 39043

**SCOTT COUNTY**
P.O. Box 371
Forest, MS 39074

**SHARKEY COUNTY**
P.O. Box 218
Rolling Fork, MS 39159

**SIMPSON COUNTY**
P.O. Box 307
Mendenhall, MS 39114

**SMITH COUNTY**
P.O. Box 517
Raleigh, MS 39153

**STONE COUNTY**
323 E. Cavers Avenue
Wiggins, MS 39577

**SUNFLOWER COUNTY**
P.O. Box 880
Indianola, MS 38751

**TALLAHATCHIE COUNTY**
P.O. Box 86
Charleston, MS 38921

**TATE COUNTY**
201 Ward Street
Senatobia, MS 38668

**TIPPAH COUNTY**
102-A N. Main Street
Ripley, MS 38663

**TISHOMINGO COUNTY**
1008 Battleground Drive, Rm. 2014
Iuka, MS 38852

**TUNICA COUNTY**
P.O. Box 184
Tunica, MS 38676

**UNION COUNTY**
P.O. Box 298
New Albany, MS 38652

**WALTHALL COUNTY**
200 Ball Avenue, Ste. C
Tylertown, MS 39667

**WARREN COUNTY**
P.O. Box 351
Vicksburg, MS 39181

**WASHINGTON COUNTY**
P.O. Box 1276
Greenville, MS 38702

**WAYNE COUNTY**
P.O. Box 428
Waynesboro, MS 39367

**WEBSTER COUNTY**
P.O. Box 308
Walthall, MS 39771

**WILKINSON COUNTY**
P.O. Box 327
Woodville, MS 39669

**WINSTON COUNTY**
P.O. Drawer 785
Louisville, MS 39339

**YALOBUSHA COUNTY**
P.O. Box 1431
Water Valley, MS 38965

**YAZOO COUNTY**
P.O. Box 108
Yazoo City, MS 39194

19-60662.3689

**2**



# Mississippi Voter Information Guide

*Know your voting rights and responsibilities*

**DELBERT HOSEMANN**
*Secretary of State*

401 Mississippi Street
P.O. Box 136
Jackson, MS 39205
Elections Hotline at 1 (800) 829-6786
www.yallvote.sos.ms.gov

## 2018-2020 Elections Calendar

The chart below reflects regularly scheduled elections and does not account for special elections, elections affected by litigation, and other special circumstances.

| | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| **Federal Offices** | | | | |
| President and Vice President | | | ■ | |
| United States Senator | ■ | | ■ | |
| United States Representative | ■ | | ■ | |
| **State Offices** | | | | |
| Governor | | ■ | | |
| Lieutenant Governor | | ■ | | |
| Secretary of State | | ■ | | |
| Attorney General | | ■ | | |
| State Auditor | | ■ | | |
| State Treasurer | | ■ | | |
| Commissioner of Insurance | | ■ | | |
| Commissioner of Agric. & Commerce | | ■ | | |
| State Senator | | ■ | | |
| State Representative | | ■ | | |
| Transportation Commissioner | | ■ | | |
| Public-Service Commissioner | | ■ | | |
| **State District Offices** | | | | |
| Supreme Court Justice | ■ | | ■ | |
| Court of Appeals Judge | ■ | | ■ | |
| Circuit Court Judge | | ■ | | |
| Chancery Court Judge | | ■ | | |
| District Attorney | | ■ | | |
| Levee Commissioner | | ■ | | |
| **County Offices** | | | | |
| Sheriff | | ■ | | |
| Chancery Clerk | | ■ | | |
| Circuit Clerk | | ■ | | |
| County Court Judge | | ■ | | |
| Tax Assessor | | ■ | | |
| Tax Collector | | ■ | | |
| Coroner | | ■ | | |
| Superintendent of Education | | ■ | | |
| County Attorney | | ■ | | |
| Surveyor | | ■ | | |
| **County District Offices** | | | | |
| Supervisor | | ■ | | |
| Justice Court Judge | | ■ | | |
| Constable | | ■ | | |
| Election Commissioner | ■ | | ■ | |
| **Municipal Offices** | | | | ■ |

*NOTE: Not all counties elect all of the offices listed. Some special-charter municipalities hold elections in years other than the one indicated. Supreme Court Justices, Appeals Court Judges, and County Board of Education members run in staggered terms.*

## Voting with Photo ID

All Mississippi voters casting a ballot in person at the polls or casting an absentee ballot in the Circuit or Municipal Clerk's Office must present one of the following forms of acceptable photo ID:

- A driver's license;
- A government issued photo ID card;
- A United States passport;
- A government employee photo identification card;
- A firearms license;
- A student photo ID issued by an accredited Mississippi university, college, or community/junior college;
- A United States military photo ID;
- A tribal photo ID;
- Any other photo ID issued by any branch, department, agency or entity of the United States government or any State government; or
- A Mississippi Voter Identification Card

If you do not present an acceptable form of photo ID or are unable to do so because of a religious objection, you are entitled to cast an affidavit ballot.

A voter casting an affidavit ballot because he/she did not present an acceptable form of photo ID based upon a religious objection may not have his/her ballot rejected for this reason if he/she completes an Affidavit of Religious Objection in the Circuit or Municipal Clerk's Office within five business days after Election Day.

A voter casting an affidavit ballot because he/she did not present an acceptable form of photo ID may not have his/her ballot rejected for this reason if he/she presents an acceptable form of photo ID in the Circuit or Municipal Clerk's Office within five business days after Election Day.

**Call 1 (844) MSVoter (1 (844) 678-6837) for Voter ID information or assistance in obtaining a Mississippi Voter Identification Card.**

## Voting by Absentee Ballot

Some registered voters are eligible to vote by an absentee ballot because of age, health, work demands, temporary relocation for educational purposes, or their affiliation with the U.S. Armed Forces. Please determine if you are entitled to vote by an absentee ballot and to learn the procedures for doing so.

If you know how you will vote by an absentee ballot, you may contact your Circuit or Municipal Clerk's Office at any time within 45 days of the election.

Voters included within the Uniform and Overseas Citizens Absentee Voting Act (UOCAVA), such as members of the military and overseas citizens, may register to vote and request an absentee ballot by Federal Post Card Application (FPCA). UOCAVA voters may register to vote using the FPCA up until ten days before the date of an election and may receive and return an absentee ballot by mail, email, or fax. For more information, call the Secretary of State's Election Hotline at 1 (800) 829-6786 or visit our website at www.yallvote.sos.ms.gov.

Pls_Prod_Doc_0011735

19-60662.2019
Pls_Prod_Doc_011738

# How to Register to Vote

## Registration Qualifications

Every U.S. citizen who possesses the following qualifications is eligible to register to vote in Mississippi:

- A resident of Mississippi and the county, city, or town for 30 days prior to the election;
- At least 18 years old (or will be 18 by the date of the next General Election);
- Not declared mentally incompetent by a court; and
- Not convicted of a disenfranchising crime as defined by Section 241 of the Mississippi Constitution or by Attorney General Opinion, unless pardoned, rights of citizenship restored by the Governor or suffrage rights restored by the Legislature.

## Registering by Mail

1. Complete a Mail-In Voter Registration Application. Provide the information requested, including your driver's license number and/or the last four digits of your driver's license number or the last four digits of your Social Security number, you must send with your application:
   - A copy of a current and valid photo ID; **or**
   - A copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address.
2. Send your Mail-In Voter Registration Application to the Circuit Clerk's Office located in the county of your residence.
3. Applications must be postmarked 30 days before the date of the election. If the 30th day falls on a Sunday or legal holiday, then both the postmark and in-person deadline is extended to the next regular business day.
4. Mail-In Registration Applications are available at your Circuit Clerk's Office, Municipal Clerk's Office, public library, and other participating government offices. Also, Mail-In Registration Applications may be downloaded from our website at www.yallvote.sos.ms.gov.

## Registering in Person

1. You may register to vote in person at any of the following locations:
   - Circuit Clerk's Office;
   - Municipal Clerk's Office;
   - Department of Public Safety; or
   - Any state or federal agency offering government services, such as the Department of Human Services.
2. You must register to vote 30 days before the date of the election. If the 30th day falls on a Sunday or legal holiday, then both the postmark and in-person deadline is extended to the next regular business day.

## Know Your Voting Rights

- Every qualified Mississippi elector is entitled to vote regardless of race, creed, color, or disability.
- No one may refuse a person the right to vote if that person is legally entitled to vote.
- No voter shall be threatened, intimidated, or paid to vote by any person.
- Voters whose names do not appear on the poll book or who do not have an acceptable form of photo ID are entitled to vote by affidavit ballot.
- Voters who cast an affidavit ballot are entitled to receive written information at the time of voting on how to determine if the vote was counted and, if not, why not.
- Voters who require assistance in marking the ballot because of disability, blindness, or an inability to read or write are entitled to receive assistance from a person of the voter's choice, excluding, a candidate whose name is on the ballot, or the spouse, parent, sibling or child of a candidate whose name is on the ballot, or by a poll watcher who is observing in the polling place on Election Day, or the voter's employer or agent of that employer, or officer or agent of the voter's union; unless, however, a candidate for office or the spouse, parent or child of a candidate is related within the first degree to the voter requesting assistance.

