No. 19-60662

# United States Court of Appeals
## for the
# Fifth Circuit

◄ ●❙● ►

DENNIS HOPKINS, individually and on behalf of a class of all others similarly situated; HERMAN PARKER, JR., individually and on behalf of a class of all others similarly situated; WALTER WAYNE KUHN, JR., individually and on behalf of a class of all others similarly situated; BYRON DEMOND COLEMAN, individually and on behalf of a class of all others similarly situated; JON O'NEAL, individually and on behalf of a class of all others similarly situated; EARNEST WILLHITE, individually and on behalf of a class of all others similarly situated,

*Plaintiffs-Appellees,*

– v. –

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

*Defendant-Appellant.*

_____

*(For Continuation of Caption See Reverse Side of Cover)*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI, NORTHERN DIVISION
DISTRICT COURT CASE NO. 3:18-CV-188-DPJ-FKB

## BRIEF FOR PLAINTIFFS-APPELLEES CROSS-APPELLANTS

PALOMA WU
SOUTHERN POVERTY LAW CENTER
111 East Capitol Street, Suite 280
Jackson, Mississippi 39201
(601) 948-8882
paloma.wu@splcenter.org

LISA GRAYBILL
SOUTHERN POVERTY LAW CENTER
1055 St. Charles Avenue
New Orleans, Louisiana 70130
(504) 486-8982
lisa.graybill@splcenter.org

NANCY G. ABUDU
CAREN E. SHORT
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, Georgia 30031
(404) 521-6700
nancy.abudu@splcenter.org
caren.short@splcenter.org

JONATHAN K. YOUNGWOOD
JANET A. GOCHMAN
ISAAC M. RETHY
NIHARA K. CHOUDHRI
TYLER ANGER
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
tyler.anger@stblaw.com

*Attorneys for Plaintiffs-Appellees Cross-Appellants*

**Consolidated with 19-60678**

DENNIS HOPKINS, individually and on behalf of a class of all others similarly situated;
HERMAN PARKER, JR., individually and on behalf of a class of all others similarly
situated; WALTER WAYNE KUHN, JR., individually and on behalf of a class of all
others similarly situated; JON O'NEAL, individually and on behalf of a class of all
others similarly situated; EARNEST WILLHITE, individually and on behalf of a class
of all others similarly situated; BYRON DEMOND COLEMAN, individually
and on behalf of a class of all others similarly situated,

*Plaintiffs-Appellees Cross-Appellants,*

– v. –

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

*Defendant-Appellant Cross-Appellee.*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following interested persons and entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## A.    Plaintiffs-Appellees Cross-Appellants

Dennis Hopkins
Herman Parker, Jr.
Walter Wayne Kuhn, Jr.
Byron Demond Coleman
Jon O'Neal
Earnest Willhite
c/o Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, MS 39201
Tel: (601) 948-8882
Paloma.Wu@splcenter.org

The foregoing individuals are the named plaintiffs in *Hopkins, et al. v. Hosemann*.

They seek to represent the following class, which was certified by the District Court:

> Any person who (a) is or becomes disenfranchised under Mississippi state law by reason of a conviction of a disenfranchising offense, and (b) has completed the term of incarceration, supervised release, parole, and/or probation for each such conviction.

i

Dkt. 89, Order, *Harness, et al. v. Hosemann*, No. 3:17-cv-00791-DPJ-FKB (S.D.

Miss. Feb. 13, 2019), at 6.

## B.    Current and Former Attorneys for Plaintiffs-Appellees Cross-Appellants

Current Attorneys

Jonathan K. Youngwood
Janet A. Gochman
Isaac Rethy
Nihara K. Choudhri
Tyler Anger
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3539
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
tyler.anger@stblaw.com

Paloma Wu
SOUTHERN POVERTY LAW CENTER
111 East Capitol Street, Suite 280
Jackson, MS 39201
Tel: (601) 948-8882
Paloma.Wu@splcenter.org

Lisa Graybill
SOUTHERN POVERTY LAW CENTER
1055 St. Charles Avenue
New Orleans, LA 70130
Tel: (504) 486-8982
Lisa.Graybill@splcenter.org

Nancy G. Abudu
Caren E. Short
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031
Tel: (404) 521-6700
Nancy.Abudu@splcenter.org
Caren.Short@splcenter.org

<u>Former Attorneys</u>

Jody E. Owens, II
SOUTHERN POVERTY LAW CENTER
111 East Capitol Street, Suite 280
Jackson, MS 39201
Tel: (601) 948-8882
Jody.Owens@splcenter.org

## C.    Defendant-Appellant Cross-Appellee

Delbert Hosemann, Secretary of State of Mississippi, in his official capacity

**D.    Current and Former Attorneys for Defendant-Appellant Cross-Appellee**

<u>Current Attorneys</u>:

Krissy C. Nobile
Justin L. Matheny
OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF MISSISSIPPI
P. O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
knobi@ago.state.ms.us
jmath@ago.state.ms.us


<u>Former Attorneys</u>:

None.

**E.    Other Interested Persons**

None.


Dated:        October 30, 2019

<u>s/ Jonathan K. Youngwood</u>
Jonathan K. Youngwood
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3539
jyoungwood@stblaw.com


*Attorney of record for Plaintiffs-Appellees*
*Cross-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is calendared for December 3, 2019. This appeal raises important questions concerning the constitutional limits on state authority to enact felony disenfranchisement and reenfranchisement laws. Plaintiffs respectfully submit that oral argument will assist this Court in resolving these significant legal issues, which impact the voting rights of tens of thousands of Mississippi citizens.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................................v

TABLE OF AUTHORITIES ...............................................................................x

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF THE ISSUES...........................................................................3

STATEMENT OF THE CASE

   A.  Mississippi's Criminal Disenfranchisement and Reenfranchisement
       Scheme...........................................................................................7

   B.  Section 253's Discriminatory Taint................................................9

   C.  The Secretary's Role in Administering and Implementing
       Mississippi's Criminal Disenfranchisement and Reenfranchisement
       Scheme...........................................................................................9

   D.  Procedural History.......................................................................11

SUMMARY OF THE ARGUMENT ....................................................................13

STANDARD OF REVIEW .................................................................................16

ARGUMENT

   I.   The District Court Properly Held that Article III Standing
       Is Satisfied..................................................................................16

       A.  Injuries Arising from Unconstitutional Voting Laws Are Fairly
          Traceable to and Redressable by the Secretary, Who Serves as
          Mississippi's Designated "Chief Election Officer" ...........................19

       B.  The District Court Correctly Held that Plaintiffs Have Standing
          with Respect to Their Section 241-Related Claims ...........................22

C.  The District Court Correctly Held that Plaintiffs Have Standing with Respect to Their Section 253-Related Claims ............................23

II.  The District Court Correctly Held that the *Ex parte Young* Exception Applies with Respect to All of Plaintiffs' Claims ......................................25

III.  The District Court Erred in Holding that Section 241 Does Not Violate the Eighth Amendment's Prohibition on Cruel and Unusual Punishment ...............................................................................................27

A.  The District Court Incorrectly Held that the Eighth Amendment's Prohibition on Cruel and Unusual Punishment Does Not Apply to Felony Disenfranchisement Laws.......................29

1.  The District Court Improperly Held that Section 2 Categorically Exempts Felony Disenfranchisement Laws From Nearly All Constitutional Limitations ................................30

2.  The District Court Erroneously Analogized to *Graham v. Connor* ....................................................................31

3.  The District Court Mistakenly Assumed that the Eighth Amendment's Standards Are Unchanging .................................32

B.  Section 241 Violates the Eighth Amendment's Prohibition on Cruel and Unusual Punishment .......................................................33

1.  Section 241 Imposes "Punishment" ...........................................34

a)  Under Binding Federal Law, Section 241 Could Only Have Been Enacted "as a Punishment" ...............................34

b)  Section 241 Bears All of the Hallmarks of Punishment......35

2.  There Is a National Consensus Against the Punishment of Lifetime Disenfranchisement ................................................40

IV.  The District Court Erred in Holding that Section 241 Does Not Violate the Equal Protection Clause ...........................................................42

A.    The District Court Erred in Holding that *Richardson* Forecloses Consideration of a Question Concerning the Interpretation of Section 2 that Was Neither Presented to Nor Addressed by the *Richardson* Court ................................................................................43

B.    Section 241 Violates the Equal Protection Clause Because It Falls Outside of Section 2's "Other Crime" Exemption ....................45

    1.    "Abridge" Refers to a Temporary Limitation on the Right to Vote ............................................................................................45

    2.    The "Other Crime" Exemption Applies Only to Laws that "Abridge" the Right to Vote........................................................46

C.    Section 241 Cannot Satisfy Strict Scrutiny Review...........................48

V.    The District Court Erred in Holding that Mississippi's Standardless Legislative Process for the Case-by-Case Restoration of Voting Rights Does Not Violate the Equal Protection Clause ...............................48

A.    The District Court Incorrectly Relied on the Equal Protection Standards Governing Executive Clemency Regimes.........................49

B.    The District Court Failed to Determine Whether There Is a Rational Basis for Section 253's Classification Between Individuals Convicted of Felonies .......................................................51

C.    Mississippi's Arbitrary Legislative Process for the Restoration of Voting Rights Violates the Equal Protection Clause.....................54

VI.    The District Court Erred in Holding that Section 253 Does Not Violate the First Amendment........................................................................55

VII.    The District Court Erred in Denying Summary Judgment to Plaintiffs on the Race-Based Equal Protection Challenge to Section 253 ........................................................................................................57

A.    The 1890 Mississippi Legislature Enacted Section 253 with Racially Discriminatory Intent....................................................58

B.    The 1890 Mississippi Legislature Would Not Have Enacted Section 253 Absent Racially Discriminatory Intent ...........................62

C.    Section 253 Has Never Been Amended or Reenacted ........................ 65

D.    Section 253 Disproportionately Impacts Black Mississippians .......... 66

     1.    Plaintiffs Do Not Have to Prove Section 253's Present-Day
Discriminatory Application ......................................................... 67

CONCLUSION ................................................................................................. 69

CERTIFICATE OF SERVICE .......................................................................... 70

CERTIFICATE OF COMPLIANCE ................................................................. 71

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) ......................................................................66

*Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*,
  851 F.3d 507 (5th Cir. 2017) ................................................. 16, 25, 26

*Am. Broad. Cos. v. Ritchie*,
  No. 08-5285 (MJD/AJB), 2011 WL 665858 (D. Minn. Feb. 14, 2011) ....... 26, 27

*Atkins v. Virginia*,
  536 U.S. 304 (2002) ..........................................................................42

*Austin v. United States*,
  509 U.S. 602 (1993) ................................................................... 34, 40

*Barker v. People*,
  20 Johns. 457 (N.Y. Sup. Ct. 1823), *aff'd*, 3 Cow. 686 (N.Y. 1824)..................36

*Beacham v. Braterman*,
  300 F. Supp. 182 (S.D. Fla. 1969), *aff'd mem.*,
  369 U.S. 12 (1969) .............................................................................49

*Beacham v. Braterman*,
  300 F. Supp. 182 (S.D. Fla. 1969)................................................. 49, 50

*BP Expl. & Prod., Inc. v. Claimant Id 100281817*,
  919 F.3d 284 (5th Cir. 2019) .............................................................16

*Brecht v. Abrahamson*,
  507 U.S. 619 (1993) ..........................................................................44

*Browning-Ferris Indus. of Ala. Inc. v. Pegues*,
  710 F. Supp. 313 (M.D. Ala. 1987)....................................................54

*Buckley v. Am. Constitutional Law Found., Inc.*,
  525 U.S. 182 (1999) ..........................................................................37

*Burson v. Freeman*,
  504 U.S. 191 (1992) ............................................................................1

*Carrington v. Rash*,
  380 U.S. 89 (1965) .............................................................................1

*Castellanos-Contreras v. Decatur Hotels, LLC*,
  622 F.3d 393 (5th Cir. 2010) ....................................................... 16, 58

*Cavazos v. Smith*,
  565 U.S. 1 (2011) ..............................................................................49

*Chen v. City of Houston*,
  206 F.3d 502 (5th Cir. 2000) ........................................................ 65, 66

*City of Carrolton Branch of the NAACP. v. Stallings*,
  829 F.2d 1547 (11th Cir. 1987) .........................................................60

*City of Lakewood v. Plain Dealer Publ'g. Co.*,
  486 U.S. 750 (1988) ..........................................................................56

*City of San Antonio v. Edwards Aquifer Authority*,
  No. SA-12-CA-620-OG, 2014 WL 12495605
  (W.D. Tex. Mar. 31, 2014) ................................................................20

*Common Cause Ind. v. Ind. Sec'y of State*,
  No. 1:12-cv-01603-RLY-DML, 2013 WL 12284648
  (S.D. Ind. Sept. 6, 2013) ...................................................................19

*Common Cause/Ga. v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) .........................................................24

*Conn. Bd. of Pardons v. Dumschat*,
  452 U.S. 458 (1981) ..........................................................................49

*Cooper Indus., Inc. v. Aviall Servs., Inc.,*
  543 U.S. 157 (2004) ..........................................................................44

*Cotton v. Fordice*,
  157 F.3d 388 (5th Cir. 1998) ............................................... 7, 9, 62, 65

*Davis v. Schnell*,
  81 F. Supp. 872 (S.D. Ala. 1949), *aff'd*, 336 U.S. 933 (1949) ...........55

*Democratic Exec. Comm. of Fla. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019) ..............................................................26

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ............................................................................61

*Dep't of Revenue of Mont. v. Kurth Ranch*,
  511 U.S. 767 (1994) ................................................................................37

*Deuel v. Barrier*,
  No. CV 08-00144-S-LMB, 2009 WL 73734 (D. Idaho Jan. 8, 2009) ................52

*Doe v. Miami-Dade Cty.*,
  846 F.3d 1180 (11th Cir. 2017)...............................................................40

*Does #1-5 v. Snyder*,
  834 F.3d 696 (6th Cir. 2016) ...................................................... 37, 38, 39

*Dunn v. Blumstein*,
  405 U.S. 330 (1972) ................................................................................48

*Energy Dev. Corp. v. St. Martin*,
  112 F. App'x 952 (5th Cir. 2004)............................................................16

*Evenwel v. Abbott*,
  136 S.Ct. 1120 (2016) ..................................................................... 39, 45