# Voter Registration Deadlines

To vote, you must register either in person at the Circuit Clerk's or Municipal Clerk's Office or by mail-in registration application at least 30 days prior to the date of the election. All applications must be postmarked on or before 30 days prior to the date of the election. If the 30th day falls on a Sunday or legal holiday, then both the postmark and in-person deadline is extended to the next regular business day.

Voters who have not yet reached the age of 18 at the time of a primary election may vote in the primary election so long as he/she will reach the age of 18 on before the date of the general election.

## 2018

**Primary Election Day - June 5**
*Register by May 7*

**General Election Day - November 6**
*Register in person by October 8*
*Voter Registration Applications sent by mail must be postmarked no later than October 9*

## 2019

**Primary Election Date - August 6**
*Register by July 8*

**General Election Date - November 5**
*Register by October 7*

## 2020

**Primary Election Day - March 10**
*Register by February 10*

**General Election Day - November 3**
*Register by October 5*

## 2021

**Primary Election Date - April 6**
*Register by March 8*

**General Election Date - June 8**
*Register by May 10*

# www.YallVote.sos.ms.gov

## Are you registered to vote?

Verify if you are an active registered voter online at www.yallvote.sos.ms.gov.

## Have you moved and need to update your address?

To update your name and address registration information online, you must already be a registered voter of the State of Mississippi and have a current and valid Mississippi driver's license or photo identification card issued by the Mississippi Department of Public Safety.

Update your voter registration information in five easy steps:

1. Enter your information exactly as it appears on your current voter registration card.
2. Choose your name out of the four possibilities listed.
3. Enter your information exactly as it appears on your driver's license or other DPS identification card.
4. Change your address or name.
5. Visit the polling place locator prior to or on Election Day to determine where you should go to cast your ballot.

# www.yallvote.sos.ms.gov

## Where to Vote

After registering to vote, your Voter Registration Card will be sent to your residence/mailing address provided on your application. Your Voter Registration Card will provide the name, location, and number of the precinct in which you will vote.

You may contact your Circuit Clerk's Office for more information. Polls are open each Election Day from 7 a.m. until 7 p.m.

**3**

Case 3:17-cv-00791-DPJ-FKB   Document 77-22   Filed 10/25/18   Page 2 of 45

19-60662.3870

# DUTIES OF ELECTION COMMISSIONERS

## 2018 ECAM Orientation

Presented by:

Hawley Robertson

Senior Attorney, Elections Division

Mississippi Secretary of State's Office



DELBERT HOSEMANN

*Secretary of State*

Case 3:17-cv-00791-DPJ-FKB   Document 77-22   Filed 10/25/18   Page 12 of 45

# Revision of Registration Books and Pollbooks

- When an elector is disqualified from voting, Election Commissioners record the reason for the removal of his name in SEMS and mark his status as purged.

- Criminal convictions are compared to the voter roll by the Election Commissioners and/or Circuit Clerk.

- The names of the persons convicted of disenfranchising crimes must be purged from the voter roll by the Election Commissioners.

**References:** *Miss. Code Ann. §§ 23-15-19; 23-15-125; 23-15-151*



DELBERT HOSEMANN
*Secretary of State*

19-60662.3880

**4**



# Circuit Clerks

Winter Conference 2018

---

**SEMS UPDATE**

Madalan Lennep

DELBERT HOSEMANN
Secretary of State

## Topics

- SEMS Update
- DPS Registration Update
- Voter Roll Maintenance
- Elections Update

DELBERT HOSEMANN
Secretary of State



19-60662.3915







**5**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | |
|---|---|
| ROY HARNESS, et al.,<br><br>     Plaintiffs,<br><br>        v.<br><br>DELBERT HOSEMANN, SECRETARY OF STATE OF MISSISSIPPI, in his official capacity,<br><br>     Defendant. | Civil Action No. 3:17-cv-791-DPJ-FKB<br>*Consolidated with*<br>Civil Action No. 3:18-cv-188-DPJ-FKB |
| DENNIS HOPKINS, et al.,<br><br>     Plaintiffs,<br><br>        v.<br><br>DELBERT HOSEMANN, SECRETARY OF STATE OF MISSISSIPPI, in his official capacity,<br><br>     Defendant. | |

## REPORT OF DOROTHY O. PRATT, Ph.D.

August 1, 2018

Case 3:17-cv-00791-DPJ-FKB   Document 89-2   Filed 10/04/18   Page 4 of 66

## I.    INTRODUCTION AND QUALIFICATIONS

1.      I have been retained as an expert by counsel for Plaintiffs in *Hopkins v. Hosemann*, captioned above. I have prepared this report according to Federal Rule of Civil Procedure 26(a)(2)(B).

2.      From August 2007 until my retirement in August 2016, I was an Associate Research Professor in the Department of History at the University of South Carolina. Before that I served at the University of Notre Dame both as an Assistant Dean in the College of Arts and Letters and as an Associate Professional Specialist in the Department of History. I earned both my Ph.D. and M.A. in History from the University of Notre Dame. In addition, I received an M.A. in Anthropology from Brigham Young University. I grew up in Jackson, Mississippi, and I come from a long line of Mississippians. A number of my family members and close friends still reside in Mississippi.

3.      One of my main research interests is the divisions between insider/outsider groups. My work in this area led to the publication of two monographs: *Sowing the Wind: The Mississippi Constitutional Convention of 1890* (University Press of Mississippi 2017) and *Shipshewana: An Indiana Amish Community* (Indiana University Press 2004). Both books investigate the creation of cultural boundaries and the construction of "fencing" to keep social and political divisions distinct. I have also researched and written a number of shorter publications and papers relating to other types of insider/outsider groups, including in the areas of gender division, racial and class specifications, and religious questions.

4.      My teaching interests are primarily focused on nineteenth-century American history. I have taught courses on the Civil War (for which I received the Kaneb Undergraduate Teaching Award at Notre Dame), the Jacksonian Era, the Gilded Age and Progressive Era,

1

19-60662.1792

Case 3:17-cv-00791-DPJ-FKB    Document 89-2    Filed 10/04/18    Page 9 of 66

History of the American West, History of the American South, and the Survey of American

History. A copy of my curriculum vitae is attached as Appendix A to this report.

5.    I have not previously testified as an expert witness.

## II.    ASSIGNMENT

6.    I have been asked by Simpson Thacher & Bartlett LLP and the Southern Poverty

Law Center, counsel for Plaintiffs in *Hopkins v. Hosemann*, to offer my opinions concerning the

purpose of the franchise-related provisions of Mississippi's 1890 Constitution (the "1890

Constitution"), with a particular focus on the intent, design, and scope of Section 253 (the

"Suffrage Restoration Provision"), which permits the Mississippi Legislature to restore voting

rights to individuals disfranchised by reason of the criminal offenses enumerated in Section 241.

7.    I am being compensated for my work at the rate of $100 an hour. This

remuneration is not contingent on my opinions and does not influence my conclusions in any

way.

## III.    SUMMARY OF MY OPINIONS

8.    Based on my review of the history of the 1890 Constitution, including the debates

that took place during Mississippi's 1890 Constitutional Convention (the "Convention"), I have

reached the following opinions:

a.    The delegates to the Convention (the "delegates") fully intended to

disfranchise African Americans. Specifically, the delegates aimed to deny

enough African Americans access to the ballot box to ensure white

political control within the state.

b.    While many of the delegates bluntly stated their intention to disfranchise

African Americans, they disguised this purpose in the words of the 1890

Constitution. Every significant franchise-related section of the 1890

2

19-60662.1793

Case 3:17-cv-00791-DPJ-FKB    Document 85-2    Filed 10/04/18    Page 6 of 66

Constitution was designed and worded to disfranchise African Americans without specifically referring to race.

c.      The delegates recognized that no single race-neutral restriction, standing alone, would accomplish their goal of white political control. For this reason, the Franchise Committee specified several requirements to qualify for the elective franchise, including a literacy test and a criminal disfranchisement provision; these requirements were designed to intertwine and interlock to create an effective barrier to African American political participation within the state.

d.      A key challenge posed by the seemingly race-neutral qualifiers the delegates selected, particularly the literacy test and criminal disfranchisement provisions, was the risk that these provisos could disfranchise some white men in addition to African Americans. To protect the white men who might be ensnared by these requirements, the delegates established remedies for the loss of the elective franchise: for illiteracy the antidote was the constitutional interpretation test, or "Understanding Clause," and for disfranchisement due to criminal conviction the antidote was the Suffrage Restoration Provision. Both the Understanding Clause and the Suffrage Restoration Provision were designed as safety nets for white men.

e.      The Understanding Clause and the Suffrage Restoration Provision were both intentionally vague. Neither the Understanding Clause nor the Suffrage Restoration Provision had any specific standards for application. Election officials who applied the Understanding Clause and legislators who introduced or voted on private bills for the restoration of suffrage (lost under the criminal disfranchisement provision) had unrestricted latitude.