*Ex parte Young*,
  209 U.S. 123 (1908) ....................................................................... 25, 26, 27

*Farrakhan v. Locke*,
  987 F. Supp. 1304 (E.D. Wash. 1997) ...................................................30

*Forsyth Cty., Ga. v. Nationalist Movement*,
  505 U.S. 123 (1992) ................................................................................57

*Foster v. Chatman*,
  136 S. Ct. 1737 (2016) ............................................................................61

*Graham v. Connor*,
  490 U.S. 386 (1989) ................................................................................32

*Graham v. Florida*,
  560 U.S. 48 (2010) ................................................................. 31, 32, 33

*Green v. Bd. of Elections*,
  380 F.2d 445 (2d Cir. 1967) ...................................................................40

*Hall v. Florida*,
  572 U.S. 701 (2014) ...................................................................34

*Hand v. Scott*,
  888 F.3d 1206 (11th Cir. 2018)................................................... 50, 55

*Harvey v. Brewer*,
  605 F.3d 1067 (9th Cir. 2010)................................................... 44, 45, 52, 54, 57

*Hayden v. Pataki*,
  449 F.3d 305 (2d Cir. 2006) ...................................................................31

*Hayden v. Paterson*,
  594 F.3d 150 (2d Cir. 2010) ...................................................................66

*Hillman v. Maretta*,
  569 U.S. 483 (2013) ...................................................................35

*Hunter v. Underwood*,
  471 U.S. 222 (1985) ................................................................. 30, 62, 63, 64, 65

*Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*,
  138 S. Ct. 2448 (2018) ...................................................................49

*Johnson v. Bredesen*,
  579 F. Supp. 2d 1044 (M.D. Tenn. 2008), *aff'd*, 624 F.3d 742
  (6th Cir. 2010) ...................................................................52

*Johnson v. Gov'r of Fla.*,
  405 F.3d 1214 (11th Cir. 2005)................................................... 36, 62, 64

*Johnson v. Sayre*,
  158 U.S. 109 (1895) ...................................................................47

*K.P. v. LeBlanc*,
  627 F.3d 115 (5th Cir. 2010)................................................... *passim*

*Kennedy v. Louisiana*,
    554 U.S. 407 (2008) ....................................................................33

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1963) ............................................ 34, 35, 36, 38

*League of Women Voters of Ohio v. Brunner*,
    548 F.3d 463 (6th Cir. 2008)....................................................19

*Legal Servs. for Prisoners with Children v. Bowen*,
    170 Cal. App. 4th 447 (Cal. Ct. App. 2009) ........................45

*Libertarian Party of Ky. v. Grimes*,
    164 F. Supp. 3d 945 (E.D. Ky. 2016), *aff'd*, 835 F.3d 570
    (6th Cir. 2016) ................................................................ 26, 27

*Lockhart v. United States*,
    136 S. Ct. 958 (2016) .............................................................47

*McCleskey v. Kemp*,
    481 U.S. 279 (1987) ...............................................................68

*McLaughlin v. City of Canton*,
    947 F. Supp. 954 (S.D. Miss. 1995). .................... 28, 37, 38

*Med. Ctr. Pharm. v. Mukasey*,
    536 F.3d 383 (5th Cir. 2008) .................................................63

*Mikaloff v. Walsh*,
    No. 5:06-CV-96, 2007 WL 2572268 (N.D. Oh. Sept. 4, 2007)...........................39

*Millard v. Rankin*,
    265 F. Supp. 3d 1211 (D. Colo. 2017) .................................29

*Miss. State Chapter, Operation Push v. Allain*,
    674 F. Supp. 1245 (N.D. Miss. 1987), *aff'd*, 932 F.2d 400 (5th Cir. 1991) .........1

*Mo. Prot. and Advocacy Servs., Inc. v. Carnahan*,
    499 F.3d 803 (8th Cir. 2007).................................................26

*Muntaqim v. Coombe*,
    366 F.3d 102 (2d Cir. 2004) ..................................................36

*N.C. State Conference of the NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ................................................... 60, 66, 67

*OCA-Greater Hous. v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ............................................ 2, 19, 20, 21

*Okpalobi v. Foster*,
  244 F.3d 405 (5th Cir. 2001) ................................................................21

*Owens v. Barnes*,
  711 F.2d 25 (3d Cir. 1983) .................................................... 52, 53, 54

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) ........................................................................29

*Pension Ben. Guar. Corp. v. LTV Corp.*,
  496 U.S. 633 (1990) .............................................................................63

*Perez v. United States*,
  167 F.3d 913 (5th Cir. 1999)................................................................64

*Planned Parenthood of Houston and Southeast Tex. v. Sanchez*,
  403 F.3d 324 (5th Cir. 2005) ...............................................................35

*Pullman-Standard v. Swint*,
  456 U.S. 273 (1982) ..................................................................... 16, 57

*Ralph v. Blackburn*,
  590 F.2d 1335 (5th Cir. 1979).............................................................28

*Ratliff v. Beale*,
  20 So. 865 (Miss. 1896) ................................................................ 9, 61

*Reno v. Bossier Parish School Bd.*,
  528 U.S. 320 (1997) .............................................................................46

*Richardson v. Ramirez*,
  418 U.S. 24 (1974) ...................................................................... *passim*

*Robinson v. California*,
  370 U.S. 660 (1962) .............................................................................29

*Roper v. Simmons,*
  543 U.S. 551 (2005) ........................................................................42

*Rose v. Ark. State Police,*
  479 U.S. 1 (1986) ...........................................................................35

*Rothe Dev., Inc. v. U.S. Dep't of,*
  *Def.*, 836 F.3d 57 (D.C. Cir. 2016)....................................................68

*Shepherd v. Trevino,*
  575 F.2d 1110 (5th Cir. 1978)................................................... *passim*

*Smith v. Doe,*
  538 U.S. 84 (2003) ................................................... 34, 37, 38, 40

*Smith v. Town of Clarkton,*
  682 F.2d 1055 (4th Cir. 1982)..........................................................67

*Snyder v. Louisiana,*
  552 U.S. 472 (2008) ...................................................... 61, 62

*Soldal v. Cook County,*
  506 U.S. 56 (1992) ......................................................... 32, 56

*Star Athletica, L.L.C. v. Varsity Brands, Inc.,*
  137 S. Ct. 1002 (2017) ...................................................................64

*Terrebonne Parish NAACP v. Jindal,*
  No. 14-069-JJB-SCR, 2014 WL 3586549 (M.D. La. July 21, 2014) .................19

*Thompson v. Alabama,*
  293 F. Supp. 3d 1313 (M.D. Ala. 2017)............................................39

*Thompson v. Alabama,*
  No. 2:16-cv-783-WKW, 2017 WL 3223915
  (M.D. Ala. July 28, 2017)..................................................................31

*Timbs v. Indiana,*
  139 S. Ct. 682 (2019) ......................................................................29

*Trop v. Dulles,*
  356 U.S. 86 (1958) ................................................... 28, 39, 40

*Underwood v. Hunter*,
  730 F.2d 614 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985) ................... 58, 63, 68

*United States v. Atkins*,
  323 F.2d 733 (5th Cir. 1963) ................................................................. 56

*United States v. Bajakajian*,
  524 U.S. 321 (1998) ............................................................................. 37

*United States v. James Daniel Good Real Prop.*,
  510 U.S. 43 (1993) ............................................................................... 32

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952) ............................................................................... 44

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ............................................................................. 33

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ................................................ 46, 59, 60, 61

*Veasey v. Abbott*,
  888 F.3d 792 (5th Cir. 2018) ................................................................. 62

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ......................................................................... 66, 67

*Voting for Am. v. Andrade*,
  888 F. Supp. 2d 816 (S.D. Tex. 2012), *rev'd on other grounds*,
  732 F.3d 382 (5th Cir. 2013) ............................................................ 22, 23

*Walker v. Barnett*,
  No. CIV 18-4015, 2019 WL 1428723 (D.S.D. Mar. 29, 2019) ......................... 26

*Washington v. Davis*,
  426 U.S. 229 (1976) ............................................................................. 66

*Williams v. New Orleans S.S. Ass'n*,
  688 F.2d 412 (5th Cir. 1982) ................................................................. 16

*Williams v. Rhodes*,
  393 U.S. 23 (1968) ............................................................................... 30

*Williams v. Taylor*,
   677 F.2d 510 (5th Cir. 1982) ........................................................ 52, 54

**United States Constitution**

Amend. I.............................................................................. *passim*

Amend. VIII ......................................................................... *passim*

Amend. XIV, § 1 ................................................................... *passim*

Amend. XIV, § 2 ................................................................... *passim*

Amend. XV ..............................................................................46

Art. VI, cl. 2 ...........................................................................35

**State Constitutions**

Del. Const. art. IV, § 1 (1831) ................................................36

Iowa Const. art. 2, §5 ..............................................................42

Ky. Const. § 145(1) .................................................................42

Miss. Const. art. 15, § 273........................................................65

Miss. Const. art. XII, § 241 .................................................. *passim*

Miss. Const. art. XII, § 253 .................................................. *passim*

**Federal Statutes**

28 U.S.C. § 1292(b) ....................................................... 12, 16, 58

52 U.S.C. § 20507(b)(1) ...........................................................21

52 U.S.C. § 20508(a)(2)....................................................... 10, 18

52 U.S.C. § 20509 ............................................................... 9, 21

52 U.S.C. § 21083(a)(1)(A) ................................................. 11, 21

**State Statutes**

MISS. CODE ANN. § 23-15-35(1) ............................................................ 10, 18

MISS. CODE ANN. § 23-15-35(2) ............................................................ 10, 18

MISS. CODE ANN. § 23-15-39(1) ............................................................ 10, 18

MISS. CODE ANN. § 23-15-47(3) ............................................................ 10, 18

MISS. CODE ANN. § 23-15-153(1) ..................................................................11

MISS. CODE ANN. § 23-15-165(1) ..................................................................11

MISS. CODE ANN. § 23-15-165(2)(c) ..............................................................11

MISS. CODE ANN. § 23-15-211(1) ..................................................................11

MISS. CODE ANN. § 23-15-211(3)-(6) ............................................................11

MISS. CODE ANN. § 23-15-211.1(1) ..............................................................10

MISS. CODE ANN. § 23-15-213(1) ..................................................................11

MISS. CODE ANN. § 23-15-223(1) ..................................................................11

MISS. CODE ANN. § 97-13-25 ..........................................................................7

MISS. CODE ANN. § 97-13-35 ..........................................................................7

MISS. CODE ANN. § 97-17-59(2) ......................................................................7

MISS. CODE ANN. § 97-19-67(1)(d) .................................................................7

MISS. CODE ANN. § 97-39-3 ..........................................................................36

**Regulations**

*Voluntary Guidance on Implementation of Statewide Voter Registration Lists,
Election Assistance Comm'n*, 70 Fed. Reg. 44593-02 .........................................9

## PRELIMINARY STATEMENT

The right to vote is "a right at the heart of our democracy," *Burson v. Freeman*, 504 U.S. 191, 198 (1992), and at "the core of our constitutional system," *Carrington v. Rash*, 380 U.S. 89, 96 (1965). This appeal concerns Mississippi's felony disenfranchisement scheme, one of the most unforgiving in the nation.

Section 241 of the Mississippi Constitution punishes individuals convicted of disenfranchising felonies by depriving them of the right to vote for the rest of their lives. Section 253 empowers the Mississippi Legislature to restore voting rights on an extremely limited case-by-case basis, with no standards to determine who may vote and who may not. Taken together, Sections 241 and 253 ensure that, with extremely limited and arbitrary exceptions, a citizen convicted in a Mississippi state court of a disenfranchising felony will never again vote in the state, no matter how minor the underlying crime or how long the citizen may live after sentence completion.

Both provisions were among the "indirect voter qualifications and procedures" adopted by the delegates to Mississippi's 1890 Constitutional Convention "to exclude black citizens from participation in the electoral process." *Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1251 (N.D. Miss. 1987), *aff'd*, 932 F.2d 400 (5th Cir. 1991). While Section 241's lifetime felony disenfranchisement provision ("Section 241") has been amended twice,

1

Section 253 has never been cleansed of its discriminatory taint.

Section 241 violates the Eighth Amendment's prohibition on cruel and unusual punishment. Section 241 also violates the Equal Protection Clause because it falls outside the limited exemption from the representation penalty in Section 2 of the Fourteenth Amendment ("Section 2") for laws that temporarily "abridge" the right to vote on the basis of a criminal conviction. It is subject to strict scrutiny, which it cannot satisfy. Section 253 violates the Equal Protection Clause because it results in the arbitrary restoration of voting rights, and also violates the First Amendment because it vests legislators with unfettered discretion to determine which individuals convicted of disenfranchising felonies may speak by registering to vote or casting a ballot.

Beyond the substantive issues at stake in this appeal, the district court correctly applied this Court's decisions in *OCA-Greater Houston v. Texas* and *K.P. v. LeBlanc* to hold that the requirements of Article III standing are satisfied, and the *Ex parte Young* exception applies, as to all of Plaintiffs' claims against the Mississippi Secretary of State ("Secretary" or "Defendant"). In all other respects, the district court either misinterpreted or disregarded Supreme Court precedent and this Court's holdings in denying Plaintiffs' motion for summary judgment. The district court's decision is grounded in an erroneously broad view of the Supreme Court's decision in *Richardson v. Ramirez*, which holds only that the Equal

Protection Clause does not "bar outright" criminal disenfranchisement laws that are "expressly exempted from" Section 2's representation penalty. 418 U.S. 24, 55 (1974). Contrary to the district court's assumption, *Richardson* does not empower states with constitutional carte blanche to enact felony disenfranchisement and reenfranchisement laws. This threshold legal error informed the district court's decisions as to each of Plaintiffs' claims.

## STATEMENT OF THE ISSUES

1.     Did the district court correctly hold that Plaintiffs' injuries arising from Sections 241 and 253 are fairly traceable to and redressable by the Secretary, where the Secretary:

(i)     serves as the state's "chief election officer" for purposes of the National Voter Registration Act ("NVRA");

(ii)    drafts and is statutorily responsible for the state's voter registration application and the Mississippi-specific instructions for the National Mail Voter Registration Application, which set forth the state's voter eligibility criteria and control whether or not an individual is eligible to vote;

(iii)   publishes the *Mississippi Voter Information Guide*, which states that individuals "convicted of a disenfranchising crime" are not "eligible to register to vote" unless their rights have been "restored by the Legislature" or the Governor;

(iv)    maintains the Statewide Election Management System ("SEMS"), which includes the state's official record of registered voters ("SEMS voter database") and provides county election officials with the names of disenfranchised individuals; and

(v)    instructs county election commissioners to remove the names of disenfranchised individuals from the SEMS voter database?