3

19-60662.1794

than their counterparts in the white counties and had carved out a pragmatic approach to the power struggles in the state.[21]

24.    The delegates from the white counties and the delegates from the black counties were mistrustful of the other, particularly over money and taxation. Only racial animosity united the white voters in all the counties.[22] Even though compromises between the delegates from the white counties and those from the black counties may appear to have been based on other grounds, they were not. Underneath issues of reapportionment, secret balloting, women voting, taxation, and prohibition was that of race.

## C.    THE PURPOSE OF THE CONVENTION

25.    The Convention began in Jackson, Mississippi, on August 12, 1890.[23] On the first day of the Convention, Judge Solomon Saladin Calhoon, a delegate of Hinds County and a former Lieutenant Colonel in the Confederate Army, was elected President of the Convention.[24] Judge Calhoon began the Convention with a speech that left no doubts about the purpose of the Convention: "This ballot system must be so arranged as to effect one object" — that white

---

[21] A number of black counties permitted some fusion voting, which allowed for a split ticket between parties; the procedure was a compromise to sanction some representation by two parties among elected officials. As a result of fusion voting, some African American Republicans were able to get elected as lower-level functionaries.

[22] See, for example, "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5, reporting on E. O. Sykes, a delegate of Monroe County: "He alluded to the phenomenal condition of affairs in the State— one portion of the State largely black, and the other largely white, and urged the necessity of striking some happy medium by which the fewest of white people shall be dissatisfied. Our hope lies solely in the unity and solidity of the white race."; "Convention Speeches," *Clarion-Ledger*, September 18, 1890, p. 2, a speech of J. B. Boothe, a delegate for the state at large and a member of the Franchise Committee, discussed "the lack of complete homogeneity of interest between the counties in the white and counties in the black belt," and stated that "concessions must come from both sides" because "there is danger of negro domination near or remote."

[23] *Proceedings*, 3.

[24] Ibid., 8-9.

10

people would be in the ascendancy.[25] He posited that when African Americans were in control, as during Reconstruction, it had "always meant economic and moral ruin." White rule, on the other hand, resulted in "prosperity and happiness to all races."[26]

26. Though Judge Calhoon often spoke at the Convention in circumlocution about race matters, he had not been so fastidious in the months leading up to the election for the delegates. Before the Convention began, Judge Calhoon wrote, "Negro suffrage is an evil and an evil to both races."[27] He questioned, "Why should the Negro have this dangerous power of suffrage?"[28] Judge Calhoon's platform was absolutely clear when he was elected as a delegate of Hinds County and then selected as the Convention's President.

27. Judge Calhoon's sentiments were not unique. Throughout the Convention debates, the delegates openly acknowledged that the purpose of the Convention was to create a new constitution which would disfranchise enough African Americans to ensure a stable white majority. For example:

- "Every scheme of self-government for the negro will prove a disastrous failure . . . We are, therefore, here for the purpose of organizing a new government, by which the political power of the State shall be vested in a majority fit to govern."— Senator George, a delegate for the state at large.[29]

---

[25] Ibid., 9-11.

[26] Ibid.

[27] "Judge Calhoon's Views. Thinks the Negro Should Be Deprivee [sic] of Suffrage," *Clarion-Ledger*, March 6, 1890, p. 2, quoting "a lengthy paper of Judge S. S. Calhoon, published in the *Times-Democrat* [New Orleans], on the negro problem."

[28] Ibid.

[29] "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5; see also "The Franchise. Senator George's Grea[t] Speech," *Daily Commercial Herald* (Vicksburg), September 17, 1890, p. 1.

11

19-60662.1802

- "It is the manifest intention of this Convention to secure to the State of Mississippi 'white supremacy.'" — Constitutional provisions submitted by Mr. Melchior, a Republican delegate of Bolivar County.[30]

- Mississippi's government should be "for all time in the control of the white race — the only race fit to govern in this country." — T. P. Bell, a delegate of Kemper County.[31]

- To prevent an "overthrow" of the white civil government it is necessary "to secure to the white race a fixed and permanent majority." — W. S. Eskridge, a delegate of Tallahatchie County.[32]

- "[I came] to assist in making a constitution that would give the power of the State into the hands of the white people, and there it should be lodged." — General S. D. Lee, delegate of Oktibbeha County and President of Mississippi A&M College (now Mississippi State University).[33]

28.     Although the delegates were unapologetic in describing their intention to disfranchise African-Americans, they were careful to avoid any reference to race in the franchise-related provisions of the 1890 Constitution. Every significant section of the 1890 Constitution was worded to avoid challenge under the Fifteenth Amendment.

## D.    CIRCUMVENTING THE OBSTACLES POSED BY THE FIFTEENTH AMENDMENT

29.     On August 22, 1890, the Convention's Judiciary Committee addressed the question of whether any efforts at disfranchisement would run afoul of the Fifteenth

---

[30] *Proceedings*, 275.

[31] "The Convention," *Clarion-Ledger*, September 11, 1890, p. 5.

[32] "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1.

[33] "And Still They Talk. Judge Chrisman's Last Grand and Eloquent Appeal," *Daily Clarion-Ledger*, September 18, 1890, p. 1.

19-60662.1803

Amendment.[34] The Committee was chaired by Judge Wiley P. Harris, Senator George's law

partner.[35]

30.    The Judiciary Committee reported that the Fifteenth Amendment could not make

anyone a voter.[36] Rather, it only forbade states to take away the franchise of citizens on the basis

of their race.[37] According to the Judiciary Committee, Mississippi had "just as large discretion in

regulating the franchise as it had before its adoption, with the single limitation, that the

regulations which it prescribes shall apply alike to both races."[38]

31.    The Judiciary Committee was of the view that if the state added race-neutral

qualifiers for registering voters, it would not be in violation of the Fifteenth Amendment. For

instance, "[i]f a property or educational qualification shall be thought wise, or expedient, or if the

payment of taxes or a longer residence in State or county should be deemed expedient, either or

all may be adopted, provided they are applied alike to both races."[39] Resting on the advice of the

Judiciary Committee, the delegates proceeded with their agenda.

---

[34] *Proceedings*, 83-87; see also "Judiciary Committee. They Make the First Report to the Convention," *Daily Clarion-Ledger*, August 22, 1890, p. 1.

[35] "Judiciary Committee. They Make the First Report to the Convention," *Daily Clarion-Ledger*, August 22, 1890, p. 1.

[36] *Proceedings*, 85: "It is plain, in the opinion of the Committee, from this section of the Constitution [referring to the Fourteenth Amendment], that Congress can not confer suffrage, can not make a voter, and that we must look to the several States, and their laws and Constitutions to ascertain who are legally competent to vote."

[37] Ibid.: "The Fifteenth Amendment has but one operation and was engrafted in the Constitution for the single purpose of laying an inhibition on the State, of discriminating against the colored man, because of race or previous condition of servitude."

[38] Ibid.

[39] Ibid.

19-60662.1804

### E.    THE PROPOSED REPEAL OF THE FIFTEENTH AMENDMENT

32.    On September 30, 1890, a special committee of delegates, designated as the

Committee on Preamble and Resolutions, proposed that Mississippi demand a repeal of the

Fifteenth Amendment.[40] Framed as a request to Congress, the language of the committee's report

was formal.[41] The report declared that Mississippi and some other states had nearly equal

numbers of the two races and stated that "[t]hese two races, though friendly and homogenous for

all business and industrial purposes, are widely separated by race instincts and prejudices in all

political and social matters." According to the committee, the two races would be forever

"divided in all political contests in the main, on race lines" and were "without any well founded

hope of a change."[42]

33.    The report posited that "one race or the other must have charge and control the

governments" or there would be "ever recurring conflicts" between the two. The report further

expressed the committee members' fundamental understanding of the issue: "the white people

only are capable of conducting and maintaining the governments," for "the negro race, even if its

people were educated, being wholly unequal to such great responsibility, if they should come

into control of such governments."[43]

---

[40] *Proceedings*, 302-04; see also "Slowly Jogging Along. Wrestling with the Legislative Report," *Daily Clarion-Ledger*, September 30, 1890, p. 1, which reported, "[T]he Committee recommended that a proposition to repeal the 15th Amendment to the Constitution of the United States be submitted by Congress." The special committee was created on the motion of M. Dabney, a delegate of Warren County, on August 26, 1890. *Proceedings*, 113-14; "Another Brief Session, A Mass of Bills Put in the Convention Hopper," *Daily Clarion-Ledger*, August 27, 1890, p. 1.