2.    Did the district court correctly hold the *Ex parte Young* exception applies with respect to all claims, for the same reasons the district court found Article III standing satisfied?

3.    Did the district court err in holding that Section 2 renders felony disenfranchisement laws categorically exempt from the Eighth Amendment's prohibition on cruel and unusual punishment, where:

(i)    constitutional provisions granting states the power to legislate are always subject to constitutional limitations; and

(ii)    Eighth Amendment claims must be measured against contemporary values, rather than the values in place in 1866, when Section 2 was passed?

4.    Did the district court err in holding that *Richardson* forecloses consideration of the question of whether Section 2 provides an exemption from the

representation penalty for laws that temporarily "abridge" the right to vote on the basis of "participation in rebellion, or other crime" (the "other crime" exemption), but not for laws that permanently deny this right, where this question was neither presented to nor addressed by the *Richardson* Court?

5.    Does Section 241 violate the prohibition in the Equal Protection Clause in Section 1 of the Fourteenth Amendment, where Section 241 falls outside the scope of Section 2's "other crime" exemption and is therefore subject to strict scrutiny review, which it cannot satisfy?

6.    Did the district court err in holding that Section 253 does not violate the Equal Protection Clause, where it arbitrarily restores voting rights to some individuals convicted of disenfranchising felonies but not others, with no rational basis for distinguishing between the handful who regain the right to vote and the tens of thousands who remain disenfranchised?

7.    Did the district court err in holding that Section 253 does not violate the First Amendment, where it vests legislators with unfettered discretion to determine which individuals convicted of disenfranchising felonies may speak by registering to vote and casting a ballot?

8.     Did the district court err in failing to consider whether Mississippi Senator James Z. George's purported race-neutral justification for Section 253 was pretextual, where Senator George had a documented history of racial animus and Section 253 was enacted by the same 1890 Mississippi Legislature that enacted other racially-discriminatory voting restrictions?

9.     Did the district court err in considering evidence concerning the 1986 Mississippi Legislature's failure to amend Section 253 in evaluating whether the 1890 Mississippi Legislature would have enacted Section 253 absent racially discriminatory intent?

10.     Does Section 253 disproportionately impact black Mississippians, who constitute a disproportionate percentage of disenfranchised individuals who have completed their sentences and are presumptively eligible for voting rights restoration under Section 253?

11.     Assuming Plaintiffs satisfied their burden to prove that Section 253 was enacted with racially discriminatory intent and has a present-day disproportionate impact, must Plaintiffs also prove that Section 253 is

discriminatorily applied?

12.    Does the Mississippi Legislature "reenact" Section 253 within the meaning of this Court's decision in *Cotton v. Fordice* each time it passes a "suffrage bill" restoring a disenfranchised individual's voting rights, even though these bills are not passed in accordance with the procedure for reenacting constitutional provisions set forth in Article 15 of the Mississippi Constitution?

## STATEMENT OF THE CASE

### A.    Mississippi's Criminal Disenfranchisement and Reenfranchisement Scheme

Under Section 241 of the Mississippi Constitution, individuals who are convicted in Mississippi state courts of numerous felonies lose the right to vote for the rest of their lives. MISS. CONST. art. XII, § 241; ROA.19-60662.1985, ROA.19-60662.3688. Section 241 applies to such minor crimes as writing a bad check for $100, or stealing $250 worth of timber. Miss Code Ann. §§ 97-17-59(2), 97-19-67(1)(d); ROA.19-60662.2000-2001; ROA.19-60662.1974. Disenfranchised individuals who register to vote or cast a ballot in violation of Section 241 are subject to severe criminal penalties. MISS. CODE ANN. §§ 97-13-25, 97-13-35; ROA.19-60662.2023-2024.

Section 253 of the Mississippi Constitution establishes a standardless

legislative process for the case-by-case restoration of voting rights. It provides:

> The Legislature may, by a two-thirds vote of both houses,
> of all members elected, restore the right of suffrage to
> any person disqualified by reason of crime; but the
> reasons therefor shall be spread upon the journals, and
> the votes shall be by yeas and nays.

MISS. CONST. art. XII, § 253. Between 2013 and 2018, the Mississippi Legislature

restored voting rights to just eighteen individuals. ROA.19-60662.1922-1924.

Apart from gubernatorial action, Section 253 is the only method for

disenfranchised individuals to regain the right to vote.[1] ROA.19-60662.2019.

Section 241 affects tens of thousands of Mississippi citizens who have

completed their sentences. Between 1994 and 2017, nearly 50,000 individuals were

convicted of disenfranchising offenses in Mississippi state courts. ROA.19-

60662.1767-1768. More than 29,000 of these individuals have completed their

sentences. ROA.19-60662.1771.

Mississippi's population of post-sentence disenfranchised individuals is

disproportionately black. The state's citizen voting-age population is

approximately 36% black and 61% white. ROA.19-60662.1769. However, of the

approximately 29,000 disenfranchised individuals who have completed their

sentences for convictions between 1994 and 2017, 58% are black and only 36% are

---

[1] Governor Phil Bryant has not granted any pardons since taking office in 2012.

white. ROA.19-60662.1771.

### B.    Section 253's Discriminatory Taint

Sections 241 and 253 were originally enacted as part of Mississippi's 1890

Constitution. MISS. CONST. art. XII, §§ 241, 253 (1890). The voting-related

provisions of the 1890 Constitution were designed to disenfranchise black

Mississippians and ensure white political control of the state. ROA-

19.60662.1793-1794; *Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896). Section 241

was carefully crafted to selectively disenfranchise black Mississippians. ROA.19-

60662.1815-1816. Section 253 was "designed as [a] safety net[] for white men"

who "might be ensnared" by Section 241. ROA.19-60662.1794.

Section 241 has been amended twice. *See Cotton v. Fordice*, 157 F.3d 388,

391 (5th Cir. 1998). Section 253 has never been amended. ROA.19-60662.1992.

### C.    The Secretary's Role in Administering and Implementing Mississippi's Criminal Disenfranchisement and Reenfranchisement Scheme

The Secretary is the state's "chief election officer" for purposes of the

NVRA. MISS. CODE ANN. § 23-15-211.1(1); 52 U.S.C. § 20509. In this capacity,

the Secretary "has, as a primary duty, the responsibility to ensure the lawful

administration of voter registration in Federal elections." *Voluntary Guidance on*

*Implementation of Statewide Voter Registration Lists, Election Assistance*

*Comm'n*, 70 Fed. Reg. 44593-02, at II(G) (Aug. 3, 2005).

The Secretary drafts and is statutorily responsible for the state's voter registration application and the Mississippi-specific instructions for the National Mail Voter Registration Application, which set forth the state's voter eligibility criteria. MISS. CODE ANN. §§ 23-15-39(1), 23-15-47(3); 52 U.S.C. § 20508(a)(2). Mississippi's voter registration application states that individuals "may not register to vote" if they have been "convicted in a Mississippi state court" of enumerated disenfranchising felonies, and it requires applicants to affirm, under penalty of perjury, as follows: "I have never been convicted of voter fraud or any other disenfranchising crime OR, if convicted, I have had my voting rights restored as required by law." ROA.19-60662.3688. County registrars are statutorily required to "use . . . the voter registration applications . . . prescribed by the Secretary" and must review the applications to determine whether an "applicant meets all the criteria necessary to qualify as a[n] . . . elector." MISS. CODE ANN. § 23-15-35(1), (2).

The Secretary publishes the *Mississippi Voter Information Guide*, which states that individuals "convicted of a disenfranchising crime" are not "eligible to register to vote . . . unless pardoned, rights of citizenship restored by the Governor or suffrage rights restored by the Legislature." ROA.19-60662.2019.

The Secretary "implement[s] and maintain[s]" Mississippi's "Statewide Elections Management System" (SEMS), which includes a "centralized database"

(the SEMS voter database) that "constitute[s] the official record of registered voters in every county of the state." MISS. CODE ANN. § 23-15-165(1); 52 U.S.C. § 21083(a)(1)(A).

The Secretary trains county election commissioners and registrars ("county election officials") on voter roll maintenance, which is the process of ensuring that the SEMS voter database contains the names only of eligible voters. ROA.19-60662.3878-3880; ROA.19-60662.3915; MISS. CODE ANN. §§ 23-15-211(3)-(6), 23-15-213(1), 23-15-153(1). The Secretary instructs county election commissioners on the statutory requirement to remove the names of voters convicted of disenfranchising felonies. ROA.19-60662.3880; MISS. CODE ANN. § 23-15-153(1). County election officials "[r]eceive regular reports of . . . convictions for disenfranchising crimes" through SEMS. MISS. CODE ANN. § 23-15-165(2)(c).

The Secretary serves, with the Governor and Attorney General, on the State Board of Election Commissioners, which appoints county registrars. *Id.* §§ 23-15-211(1), 23-15-223(1). County registrars enter the names of qualified voter registration applicants into the SEMS voter database. *Id.* §§ 23-15-33.

## D.    Procedural History

On March 27, 2018, Plaintiffs filed a putative class action asserting five constitutional claims challenging Sections 241 and 253. ROA.19-60662.14-63. The

five named plaintiffs include Dennis Hopkins, who completed his sentence for

grand larceny eighteen years ago, and Herman Parker, who completed his sentence

for grand larceny more than two decades ago. ROA.19-60662.1898; ROA.19-

60662.1903. Mr. Hopkins is the owner of a towing business, a registered foster

parent, and the former chief of his local fire department. ROA.19-60662.1898. Mr.

Parker is a father of two and a "longstanding employee" of the City of Vicksburg,

Mississippi. ROA.19-60662.1904. In 2012, a legislator proposed a bill to restore

Mr. Parker's voting rights pursuant to Section 253; the bill did not pass. ROA.19-

60662.2143.

Plaintiffs moved for class certification on August 15, 2018. ROA.19-

60662.901-907. On February 13, 2019, the district court granted Plaintiffs' motion

for class certification. ROA.19-60662.4843-4849.

Plaintiffs and Defendant cross-moved for summary judgment on October 4,

2018. ROA.19-60662.1748-1761; ROA.19-60662.2085-2088. On August 7, 2019,

the district court denied Plaintiffs' motion for summary judgment in its entirety,

and granted Defendant's motion for summary judgment as to all claims except for

Plaintiffs' race-based equal protection challenge to Section 253. ROA.19-

60662.4857-4885. The district court certified, *sua sponte*, all its holdings for

interlocutory appeal pursuant to 28 U.S.C. § 1292(b). ROA.19-60662.4884. On

September 11, 2019, this Court granted the parties permission to appeal (No. 19-

60678). On September 24, 2019, this Court consolidated that appeal with

Defendant's separately-noticed appeal (No. 19-60662), and expedited both appeals.

## SUMMARY OF THE ARGUMENT

The district court correctly held that Article III standing is satisfied, and the

*Ex parte Young* exception applies, as to all claims. The Secretary serves as the

state's "chief election officer" for purposes of the NVRA; drafts and is statutorily

responsible for the state's voter registration application, which sets forth voter

eligibility criteria and controls who may vote and who may not; and has extensive

responsibilities under Mississippi state law with respect to the implementation of

Sections 241 and 253.

The district court erred in holding that Section 2 categorically exempts

felony disenfranchisement laws from the Eighth Amendment's prohibition on cruel

and unusual punishment, because felony disenfranchisement laws are subject to

constitutional limitations. The district court's decision incorrectly assumes that

Section 2—enacted 150 years ago—could preclude a modern-day Eighth

Amendment challenge, which must be measured against contemporary values.

Today, there is an overwhelming national consensus against the punishment

of lifetime disenfranchisement.[2] Section 241 violates the Eighth Amendment's prohibition on cruel and unusual punishment by depriving tens of thousands of American citizens of the right to vote for the rest of their lives.

The district court mistakenly concluded that *Richardson* forecloses consideration of Plaintiffs' equal protection challenge to Section 241, which rests on a different construction of Section 2 that was not presented to or addressed by the *Richardson* Court. The Supreme Court's decisions do not constitute precedents for questions that were neither brought to the Court's attention nor ruled upon.

Section 241 falls outside Section 2's "other crime" exemption because it permanently "denies," rather than temporarily "abridges," the right to vote on the basis of a felony conviction; and is thus subject to strict scrutiny review. Section 241 violates the Equal Protection Clause because it is neither necessary to promote a compelling state interest, nor narrowly drawn to achieve any such interest using the least drastic means.

The district court incorrectly held that Section 253's standardless legislative reenfranchisement scheme does not violate the Equal Protection Clause. There is no rational basis for Section 253's arbitrary classification between the handful of

---

[2] Lifetime disenfranchisement" or "lifetime voting ban" means a permanent denial of the right to vote, without any non-discretionary pathway for the restoration of voting rights.

individuals convicted of felonies who regain the right to vote, and the tens of thousands of others who must remain forever disenfranchised.

The district court erred in holding that Section 253 does not violate the First Amendment. The First Amendment prohibits vesting government officials with unfettered discretion to restore voting rights because of the risk of content-based discrimination.

The district court erred in failing to consider whether a purported race-neutral justification for Section 253 was pretextual. The district court also improperly considered evidence concerning the 1986 Mississippi Legislature's failure to amend Section 253 when determining whether the 1890 Mississippi Legislature would have enacted Section 253 absent racially discriminatory intent.

Plaintiffs adequately proved Section 253's disproportionate impact with evidence that the population of post-sentence disenfranchised individuals is disproportionately black, as post-sentence disenfranchised individuals are presumptively eligible potential applicants for the restoration of voting rights under Section 253. Because Plaintiffs proved that Section 253 was enacted with discriminatory intent and has a disproportionate impact, Plaintiffs do not have to establish Section 253's discriminatory application.

Finally, the Mississippi Legislature does not "reenact" or "endorse" the 129-year-old Section 253 each time it passes a "suffrage bill." The Mississippi

15

Legislature could only "endorse" or "reenact" Section 253 by amending the Mississippi Constitution.