[41] *Proceedings*, 302-04.

[42] Ibid., 303.

[43] Ibid.

19-60662.1805

34.    The report concluded that "the true and only efficient remedy . . . lies in the repeal
of the XV Amendment of the Constitution of the United States." The committee felt so strongly
about this issue that they added, "we will cheerfully accept as a condition to such repeal such
reduction in representation the House of Representatives . . . as may be reasonable."[44] The
proposal went nowhere.

### F.    THE WORK OF THE FRANCHISE COMMITTEE

35.    The delegates were divided into committees to draft different sections of the
state's new constitution. The largest and most important committee was the 35-member
Committee on the Elective Franchise, Apportionment and Elections (the "Franchise
Committee").[45] Senator George was a member, as was Judge Harris and many other important
state leaders.[46] Over eighty percent of the Franchise Committee members resided in black
counties. The Franchise Committee's proposals reflected that ethos in that they sought restriction
of the African American vote and were less concerned about the incidental disfranchisement of

---

[44] Ibid., 304.

[45] *Proceedings*, 19-20.

[46] Ibid., 22. Isaiah Montgomery, the lone African American delegate, was a member of the Franchise
Committee. He remains an enigma, as he not only served on the Franchise Committee but also voted for
the 1890 Constitution—including the disfranchisement components. In a speech during the Convention
on September 15, 1890, Mr. Montgomery acknowledged that Mississippians had employed "every form
of demoralization" including "bloodshed, bribery, [and] ballot-stuffing" to restrict the African American
vote. He further stated that the African American race "has not yet attained the high plane of moral,
intellectual and political excellence common" to the white race. Given the realities of the time, he argued
that "the work of this Convention, in order to be successful, must restrict the franchise by prescribing
such qualifications for voters as would reduce the negro vote considerably below the white vote of the
State." He expressed his view that in order "to restore honesty and purity to the ballot box," the new
constitution must ensure to the state "a safe and intelligent voting population, capable of comprehending
the intricate responsibilities." "A Noble Speech. The Remarkable Address of Isaiah T. Montgomery, a
Negro," *World* (New York), September 27, 1890, p. 1; part of the speech can also be found in "The
Convention," *Clarion-Ledger,* September 18, 1890, p. 5.

19-60662.1806

white men.[47] Such disregard for the white county voters did not sit well with their representatives, especially for members of the Farmers' Alliance, who represented many poor white farmers.

36.    The Franchise Committee operated in secrecy, with all debates taking place behind closed doors.[48] While some delegates objected to this secrecy in principle, others felt the closed-door approach was necessary.[49] Edward Mayes, a delegate for the state at large, said the Franchise Committee's secret meetings were not only understandable but also "wise and justifiable" for the Convention's "avowed purpose was an alteration of the whole basis of franchise, and necessarily in the shape of restriction."[50]

37.    The members of the Franchise Committee realized that the way to avoid scrutiny under the Fifteenth Amendment was to create qualifiers, rather than disqualifiers, for voters that would apply equally to white and African American males. The difficulty they faced was

---

[47] See, for example, "Convention Speeches. Hon. J. H. Jones Speaks Against Female Suffrage," *Clarion-Ledger*, September 18, 1890, p. 2, reporting a speech of J. B. Boothe, a delegate for the state at large and a member of the Franchise Committee, who questioned whether all of the white county delegates would oppose provisions that disfranchised some white men, and positing that they would be willing to accept the Franchise Committee's propositions for the greater good.

[48] "Is It a Failure?" *Daily Clarion-Ledger*, August 30, 1890, p. 2: "The Franchise Committe[e] sit[s] with closed doors and its deliberations are supposed to be secret."

[49] Compare, for example, "The Franchise, Senator George's Grea[t] Speech," *Daily Commercial Herald* (Vicksburg), September 17, 1890, p. 1, which notes that H. L. Muldrow, a delegate for the state at large, "criticised [sic] the action of the committee in holding secret sessions," according to Senator George, with "Convention Speeches," *Clarion-Ledger*, September 18, 1890, pp. 1-2, the speeches of E. Mayes and J. B. Boothe, delegates for the state at large, in which both defended the secret sessions of the Franchise Committee. Mr. Mayes was also chancellor at what is now the University of Mississippi (Ole Miss).

[50] "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1.

16

19-60662.1807

avoiding the disfranchisement of too many white men. Therefore, for example, they rejected the inclusion of a property test.[51]

38.     The Franchise Committee issued its first report on September 2, 1890 (the "Franchise Committee Report"), which comprised franchise provisions, re-apporentation directions, and an ordinance regarding the official and secret ballot to be used henceforth in elections (the "Election Ordinance").[52] The Franchise Committee Report proposed several voter eligibility requirements, including a poll tax, a lengthy residency requirement, a literacy test, and a targeted criminal disfranchisement provision:

> **Section 1** specified that elections were to be by secret ballot, printed by the government (previously voters literally cast a party ticket, printed by the party); the particulars were to be found in the Election Ordinance.
>
> **Section 2** listed the qualifications of voters: registered, males at least twenty-one years old, citizens, not Indians not taxed; residency within the state for two years and the county for one year; not convicted of certain crimes (bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement, or bigamy); and having paid the poll tax for the previous two years. Certain exceptions were made, including for ministers of the gospel.
>
> **Section 3** required an oath admitting to the provisions under Section 2; false testimony could result in perjury charges.
>
> **Section 4** required a poll tax for all males between the ages of twenty-one and sixty that was to be used to support the public schools; failure to pay the tax could result in seizure of personal property. An exception was made for those who were deaf, dumb, blind, or maimed.
>
> **Section 5** required qualified voters to be able to read the state constitution or "be able to understand the same when read to him; or give a reasonable interpretation thereof." This interpretation test came to be known as the Understanding Clause.

---

[51] The delegates recognized that a property test would disfranchise many white men. See "Hon. Irvin Miller. He Speaks Against an Educational or Property Qualification," *Daily Clarion-Ledger*, September 13, 1890, p. 1, which quotes I. Miller, a delegate of Leake County, who stated that a property qualification "will cause a division in the ranks of the white people of our State."

[52] *Proceedings*, 134-44.

19-60662.1808

Section 5 also required all voters to re-register after the new qualifications became effective.

**Section 6** provided the date when the Election Ordinance would be effective: January 1, 1896.[53]

39.    The members of the Franchise Committee intended to craft specifications to apply principally to African American voters, but they knew that some white men would be disfranchised in the process. The possibility of disfranchising some white men caused a notable split between the delegates from the white counties and the delegates from the black counties.

40.    Certain white-county delegates were blunt and aggressive in their reaction to any threat of disfranchising white men.[54] Irvin Miller of Leake County wanted to be sure not to disfranchise any Confederate veterans.[55] W. A. Boyd of Tippah County agreed, stating that he would not support any proposal that disfranchised any white men in his county.[56] Mr. Boyd had previously asserted that the Convention had "no power . . . to disfranchise because of poverty or illiteracy."[57] He stated that to white men, the right to vote was "an inheritance" and asked, "What right have you to take it away?"[58] In contrast, J. H. McGehee of Franklin County asked everyone

---

[53] Ibid., 134-36.

[54] See, for example, "Stuck in the 'Whole.' The Report of the Franchise Committee," *Daily Clarion-Ledger*, September 13, 1890, p. 1, which reports on a speech by J. Kennedy, a delegate of Clay County: "He would do anything for the relief of the Delta, except to sacrifice the rights of one poor white man in his county." "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5, quotes E. O. Sykes, a delegate of Monroe County, who adds: "The moral effect of one white vote is greater than that of fifty black votes."

[55] "Convention Speeches. Hon. J. H. Jones Speaks Against Female Suffrage," *Clarion-Ledger*, September 18, 1890, p. 2.

[56] Ibid.

[57] "A Property Qualification. Speech of Hon. W. A. Boyd, in Reply to Judge Chrisman," *Daily Clarion-Ledger*, September 10, 1890, p. 1.

[58] Ibid.

18

19-60662.1809

to compromise for a greater good:  white political control.[59] Both goals — protecting white male

voters and creating a white polity — were important to the representatives from the white

counties. They needed a compromise.[60]

41.     The members of the Franchise Committee sought to navigate the tricky waters of

federal constitutional requirements and still disfranchise the very group that these provisions

required the state not to disfranchise. In an effort to pacify everyone among the white race, the

Franchise Committee created escape clauses in the form of the Understanding Clause and the

Suffrage Restoration Provision. The fundamental purpose of both provisions was to mitigate the

effect of the disfranchisement provisions on white males.