## STANDARD OF REVIEW

"Under 28 U.S.C. § 1292(b), a grant or denial of summary judgment is reviewed de novo, applying the same standard as the district court." *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 397 (5th Cir. 2010).[3]

Reversal is warranted if the district court "misapplied" precedent, *Energy Dev. Corp. v. St. Martin*, 112 F. App'x 952, 953 (5th Cir. 2004), or if the district court's findings are "based upon an erroneous view of the law." *Williams v. New Orleans S.S. Ass'n*, 688 F.2d 412, 414 (5th Cir. 1982). "[R]emand is unnecessary" if any remaining issues are "purely legal questions," *BP Expl. & Prod., Inc. v. Claimant Id 100281817*, 919 F.3d 284, 288-89 (5th Cir. 2019), or if "the record permits only one resolution of the factual issue." *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982).

## ARGUMENT

## I.    The District Court Properly Held that Article III Standing Is Satisfied

Article III standing requires: "(1) injury-in-fact; (2) fairly traceable causation; and (3) redressability." *Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of*

---

[3] "Def.-Br." refers to Defendant's principal brief. Unless otherwise noted, internal quotation marks, alterations and citations are omitted throughout.

*Workers' Comp.*, 851 F.3d 507, 513 (5th Cir. 2017). Defendant concedes the injury-in-fact requirement is met for all claims. ROA.19-60662.2097. Traceability is satisfied if the defendant "is among those who . . . contribute to" the plaintiff's injuries. *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). The defendant's actions need not be the "proximate cause" of the plaintiff's injuries. *Id.* Redressability is satisfied if the defendant has "definite responsibilities relating to the application of" the challenged law, even if the defendant "is far from the sole participant in the application of the challenged statute." *Id.* at 123-24. Redressability requires only that "a favorable decision will relieve a discrete injury" to the plaintiff, even if it will not "relieve his *every* injury." *Id.* at 123.

The district court correctly held that Plaintiffs' injuries are fairly traceable to and redressable by the Secretary based on his designation as Mississippi's "chief election officer," as well as his statutory responsibilities in connection with the implementation of Sections 241 and 253. ROA.19-60662.4861-4863. As to Section 241, the district court properly found the Secretary "plays a crucial role in the process" of "disenfranchising a voter." ROA.19-60662.4863. The district court found the Secretary "receives information regarding disenfranchising convictions, adds that information to SEMS, and trains county officials on the next step." ROA.19-60662.4862. As to Section 253, the district court found the Secretary "maintains SEMS, which would presumably be involved in one of the final steps in

returning a convicted felon to the voting rolls after he or she successfully files a [S]ection 253 petition." ROA.19-60662.4864-65.

Significantly, in addition to the maintenance of SEMS, the Secretary drafts and is statutorily responsible for the state's voter registration application and the state-specific instructions of the National Mail Voter Registration Form, which set forth the state's voter eligibility criteria and control whether or not an individual is eligible to vote. MISS. CODE ANN. §§ 23-15-39(1), 23-15-47(3); 52 U.S.C. § 20508(a)(2). County registrars must "use . . . the voter registration applications . . . prescribed by the Secretary" and must review the applications to determine whether an applicant is eligible for registration. MISS. CODE ANN. § 23-15-35(1), (2). Through the state's voter registration application, the Secretary instructs county election officials that individuals convicted of disenfranchising offenses are ineligible to vote, while individuals whose voting rights have been "restored" are eligible to vote. The Secretary also directly advises Mississippi citizens of these voter eligibility requirements through the *Mississippi Voter Information Guide*. ROA.19-60662.2019.

Traceability is met because the Secretary is "among those who . . . contribute" to Plaintiffs' injuries. *K.P.*, 627 F.3d at 123. Redressability is also satisfied in view of the Secretary's "definite responsibilities relating to the application of" Sections 241 and 253. *Id.* at 124. The Secretary could redress

18

Plaintiffs' injuries by, for example, revising the state's voter registration application to provide that post-sentence individuals are eligible to vote, even if they have not obtained the passage of a suffrage bill pursuant to Section 253; or instructing county election commissioners, as part of their mandatory training, not to remove the names of individuals who have completed their sentences for disenfranchising convictions from the SEMS voter database.

### A.   Injuries Arising from Unconstitutional Voting Laws Are Fairly Traceable to and Redressable by the Secretary, Who Serves as Mississippi's Designated "Chief Election Officer"

Defendant claims that the Secretary's statutory role as the state's "chief election officer" is irrelevant to the standing analysis because "this is not a suit brought under the NVRA." Def.-Br. at 48-49. But as the district court recognized, this Court and other federal courts have found that "the designation of 'chief election officer' militates in favor of finding Article III standing in various election-law contexts," even when plaintiffs do not assert claims under the NVRA. ROA.19-60662.4862. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613-14 (5th Cir. 2017); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 n.16 (6th Cir. 2008); *Terrebonne Parish NAACP v. Jindal*, No. 14-069-JJB-SCR, 2014 WL 3586549, at *4 (M.D. La. July 21, 2014); *Common Cause Ind. v. Ind. Sec'y of*

*State*, No. 1:12-cv-01603-RLY-DML, 2013 WL 12284648, at *3-4 (S.D. Ind. Sept. 6, 2013).[4]

In *OCA-Greater Houston v. Texas*, plaintiffs brought a Voting Rights Act suit against the Texas Secretary of State, the state's "chief election officer," challenging a Texas law restricting voter interpretation assistance. The Texas Secretary of State claimed that Article III standing was not satisfied because "county officials are the only ones who can redress the injury." 867 F.3d at 613. But this Court held that "[t]he facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the . . . [Texas] Secretary of State, who serves as the 'chief election officer of the state.'" *Id.* As in *OCA-Houston*, Plaintiffs' claims concern the "facial invalidity" of Mississippi "election statute[s]." *Id.* Their injuries are, "without question, fairly traceable to and redressable by" Mississippi's "chief election officer." *Id.*

Defendant suggests that *OCA-Greater Houston* is inapposite because it involved a "misunderstanding by local officials." Def.-Br. at 21. But this Court found that plaintiffs' claims arose from a "straightforward application" of a law challenged as "facially invalid." 867 F.3d at 613. Defendant also attempts to

---

[4] Defendant cites to *City of San Antonio v. Edwards Aquifer Authority*, in which the court dismissed claims against the Texas Secretary of State. No. SA-12-CA-620-OG, 2014 WL 12495605 (W.D. Tex. Mar. 31, 2014). But *City of San Antonio* did not concern a statewide election law.

distinguish *OCA-Greater Houston* by pointing to the Texas Secretary of State's

obligation to "obtain and maintain uniformity in the application, operation and

interpretation" of the Texas Election Code. Def.-Br. at 21-22. While the Secretary

may have no similar obligation under Mississippi law, he is responsible under

federal law for "the maintenance of an accurate and current voter registration roll"

that is "uniform" and "nondiscriminatory." 52 U.S.C. §§ 20507(b)(1), 20509,

21083(a)(1)(A).

Defendant also incorrectly contends that *Okpalobi v. Foster* requires

dismissal of all claims. Def.-Br. at 16, 48. At issue in *Okpalobi* was the

constitutionality of a statute establishing a private cause of action for patients to

sue doctors who performed abortions. This Court determined that plaintiffs'

injuries were not fairly traceable to the Governor of Louisiana and the Louisiana

Attorney General because neither had any "duty or ability to do *anything* . . . to

prevent a private plaintiff from invoking the statute in a civil suit." 244 F.3d 405,

427 (5th Cir. 2001). *Okpalobi* has no relevance here because it does not apply

where plaintiffs bring suit against a state's "chief election officer" to challenge a

state election law. *See OCA-Greater Houston*, 867 F.3d at 613 (explaining that

"unlike in *Okpalobi,* where the defendants had no enforcement connection with the

challenged statute, the Texas Secretary of State is the 'chief election officer of the

state'").

**B.    The District Court Correctly Held that Plaintiffs Have Standing with Respect to Their Section 241-Related Claims**

Defendant asserts that Plaintiffs' Section 241-related injuries are only fairly traceable to and redressable by the "local officials" who purportedly "enforce Mississippi's felon disenfranchisement laws." Def.-Br. at 46-48. This "argument is at odds with numerous cases in which plaintiffs have sued secretaries of state when challenging voter registration laws even though states commonly delegate voter registration responsibilities to county officials." *Voting for Am. v. Andrade*, 888 F. Supp. 2d 816, 828-29 (S.D. Tex. 2012), *rev'd on other grounds*, 732 F.3d 382 (5th Cir. 2013); *see, e.g.*, *Common Cause Ind.*, 2013 WL 12284648, at *3 (denying the Indiana Secretary of State's motion to dismiss a constitutional challenge to a judicial election process, despite the Secretary's objection that "only the county election boards are enlisted with the requisite powers to administer and enforce local judicial elections").

In *Voting for America*, the Southern District of Texas held that Article III standing was satisfied where plaintiffs brought suit against the Texas Secretary of State asserting "constitutional challenges" to a third-party voter registration law, even though "the Election Code delegates enforcement authority to county registrars." 888 F. Supp. 2d at 828-29. Contrary to Defendant's assertion that "county registrars were required to 'obey' the [Texas] Secretary of State's 'restrictions,'" Def.-Br. at 49, the Texas Secretary of State "contend[ed] that her

22

authority is only persuasive, and that she is powerless to stop county registrars from disobeying her." 888 F. Supp. 2d at 828.

The court found that Article III's requirements would be met "[e]ven if the Secretary's powers were limited to interpretation" of the challenged law. *Id.* at 832. The court reasoned that "[i]f the Secretary were to be enjoined, most—if not all—Texas county registrars are likely to amend their conduct in response to the injunction." *Id.* As in *Voting for America*, if the Secretary were to revise the voter eligibility criteria on Mississippi's voter registration application and instruct county election commissioners not to remove the names of post-sentence disenfranchised individuals from the SEMS voter database to comply with an injunction, county election officials would be "likely to amend their conduct" accordingly. *Voting for Am.*, 888 F. Supp. 2d at 832.

### C.   The District Court Correctly Held that Plaintiffs Have Standing with Respect to Their Section 253-Related Claims

Defendant argues that Plaintiffs lack Article III standing as to their Section 253-related claims because the Secretary "plays no role whatsoever in the passage of suffrage bills." Def.-Br. at 14. This contention rests on the faulty predicate that "the injury alleged for purposes of the Section 253 challenge *is* the actual *legislative process*." Def.-Br. at 10. In fact, Plaintiffs' injuries arise from Section 253's imposition of the unconstitutional burden to obtain the passage of a suffrage bill in order to regain the right to vote, which the Secretary implements and

23

enforces through the state's voter registration application and the maintenance of

the SEMS voter database, among other responsibilities. ROA.19-60662.56 ¶111.

*See, e.g.*, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (the

"imposition of [the] burden" to obtain a photo identification to vote "is an injury

sufficient to confer standing" irrespective of whether the plaintiffs "are able to

obtain photo identification").[5]

In *K.P.*, this Court found Article III's requirements satisfied in analogous

circumstances. There, doctors brought suit against the board of a state patient

compensation fund challenging the constitutionality of a Louisiana law that

prohibited fund payments for abortion-related damages. Patients could only

recover abortion-related damages by bringing a civil suit under the law at issue in

*Okpalobi*. This Court recognized that the board could not "prevent a private litigant

from pursuing relief." *K.P.*, 627 F.3d at 123. However, this Court found the

doctors' injuries traceable to the board because it "is responsible for administering

the benefits the Plaintiffs claim to have been denied." *Id.* This Court also found the

redressability requirement met because "at several points, [the challenged law]

impacts the Board's actions." *Id.*

---

[5] The district court's determination that Plaintiffs only "minimally" demonstrated standing with respect to their Section 253-related claims also rests on an unduly narrow view of Plaintiffs' injuries. ROA.19-60662.4865.

Here, the Secretary "is responsible for administering the benefit[] the Plaintiffs claim to have been denied" by Section 253: eligibility to register to vote. *Id.* The Secretary implements Section 253 by drafting the state's voter registration application, which includes voter eligibility criteria, training county election commissioners, and publishing the *Mississippi Voter Information Guide*—all of which ensure that individuals who regain the right to vote pursuant to Section 253 may register to vote, while all other individuals convicted of disenfranchising felonies may not. Section 253 "impacts [the Secretary's] actions sufficiently to confer standing" on Plaintiffs. *Id.*

## II. The District Court Correctly Held that the *Ex parte Young* Exception Applies with Respect to All of Plaintiffs' Claims

"[T]here is significant overlap between standing and *Ex parte Young*'s applicability." *Air Evac EMS*, 851 F.3d at 518-19. The *Ex parte Young* exception to Eleventh Amendment sovereign immunity provides that "where a state actor enforces an unconstitutional law, he is stripped of his official clothing and becomes . . . subject to suit." *K.P.*, 627 F.3d at 124. The *Ex parte Young* exception applies if "the state officer has 'some connection'" with the "'enforcement'" of the challenged law. *Id.* In the *Ex parte Young* context, "'enforcement'" simply means "compulsion or constraint." *Id.* The requisite "connection" does not have to arise directly from the challenged law. *See Ex parte Young*, 209 U.S. 123, 157 (1908) (explaining that it does not matter whether the state officer's "connection with the

enforcement of the act . . . arises out of the general law, or is specifically created

by the act itself"). Rather, the "some connection" requirement is satisfied if the

defendant has "a specific means through which to apply" the challenged law. *Air

Evac EMS*, 851 F.3d at 518-19.

For the same reasons the district court found Article III standing, the district

court properly held that the *Ex parte Young* exception applies with respect to all

claims. Numerous courts have found the *Ex parte Young* exception applicable in

voting or election-related suits against a state's designated chief election officer.

*See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir.

2019); *Walker v. Barnett*, No. CIV 18-4015, 2019 WL 1428723, at *6 (D.S.D.

Mar. 29, 2019); *Libertarian Party of Ky. v. Grimes*, 164 F. Supp. 3d 945, 951 (E.D.

Ky. 2016), *aff'd*, 835 F.3d 570 (6th Cir. 2016); *Am. Broad. Cos. v. Ritchie*, No. 08-

5285 (MJD/AJB), 2011 WL 665858, at *3-4 (D. Minn. Feb. 14, 2011).