### G.    THE UNDERSTANDING CLAUSE

42.     A literacy requirement was a cornerstone of the Franchise Committee's

disfranchisement scheme. The problem was that too many white men were also illiterate.[61] The

---

[59] "Discussion Continues. Seven Hundred Dollars per Day for Talk," *Clarion-Ledger*, September 18, 1890, p. 3.

[60] A number of delegates, including Senator George, acknowledged that Franchise Committee Report was the product of compromise. See "The Franchise. Senator George's Great Speech," *Daily Commercial Herald* (Vicksburg), September 17, 1890, p. 1:  "It is the result of a compromise of divergent and conflicting views."; "Convention Speeches," *Clarion-Ledger*, September 18, 1890, p. 2, quoting a speech of J. B. Boothe, a delegate for the state at large and a member of the Franchise Committee: "We came here from different parts of the State, representing different interests so far as the great question of suffrage is concerned . . . compromise and concession was necessary."; "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1, in a speech of E. Mayes, a delegate for the state at large: "[T]his report has been criticised [sic] as a report of compromise . . . Here it is simply a question of choice between different conditions to reach a result which we all desire and that is the future safety of our common State. It seems to me that this is particularly a subject for compromise and concession."

[61] "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5, which quotes T. S. Ford, a delegate for the state at large, who discussed the high rate of white illiteracy in his county and cautioned that the delegates should not "substitute a negro [problem] for a white problem."; see also "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1, which quotes W. B. Eskridge, a delegate of Tallahatchie County, who noted that "[o]n the basis of the census of 1880 there is eleven percent of illiteracy amongst the white race."

19

consequence was that the literacy requirement, in particular, exposed widening fissures between the delegates from the black and the white counties. The delegates from the white counties feared that a literacy test would disfranchise enough illiterate white males statewide to allow the black counties to maintain control of the state. To remedy this situation, the Franchise Committee, through the maneuvers of Senator George, proposed a constitutional interpretation test—which came to be known as the Understanding Clause—in Section 5 of the article on the franchise in the Franchise Committee Report.[62]

43.    The wording of Section 5 was exceptionally vague. Following the requirement that a voter must be able to read the constitution, the provision added, "[O]r he shall be able to understand the same when read to him; or give a reasonable interpretation thereof."[63] The Understanding Clause permitted a voting official to read to an illiterate person a portion of the state constitution and ask that the person demonstrate an "understanding" of the text. If the person was able to do so to the satisfaction of the voting official, that person would have access to the ballot box despite his illiteracy. Neither Section 5 nor any other provision of the Franchise Committee Report identified who should administer the test, what portion of the constitution should be read to a potential voter (or for that matter, how many portions of the text could be used), or how the determination of sufficient understanding should be made. In short, there were no standards for the Understanding Clause, which worried many people within the state.

---

[62] By many accounts, Senator George is considered to be the author of the Understanding Clause. See "The Obnoxious Section," *Clarion-Ledger*, October 9, 1890, p. 1: "This particular clause is said to be an emanation from Senator George." In "George, Not Taylor," *Vicksburg Evening Post,* November 29, 1890, p. 2, the editors pointed out that "Senator George is the author of that famous clause. It was his pet and nursling, and but for him would not to-day be part of the organic law." Additionally, in "Give the Devil His Due," *Clarion-Ledger*, November 6, 1890, p. 5, the editors noted that "Senator George is the reputed and undoubted author of the clause which provides that illiterates who cannot read but who can understand and interpret the Constitution when read to them, shall be allowed to vote."

[63] *Proceedings*, 136.

20

44.     A number of the delegates felt that the Understanding Clause was plainly dishonest.[64] For example, Judge Chrisman of Lincoln County stated that the clause "looks like a farce to make a registration officer decide whether a voter rightly interprets a clause of the Constitution."[65] He observed:

> It looks as if it was intended that if the register wanted the man to vote he would read him some such clause as: Slavery except as a punishment for crime shall be forever prohibited. "Do you understand that?" "Oh, yes." But if he did not want him to vote he would read him the interstate clause or the section forbidding the legislature to pass *ex post facto* laws and demand a construction.[66]

45.     Senator George defended the Understanding Clause as a provision that "disfranchised nobody—it only enlarges the franchise."[67] He emphasized that "[n]o man loses, irrevocably, the right of suffrage" because of the literacy test.[68] Rather, "[h]e had one more chance to lift his head and exercise the highest privilege of an American freeman."[69]

---

[64] See, for example, "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1, quoting a speech of W. B. Eskridge, a delegate from Tallahatchie County: "My objection to this qualification [referring to the Understanding Clause] I will state very briefly. I fear sir, it will lead to trickery and fraud." "The Convention," *Clarion-Ledger*, September 18, 1890, p. 8, reported that L. W. Magruder, a delegate for the state at large and a member of the Franchise Committee, sought to replace the Understanding Clause with a property requirement because the Understanding Clause "was a fraud on its face—it was the serpent whose trail is on every section and clause of the scheme."; "Female Suffrage Day. Convention Turned into a Debating Society," *Daily Clarion-Ledger*, September 10, 1890, p. 1, quoted W. F. Love, a delegate of Amite County: "The clause giving to [the] manager of an election the right to judge whether or not voters understood the Constitution of the State, would lead to fraud and great dissatisfaction."

[65] "Two Good Speeches: Delivered by Judge Chrisman and Hon. W. A. Boyd," *Clarion-Ledger*, September 11, 1890, p. 1.

[66] Ibid.

[67] "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5. Judge Harris later made the same argument. See "Understanding Clause, Convention Refuses to Reconsider It," *Clarion-Ledger*, October 30, 1890, p. 5, quoting Judge Harris: "[T]he clause was simply an enlargement, and not a restriction of the suffrage."

[68] "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5.

[69] Ibid.

21

46.    But the problem with the Understanding Clause was that one of the overriding

reasons for calling the Convention was to ensure white political control through straightforward

methods.[70] The *Clarion-Ledger* reported that the Understanding Clause was "regarded by many

of the very best men of the Convention as a manifest sham."[71] The *Lexington Advertiser* said the

Understanding Clause would "incur the contempt of the honesty and intelligence of the Union

. . . Such a wicked and silly scheme can be seen through by any man of sense, and is

indefensible, morally and politically.[72] The *Monticello Press* agreed, calling it a "gigantic"

"fraud."[73]

47.    Members of the press also raised concerns that the Understanding Clause had the

potential to be used against white men.  The *Clarion-Ledger* reported that the Understanding

Clause "would be a constant menace to white supremacy."[74] Why the provision was dangerous

---

[70] See, for example, "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1. W. B. Eskridge, a delegate of Tallahatchie County stated, "The people of the State are looking to us and expecting at our hands to settle the suffrage question on such a basis as will establish beyond doubt white supremacy and place the State above trickery and fraud at the ballot box."; "Expunge the Clause," *Clarion-Ledger*, October 9, 1890, p. 4, quoted W. C. McLean, a delegate of Grenada County: "[T]he people sent the delegates to the Convention to secure white supremacy, not by trick or artifice, not by fraud, stratagem or subterfuge but by brave, open, honest and honorable methods . . . [T]his section was a fraud upon its face."

[71] "The Obnoxious Section," *Clarion-Ledger*, October 9, 1890, p. 1 (quoting the *Memphis Appeal*).

[72] "Will Incur Contempt," *Clarion-Ledger*, October 9, 1890, p. 1 (quoting the *Lexington Advertiser*). Many of the small newspapers in the state are no longer extant and can only be found when quoted in another paper. The *Clarion-Ledger* editors quoted these examples as supportive of their own position.

[73] "A Gigantic Fraud," *Clarion-Ledger*, October 9, 1890, p. 1 (quoting the *Monticello Press*).

[74] "The Understanding Clause. A Growing Sentiment in Favor of Its Repeal," *Clarion-Ledger*, October 2, 1890, p. 1 (quoting the *Memphis Appeal*).

19-60662.1813

appeared obvious to the editors: "If . . . a few men unfaithful to the white race should get in power, there is no telling how much damage would result."[75]

48.     Some delegates pushed to rescind the Understanding Clause, but these efforts were met with equally vigorous opposition from the members of the Franchise Committee, including Senator George and his allies.[76] Members of the Franchise Committee from white counties saw the provision as a compromise that they needed to make. In a letter to his hometown paper the *Corinth Herald*, L. P. Reynolds, a delegate of Alcorn County and a member of the Franchise Committee, wrote:

> The intelligence clause, I think, is not objectionable as it will exclude no man with ordinary sense . . . No white man who has sense enough to go to [the] mill will be disfranchised under this clause, for all of our race have an aptitude for Republican government which will enable all our people except idiots to 'understand or give some reasonable interpretation' of some clause in the State Constitution. While I do not like this clause I found it necessary to take it in order to prevent a combination of all the black counties, for the purpose of establishing an educational and property qualification, and by doing this we also secured a white basis upon which to erect a permanent State government . . . We are relieved from all apprehension of negro rule. Our end of the States gets a large part of the new strength.[77]

49.     Many delegates from the black counties supported the provision. Judge Harris, a delegate of Hinds County and a member of the Franchise Committee, defended the

---

[75] Ibid.