Courts have also found the *Ex parte Young* exception applies where a state's

"chief elections officer" provides county election officials with the names of

individuals who are ineligible to vote under the challenged law, or instructions on

implementing the challenged law. *See, e.g.*, *Mo. Prot. and Advocacy Servs., Inc. v.

Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (*Ex parte Young* applied where the

Missouri Secretary of State provided local election officials with the names of

individuals deemed "incapacitated" under the challenged law, even though he

played no role in determining which individuals were "incapacitated"); *Libertarian Party of Ky.*, 164 F. Supp. 3d at 950 (*Ex parte Young* exception applied where the Kentucky Secretary of State was "tasked with providing training to county clerks and other members of county boards of elections," even though he was not "directly responsible" for "the day-to-day" implementation of the challenged law); *Am. Broad.*, 2011 WL 665858 at *4 (*Ex parte Young* exception applied where the Minnesota Secretary of State provided "uniform instructions" to local officials concerning the challenged law).

In *K.P.*, this Court found the *Ex parte Young* exception applied because the challenged law "implicitly require[d] the Board to differentiate between claims allowable and not allowable under the statute." 627 F.3d at 124. Similarly, Sections 241 and 253 "require" the Secretary "to differentiate between" previously disenfranchised individuals who have regained the right to vote, and other individuals convicted of disenfranchising felonies who remain ineligible to vote, in the state's voter registration application and the Secretary's instructions to county election commissioners.

III. **The District Court Erred in Holding that Section 241 Does Not Violate the Eighth Amendment's Prohibition on Cruel and Unusual Punishment**

Section 241 violates the Eighth Amendment's prohibition against cruel and unusual punishment by "sever[ing]" tens of thousands of American citizens "from

the body politic" and condemning them to lifetime spent in a "shadowy form of citizenship."[6] *McLaughlin*, 947 F. Supp. at 971. Like the punishment of forfeiture of citizenship held unconstitutional in *Trop v. Dulles*, Section 241 "destroys for the individual the political existence that was centuries in the development" and "strips the citizen of his status in the national and international political community." 356 U.S. 86, 101 (1958).

Section 241 is a particularly cruel form of punishment for those convicted of disenfranchising felonies early in their lives. Because of Section 241, citizens like named plaintiff Dennis Hopkins lose the right to vote forever for nonviolent convictions that occurred when they were barely older than teenagers. ROA.19-60662.1898. Today, Mr. Hopkins runs his own business, raises foster children, and coaches football. *Id.* Yet he can never vote again.

Section 241 also violates the Eighth Amendment because it is not part of the sentence for the conviction of a crime, but is instead an additional punishment that exceeds the duration of the individual's sentence. *See Ralph v. Blackburn*, 590 F.2d 1335, 1337 (5th Cir. 1979) ("A sentence that exceeds the statutory maximum has traditionally been viewed as a violation of the [E]ighth [A]mendment's

---

[6] Defendant acknowledges that Section 241 "might be cruel and unusual" punishment for certain disenfranchising felonies. ROA.19-60662-4276.

prohibition against cruel and unusual punishment."); *Millard v. Rankin*, 265 F. Supp. 3d 1211, 1231 (D. Colo. 2017) (state sex offender registry act violated the Eighth Amendment as applied to plaintiffs where it "subject[ed] them to additional punishment beyond their sentences"). *See generally Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) (striking down on First Amendment grounds a law limiting access to social networking websites by registered sex offenders, and observing that it is "troubling . . . that the law imposes severe restrictions on persons who have already served their sentences").

Once an individual has completed her sentence, any punishment—no matter how slight—is constitutionally prohibited because the only "crime" for which this penalty is imposed is the individual's prior felony conviction. *See generally Robinson v. California*, 370 U.S. 660, 667 (1962) ("Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold.").

### A. The District Court Incorrectly Held that the Eighth Amendment's Prohibition on Cruel and Unusual Punishment Does Not Apply to Felony Disenfranchisement Laws

Contrary to the district court's erroneous conclusion, Section 2 does not immunize felony disenfranchisement laws from the Eighth Amendment's prohibition of cruel and unusual punishment, which "guards against abuses of government's punitive or criminal-law-enforcement authority." *Timbs v. Indiana*, 139 S. Ct. 682, 686 (2019).

1.    **The District Court Improperly Held that Section 2 Categorically Exempts Felony Disenfranchisement Laws From Nearly All Constitutional Limitations**

The district court stated that "the same Constitution that recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment" could not "also prohibit[] disenfranchisement under other amendments." ROA.19-60662.4878 (quoting *Farrakhan v. Locke*, 987 F. Supp. 1304, 1314 (E.D. Wash. 1997). In essence, the district court determined that Section 2 empowers states with unbounded authority to enact felony disenfranchisement laws, free from almost any constitutional limitations.

But the Supreme Court has expressly held that constitutional "provisions that grant Congress or the States specific power to legislate in certain areas . . . are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29 (1968). Consistent with this precedent, the Supreme Court has made it clear that there are constitutional limits to a state's authority to enact and enforce criminal disenfranchisement laws. *See Hunter v. Underwood*, 471 U.S. 222, 233 (1985) ("[W]e are confident that § 2 [of the Fourteenth Amendment] was not designed to permit the purposeful racial discrimination attending the enactment and operation of § 182 which otherwise violates § 1 of the Fourteenth Amendment."); *Richardson*, 418 U.S. at 56 (remanding for further consideration of

the plaintiffs' equal protection challenge to the "total lack of uniformity" in the

enforcement of California's felony disenfranchisement laws).

This Court and other courts have also recognized that felony

disenfranchisement laws are subject to constitutional limitations. *See Shepherd v.

Trevino*, 575 F.2d 1110, 1114-15 (5th Cir. 1978) (rejecting "the proposition that

[S]ection 2 removes" felony disenfranchisement laws from "all equal protection

considerations"); *Hayden v. Pataki*, 449 F.3d 305, 316 n.11 (2d Cir. 2006) ("The

Fourteenth Amendment, as interpreted by the Supreme Court, does not completely

insulate felon disenfranchisement provisions from constitutional scrutiny."); 

*Thompson v. Alabama*, No. 2:16-cv-783-WKW, 2017 WL 3223915, at *6 n.3

(M.D. Ala. July 28, 2017) ("[T]he Supreme Court has not immunized all felon

disenfranchisement laws from constitutional review.").

### 2.    The District Court Erroneously Analogized to *Graham v. Connor*

The district court incorrectly reasoned that the Eighth Amendment is

inapplicable to felony disenfranchisement laws because it "does not mention

voting rights," while "§ 2 . . . affirmatively sanctions a state's right to deny the

franchise based on a criminal conviction." ROA.19-60662.4878. The Court

analogized to *Graham v. Connor*, which held that the Fourteenth Amendment's

substantive due process protections do not apply to an excessive force claim

because the Fourth Amendment "provides an explicit source of constitutional

protection against [that] sort of . . .governmental conduct." 490 U.S. 386, 395

(1989). *Graham* has no relevance to whether the constitutional protections of the

Eighth Amendment limit the exercise of legislative power under Section 2.

    *Graham* also does not hold that "the applicability of one constitutional

amendment pre-empts the guarantees of another." *United States v. James Daniel*

*Good Real Prop.*, 510 U.S. 43, 50-51 (1993). In *Soldal v. Cook County*, the

Supreme Court distinguished *Graham* and explained:

> Certain wrongs affect more than a single right and,
> accordingly, can implicate more than one of the
> Constitution's commands. Where such multiple
> violations are alleged, . . . we examine each constitutional
> provision in turn.

506 U.S. 56, 70 (1992). *See also James Daniel*, 510 U.S. at 50 (holding that a

plaintiff may bring Fourth and Fifth Amendment claims arising out of the same

conduct, and reasoning that when government conduct "implicates two explicit

textual sources of constitutional protection, . . . [t]he proper question is not which

Amendment controls but whether either Amendment is violated").

### 3.    The District Court Mistakenly Assumed that the Eighth Amendment's Standards Are Unchanging

    The district court's analysis rests on the flawed assumption that Section 2—

ratified in 1868—precludes an Eighth Amendment challenge to a punitive felony

disenfranchisement law in effect today. But the question of whether a punishment

violates the Eighth Amendment is not determined by "historical conceptions."

*Graham v. Florida*, 560 U.S. 48, 58 (2010). Rather, courts must measure the challenged punishment against "the evolving standards of decency that mark the progress of a maturing society." *Id.*

Because the Eighth Amendment is governed by "the norms that currently prevail," a punishment that was constitutionally permissible decades ago might nevertheless violate the Eighth Amendment today. *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).[7]

### B.    Section 241 Violates the Eighth Amendment's Prohibition on Cruel and Unusual Punishment

In considering an Eighth Amendment challenge to a mode of punishment, a court must first consider "objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against" the punishment at issue. *Graham v. Florida*, 560 U.S. at 61. The court must then "determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Id.* As demonstrated

---

[7] In *Richardson*, the Court stated that it has "strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision." 418 U.S. at 53. This language in *Richardson* does not foreclose an Eighth Amendment challenge to a felony disenfranchisement law. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990) ("The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions . . . . [S]uch assumptions . . . are not binding in future cases that directly raise the questions.").

below, Section 241 is a form of punishment that violates "the duty of the

government to respect the dignity of all persons" enshrined in the Eighth

Amendment. *Hall v. Florida*, 572 U.S. 701, 708 (2014).

### 1. Section 241 Imposes "Punishment"

"The Cruel and Unusual Punishments Clause is self-evidently concerned

with punishment," and its purpose is "to limit the government's power to punish."

*Austin v. United States*, 509 U.S. 602, 609 (1993). Section 241 is a "punishment"

because "the intention of the legislature was to impose punishment." *Smith v. Doe*,

538 U.S. 84, 92 (2003). Section 241's "punitive nature" is also "evident under the

tests traditionally applied determine whether [a law] is penal or regulatory in

character." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963).

### a) Under Binding Federal Law, Section 241 Could Only Have Been Enacted "as a Punishment"

Federal law has long prohibited Mississippi from enacting a criminal

disenfranchisement provision in its state constitution for any purpose other than

punishment. The "Act to admit the State of Mississippi to Representation in the

Congress of the United States" (the "Readmission Act") provides that

Mississippi's "constitution. . . shall never be so amended or changed as to deprive

any citizen or class of citizens of the United States of the right to vote . . . *except as*

*a punishment for such crimes as are now felonies at common law, whereof they*

*shall have been duly convicted.*" ROA.19-60662.2402-2403 (emphasis added).

Under the Readmission Act, Mississippi could not have enacted Section 241 for non-punitive purposes. *See Hillman v. Maretta*, 569 U.S. 483, 496 (2013) ("[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). As a matter of law, Section 241 must be considered punishment. *See* U.S. CONST. art. VI, cl. 2; *Rose v. Ark. State Police*, 479 U.S. 1, 3 (1986) ("There can be no dispute that the Supremacy Clause invalidates all state laws that conflict or interfere with an Act of Congress."); *Planned Parenthood of Houston and Southeast Tex. v. Sanchez*, 403 F.3d 324, 342 (5th Cir. 2005) (courts "must choose the interpretation . . . that has a chance of avoiding federal preemption").

**b)   Section 241 Bears All of the Hallmarks of Punishment**

In determining whether a sanction is punitive, courts consider whether: (1) "it has historically been regarded as a punishment," (2) "the behavior to which it applies is already a crime," (3) "it comes into play only on a finding of scienter," (4) "the sanction involves an affirmative disability or restraint," (5) "its operation will promote the traditional aims of punishment—retribution and deterrence," (6) "an alternative purpose to which it may rationally be connected is assignable for it," and (7) "it appears excessive in relation to the alternative purpose assigned." *Mendoza-Martinez*, 372 U.S. at 168-69. Each of these tests demonstrates that

Section 241's "primary function is to serve as an additional penalty" for

disenfranchised individuals. *Id.* at 169-70.

*First*, "throughout history, criminal disenfranchisement provisions have

existed as a punitive device." *Johnson v. Gov'r of Fla.*, 405 F.3d 1214, 1218 n.5

(11th Cir. 2005); *Muntaqim v. Coombe*, 366 F.3d 102, 104 (2d Cir. 2004) ("[S]tate

felon disenfranchisement statutes . . . have been widely used as a penological tool

since before the Civil War."), *vacated on other grounds*, 449 F.3d 371 (2d Cir.

2006) (*en banc*). It was a standard form of punishment in the 1800s. *See, e.g.*,

*Barker v. People*, 20 Johns. 457, 459 (N.Y. Sup. Ct. 1823), *aff'd*, 3 Cow. 686

(N.Y. 1824) ("The disenfranchisement of a citizen is not an unusual punishment; it

was the consequence of treason, and of infamous crimes."); ROA.19-60662.2449

(DEL. CONST. art. IV, § 1 (1831) (empowering the state legislature to "impose the

forfeiture of the right of suffrage as a punishment for crime")). Mississippi's

criminal code continues to impose disenfranchisement as one of the "[a]dditional

penalties" for the historic crime of dueling. MISS. CODE ANN. § 97-39-3.

The Readmission Act and the other post-Civil War enabling acts evidence

the historically punitive purpose of criminal disenfranchisement. *See Ramirez*, 418

U.S. at 51-52 (discussing the enabling acts); ROA.19-60662.2402-2412. Justice

Rehnquist, who authored the *Ramirez* opinion, later explicitly recognized that

individuals convicted of felonies are "denied the franchise as part of their

punishment." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 229 (1999) (Rehnquist, J., dissenting).

*Second*, Section 241's exclusive application to individuals convicted of crimes "is significant of penal and prohibitory intent." *Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 781, 783 (1994) (finding a tax on illegal drug possession constituted "punishment" where it was "imposed on criminals and no others"); *see also Does #1-5 v. Snyder*, 834 F.3d 696, 705 (6th Cir. 2016) (holding a state sex offender registry act "imposes punishment" because, *inter alia*, it "brands registrants as moral lepers solely on the basis of a prior conviction"). In *United States v. Bajakajian*, the Court had "little trouble concluding" that a statutory currency forfeiture "constitute[d] punishment" because it was "imposed at the culmination of a criminal proceeding and require[d] conviction of an underlying felony," and could not "be imposed upon an innocent owner of unreported currency." 524 U.S. 321, 328 (1998). Section 241 similarly requires an underlying felony conviction and cannot be imposed on anyone who has not been convicted of a disenfranchising felony.