[76] For example, "Understanding Clause, It Is Made the Special Order for Wednesday. 68 Votes Needed to Rescind It," *Daily Clarion-Ledger*, October 25, 1890, p. 1, reported that H. L. Muldrow, a delegate for the state at large, "made an earnest appeal for reconsideration" of the Understanding Clause, "and called attention to the universal protest from the press and [the] people."; see also "The Understanding Clause," *Daily Clarion-Ledger*, October 25, 1890, p. 2: "It is evident that some members of the Convention have decided to make a desperate fight to retain the section as adopted, 'understanding clause' and all."

[77] Reprinted in "Don't Like it But Takes It," *Clarion-Ledger*, October 9, 1890, p. 1.

19-60662.1814

Understanding Clause as "a chief prop of the whole structure."[78] He pointed out that all of the provisions on the franchise were interrelated.[79]

50.     On October 29, 1890, the delegates voted to retain the Understanding Clause; it passed with the support of sixty-seven votes, only one vote shy of rejecting the provision.[80]

## H.     THE SUFFRAGE RESTORATION PROVISION

51.     As part of their multipronged approach to restricting the number of African American voters, the Franchise Committee structured the criminal disfranchisement provision (enacted as Section 241 of the 1890 Constitution) to narrow the African American franchise base. While many states forbade voting by persons convicted of any felony, the Franchise Committee limited Mississippi's criminal disfranchisement provision to a carefully selected list of crimes that aimed to ensnare more African Americans than whites.  The list notably omitted violent crimes, such as murder and rape, and instead focused primarily on property-related offenses. The delegates believed that these particular crimes were disproportionately committed by African Americans because they held firmly to the stereotype that African Americans were always at the bottom of the state's economic ladder. In 1896, Mississippi Supreme Court Justice C. J. Cooper recognized that the delegates selected disfranchising offenses to target African American voters:

> [T]he convention swept the circle of expedients to obstruct the exercise of the franchise by the negro race. By reason of its previous condition of servitude and dependence, this race had acquired or accentuated certain peculiarities of habit, of

---

[78] "Understanding Clause, Convention Refuses to Reconsider It," *Clarion-Ledger*, October 30, 1890, p. 5 (quoting Judge Harris).

[79] Ibid. "[T]he Convention could not act on this particular clause without acting on the entire section; that each clause in that section qualified and was dependent on the others."

[80] *Proceedings*, 543; "Understanding Clause, Convention Refuses to Reconsider It," *Daily Clarion-Ledger*, October 29, 1990, p. 1.

19-60662.1815

> temperament, and of character, which clearly distinguished it as a
> race from that of the whites — a patient, docile people, but
> careless, landless, and migratory within narrow limits, without
> forethought, and its criminal members given rather to furtive
> offences than to the robust crimes of the whites. Restrained by the
> federal constitution from discriminating against the negro race, the
> convention discriminated against its characteristics and the
> offenses to which its weaker members were prone.[81]

52.    Even though the new criminal disfranchisement provision was crafted to

selectively disqualify African Americans, the delegates were aware that some white men

convicted of these same offenses would also lose their right to vote. The Franchise Committee

came forward with a proposed remedy in a supplemental report issued on September 15, 1890

(the "Supplemental Report"), while the polarizing and lengthy argument against the

Understanding Clause remained underway.[82] Section 10 of the Supplemental Report provided as

follows:

> The Legislature may by a two-thirds vote of both Houses, restore
> to the right of suffrage any person disqualified by reason of
> crime.[83]

The records of the Convention on the origins of the Supplemental Report are meager. Given the

timing and the context of the Supplemental Report, however, it is clear that the provisions of the

Supplemental Report, including Section 10, reflected compromises within the Franchise

Committee.

53.    Section 10, which was ultimately enacted as Section 253 of the 1890 Constitution,

empowered the state legislature to restore the franchise to those convicted of disfranchising

---

[81] *Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896).

[82] *Proceedings*, 193-95.

[83] Ibid., 195.

19-60662.1816

offenses provided that both legislative houses approved of the restoration by a two-thirds vote. The Suffrage Restoration Provision established only a limited remedy for certain people affected by the criminal disfranchisement provision. Just as the Understanding Clause served as a safety net for illiterate white males who would otherwise be disfranchised by the proposed literacy test, the Suffrage Restoration Provision ensured that whites caught up in the criminal justice system had a possible remedy and could redeem their franchise.

54.     Like the Understanding Clause, the Suffrage Restoration Provision included no standards of any kind. There were no specified parameters for legislators' deliberations, nor any requirement that legislators act in a race-neutral manner. The Suffrage Restoration Provision allowed the legislators complete discretion to determine whose voting rights to restore. The delegates expected that the legislators would use this discretion to permit only those convicted of disfranchising crimes who had influence and money to regain access to the franchise. For Mississippi of the 1890s, and under a new constitution that by its nature excluded African American representatives, the only ones with influence and money were white men.

**1.     The Convention Debates on the Suffrage Restoration Provision**

55.     On September 24, 1890, the Convention considered Section 10 of the Supplemental Report.[84] Senator George "expressed the hope that the section would stand" and explained that "[t]here would be many instances where the exercise of this power by the Legislature would be of the most beneficent character."[85] He argued that if someone had

---

[84] *Proceedings,* 267-69; "The Great Question. Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

[85] "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

19-60662.1817

straightened out his life then he should deserve a reprieve from the strictures prohibiting the franchise to those convicted of certain crimes.[86] Senator George further argued:

> Where a man hasn't got sufficient intelligence to vote, there is always the incentive and encouragement to become qualified; and so, where disqualified for crime, he should be encouraged to reform and become a good citizen.[87]

56.      Support for then-Section 10 came not only from Senator George, but also from Franchise Committee members from the white counties.[88] The other white county delegates were divided over the Suffrage Restoration Provision, just as they were about the Understanding Clause. These delegates wanted some sort of promise of franchise security for poor white farmers, but both of these provisions were entirely too vague and uncertain. The white county delegates knew that nothing in the Suffrage Restoration Provision *guaranteed* that a disfranchised person could regain his right to vote; instead the provision presented a set of difficult hurdles that the person may not be able to overcome.

57.      Given the concern of protecting poor white farmers, the delegates declined to adopt proposed amendments to then-Section 10 to establish merit-based or race-neutral standards for the restoration of suffrage. One delegate wanted to provide an option for restoration to those over forty-five years of age and of good moral character; this amendment was subsequently

---

[86] Ibid. See also "The Convention. Rapid Progress Being Made Towards the Completion of the Constitution," *Daily Commercial Herald* (Vicksburg), September 25, 1890, p. 1, which reported: "Mr. George advocated strongly the section as it stands, saying that when a man is guilty of crime, and afterwards reforms and becomes a good citizen, it will be a hardship to have the brand of infamy for ever fixed upon him."

[87] "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

[88] Ibid., reporting that L. P. Reynolds, a delegate of Alcorn County, and D. T. Guyton, a delegate of Attala County, both supported Section 10.

19-60662.1818

withdrawn.[89] Another wanted to confine eligibility to individuals who committed crimes as

juveniles.[90] A third wanted to prohibit restoration of the elective franchise to those convicted of

"infamous" crimes.[91] One delegate suggested that the trial judge and the prosecuting attorney

must provide recommendations in support of the applicant's restoration petition.[92] These

proposals were all tabled.[93]

     58.     In contrast to the tabled amendments, a few proposals to amend Section 10 were

affirmatively voted down.[94] Among those were ones to tie the restoration power of the legislature

to the governor in some way.[95] A proposal to strike the section entirely, and a proposal to allow

the legislature to restore suffrage lost for any reason (not just "by reason of crime"), were both

also rejected.[96]

---

[89] "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1. It appears that the amendment was proposed by T. S. Ward, a delegate of Madison County.

[90] *Proceedings*, 267. W. C. Richards, a delegate of Lowndes County, proposed the amendment.

[91] Ibid., 267-68. R. H. Thompson, a floater delegate of Lincoln and Jefferson Counties, proposed the amendment.

[92] Ibid., 267. E. Henderson, a delegate of Harrison County, proposed the amendment.