*Third*, Section 241 imposes a severe "disability or restraint," as evidenced by "how the effects of [Section 241] are felt by those subject to it." *Smith*, 538 U.S. at 99-100. In *McLaughlin v. City of Canton*, the court found that Section 241 has "draconian consequences" for disenfranchised individuals:

> Disenfranchisement is the harshest civil sanction imposed by a democratic society. When brought beneath its axe, the disenfranchised is severed from the body politic and condemned to the lowest form of citizenship, where voiceless at the ballot box the disenfranchised, the disinherited must sit idly by while others elect his civic leaders and while others choose the fiscal and governmental policies which will govern him and his family.

947 F. Supp. 954, 971 (S.D. Miss. 1995). The testimony of the named Plaintiffs echo the *McLaughlin* Court's findings. For example, Dennis Hopkins "feel[s] like a third or fourth-class citizen of" Mississippi because he cannot vote. ROA.19-60662.1898. Herman Parker "dread[s] Election Day because it reminds [him] of what [he has] lost." ROA.19-60662.1903. The criminal enforcement mechanisms for Section 241 amplify its exceedingly harsh consequences. *See Does #1-#5*, 834 F.3d at 703 (a law's effects were not "minor and indirect" where the "failure to comply with [its] restrictions carries with it the threat of serious punishment, including imprisonment").

*Fourth*, there is no evidence in the legislative history that Section 241 was enacted for any purpose other than retribution. *See Mendoza-Martinez*, 372 U.S. at 181 (finding "[t]he obvious inference" from the absence of any reference to a sanction's non-punitive purpose in the legislative history "is that Congress was concerned solely with inflicting effective retribution"). Like the sex offender registry act the Sixth Circuit deemed punitive in *Does #1-5*, Section 241 is

"retributive in that it looks back at the offense (and nothing else) in imposing its restrictions, and it marks [disenfranchised individuals] as ones who cannot be fully admitted into the community." 834 F.3d at 704. Section 241's imposition of a blanket prohibition on every individual convicted of a disenfranchising felony also evidences its retributive purpose. *See Mikaloff v. Walsh*, No. 5:06-CV-96, 2007 WL 2572268, at *11 (N.D. Oh. Sept. 4, 2007) (finding a law's "lack of any case-by-case determination demonstrates that the restriction is 'vengeance for its own sake'").

*Fifth*, there is no evidence that Section 241—or any form of lifetime disenfranchisement—promotes any rational nonpunitive purpose. Defendant claims that felony disenfranchisement laws are "based on the philosophy of republican government and theory of social compact." Def.-Br. at 3. But Defendant's proffered abstract purpose finds no footing in Section 2 of the Fourteenth Amendment or the legislative history of Section 241. *See Evenwel v. Abbott*, 136 S.Ct. 1120, 1146 (2016) (Alito, J., concurring) (explaining that Section 2 was based on "power politics,  not democratic theory").[8] Nor is there any

---

[8] This Court and other courts have directly and indirectly relied on dicta in *Trop v. Dulles*, which did not concern a criminal disenfranchisement law, to find that there is a rational nonpunitive purpose for criminal disenfranchisement laws generally. *See, e.g.*, *Shepherd*, 575 F.2d at 1115. But even the *Trop* opinion noted that criminal disenfranchisement would be "penal" if it was "imposed for the purpose of punishing." 356 U.S. 86, 96 (1958). *See Thompson v. Alabama*, 293 F. Supp. 3d 1313, 1329 (M.D. Ala. 2017) (denying a motion to dismiss an Eighth Amendment

evidence that this abstract rationale is Section 241's sole purpose. *See Austin*, 509

U.S. at 610 ("sanctions frequently serve more than one purpose").

*Finally*, Section 241's lifetime duration, coupled with its across-the-board

application, far exceeds any plausible regulatory purpose. *See Doe v. Miami-Dade*

*Cty.*, 846 F.3d 1180, 1185-86 (11th Cir. 2017) (finding plaintiffs adequately

alleged that a sex offender residency restriction was "excessive" in relation to its

asserted "public safety goal" because the "residency restriction applies for life,

even after an individual no longer has to register as a sexual offender"). Where, as

here, "a legislature uses prior convictions to impose burdens that outpace the law's

stated civil aims, there is room for serious argument that the ulterior purpose is to

revisit past crimes, not prevent future ones." *Smith*, 538 U.S. at 109 (Souter, J.,

concurring).

### 2.    There Is a National Consensus Against the Punishment of Lifetime Disenfranchisement

In 1967, the Second Circuit held that "the great number of states excluding

felons from the franchise" precluded an Eighth Amendment challenge to New

York's lifetime disenfranchisement law. *Green v. Bd. of Elections*, 380 F.2d 445,

450-51 (2d Cir. 1967). A few years later, the New York legislature ended the

---

challenge to Alabama's criminal disenfranchisement law, and reasoning that
Alabama's law "requires its own analysis" of purpose).

punishment of lifetime disenfranchisement because "[i]t is inconsistent with the general philosophy of corrections to continue punishment after a person has accounted" for his crimes. ROA.19-60662.2468. One by one, states around the country followed suit. ROA.19-60662.1925-1936; ROA.19-60662.2476 (rejecting this "system of permanent punishment"); ROA.19-60662.2489 (individuals convicted of felonies should not be "punished for the rest of their lives").

Today, forty states and the District of Columbia do not impose a lifetime voting ban for convictions of disenfranchising offenses, other than election and government-related offenses.[9] ROA.19-60662.1937-1941. Seven states impose a lifetime voting ban for convictions of certain categories of disenfranchising offenses; these states restore voting rights after sentence completion for many or most categories of disenfranchising offenses. ROA.19-60662.1943-1945; ROA.19-60662.4710-4714. A majority of Florida's electorate voted to end the state's longstanding lifetime voting ban for almost all disenfranchising offenses during the pendency of this litigation. ROA.19-60662.4710-4714. Mississippi is one of only three states that imposes a lifetime voting ban for convictions of all disenfranchising offenses. IOWA CONST. art. 2, §5; KY. CONST. § 145(1).

---

[9] Lifetime disenfranchisement is applied so rarely, if at all, in these states that most make no mention of it in their voter registration materials. ROA.19-60662.4416–4435.

There is a clear national consensus against the punishment of lifetime disenfranchisement. *See Roper v. Simmons*, 543 U.S. 551, 564 (2005) (national consensus where 30 states rejected the punishment of executing individuals who were under 18 at the time of their crimes); *Atkins v. Virginia*, 536 U.S. 304, 314-16 (2002) (national consensus where 30 states rejected the punishment of executing individuals with intellectual disabilities).

## IV. The District Court Erred in Holding that Section 241 Does Not Violate the Equal Protection Clause

The district court incorrectly relied on *Richardson v. Ramirez* to hold that Section 241 does not violate the Equal Protection Clause. The *Richardson* Court held that the Equal Protection Clause does not "bar outright a form of disenfranchisement which was *expressly exempted* from" Section 2's representation penalty. 418 U.S. at 55 (emphasis added). Section 2 provides in relevant part:

> [W]hen the right to vote . . . is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced . . . .

U.S. CONST. amend. XIV, § 2.

Section 241 is not "expressly exempted" from Section 2's representation penalty. This penalty applies if "the right to vote . . . is denied" for any reason to male citizens twenty-one years of age and older. *Id.* Section 2's representation

penalty also applies if "the right to vote" of male citizens twenty-one years of age and older is "in any way abridged," *except* on the basis of "participation in rebellion, or other crime." *Id.* No representation penalty applies if a state denies or abridges the right of vote to non-citizens, men under the age of twenty-one, or women.

As demonstrated below, Section 2 "expressly exempt[s]" from the representation penalty only those laws that temporarily "abridge" the right to vote based on "participation in rebellion, or other crime," and does not exempt laws that permanently "deny" the right to vote on this basis. Because Mississippi's lifetime voting ban falls outside of Section 2's "other crime" exemption, it is subject to strict scrutiny under the Equal Protection Clause, which it cannot satisfy.

**A.    The District Court Erred in Holding that *Richardson* Forecloses Consideration of a Question Concerning the Interpretation of Section 2 that Was Neither Presented to Nor Addressed by the *Richardson* Court**

In *Richardson*, the Court focused its analysis exclusively on the meaning of the phrase "except for participation in rebellion, or other crime" (the "other crime" exemption). 418 U.S. at 43 (finding "this language was intended by Congress to mean what it says"). Plaintiffs do not challenge the meaning of the "other crime" exemption in this appeal. However, the *Richardson* Court was not presented with, and did not consider, the question Plaintiffs do raise: whether Section 2's "other crime" exemption applies only to laws that temporarily "abridge" the right to vote,

43

and not to laws that permanently "deny" this right.

The district court erroneously concluded that it "must reject" Plaintiffs' "alternative construction" because *Richardson*'s "holding is squarely on point." ROA.19-60662.4876-4877. The Supreme Court has, however, held that a legal question that "was not . . . raised in briefs or argument nor discussed in the opinion of the Court . . . is not a binding precedent on this point." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.,* 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). Even if the *Richardson* Court had assumed that the "other crime" exemption modifies the words "is denied" as well as the phrase "or in any way abridged," the Supreme Court's unstated assumption does not foreclose consideration of this question. *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (where the Court has "never squarely addressed" a question but has "at most assumed" the answer, the Court is "free to address the issue on the merits").

The Ninth Circuit's decision in *Harvey v. Brewer* is instructive. There, the court reached the merits of plaintiffs' contention that the "other crime" exemption applies only to common-law felonies, even though the court observed that plaintiffs' "proposed reading . . . seems to be in direct conflict with *Richardson*"

because one of the *Richardson* plaintiffs was "convicted of a crime that was clearly not a felony at common law." 605 F.3d 1067, 1074 (9th Cir. 2010) (O'Connor, J., sitting by designation). The court found *Richardson* did not preclude plaintiffs' argument because the Court did not "directly address[] this precise question." *Id.*; *see also Legal Servs. for Prisoners with Children v. Bowen*, 170 Cal. App. 4th 447, 458 (Cal. Ct. App. 2009) (reaching the merits of the same question because the court could not "confidently conclude that the Supreme Court has" ruled on it).

**B.    Section 241 Violates the Equal Protection Clause Because It Falls Outside of Section 2's "Other Crime" Exemption**

Section 2's penalty of reduced representation has never been enforced, even "during the long period when voting rights were widely abridged." *Evenwel*, 136 S.Ct. at 1148-49 (Alito, J., concurring). While Section 2 was enacted to penalize states for restricting voting rights, it has been incorrectly construed as an express authorization for states to permanently disenfranchise millions of American citizens. This error of constitutional construction must be reversed.

**1.    "Abridge" Refers to a Temporary Limitation on the Right to Vote**

The word "abridge" in Section 2 refers to a restriction on the right to vote that is different from, and less severe than, the complete "denial" of the right to

vote.[10] The "core meaning" of the term "abridge" is to "shorten." *Reno v. Bossier*

*Parish Sch. Bd.*, 528 U.S. 320, 334-35 (1997); ROA.19-60662.2604-2606 (Noah

Webster, *An American Dictionary of the English Language* 105 (1828) (defining

"abridge" as "[t]o make shorter" or "[t]o lessen; to diminish")).

Legislative history sheds light on the definition of "abridge." *See*

*Richardson*, 418 U.S. at 43 (relying on "legislative history" to interpret Section 2).

Congress debated, but ultimately rejected, a provision temporarily disenfranchising

former Confederates. ROA.60662.2596-2602. Given this legislative context, the

phrase "or in any way abridged" must refer to the *temporary* loss of voting rights.

*See Richardson*, 418 U.S. at 54 ("The understanding of those who adopted the

Fourteenth Amendment . . . is of controlling significance" in interpreting Section

2.).

## 2.    The "Other Crime" Exemption Applies Only to Laws that "Abridge" the Right to Vote

In contrast to Section 2, the Fifteenth Amendment provides: "The right of

citizens of the United States to vote *shall not be denied or abridged* by the United

States or by any State on account of race, color, or previous condition of

servitude." U.S. Const. amend. XV (emphasis added). The Fifteenth Amendment

---

[10] *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 259–260 (5th Cir. 2016); *see also Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 359 (1997) (Souter, J., concurring in part and dissenting in part).

uses the combined phrase "shall not be denied or abridged" because it imposes the same conditions on both the denial and abridgement of the right to vote.

Section 2, passed just three years prior, separates the words "denied" and "abridged" because Section 2 establishes an exclusion—the "other crime" exemption—that applies only when the right to vote is "in any way abridged" but not when the right to vote "is denied." This construction is embedded in Section 2's grammatical structure. Because the "other crime" exemption immediately follows the phrase "or in any way abridged," it does not reach backwards to modify the distant words "is denied." *See Lockhart v. United States*, 136 S. Ct. 958, 962-63 (2016) ("[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012) ("When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent."); *see also Johnson v. Sayre*, 158 U.S. 109, 114 (1895) (the last phrase of the Fifth Amendment's first clause refers only to the phrase it immediately follows).

If Congress had intended the "other crime" exemption to apply to laws that deny the right to vote, and not solely to laws that abridge the right to vote, Congress would have addressed the denial and the abridgement of the right to vote

together—as it did in the Fifteenth Amendment.

### C.    Section 241 Cannot Satisfy Strict Scrutiny Review

Section 241 falls outside Section 2's "other crime" exemption because it permanently denies, rather than temporarily abridges, the right to vote on the basis of a felony conviction. Strict scrutiny review therefore applies. *See Dunn v. Blumstein*, 405 U.S. 330, 337 (1972) (strict scrutiny applies "if a challenged statute grants the right to vote to some citizens and denies the franchise to others"). Section 241 is not "necessary to promote a compelling state interest," nor "drawn with precision" to achieve any purported state interest using the "least drastic means." *Id.* at 337, 345-46 (a state's purported interest in the "purity of the ballot box" did not justify a lengthy durational residency requirement).