[93] Ibid., 267-69; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

[94] *Proceedings*, 267-69; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

[95] *Proceedings*, 267-69; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1

[96] T. S. Ward, a delegate of Madison County, moved to strike out Section 10. Ward's motion was lost by a vote of 62-41. See "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1; see also *Proceedings*, 267, which does not give the vote count. J. E. Gore, a delegate of Webster County, moved to strike the phrase "by reason of crime." *Proceedings*, 267, reports that the motion was lost. According to "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1, however, Gore's motion was tabled.

19-60662.1819

59.     One of the delegates successfully moved to add the following language: "The reasons therefor[e] shall be spread upon the Journal, and the vote shall be by yeas and nays, and in determining the vote the whole number of members elected shall be considered."[97] The purpose of the publication notice in the legislative journals was to prevent fraud (all too often perceived as a problem in state government) and secrecy in the restoration of voting rights. Publication under the Suffrage Restoration Provision was required only *after* the vote, unlike the governor's pardon provision (enacted as Section 124 of the 1890 Constitution) which required notice *before* a vote. Moreover, notice under the Suffrage Restoration Provision was to be published in-house, within the journals of the legislature; it was not required to be published in the papers (as specified in the pardon provision).[98] The amendment made it clear that consideration of restoration of suffrage was to be within the legislature and not through public opinion and the press.

60.     Following the debates on then-Section 10, W. S. Featherston, a delegate of Marshall County, moved the adoption of the provision, as amended, which carried.[99] The

---

[97] *Proceedings*, 268; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1; "The Convention, Rapid Progress Being Made Towards the Completion of the Constitution," *Daily Commercial Herald* (Vicksburg) September 25, 1890, p. 1. According to the *Proceedings*, this amendment was proposed by R. H. Thompson, a floater delegate of Lincoln and Jefferson Counties. But both the *Daily Clarion-Ledger* and the *Daily Commercial Herald* (Vicksburg*)* reported that the amendment was proposed by W. F. Love, a delegate of Amite County.

[98] Compare 1890 Const., art. V, § 124: "[I]n cases of felony after conviction no pardon shall be granted until the applicant therefor shall have published for thirty days, in some newspaper in the county where the crime was committed . . . his petition for pardon, setting forth therein the reasons why such pardon should be granted" with 1890 Const., art. XII, § 253: "The legislature may . . . restore the right of suffrage to any person disqualified by reason of crime; but the reasons therefore shall be spread upon the journals, and the vote shall be by yeas and nays." *Proceedings*, 655, 677. See also "Swamp Land Matters . . . Petitions for Pardon Must Be Published," *Clarion-Ledger*, October 2, 1890, pp. 2-3.

[99] *Proceedings*, 269.

29

measure then became part of the draft constitution. Immediately after debating then-Section 10, the delegates resumed consideration of the Understanding Clause.[100]

61.   During the confusion of the last days of the Convention, as delegates rushed to finish the constitution, amendments to numerous sections were offered — including last-ditch efforts to repeal the Understanding Clause. On October 24, 1890, delegates revisited then-Section 10.[101] M. McClurg, a delegate of Carroll County, moved to require both a roll-call vote and approval by two-thirds of those elected to both houses.[102] This amendment was adopted.[103]

62.   The final version of the Suffrage Restoration Provision, enacted as Section 253 of Article XII (Franchise) of the 1890 Constitution, read as follows:

> The legislature may by a two-thirds vote of both houses, of all members elected, restore the right of suffrage to any person disqualified by reason of crime; but the reasons therefor shall be spread upon the Journals, and the vote shall be by yeas and nays.[104]

### 2.   The Suffrage Restoration Process Was Designed to Be Onerous.

63.   The Franchise Committee did not design the suffrage restoration process to be easy. Regaining the franchise pursuant to the Suffrage Restoration Provision required a private legislative action; this meant that the petitioner would need a network of influence even to be

---

[100] Ibid., 269-70.

[101] Ibid., 490-92. See also "Understanding Clause, It Is Made the Special Order for Wednesday," *Daily Clarion-Ledger*, October 25, 1890, p. 1.

[102] *Proceedings*, 490. See also "Understanding Clause, It Is Made the Special Order for Wednesday," *Daily Clarion-Ledger*, October 25, 1890, p. 1.

[103] *Proceedings*, 490-91.

[104] Ibid., 677.

19-60662.1821

considered for restoration. To get the local representative interested required connections or resources.

64.     The Suffrage Restoration Provision also required a two-thirds vote in both houses "of all members elected" in order for a petitioner to regain his voting rights.[105] This presented an unusually high hurdle; numerous other legislative provisions of the 1890 Constitution required only a majority, including Section 54 (enactment of a statute requires a majority of those present), Section 62 (amendment to a bill adopted in one house requires a vote by a majority in the other house), and Section 64 (appropriation of funds requires a majority of "all the members elected").[106] Section 72 provided that the legislature could even override a governor's veto with a two-thirds vote of each house, rather than a two-thirds vote of "all members elected" specified in the Suffrage Restoration Provision.[107] The requirement of a two-thirds vote "of all members elected" in both houses of the legislature strongly suggests that the Suffrage Restoration Provision was designed to benefit individuals of significance in the community, who would have access to influence or money to purchase it.

### 3.     Suffrage Restoration Was Not a Gubernatorial Pardon Power.

65.     It is clear that the Suffrage Restoration Provision was never intended to be in any way related to the governor's pardon power. L. P. Reynolds, a member of the Franchise

---

[105] *Proceedings*, 677.

[106] 1890 Constitution art. IV, § 54, states, "A majority of each house shall constitute a quorum to do business . . . "; § 62, states, "No amendment to bills by one house shall be concurred in by the other, except by a vote of a majority thereof . . . "; § 64, states, "No bill passed after the adoption of this Constitution to make appropriations of money . . . shall . . . be passed except by the votes of a majority of all the members elected to each house of the Legislature."; *Proceedings*, 645-46.

[107] 1890 Constitution art. IV, § 72, provides that in the event that the governor does not sign a bill, the legislature may reconsider the bill; "[i]f, after such reconsideration, two-thirds of that house shall agree to pass the bill, it shall be sent, with the objections, to the other house, by which, likewise, it shall be reconsidered, and if approved by two-thirds of that house, it shall become a law"; *Proceedings*, 647.

31

Committee and a delegate of Alcorn County, specifically stated that the Committee had shifted "this feature of the pardoning power . . . from the Executive to the Legislative Department, because such should not be vested in the Executive."[108]

66.    The delegates were exceedingly suspicious of the gubernatorial pardon power because of what many viewed as historical abuses.[109] If the Franchise Committee had considered the Suffrage Restoration Provision to be part of the gubernatorial pardon power, the delegates would have placed the provision in Article V of the 1890 Constitution, which concerned the Executive branch.[110] Article V included a provision on the gubernatorial pardon power (Section 124), but the Suffrage Restoration Provision was not mentioned or referenced in Section 124.[111]

67.    During the Convention debates, attempts to link the Suffrage Restoration Provision to the governor's pardon powers were defeated.[112] In fact, one delegate made a motion that would have forbidden the use of the gubernatorial pardon in these matters, a motion which

---

[108] "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1. Reynolds did not explain the reasoning behind this statement. Notably, he supported both the Understanding Clause and the Suffrage Restoration Provision. See "The Franchise, Voting on the Amendments," *Daily Commercial Herald* (Vicksburg), September 18, 1890, page 2, which reported on Reynolds' support of the Understanding Clause; see also "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1, which reported on Reynolds' support for the Suffrage Restoration Provision.

[109] See *Proceedings*, e.g. 51-52, 104-05, 281-82, addressing gubernatorial pardons; "Swamp Land Matters . . . Petitions for Pardon Must Be Published," *Clarion-Ledger*, October 2, 1890, pp. 2-3. The administration of Governor Adelbert Ames collapsed in 1875 following the impeachment of the lieutenant governor based on the claimed abuse of the pardon power. Governor Robert Lowry, who remained in office until January 1890, also faced criticism for pardoning scores of prisoners who had been subject to abuse by the convict lease system.

[110] Similarly, if the Franchise Committee had considered the Suffrage Restoration Provision to be an extension of the legislative powers, the Committee would have placed the provision in Article IV, which addressed the Legislative branch.

[111] See 1890 Constitution art. V, § 124; *Proceedings*, 655.

[112] *Proceedings*, 267-69; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

32

he lost.[113] Another delegate made a counter proposal which would have guaranteed that the

Suffrage Restoration Provision would *not* conflict with the governor's power to pardon.[114] This

motion lost as well.[115] The rejection of these motions confirms that the Suffrage Restoration

Provision was not viewed as an accompaniment to the governor's pardon power, but instead as

an integral component of the web of racially-targeted restrictions on the franchise.