### V.    The District Court Erred in Holding that Mississippi's Standardless Legislative Process for the Case-by-Case Restoration of Voting Rights Does Not Violate the Equal Protection Clause

The district court incorrectly held that Mississippi's standardless legislative process for the case-by-case restoration of voting rights implicates "no recognized equal-protection rights." ROA.19-60662.4884. The district court reached this determination based on its erroneous view that "there is a substantive difference" between the equal protection standards applicable to reenfranchisement and disenfranchisement laws. ROA.19-60662.4881. In so concluding, the district court disregarded this Court's holding that the same standard of review under the Equal

Protection Clause—rational basis—applies to both felony disenfranchisement laws and laws providing for the restoration of voting rights. *See Shepherd*, 575 F.2d at 1114-15 ("[W]e conclude that selective disenfranchisement or re-enfranchisement of convicted felons must pass the standard level of scrutiny applied to state laws allegedly violating the equal protection clause.").

### A.  The District Court Incorrectly Relied on the Equal Protection Standards Governing Executive Clemency Regimes

The district court erroneously determined that Mississippi's standardless legislative process for the case-by-case restoration of voting rights is a "matter of clemency," and found no reason why it "should be treated any differently" for equal protection purposes than a discretionary executive clemency regime for the restoration of voting rights. ROA.19-60662.4881. But clemency is the "peculiar right of the executive branch of government." *Beacham v. Braterman*, 300 F. Supp. 182, 184 (S.D. Fla. 1969), *aff'd mem.*, 369 U.S. 12 (1969); *see also Cavazos v. Smith*, 565 U.S. 1, 8-9 (2011) (clemency is "a prerogative granted to executive authorities").

Unlike state legislation, the exercise of executive clemency is largely beyond the scope of judicial review. *Compare Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981) ("[P]ardon and commutation decisions . . . are rarely, if ever, appropriate subjects for judicial review."), *with Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2486 n.28 (2018) ("[W]hen a

49

federal or state law violates the Constitution, the American doctrine of judicial review requires us to enforce the Constitution."). The district court erred in relying on executive clemency jurisprudence—*Beacham v. Braterman* and *Hand v. Scott*—to reject Plaintiffs' equal protection challenge to Section 253.

In *Beacham*, the court held that Florida's discretionary executive clemency regime for the case-by-case restoration of voting rights does not violate the Equal Protection Clause because it is "part of the pardon power and as such is an act of executive clemency not subject to judicial control." 300 F. Supp. at 184. In *Hand*, the Eleventh Circuit stayed an injunction restricting the modern-day version of Florida's executive vote restoration process on the grounds that *Beacham* "establishes the broad discretion of the executive to carry out a standardless clemency regime." 888 F.3d 1206, 1208 (11th Cir. 2018).

*Beacham* and *Hand* do not apply to reenfranchisement laws, as confirmed by this Court's decision in *Shepherd*, which post-dates by nine years the Supreme Court's summary affirmance of the district court's decision in *Beacham*. This Court made no mention of *Beacham* in considering an equal protection challenge to "a Texas statute which provide[d] a mechanism for the re-enfranchisement of convicted state felons who satisfactorily complete[d] the terms of their probation without providing a similar mechanism for the reenfranchisement of successful federal probationers." *Shepherd*, 575 F.2d at 1111. Under *Shepherd*, laws

providing for the reenfranchisement of some individuals convicted of felonies and

not others "must bear a rational relationship to the achieving of a legitimate state

interest." *Id.* at 1115.

**B.    The District Court Failed to Determine Whether There Is a Rational Basis for Section 253's Classification Between Individuals Convicted of Felonies**

The district court found that Section 253 passes muster under the Equal

Protection Clause because it is "rationally related" to the "legitimate governmental

interest" in "excluding from the franchise" individuals who "violat[ed] those laws

sufficiently important to be classed as felonies." ROA.19-60662.4882 (quoting

*Shepherd*, 575 F.2d at 1115). But the district court failed to consider whether there

is a rational basis for Section 253's *classification* between the handful of

disenfranchised individuals who regain the right to vote, and the thousands of

others who must remain disenfranchised—as *Shepherd* requires.

In *Shepherd*, this Court expressly rejected "the proposition that [S]ection 2

[of the Fourteenth Amendment] removes all equal protection considerations from

state-created classifications denying the right to vote to some felons while granting

it to others." 575 F.2d at 1114. However, this Court found "the classifications

created by the Texas system" at issue survived rational basis review because Texas

state courts had access to far more information about state probationers and could

therefore better "gauge the progress and rehabilitation of" state probationers as

51

compared with federal probationers.[11] *Id.* at 1115.

This Court has since reiterated the requirement that a state's "classification of felons for voting restrictions must bear . . . a rational relation to the achieving of a legitimate state interest." *Williams v. Taylor*, 677 F.2d 510, 514 (5th Cir. 1982). Federal courts around the country are in accord. *See Harvey,* 605 F.3d at 1079 (a reenfranchisement law "can run afoul of the Equal Protection Clause. . . if it . . . distinguishes between groups [of individuals convicted of felonies] in a manner that is not rationally related to a legitimate state interest"); *Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983) (a state may "distinguish among [individuals convicted of felonies] provided that such distinction is rationally related to a legitimate state interest"); *Deuel v. Barrier*, No. CV 08-00144-S-LMB, 2009 WL 73734, at *3 (D. Idaho Jan. 8, 2009); *Johnson v. Bredesen*, 579 F. Supp. 2d 1044, 1052 (M.D. Tenn. 2008), *aff'd*, 624 F.3d 742 (6th Cir. 2010).

In *Owens*, the Third Circuit found that there was a rational basis for a Pennsylvania law that "permits unincarcerated felons to vote but denies that right to incarcerated felons." 711 F.2d at 27. The Third Circuit reasoned that

---

[11] The district court found it significant that the Texas system provided state courts with discretion to restore voting rights to state probationers. ROA.19-60662.4881. But the plaintiffs in *Shepherd* challenged only the selective availability of judicial reenfranchisement to state probationers and not federal probationers; they did not challenge the exercise of judicial discretion in restoring voting rights. *See Shepherd*, 575 F.2d at 1114 (explaining that the "distinction" between categories of convicted felons "is the very target of plaintiffs' equal protection claim").

"Pennsylvania could rationally determine that those convicted felons who had served their debt to society and had been released from prison or whose crimes were not serious enough to warrant incarceration in the first instance stand on a different footing from those felons who required incarceration, and should therefore be entitled to participate in the voting process." *Id.* at 28.

Here, the district court made no attempt to determine whether Mississippi's standardless legislative process for the restoration of voting rights *rationally* distinguishes between the tiny handful of individuals convicted of felonies who regain the right to vote, and the thousands of others who must remain forever disenfranchised. There cannot be any rational basis for the Mississippi Legislature's conclusion that during the six-year period from 2013 to 2018, just eighteen disenfranchised individuals merited the restoration of voting rights. ROA.19-60662.1922-1924. Nor could there be any rational basis for the Mississippi Legislature's failure to pass a proposed suffrage bill to restore voting rights to named plaintiff Herman Parker—nearly fourteen years after he had completed his sentence for a larceny conviction. ROA.19-60662.2143; ROA.19-60662.1903. Although Mr. Parker works for a municipal government agency, ROA.19-60662.940, the Mississippi Legislature determined that he was unworthy to vote for municipal government employees.

### C.    Mississippi's Arbitrary Legislative Process for the Restoration of Voting Rights Violates the Equal Protection Clause

In *Shepherd*, this Court held that a state reenfranchisement law may not "make a completely arbitrary distinction between groups of felons with respect to the right to vote." 575 F.2d at 1114. Other circuit courts agree. *See Harvey*, 605 F.3d at 1079 ("[A] state could not choose to re-enfranchise voters of only one particular race, or re-enfranchise only those felons who are more than six feet tall."); *Owens*, 711 F.2d at 27 (noting that a "state could not disenfranchise similarly situated blue-eyed felons but not brown-eyed felons"). This principle stems from *Richardson* itself, which remanded plaintiffs' equal protection claim challenging the "total lack of uniformity" in the enforcement of California's disenfranchisement law. 418 U.S. at 56; *see also Williams*, 677 F.2d at 515 (finding that *Richardson* "clearly recognized" that state officials "cannot discriminate arbitrarily among felons" in enforcing disenfranchisement laws).

Section 253 is inherently arbitrary because it establishes no standards for distinguishing between those who may regain the right to vote, and those who must remain disenfranchised. *See, e.g.*, *Browning-Ferris Indus. of Ala. Inc. v. Pegues*, 710 F. Supp. 313, 315 (M.D. Ala. 1987) ("It would be difficult to conceive of a statute which is more susceptible of arbitrariness in violation of the Fourteenth Amendment than one that gives absolute discretion to a legislature . . . .").

Here, there is no dispute that Section 253 vests the Mississippi Legislature

with the unrestricted "power to establish two classes" of individuals convicted of felonies, "those who may vote and those who may not." *Davis v. Schnell*, 81 F. Supp. 872, 878 (S.D. Ala. 1949) (striking down Alabama's standardless constitutional interpretation test), *aff'd*, 336 U.S. 933 (1949). "Such arbitrary power amounts to a denial of equal protection of the law." *Id.*

## VI.    The District Court Erred in Holding that Section 253 Does Not Violate the First Amendment

The district court incorrectly concluded that "[t]he First Amendment provides no greater protection for voting rights than is otherwise found in the Fourteenth Amendment."[12] ROA.19-60662.4879. But this is not a case in which Plaintiffs are challenging a *dis*enfranchisement law on First Amendment grounds.[13]

In the context of a standardless reenfranchisement law, the First Amendment and the Equal Protection Clause of the Fourteenth Amendment proscribe different constitutional violations: the Equal Protection Clause prohibits laws that arbitrarily

---

[12] Plaintiffs did not petition this Court for permission to appeal the question of whether a standardless reenfranchisement law violates the First Amendment. Plaintiffs have included argument on this issue because it was raised by Defendant in his brief, and in the event it is reached by the Court.

[13] *Hand v. Scott* is inapposite. There, the court found that because Florida's executive clemency regime "likely . . . does not violate the Equal Protection Clause . . . it is unlikely indeed that the same exercise of the pardon power violates the First Amendment." 888 F.3d at 1211. Here, however, Section 253 is not an "exercise of the pardon power"; it is legislation that, like any other legislation, can violate various provisions of the Constitution.

classify between categories of individuals convicted of felonies, while the First

Amendment prohibits laws that vest government officials with unfettered

discretion to determine who may engage in political speech by registering to vote

and casting a ballot, because of the risk of content-based discrimination. *Compare*

*Shepherd*, 575 F.2d at 1114-15, *with City of Lakewood v. Plain Dealer Publ'g.*

*Co.*, 486 U.S. 750, 759 (1988) (holding that "a facial challenge lies" when a law

governing First Amendment-protected speech vests a government official with

unbridled discretion, because of the possibility that the government official might

"discriminate . . . by suppressing disfavored speech or disliked speakers"). Instead

of "identifying . . . the claim's 'dominant' character," the district court was

required to "examine each constitutional provision in turn." *Soldal*, 506 U.S. at 70.

Because Section 253 provides no objective criteria for the Mississippi

Legislature to apply, it plainly allows for discrimination. *See, e.g.*, *United States v.*

*Atkins*, 323 F.2d 733, 740 (5th Cir. 1963) (enjoining the use of a standardless voter

registration questionnaire while affirming the district court's finding that the

questionnaire was not being discriminatorily applied, and reasoning that "there is a

cognizable danger that there would be some amount of discrimination" and it

would be "difficult, if not impossible, to determine whether the Board is

discriminating"). The possibility of content-based discrimination—even without

evidence of actual discrimination—is what renders Section 253 invalid under the

First Amendment. *See Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123,

133 n.10 (1992) ("[T]he success of a facial challenge . . . rests not on whether the

administrator has exercised his discretion in a content-based manner, but whether

there is anything preventing him from doing so.").

The cases cited by Defendant do not hold otherwise. None of these

decisions—including *Harvey v. Brewer* and this Court's decision in *Shepherd*—

concerned a First Amendment challenge to a reenfranchisement law that vests

government officials with unfettered discretion to determine who may vote and

who must remain disenfranchised.

## VII.  The District Court Erred in Denying Summary Judgment to Plaintiffs on the Race-Based Equal Protection Challenge to Section 253

The district court denied both parties' motions for summary judgment on

Plaintiffs' race-based equal protection challenge to Section 253 because it:

(i) found "conflicting evidence" as to the 1890 Mississippi Legislature's

discriminatory intent in enacting Section 253; and (ii) determined that "the record

is not sufficient to hold—as a matter of law" that the 1890 Mississippi Legislature

would have enacted Section 253 even absent discriminatory intent. ROA.19-

60662.4883. The district court's "findings are infirm because of an erroneous view

of the law."[14] *Pullman-Standard*, 456 U.S. at 292.

---

[14] Plaintiffs did not petition this Court for permission to appeal the legal standards
the district court applied when reaching these findings. Because Defendant has

## A.    The 1890 Mississippi Legislature Enacted Section 253 with Racially Discriminatory Intent

Like the evidence presented by the plaintiffs in *Hunter* concerning Alabama's 1901 constitutional convention, Plaintiffs provided extensive evidence that the delegates to the 1890 Constitutional Convention "set about to achieve [white supremacy] by settling on devices that would subvert the guarantees of the [F]ourteenth and [F]ifteenth [A]mendments without directly provoking a legal challenge." *Underwood v. Hunter*, 730 F.2d 614, 619 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985). ROA.19-60662.1793-1795; ROA.19-60662.1801-1804. The record is replete with evidence of racial animus by the delegates to the 1890 Constitutional Convention, including Senator James Z. George, who is "widely credited as a key architect of the 1890 Constitution's disenfranchisement provisions." ROA.19-60662.1798; ROA.19-60662.1824-1826; ROA.19-60662.1947-1958.

Senator George publicly advocated for a constitutional convention to "devise

---

appealed the question of whether Plaintiffs proved disproportionate impact as a matter of law, Plaintiffs respectfully submit that this Court should exercise its discretion to reach the additional legal questions Plaintiffs raise concerning the race-based equal protection challenge to Section 253. *See Castellanos-Contreras*, 622 F.3d at 399 (addressing, on an appeal pursuant to 28 U.S.C. § 1292(b), a "threshold" legal conclusion that was "critical and material to the district court's conclusion that there are fact issues").