## I.   THE ADOPTION OF THE 1890 CONSTITUTION

68.    On November 1, 1890, the 1890 Constitution was adopted by vote of the

delegates, without ratification by the citizens of Mississippi.[116] Article XII of the 1890

Constitution included both the Understanding Clause and the Suffrage Restoration Provision.[117]

69.    On the last day of the Convention, Judge Calhoon, the President of the

Convention, delivered a lengthy closing address in which he declared, "Our mission here has

---

[113] *Proceedings*, 268. G. G. Dillard, a delegate of Noxubee County, proposed an amendment adding the language, "but no executive pardon shall be construed to remove the disqualification."

[114] Ibid. L. W. Magruder, a delegate for the state at large and a member of the Franchise Committee, proposed adding the language, "[p]rovided, [t]hat this shall not interfere with the right of the Governor to pardon."

[115] Both amendments were rejected, according to the *Daily Clarion-Ledger* and *Daily Commercial Herald* (Vicksburg). See "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1; "The Convention, Rapid Progress Being Made Towards the Completion of the Constitution," *Daily Commercial Herald* (Vicksburg), September 25, 1890, p. 1. The *Proceedings* reported that Mr. Dillard's motion was rejected while Mr. Magruder's motion was tabled; in addition, the *Proceedings* reported slightly different wording to the newspaper accounts. *Proceedings*, 268.

[116] *Proceedings*, 637-38; "The Great Convention, Adjourned After a Long and Laborious Session. The Constitution Promulgated," *Clarion-Ledger*, November 6, 1890, p. 3. In reliance on an opinion by the Judiciary Committee, the delegates did not seek ratification of the 1890 Constitution. The Judiciary Committee reported that "ratification by a vote of the people, has no support in any principle of constitutional law, and is merely a political theory." *Proceedings*, 148-49.

[117] 1890 Const. art. XII, §§ 244, 253; *Proceedings*, 675-77.

19-60662.1824

been accomplished."[118] He again emphasized that the purpose of the Convention was to concentrate political control in the hands of white men:

> In my judgment the material interest and moral advancement of the people of both races here depend on the predominance in government of that virtue and intelligence, which for the present at least, can come only from that race which in the past has shown a capacity for the successful administration of free institutions. That race alone can now safely exercise the functions of ruling with moderation and justice and accomplish the great purpose for which governments are established.[119]

70.    Judge Calhoon justified his position by claiming that African Americans had no history or civilization: "The race up to this time has shown no science, no literature, no art, no enterprise, no progress, no invention."[120] According to Judge Calhoon, the rule of African Americans had "always meant, stagnation, the enslavement of woman [sic], the brutalization of man, animal savagery, universal ruin."[121] Although he added reference to the necessary control of corporations and evil cartels, his emphasis for the entire speech was on race matters.

71.    To the extent his closing address left any doubts concerning the purpose of the 1890 Constitution, Judge Calhoon further clarified his position during his defense of Ambus Beale, an indigent African American whose bedstead was seized by the Hinds County Sheriff for payment of delinquent poll taxes. Judge Calhoon and his team of co-counsel, including former

---

[118] *Proceedings*, 700-03; "The Farewell Address. Delivered to the Convention by Judge S. S. Calhoon," *Clarion-Ledger*, November 6, 1890, p. 5. Senator George "moved that the address of President Calhoon be spread upon the Journal and published with the proceedings of the Convention." Senator George's motion was "adopted by a unanimous vote." *Proceedings*, 703.

[119] *Proceedings*, 702-03.

[120] Ibid., 701.

[121] Ibid., 702.

19-60662.1825

governor Robert Lowry, argued that if the poll tax could be satisfied through the seizure of

property, "as it will be if a voter's bed and blankets may be seized for tax, it will be but a short

time before the State is again cursed with a negro majority, with all the evils and perils that

follow in the train of so disastrous an event."[122] The Mississippi Supreme Court in *Ratliff v.*

*Beale* held that the poll tax was optional, and the network of disfranchisement provisions in the

1890 Constitution stayed intact.[123]

72.      Unlike Judge Calhoon, Senator George refused to admit that the 1890

Constitution was designed to disfranchise African Americans. For example, during the

Convention debates, Senator George stated, "I deny here, as I would deny in the Senate, that the

educational test was intended to exclude negroes from voting."[124] In December of 1890, Senator

George defended the 1890 Constitution in lengthy remarks on the floor of the United States

Senate. He contended that Mississippi had a large majority of African Americans, whom he

described as "unlettered, ignorant, . . . unable to read, unused, unpracticed [and] uninformed."[125]

He claimed that Mississippi, in its wisdom, "saw [it] proper to call a convention to correct the

evil, not of negro suffrage *per se*, but of ignorant and debased suffrage."[126]

### J.      THE IMPACT OF THE 1890 CONSTITUTION

73.      The 1890 Constitution succeeded beyond anyone's wildest imaginations at

disfranchising African American voters. Isaiah Montgomery, the lone African American delegate

---

[122] *Ratliff v. Beale*, Brief in Reply for Appellee, Mississippi Supreme Court, October term 1896.

[123] *Ratliff v. Beale*, 20 So. 865, 869 (Miss. 1896). Judge Calhoon was later appointed to the Mississippi Supreme Court and served as a Justice from 1900 through 1908.

[124] "Interesting Colloquy," *Clarion-Ledger*, September 11, 1890, p. 4.

[125] Appendix to the *Congressional Record*, 51st Cong., 2nd sess., vol. 22, pp. 52-53 (December 31, 1890).

[126] Ibid.

35

**6**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROY HARNESS, ET AL.                                      **PLAINTIFFS**

VS.                              CIVIL ACTION NO. 3:17cv791-DPJ-FKB

DELBERT HOSEMANN,
Secretary of State of Mississippi                        **DEFENDANT**

*consolidated with*

DENNIS HOPKINS, ET AL.                                   **PLAINTIFFS**

VS.

SECRETARY OF STATE DELBERT HOSEMANN,
in his official capacity                                 **DEFENDANT**

---

### SECRETARY HOSEMANN'S RESPONSES TO THE *HOPKINS* PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS

---

Defendant Secretary of State Delbert Hosemann, in his official capacity

("Secretary Hosemann"), without waiving any privileges or immunities from discovery,

or defenses to the claims asserted in this action, responds to the *Hopkins* "Plaintiffs'

First Set of Requests for Admission" served on August 8, 2018:

### OBJECTIONS TO "DEFINITIONS" AND "INSTRUCTIONS"

Secretary Hosemann objects to the Plaintiffs' "Definitions" to the extent they

purport to impose any obligations on Secretary Hosemann inconsistent with Rules 26,

36, or any other applicable rules of the Federal Rules of Civil Procedure. Secretary

Hosemann interprets the terms contained in Plaintiffs' First Set of Requests for

Admissions to Defendant in accordance with their common and usual meaning. The

following responses respond to Plaintiffs' admission requests consistent with Secretary

19-60662.1982

a fine of no more than $3,000, or both; or (ii) imprisonment in a county jail for up to one year, or a fine of no more than $1,000, or both, even if the Disenfranchised Person has completed the terms of his or her Sentence.

**RESPONSE**: Denied as stated. Secretary Hosemann admits only that Code Section 23-15-93 speaks for itself. Any remaining allegations in Request No. 26 are denied.

**REQUEST NO. 27**: Admit that, pursuant to Miss. Code § 97-13-33, the "manager" of any election who "knowingly permit[s]" a Disenfranchised Person to vote may be convicted of a crime punishable by imprisonment in the county jail for up to one year, or a fine of no more than $3,000, or both, even if the Disenfranchised Person has completed the terms of his or her Sentence.

**RESPONSE**: Denied as stated. Secretary Hosemann admits only that Code Section 97-13-33 speaks for itself. Any remaining allegations in Request No. 27 are denied.

**REQUEST NO. 28**: Admit that Section 253 of the Mississippi Constitution has never been amended since its original enactment in 1890.

**RESPONSE**: Admitted.

**REQUEST NO. 29**: Admit that neither Section 253 of the Mississippi Constitution nor any Mississippi statute enumerates standards that Legislators or the Mississippi Legislature must apply when determining whether or not to restore a Disenfranchised Person's voting rights.

**RESPONSE**: Denied as stated. Secretary Hosemann admits only that Section 253 of the Mississippi Constitution and other state laws regarding the passage of legislation speak for themselves. Any remaining allegations in Request No. 29 are denied.

**REQUEST NO. 30**: Admit that if a Suffrage Bill is introduced to the Mississippi

19-60662.1992

## **CERTIFICATE OF SERVICE**

I hereby certify that, on October 30, 2019, an electronic copy of the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit and served on counsel for Defendant-Appellant-Cross-Appellee using the appellate CM/ECF system.

/s/    Jonathan K. Youngwood
    Jonathan K. Youngwood
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3539
jyoungwood@stblaw.com