.

such measures . . . as will enable us to maintain a home government, under the control of the white people of the State." ROA.19-6062.1948; ROA.19-60662.2291. He argued that "good government in Mississippi can come only from the predominance of influence and political power in the white race." ROA.19-60662.1956; ROA.19-60662.2295. At the same time, Senator George often used traits such as goodness and intelligence as coded reference to race. For instance, he testified before Congress that the purpose of the 1890 Constitutional Convention was "to correct the evil, not of negro suffrage *per se*, but of ignorant and debased suffrage." ROA.19-60662.1826.

In addition to evidence of discriminatory intent concerning the franchise-related provisions of the 1890 Constitution as a whole, Plaintiffs also presented the testimony of expert historian Dorothy Pratt, who opined that Section 253 was enacted to provide a mechanism for the selective restoration of voting rights to white disenfranchised individuals. ROA.19-60662.1794. Defendant did not submit an expert report contradicting or challenging Dr. Pratt's testimony.[15]

The only evidence in the record of a race-neutral purpose for Section 253 is

---

[15] Defendant posits that Plaintiffs are required to provide direct evidence that Section 253 was enacted with discriminatory intent. But as this Court has recognized, "requir[ing] direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions." *Veasey*, 830 F.3d at 235-36.

Senator George's contention that "if someone had straightened out his life then he should deserve [a] reprieve from the strictures prohibiting the franchise to those convicted of certain crimes." Def.-Br. at 33 (quoting ROA.19-90662.1817-1818); ROA.19-60662-4301. In *Veasey v. Abbott*, this Court instructed that factfinders should not "ignore the reality that neutral reasons can and do mask racial intent." 830 F.3d 216, 236 (5th Cir. 2016).

But the district court failed to consider Senator George's rationale for Section 253 in the context of the 1890 Constitutional Convention. *See id.* at 239-40 (finding it probative that "the same Legislature that passed SB 14 also passed two laws found to be passed with discriminatory purpose"); *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 225 (4th Cir. 2016) ("a holding that a legislature impermissibly relied on race certainly provides relevant evidence as to whether race motivated other election legislation passed by the same legislature"). The district court also disregarded Senator George's documented history of racial animus. *See, e.g.*, *City of Carrolton Branch of the NAACP. v. Stallings*, 829 F.2d 1547, 1551, 1563 (11th Cir. 1987) (a legislator's speech that "[t]his is a white man's country and we must keep it that way" "raise[d] an inference of an unconstitutional motive" with respect to legislation he sponsored).

The district court also made no effort to determine whether Senator George's race-neutral explanation for Section 253 was plausible. It is beyond dispute that

Section 241's criminal disenfranchisement provision was motivated by racial animus. ROA.19-60662.1815-1816; *Ratliff*, 20 So. at 868. The district court did not question why the same delegates that aimed to selectively disenfranchise black Mississippians convicted of certain crimes would have wanted to reenfranchise without regard to race. *See, e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (declining to credit a purported justification for a government action where there was a "significant mismatch" between the government action and "the rationale . . . provided").

If the district court had viewed Senator George's purported race-neutral justification for Section 253 in context, as it was required to do, the district court would have been constrained to conclude that Senator George's rationale was entirely pretextual. *See Foster v. Chatman*, 136 S. Ct. 1737, 1754 (2016) (rejecting a race-neutral justification in view of "all of the circumstantial evidence that bears upon the issue of racial animosity"); *see also Veasey*, 830 F.3d at 236 (citing *Foster*, and explaining that "[c]ontext matters" when evaluating "seemingly legitimate reasons" for allegedly racially discriminatory actions). Senator George's pretextual justification provides further evidence that Section 253 was racially motivated. *See Snyder v. Louisiana*, 552 U.S. 472, 485 (2008) (a "pretextual explanation naturally gives rise to an inference of discriminatory intent").

## B. The 1890 Mississippi Legislature Would Not Have Enacted Section 253 Absent Racially Discriminatory Intent

"Once racial discrimination is shown to have been a substantial or motivating factor behind enactment of [a] law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228. The district court erroneously considered evidence concerning the Mississippi Legislature's failure to amend Section 253 in 1986—nearly a hundred years after Section 253's original enactment— in assessing Defendant's "final burden under *Hunter*." ROA.19-60662.4883. This approach was flawed for several reasons.

First, under this Court's decision in *Cotton v. Fordice*, the only legally relevant intent is that of the legislature which enacted or amended the provision at issue. 157 F.3d at 391-92. When a subsequent legislature enacts "substantial, race-neutral alterations in an old unconstitutional law," then "the state of mind of the subsequent legislature must . . . be considered." *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018) (citing *Cotton*); *see also Johnson*, 405 F.3d at 1225 (assessing the intent of Florida's 1968 legislature, rather than Florida's 1868 legislature, because the 1968 legislature "substantively altered and reenacted" the state's felony disenfranchisement provision). But where, as here, a law has never been amended, the court must confine its analysis to the intent of the original legislature. *See Hunter*, 471 U.S. at 232-33; *see also Cotton*, 157 F.3d at 391 (explaining that

if Section 241's original enactment in 1890 had been "the end of the [legislative] story," this Court would have been "bound by *Hunter*" to consider only the intent of the 1890 Mississippi Legislature).

Second, *Hunter* does not permit a state to meet its burden simply by showing that a *subsequent* legislature might have enacted the challenged law for race-neutral reasons. Rather, *Hunter* requires courts to consider whether the legislature that enacted the challenged law would have done so "in the absence of the racially discriminatory motivation." *Hunter*, 471 U.S. at 231; *see also Underwood*, 730 F.2d at 617, 621 (considering the motivations of the 1901 Alabama legislature to determine whether "the same decision would have resulted had the impermissible purpose not been considered").

Third, the 1986 Mississippi Legislature's failure to amend Section 253 has no relevance to the question of whether the 1890 Mississippi Legislature would have enacted Section 253 absent racially discriminatory intent. *See, e.g.*, *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("a proposal that does not become law" "is a hazardous basis for inferring the intent of an earlier Congress"); *Med. Ctr. Pharm. v. Mukasey*, 536 F.3d 383, 400-01 (5th Cir. 2008) ("[A]bsent a valid amendment to alter the statutory structure, the opinion of the 1997 Congress informs us little in deciding what the 1937 Congress intended . . . ."). As a matter of both law and logic, the motivations of the 1986 Mississippi

Legislature in failing to amend Section 253 cannot be imputed to the 1890

Mississippi Legislature. *Cf. Johnson*, 405 F.3d at 1226 ("It is not reasonable to

assign any impermissible motives held by the 1868 Florida legislators to the 1968

legislators who voted for the present felon disenfranchisement provision.").

Finally, nothing in *Hunter* supports Defendant's contention that "proving

different state lawmakers subsequently *endorsed* the present scheme—without

discriminatory motivation—may discharge the State's burden." Def.-Br. at 35

(citing *Hunter*) (emphasis added). *Hunter* simply left open the question of whether

the challenged disenfranchisement law "would be valid if *enacted* today without

any impermissible motivation." *Hunter*, 471 U.S. at 233 (emphasis added). Even if

evidence of subsequent legislative "endorsement" had any relevance to the *Hunter*

analysis, which it does not, the 1986 Mississippi Legislature's failure to amend

Section 253 cannot be construed as an "endorsement" of Section 253. *See, e.g.*,

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1015 (2017)

(declining to infer legislative intent from a "history of failed legislation" because

"congressional inaction lacks persuasive significance in most circumstances");

*Perez v. United States*, 167 F.3d 913, 916-17 (5th Cir. 1999) (ascribing no

significance to Congress's "failure to amend [a] statute," and reasoning that

"deductions from congressional inaction are notoriously unreliable"). Adopting

Defendant's argument would mean that any legislature could defeat an equal

protection challenge to a law motivated by discriminatory intent simply by considering and rejecting a proposal to amend that law. Such a holding would effectively eviscerate *Hunter*.

### C.    Section 253 Has Never Been Amended or Reenacted

Defendant has admitted that Section 253 has never been amended. ROA.19-60662.1992. However, Defendant now contends, for the first time, that "present-day Mississippi legislators endorse both the substance and procedure of Section 253 each time they exercise their authority to pass a suffrage bill by a two-thirds vote of the Legislature." Def.-Br. at 38. In essence, Defendant is claiming that the Mississippi Legislature reenacts Section 253 every time it votes to restore a disenfranchised individual's voting rights. But Section 253 is no ordinary statute that can be "reenacted" with a simple two-thirds vote of both houses of the Mississippi Legislature, as is required to pass a suffrage bill. Rather, Section 253 is a provision of the Mississippi Constitution that may only be reenacted through a multi-step "deliberative process" that includes public notice of the reenactment by the Secretary and a vote in favor of the reenactment by a majority of the state's electorate. *See Cotton*, 157 F.3d at 391 (discussing Section 241's reenactments); *see also* MISS. CONST. art. 15, § 273.

Moreover, under this Court's precedent, only an "intervening reenactment *with meaningful alterations* may render the current law valid." *Chen v. City of*

*Houston*, 206 F.3d 502, 521 (5th Cir. 2000) (emphasis added). The Supreme Court

has also signaled that a wholesale reenactment would not purge a statute of its

original discriminatory intent. *See Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018)

(rejecting an equal protection challenge to a Texas redistricting plan that

substantively changed a prior version of the plan, and reasoning that the case

before it was not one in which "a law originally enacted with discriminatory intent

is later reenacted by a different legislature"). This stands to reason, as a legislature

might otherwise "seek to insulate from challenge a law known to have been

originally enacted with a discriminatory purpose by (quietly) reenacting it without

significant change." *Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010).

### D.    Section 253 Disproportionately Impacts Black Mississippians

"When plaintiffs contend that a law was motivated by discriminatory intent,"

plaintiffs need not "[s]how[ ] . . . overwhelming impact" because "disproportionate

impact is not 'the sole touchstone' of the claim." *N.C. State Conference of the

NAACP*, 831 F.3d at 231 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

Plaintiffs must simply demonstrate that the law "bears more heavily on one race

than another." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

266 (1977) (quoting *Washington*, 426 U.S. at 242).

Here, Plaintiffs presented undisputed expert testimony that black

Mississippians comprise a disproportionate percentage of disenfranchised

individuals who have completed their sentences. ROA.19-60662.1771-1773.

Section 253 thus bears more heavily on the black community because "it is the one

with the highest percentage of presumptively eligible" potential applicants. *Smith*

*v. Town of Clarkton,* 682 F.2d 1055, 1065-66 (4th Cir. 1982) (holding that a town's

racially discriminatory decision to abandon a public housing project

disproportionately impacted black individuals); *see also Arlington Heights*, 429

U.S. at 269 (denial of rezoning request did "arguably bear more heavily on racial

minorities," who constituted "40% of the income groups said to be eligible for" the

proposed housing). Put differently, black Mississippians are disproportionately

subject to Section 253's requirements. *See N.C. State Conference of the NAACP*,

831 F. 3d at 231 (finding a voter identification law disproportionately impacted

African Americans because they "disproportionately lacked the photo ID

required"). Plaintiffs are not required to prove that "proportionally, more

Caucasians receive suffrage bills than African Americans," as Defendant claims.

Def.-Br. at 29.

> ### 1.    Plaintiffs Do Not Have to Prove Section 253's Present-Day Discriminatory Application

Defendant alternatively argues that Plaintiffs must prove that "present-day

legislators enforce their Section 253 authority in a discriminatory fashion." Def.-

Br. at 30. In so contending, Defendant incorrectly conflates the elements of two

separate types of equal protection challenges to facially neutral laws. First,

plaintiffs can demonstrate "that the government has applied [the law] . . . in an intentionally discriminatory manner." *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 63 (D.C. Cir. 2016). Second, plaintiffs can show that the law was "motivated by a racially discriminatory purpose" and has a "racially disproportionate impact." *Id.* In *McCleskey v. Kemp*, a case relied on by Defendant, the plaintiff presented "no evidence" that the challenged law was enacted "to further a racially discriminatory purpose." 481 U.S. 279, 298 (1987). The Court therefore held that the plaintiff could only prevail by proving the law's discriminatory application. *Id.* at 292-93.

Here, Plaintiffs have proved that Section 253 was enacted with discriminatory intent and has a disproportionate impact. Plaintiffs do not have to prove present-day discriminatory application in order to prevail.[16] *See Underwood*, 730 F.2d at 621 (holding that Alabama's racially motivated criminal disenfranchisement law violated the Equal Protection Clause even though the registrars were "administering the statute without reference to race" when plaintiffs brought suit).

---

[16] Defendant cites no authority for the proposition that Plaintiffs must prove Section 253's present-day discriminatory application because the law is not "self-enforcing" but instead "requires the action of the *present-day* Mississippi Legislature to be implicated." Def.-Br. at 30.

# CONCLUSION

For the foregoing reasons, the district court's decision should be reversed.


Dated: October 30, 2019


By:   /s/  Jonathan K. Youngwood


SOUTHERN POVERTY LAW CENTER
Paloma Wu
111 East Capitol Street, Suite 280
Jackson, MS 39201
Tel: (601) 948-8882
Paloma.Wu@splcenter.org

Lisa Graybill
1055 St. Charles Avenue
New Orleans, LA 70130
Tel: (504) 486-8982
Lisa.Graybill@splcenter.org

Nancy G. Abudu
Caren E. Short
P.O. Box 1287
Decatur, GA 30031
Tel: (404) 521-6700
Nancy.Abudu@splcenter.org
Caren.Short@splcenter.org

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood
Janet A. Gochman
Isaac M. Rethy
Nihara K. Choudhri
Tyler Anger
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
nchoudhri@stblaw.com
irethy@stblaw.com
tyler.anger@stblaw.com


*Attorneys for Plaintiffs-Appellees*
*Cross-Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that, on October 30, 2019, an electronic copy of the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit and served on counsel for Defendant-Appellant-Cross-Appellee using the appellate CM/ECF system.

Dated:          October 30, 2019

s/ Jonathan K. Youngwood
Jonathan K. Youngwood
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3539
jyoungwood@stblaw.com

# CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, it contains 15,208 words.

Undersigned counsel certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Fifth Circuit Rule 32.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

Dated:        October 30, 2019

                             s/ Jonathan K. Youngwood
                             Jonathan K. Youngwood
                             SIMPSON THACHER & BARTLETT LLP
                             425 Lexington Avenue
                             New York, NY 10017
                             Tel: (212) 455-3539
                             jyoungwood@stblaw.com