NO. 19-60662

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

DENNIS HOPKINS, individually and on behalf of a class of all others similarly situated,

Plaintiffs-Appellees,

v.

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

Defendant-Appellant.

(Continuation of Caption on Following Page)

---

On Appeal from the United States District Court for the
Southern District of Mississippi

**BRIEF OF *AMICUS CURIAE***
**THE AMERICAN PROBATION AND PAROLE ASSOCIATION**
**IN SUPPORT OF PLAINTIFF-APPELLEES AND REVERSAL**

ASHLEY I. KISSINGER
BALLARD SPAHR LLP
5480 Valmont Road, Suite 200
Boulder, CO 80301-2369
kissingera@ballardspahr.com
(303) 379-2275

LOUIS P. PETRICH
BALLARD SPAHR LLP
2029 Century Park East, Suite 900
Los Angeles, CA 90067-2909
petrichl@ballardspahr.com
(424) 204-4400

Counsel for *Amicus Curiae*
The American Probation and Parole Association

No. 19-60662

───────────────────────────────

HERMAN PARKER, JR., individually and on behalf of a class of all others
similarly situated; WALTER WAYNE KUHN, JR., individually and on behalf of a
class of all others similarly situated; BYRON DEMON COLEMAN; individually
and on behalf of a class of all others similarly situated; JON O'NEAL, individually
and on behalf of a class of all others similarly situated; EARNEST WILLHITE,
individually and on behalf of a class of all others similarly situated,

Plaintiffs-Appellees

───────────────────────────────

Consolidated with No. 19-60678

───────────────────────────────

DENNIS HOPKINS, individually and on behalf of a class of all others similarly
situated; HERMAN PARKIER, JR., individually and on behalf of a class of all
others similarly situated; WALTER WAYNE KUHN, JR.; individually and on
behalf of a class of all others similarly situated; BYRON DEMOND COLEMAN,
individually and on behalf of a class of all others similarly situated; JOHN
O'NEAL, individually and on behalf of a class of all others similarly situated;
EARNEST WILLHITE, individually and on behalf of a class of all others similarly
situated,

Plaintiffs-Appellees Cross-Appellants

V.

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

Defendant-Appellant Cross-Appellee

───────────────────────────────

## CERTIFICATE OF INTERESTED PARTIES
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 29(a) and 5th Cir. R. 29.2, the undersigned hereby certifies that, in addition to the Certificate of Interested Persons and Corporate Disclosure Statements submitted by Plaintiff-Appellees and Defendant-Appellant, the following persons or entities have an interest in the outcome of this case:

American Probation and Parole Association, *Amicus Curiae*

Kissinger, Ashley, *Attorney for Amicus Curiae*

Petrich, Louis, *Attorney for Amicus Curiae*

Sakai, Joseph, *Attorney for Amicus Curiae*

**A. Corporate Disclosure Statement**

Pursuant to Fed. R. App. P. 29(4)(A), *Amicus Curiae* states that it is not a corporation, has no separate parent organization, and has no stockholders.

Undersigned counsel of record certifies that the American Probation and Parole Association is the only entity that has an interest in this *amicus* brief, which is filed in support of the Plaintiffs-Appellees. No counsel for any party authored any portion of this brief. No party, and no person other than the American Probation and Parole Association and its counsel, contributed monetarily to the preparation of this *amicus* brief.

i

These representations are made in order that the judges of this Court may evaluate their possible recusal or disqualification as provided by Fifth Circuit Rules 29.2 and 28.2.1.

SO CERTIFIED, this the 6th day of November, 2019.


/s/ Ashley Kissinger

Counsel for *amicus curiae*

# **TABLE OF CONTENTS**

Page

IDENTITY AND INTERESTS OF AMICUS CURIAE ........................................... 1

SUMMARY OF ARGUMENT .................................................................. 4

ARGUMENT ........................................................................................ 5

    I.    ARBITRARY DISENFRANCHISEMENT OF PEOPLE WHO
        HAVE COMMITTED OFFENSES UNDERMINES THEIR
        SUCCESSFUL REINTEGRATION AND HARMS THEIR
        COMMUNITIES ............................................................................. 5

        A.    The Impact of Mississippi's Disenfranchisement Practices ....... 5

        B.    Arbitrarily Disenfranchising Citizens Prevents People With
                Criminal Records from Fully Rejoining Society ...................... 8

        C.    Arbitrarily Disenfranchising Citizens Who Have
                Committed Felonies Harms Their Families and
                Communities ......................................................................... 10

        D.    Granting People With Criminal Records the Right to Vote
                Enhances Public Safety ......................................................... 11

    II.    MISSISSIPPI'S FELON DISENFRANCHISEMENT IS
         HISTORICALLY PREMISED ON RESTRICTING THE
         VOTING RIGHTS OF AFRICAN AMERICANS ........................... 12

    III.    PROBATION AND PAROLE OFFICERS—THOSE CLOSEST
          TO UNDERSTANDING THE INTERESTS AT STAKE—
          ADVOCATE FOR GRANTING THE FRANCHISE TO
          OFFENDERS ................................................................................ 15

CONCLUSION .................................................................................... 17

CERTIFICATE OF COMPLIANCE ....................................................... 18

STATEMENT OF RELATED CASES ..................................................... 19

iii

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Farrakhan v. Gregoire*,
  623 F.3d 990 (9th Cir. 2010) .................................................................2

*Hand v. Scott*,
  Case No. 18-11388 (11th Cir. June 28, 2018) ....................................2

*Ratliff v. Beale*,
  20 So. 863 (Miss. 1896).........................................................................5

*Voice of the Ex-Offender v. State of Louisiana*,
  Dkt. No. 2017-CA-1141, 2018 La. App. LEXIS 885 (La. Ct. App.
  May 9, 2018).............................................................................................2

**STATUTES**

Miss. Laws 1950, Chapter 569 .................................................................5

Miss. Laws 1968, Chapter 614 .................................................................5

**REGULATIONS**

State of New York, Executive Chamber, Exec. Order No. 181,
  *Restoring the Right to Vote for New Yorkers on Parole* (Apr. 18,
  2018), https://on.ny.gov/2N6sUft .......................................................9

*Voting Rights Bill for Some Louisiana Felons Wins Passage,* U.S.
  News & World Report, May 17, 2018, https://bit.ly/2tIOe1N;
  Office of the Governor of Louisiana, *Notice: Bills Signed, Vetoed
  by Gov. Edwards* (June 5, 2018), https://bit.ly/2tKPNw6...................10

**CONSTITUTIONAL PROVISIONS**

Miss. Const. Article XII, § 241.................................................................5

Miss. Const. Article XII, § 253.................................................................7

Mississippi Constitution § 241..............................................................5, 7

OTHER AUTHORITIES

Am. Corr. Ass'n, *Public Correctional Policy on Restoration of Voting Rights for Felony Offenders 2005-3* .................................................15

Am. Probation & Parole Ass'n, *Reslution Supporting Restoration of Voting Rights* (Sept. 2007)....................................................................2

Amy Heath, *Cruel and Unusual Punishment: Denying Ex-Felons the Right to Vote* .........................................................................................11, 12

Arman McLeod, et al., *The Locked Ballot Box: The Impact of* ...............11

Camila DeChalus, *In Virginia, Ex-Felons Find Empowerment in the Voting Booth* ................................................................................................9

Cent. Ky. News-J. (Jan. 28, 2007) ...........................................................16

*Changing Virginia*, The Atlantic, Jan. 8, 2018, https://bit.ly/2CTIpVO..................9

Christopher Uggen & Jeff Manza, *Voting and Subsequent Crime and Arrest: Evidence from a Community Sample*, 36 Colum. Hum. Rts. L. Rev. 193, 213 (2004) ............................................................................12

Christopher Uggen, Jeff Manza, & Angela Behrens, *'Less Than the Average Citizen': Stigma, Role Transition and the Civic Reintegration of Convicted Felons* ..........................................................8

Christy A. Visher & Jeremy Travis, *Transitions from Prison to Community: Understanding Individual Pathways* .............................8

*Democracy Restoration Act of 2009: Hearing on H.R. 3335 Before the Subcomm. On the Constitution, Civil Rights & Civil Liberties of the H. Comm. on the Judiciary*, 111th ...................................................2

Eric Plutzer, *Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood* ...............................................................10

Guy Padraic Hamilton-Smith & Matt Vogel, *The Ballot as Bulwark: The Impact of Felony Disenfranchisement on Recidivism* 1 (Aug. 30, 2011), https://goo.gl/jGTmcm ...................................................12

Guy Padraic Hamilton-Smith & Matt Vogel, *The Violence of Voicelessness: The Impact of Felony Disenfranchisement on Recidivism*, 22 La Raza L. J. 407, 413 (2015) .................................................. 12

*Hearing on the Democracy Restoration Act of 2009*, *supra* n. 3 ........................... 15

Holona Leanne Ochs, *"Colorblind" Policy in Black and White: Racial Consequence of Disenfranchisement Policy* ............................................. 8

Laura Vozzella, *Va. Gov. McAuliffe Says He Has Broken U.S. Record for Restoring Voting Rights*, Wash. Post, Apr. 27, 2017 ..................................... 9

Leah Sakala, Prison Policy Initiative, *Breaking Down Mass Incarceration in the 2010Census: State-by-State Incarceration Rates by Race/Ethnicity* (May 28, 2014), https://www.prisonpolicy.org/reports/rates.html ................................. 13

Marc Mauer, *Disenfranchising Felons Hurts Entire Communities* ........................ 11

Martha Guarnieri, *Civil Rebirth: Making the Case for Automatic Ex-Felon Vote Restoration*, 89 Temp. L. Rev. 451, 480-81 (2017) ......................... 11

Mississippi Freedom Democratic Party, *Statistics of Negro and White Voter Registration in the Five Congressional Districts of Mississippi* (1964) ............................................................................... 13

Nat'l Black Police Ass'n, *Resolution on Restoring Voting Rights* (June 1, 2008) ........................................................................................... 15

*on African American Voting Behavior and Implications for Reform*, 11 Va. J. Soc. Pol'y & L. 66, 80 (2003) ............................................. 11

Paroling Auths. Int'l, *Resolution on Restoring Voting Rights* (Apr. 30, 2008) ............................................................................................. 15

President George W. Bush, *State of the Union Address* .......................................... 16

*Public Correctional Policies* 73 (Jan. 25, 2017), https://bit.ly/2gbSHYg .................................................................... 15

R. David Stengel, *Let's Simplify the Process for Disenfranchised Voters* ....................................................................................... 16

*Restoring the Right to Vote*, *supra* n. 24 ................................................................ 16

Sam Levine, *In Virginia, Ex-Felons Voted for the First Time After Regaining Their Rights* ............................................................. 9

Sentencing Project, *Felony Disenfranchisement in Mississippi* (Feb. 13, 2018) https://www.sentencingproject.org/publications/felony-disenfranchisement-mississippi/ .................................................... 6, 7

Shadd Maruna, *Making Good: How Ex-convicts Reform and Rebuild Their Lives* (2001) ......................................................................... 8

*Vote*, Brennan Ctr. For Justice, at 13 (2009), https://goo.gl/Gr5pMG .................. 10

## IDENTITY AND INTERESTS OF AMICUS CURIAE

The American Probation and Parole Association ("APPA") respectfully submits this brief as amicus curiae in support of Plaintiffs-Appellees. The APPA is an international association of professionals who work in probation, parole, and community-based corrections. The APPA is a non-profit organization founded in Houston, Texas in 1974 and is now based in Lexington, Kentucky. The APPA's membership in the United States includes more than 1,700 individual probation or parole officers, and more than 200 state and local probation and parole agencies, who together employ more than 25,000 probation and parole professionals. All told, the APPA represents the interests of the probation and parole officers who supervise more than five million individuals on probation and parole.

The APPA provides training, education, and technical assistance to its members in support of its mission to promote a fair and effective system of community justice for individuals in the parole and probation system. The APPA conducts two major conferences each year; publishes a quarterly journal, *Perspectives*, dedicated to issues of concern to the probation and parole community; and conducts both on-site and online training programs for its members on a year-round basis.

As part of its work, the APPA has focused on ways in which the parole and probation systems can be improved to better reintegrate offenders back into society.

The APPA has found that restoring the right to vote to people with criminal records who have been released from incarceration is of critical importance to that mission. As detailed below, providing released offenders with the right to vote gives them an important stake in the community, allows them to reintegrate as full-fledged members of the community rather than second-class citizens, allows them to teach their children the importance of voting, and provides many other community benefits. Accordingly, in 2007, the APPA adopted a formal resolution advocating for the full "restoration of voting rights upon completion of an offender's prison sentence," and for no loss of voting rights while on community supervision."[1]  In addition, the Executive Director of the APPA has testified before Congress on the importance of restoring voting rights.[2]  The APPA has also filed an amicus brief in at least three other cases in support of restoring voting rights to people with criminal records.[3]

The APPA thus has deep knowledge of the parole and probation systems in Mississippi and elsewhere around the country, and a strong commitment to the

---

[1] Am. Probation & Parole Ass'n, *Reslution Supporting Restoration of Voting Rights* (Sept. 2007), goo.gl/zz5uCj.
[2] *Democracy Restoration Act of 2009: Hearing on H.R. 3335 Before the Subcomm. On the Constitution, Civil Rights & Civil Liberties of the H. Comm. on the Judiciary*, 111th Cong. 59 (2010) (statement of Carl Wicklund, Exec. Dir., Am. Probation & Parole Ass'n).
[3] *See Farrakhan v. Gregoire*, 623 F.3d 990 (9th Cir. 2010); *Voice of the Ex-Offender v. State of Louisiana*, Dkt. No. 2017-CA-1141, 2018 La. App. LEXIS 885 (La. Ct. App. May 9, 2018); *Hand v. Scott*, Case No. 18-11388 (11th Cir. June 28, 2018).

importance of voting rights to the reintegration of people who have committed offenses into the community. In this light, the APPA respectfully submits this brief to emphasize the importance of restoring the right to vote to individuals upon their release from prison, to explain how arbitrarily disenfranchising citizens following completion of their sentence, probation, and/or parole does not serve – and in fact undermines – the rehabilitation and reintegration of offenders and negatively impacts their communities.

# SUMMARY OF ARGUMENT

This brief will focus on the devastating practical impact of Mississippi's policies and practices regarding felon disenfranchisement. As we show below, the disenfranchisement of people who have committed offenses undermines their successful reintegration into the community, and harms them, their families, their children and their communities. The exercise of the right to vote entails far more than a simple act of casting a ballot. Voting is one of the basic foundations of citizenship and provides a tangible pathway to responsible civic engagement for people who have committed offenses and their families. Denying released offenders this basic right takes away their full dignity as citizens, separates them from the rest of their community, and reduces them to second-class citizens. It makes their reintegration into society more difficult, increases recidivism and social ostracism, lowers community participation in the political process, and hinders effective policing.

## ARGUMENT

I.    **ARBITRARY DISENFRANCHISEMENT OF PEOPLE WHO HAVE COMMITTED OFFENSES UNDERMINES THEIR SUCCESSFUL REINTEGRATION AND HARMS THEIR COMMUNITIES**

### A. The Impact of Mississippi's Disenfranchisement Practices

Section 241 of the Mississippi Constitution automatically disenfranchises any individual convicted of one of the following crimes: "murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy."[4] While Appellees do not object to automatic disenfranchisement based on rape or murder, which were added to the list only in 1968, the rest of the list is premised on the intent of the 1890 state legislature to disenfranchise black male voters.

Upon ratifying Section 241, Mississippi legislators crafted a list of crimes to include those crimes which were more often prosecuted against black men than white men.[5] Crimes in the original list have a tenuous—if any—connection to the right to vote. The state legislature has amended the list only twice since ratification. In 1950, the legislature removed burglary,[6] and in 1968 added rape and murder.[7] Neither amendment did anything to address the law's original race-based

---

[4] Miss. Const. art. XII, § 241.
[5] *See Ratliff v. Beale*, 20 So. 863, 868 (Miss. 1896) (explaining that the framers aimed to disenfranchise black voters by targeting "the offenses to which its weaker members were prone.").
[6] Miss. Laws 1950, ch. 569.
[7] Miss. Laws 1968, ch. 614.

motivation. The original list was invented at the same time as other voting restrictions designed to limit minority voter participation, such as literacy tests and residency requirements that were common throughout the American South during Reconstruction. Today, Mississippi is one of only twelve states that imposes a lifetime voting ban on all individuals convicted of a crime deemed worthy of disenfranchisement.[8]

Under Mississippi law, the process to reinstate voting rights after a conviction is onerous and ineffective. A disenfranchised voter has two options to seek restoration of his or her rights: a gubernatorial pardon or a "suffrage bill" passed by a two-thirds majority of the state legislature. Section 253 of the Constitution sets forth the latter option, which only restored the rights of 14 individuals between 2014 and 2017.

In order to have voting rights restored by the legislature, a disenfranchised individual must first ask his or her legislator to act as a sponsor. Then the individual's information is submitted to the Suffrage Subcommittee of the chamber's Judiciary Committee, where a background check is performed in coordination with the State Department of Corrections. The Chair of the Judiciary Committee then subjectively

---

[8] The Sentencing Project, *Felony Disenfranchisement in Mississippi* (Feb. 13, 2018) https://www.sentencingproject.org/publications/felony-disenfranchisement-mississippi/.

selects which applications may be voted on by the full committee. If the bill passes the committee, it then must pass the entire chamber by a two-thirds vote.[9] If it survives, the bill proceeds to the second chamber of the legislature. Finally, a bill that obtains committee approval and a two-thirds floor vote in the second house must be signed into law by the Governor. In at least one recent legislative session in 2016, the legislature did not reinstate the voting rights of a single disenfranchised citizen. And in most years of the last decade, more suffrage bills have failed than have passed.[10]

Evidence shows that the law, originally intended to disenfranchise black men, has accomplished its goal. Statewide, black adults are 2.7 times more likely than white adults to have their voting rights revoked under Section 241. From 2000 to 2015, only 335 people had their voting rights restored, leaving 166,159 people who completed their sentence yet were still unable to exercise the right to vote.[11] All told, nearly one out of every ten adults in Mississippi is disenfranchised due to a felony conviction.[12] That is more than triple the national rate.

---

[9] Miss. Const. art. XII, § 253.
[10] The Sentencing Project, *Felony Disenfranchisement in Mississippi* (Feb. 13, 2018) https://www.sentencingproject.org/publications/felony-disenfranchisement-mississippi/.
[11] *Id.*
[12] *Id.*

## B. Arbitrarily Disenfranchising Citizens Prevents People With Criminal Records from Fully Rejoining Society

It is well-documented that civic engagement plays a vital role in the successful transformation from prisoner to citizen.[13]   When an individual identifies as a responsible citizen, including participation in volunteer work, community involvement and voting, it benefits his or her transition back into the community. "People who are part of the decision making process not only have a greater investment in the decisions, but a greater investment in society as well . . . Those who participate in the democratic process have a greater investment in the resulting decisions, and more importantly, an investment in preserving that process."[14]   One study found that the "desire to 'be productive and give something back to society'" was critical to full reintegration into the community.[15]   The restoration of voting rights for people who with criminal records sends a message that they have repaid their debt to society and are being welcomed back as valuable members of their communities.

---

[13] Christy A. Visher & Jeremy Travis, *Transitions from Prison to Community: Understanding Individual Pathways*, 299 Ann. Rev. Soc. 89, 97 (2003).

[14] Holona Leanne Ochs, *"Colorblind" Policy in Black and White: Racial Consequence of Disenfranchisement Policy*, 34 Pol'y Stud. J. 81, 89 (2006).

[15] Christopher Uggen, Jeff Manza, & Angela Behrens, *'Less Than the Average Citizen': Stigma, Role Transition and the Civic Reintegration of Convicted Felons*, in *After Crime and Punishment: Pathways to Offender Reintegration* 263 (Shadd Maruna & Russ Immarigeon eds., 2004) (quoting Shadd Maruna, *Making Good: How Ex-convicts Reform and Rebuild Their Lives* (2001)).

This has been evident recently in Virginia, where former Governor Terry McAuliffe restored the voting rights of more than 170,000 formerly incarcerated citizens between 2013 and 2018.[16]  Many of these individuals voted recently for the first time since their imprisonment, and their comments on that experience reflect the great personal and civic impact of their ability to participate in our democracy. LaVaughn Williams, who had not voted in decades, said after voting, "I now felt like a citizen.  I now felt like I will make a difference in some kind of way."[17] Muhamad As-saddigue Abdul Rahman voted for the first time in his life at age 53, having been imprisoned for a felony at age 16.  Abdul-Rahman explained: "[H]aving my right to vote back has made me feel whole as a human being."[18]

Other states, including New York and Louisiana have achieved similar goals through executive and legislative processes.  In April 2018, New York Governor Andrew Cuomo signed an Executive Order resorting voting rights to individuals on parole supervision.[19]  In May 2018, Louisiana enacted legislation automatically

---

[16] Laura Vozzella, *Va. Gov. McAuliffe Says He Has Broken U.S. Record for Restoring Voting Rights*, Wash. Post, Apr. 27, 2017, goo.gl/XAP5uL; Vann R. Newkirk II, *How Letting Felons Vote is Changing Virginia*, The Atlantic, Jan. 8, 2018, https://bit.ly/2CTIpVO.

[17] Sam Levine, *In Virginia, Ex-Felons Voted for the First Time After Regaining Their Rights*, Huffpost, Nov. 8, 2017, goo.gl/RNGZ2T.

[18] Camila DeChalus, *In Virginia, Ex-Felons Find Empowerment in the Voting Booth*, CNN Politics, Nov. 5, 2016, goo.gl/78qr2E.

[19] State of New York, Executive Chamber, Exec. Order No. 181, *Restoring the Right to Vote for New Yorkers on Parole* (Apr. 18, 2018), https://on.ny.gov/2N6sUft.

restoring voting rights to convicted felons who have been out of prison for five years, even if they remain on probation or parole.[20]

### C. Arbitrarily Disenfranchising Citizens Who Have Committed Felonies Harms Their Families and Communities

Preventing people with criminal records from voting also harms their families and their communities. Evidence suggests that when heads of households are disenfranchised, the level of civic engagement for the entire family drops.[21] Voting is an experience, in many cases, passed on from parent to child. Parents often take their children into the voting booth at young ages, exposing the children to their first act of civic engagement. Research confirms that "[a] parent's electoral participation plays a significant role in determining whether his child will become civically engaged."[22] One study found that a parent's political participation had the greatest effect, more than any other factor, on a child's decision to vote when he or she becomes eligible.[23]

---

[20] Melinda Deslatte, *Voting Rights Bill for Some Louisiana Felons Wins Passage,* U.S. News & World Report, May 17, 2018, https://bit.ly/2tIOe1N; Office of the Governor of Louisiana, *Notice: Bills Signed, Vetoed by Gov. Edwards* (June 5, 2018), https://bit.ly/2tKPNw6.
[21] Erika Wood, *Restoring the Right to Vote*, Brennan Ctr. For Justice, at 13 (2009), https://goo.gl/Gr5pMG.
[22] *Id.*; *see also* Eric Plutzer, *Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood*, 96 Am. Pol. Sci. Rev. 41, 43 (2002), goo.gl/tN2QzY.
[23] Plutzer, *supra* note 25, at 48.

Moreover, the effect of disenfranchisement extends further than an individual's household; it affects other members of the community as well.[24] Studies have found that where there are restrictions on the right to vote for some members of a community, overall voter participation drops, "even among people who are legally eligible to vote."[25] One study found that in the 1996 and 2000 presidential elections, there was lower voter turnout in states with the most restrictive criminal disenfranchisement laws, and higher turnout in states with less restrictive criminal disenfranchisement.[26]

### D. Granting People With Criminal Records the Right to Vote Enhances Public Safety

Finally, in addition to helping individuals to re-enter their communities, reinstating the right to vote is strongly tied to lower recidivism rates and increased public safety.[27] Research suggests that there are "consistent differences between voters and non-voters in rates of subsequent arrests, incarceration, and self-reported

---

[24] *See* Wood, *supra* note 24 at 12; Martha Guarnieri, *Civil Rebirth: Making the Case for Automatic Ex-Felon Vote Restoration*, 89 Temp. L. Rev. 451, 480-81 (2017) ("Voting and civic participation are connected with prosocial behavior, such as participation in stable work and family relationships").

[25] Marc Mauer, *Disenfranchising Felons Hurts Entire Communities*, Joint Ctr. For Pol. & Econ. Stud., (May/June 2004), at 5, goo.gl/zY6w5f; *see also* Arman McLeod, et al., *The Locked Ballot Box: The Impact of State Criminal Disenfranchisement Laws on African American Voting Behavior and Implications for Reform*, 11 Va. J. Soc. Pol'y & L. 66, 80 (2003).

[26] McLeod, *supra* note 29, at 77.

[27] Amy Heath, *Cruel and Unusual Punishment: Denying Ex-Felons the Right to Vote*, 25 Am. U. J. Of Gender, Soc. Pol'y & L. 327, 356 (2017).

criminal behavior."[28]  One study found that former offenders who voted were half as likely to be re-arrested than those who did not,[29] and that states that permanently disenfranchise people with criminal records experience significantly higher rates of repeat offenses than states that do not.[30]  Voter disenfranchisement serves "only to further alienate and isolate a group of individuals at a time when they are trying to re-integrate into society."[31]  Indeed, disenfranchisement creates a "perpetual criminal underclass unable to fully rejoin society after their sentence is served," which only increases the potential for an increase in criminal activity.[32]

## II.  MISSISSIPPI'S FELON DISENFRANCHISEMENT IS HISTORICALLY PREMISED ON RESTRICTING THE VOTING RIGHTS OF AFRICAN AMERICANS

Mississippi's felon disenfranchisement law is historically rooted in restricting the ability of African Americans to vote.[33]  Mississippi initially enacted its felon disenfranchisement law in 1890, only two and a half decades after the conclusion of the Civil War.[34]  The Mississippi legislature's choice of offenses subjecting offenders to lifetime disenfranchisement was based upon offenses that were

---

[28] Christopher Uggen & Jeff Manza, *Voting and Subsequent Crime and Arrest: Evidence from a Community Sample*, 36 Colum. Hum. Rts. L. Rev. 193, 213 (2004).
[29] *Id.* at 205.
[30] Guy Padraic Hamilton-Smith & Matt Vogel, *The Ballot as Bulwark: The Impact of Felony Disenfranchisement on Recidivism* 1 (Aug. 30, 2011), https://goo.gl/jGTmcm.
[31] Guy Padraic Hamilton-Smith & Matt Vogel, *The Violence of Voicelessness: The Impact of Felony Disenfranchisement on Recidivism*, 22 La Raza L. J. 407, 413 (2015).
[32] *The Ballot as Bulwark*, *supra* note 33, at 21.
[33] Appellees' Brief at 58.
[34] *Id.*

prosecuted primarily, if not exclusively, against African Americans.[35]     The legislature's overt intent was to ensure that African Americans, especially recently freed, former slaves, had no voice in the State's civic discourse.

Felon disenfranchisement laws were part of a concerted effort across Southern states after the Civil War to preclude African Americans from voting.  Along with these laws, Southern states passed poll taxes and literacy tests – measures directed at inhibiting African American voting.[36] The measures were resoundingly effective, even several decades after enactment.   In 1964, 73.2% of eligible white Mississippians were registered to vote.  In contrast, in the same year only 5.4% of eligible black Mississippians were registered to vote.[37]   The disparate impact of the felon disenfranchisement law is also evident in Mississippi's incarceration statistics. African Americans make up 37% of Mississippi's population; however, they constitute 57% of its incarcerated population.[38]   The result of this disparate impact is disenfranchisement of African Americans at a far greater proportional rate, than any other racial group in the State.

---

[35] *Id*. at 60-61.
[36] *Id*.
[37] Mississippi Freedom Democratic Party, *Statistics of Negro and White Voter Registration in the Five Congressional Districts of Mississippi* (1964), crmvet.org/docs/ms_vote_stats.pdf.
[38] Leah Sakala, Prison Policy Initiative, *Breaking Down Mass Incarceration in the 2010 Census: State-by-State Incarceration Rates by Race/Ethnicity* (May 28, 2014), https://www.prisonpolicy.org/reports/rates.html.

The impact of Mississippi's felon disenfranchisement law becomes more startling when one considers that it has remained largely untouched since its enactment in 1890. Aside from minimal changes to the applicable offenses, the application and impact has remained the same, including in its disproportionate effect on Mississippi's African American citizens. A tool of restricting voting on the basis of race alone is not only still in force, it still has its same racial impact. As of 2016, 15.86% of the African American population of Mississippi has been disenfranchised by the felon disenfranchisement law, compared to only 9.63% of Mississippi's population, generally.[39] Further, those that hold the power to ameliorate the impact of the felon disenfranchisement law have refused to do so, choosing to restore the right to vote to only 18 disenfranchised individuals since 2013.

The result of the enforcement of the felon disenfranchisement law and the failure of officials to take corrective action in the face of a law with blatant racially disparate impact is the continuation of voting restrictions that were explicitly enacted to prevent African Americans from voting. The motivations of a post-Civil War Mississippi to divest African Americans of a say in their own community survives

---

[39] The Sentencing Project, *State-by-State Data (Mississippi)*.

today so long as this Court allows Mississippi's felon disenfranchisement law to remain in force.

## III. PROBATION AND PAROLE OFFICERS—THOSE CLOSEST TO UNDERSTANDING THE INTERESTS AT STAKE— ADVOCATE FOR GRANTING THE FRANCHISE TO OFFENDERS

Probation and parole officers are the state officials most directly responsible for reintegrating offenders back into society after their term of imprisonment. Among these officers, there is a growing consensus that voting plays an important role in the reintegration process.[40]   In addition to the APPA, which passed its resolution in support of restoring voting rights in 2007, the American Correctional Association, the National Black Police Association, and the Association of Paroling Authorities International, among others, have passed similar resolutions.[41]   The American Correctional Association maintains that any ban prohibiting an individual from voting, after successful discharge from correctional supervision, is "contradictory to the goals of a democracy, the rehabilitation of felons, and their successful reentry to the community."[42]

---

[40] *See Hearing on the Democracy Restoration Act of 2009*, *supra* note 3, at 60.
[41] Nat'l Black Police Ass'n, *Resolution on Restoring Voting Rights* (June 1, 2008), goo.gl/Z4uVPk; Ass'n of Paroling Auths. Int'l, *Resolution on Restoring Voting Rights* (Apr. 30, 2008), goo.gl/7uZLe3.
[42] Am. Corr. Ass'n, *Public Correctional Policy on Restoration of Voting Rights for Felony Offenders 2005-3*, in *Public Correctional Policies* 73 (Jan. 25, 2017), https://bit.ly/2gbSHYg.

This position has been echoed and reinforced by prosecutors, police officers, and other officials intimately familiar with the parole and probation systems. "Annually, we spend millions to rehabilitate offenders and bring them back into society only to let an outdated system push them back with one hand while we pull with the other," argues one former prosecutor from Kentucky.[43]   The former President of the Police Executive Research Forum explains that it is "better to remove any obstacles that stand in the way of offenders resuming a full, healthy productive life."[44]  And the former President of the Police Foundation argues that, rather than treating people who have committed offenses as a "pariah class," "we need to bring people back as whole citizens" in order to have "effective policing."[45]

In his 2004 State of the Union address, then-President George W. Bush declared that "America is the land of second chances, and when the gates of the prison open, the path ahead should lead to a better life."[46]   The experiences of probation and parole officials, who are deeply involved in ensuring that the State's interests are enforced, show the importance of granting voting rights to people with criminal records and the ineffectiveness of disenfranchising them.

---

[43] R. David Stengel, *Let's Simplify the Process for Disenfranchised Voters*, Cent. Ky. News-J. (Jan. 28, 2007), https://bit.ly/2Kia8Ea.
[44] *See Restoring the Right to Vote*, *supra* note 24, at 10.
[45] *Id.*
[46] President George W. Bush, *State of the Union Address*, White House Archives (Jan. 20, 2004), goo.gldhEiVR.

## **<u>CONCLUSION</u>**

The Court should reverse the decision of the District Court.


Dated: November 6, 2019.

BALLARD SPAHR LLP

/s/ Ashley Kissinger
Ashley I. Kissinger
5480 Valmont Road, Suite 200
Bouler, CO 80301-2369


*Attorneys for Amici*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with word limitations of Fed. R. App. P. 29(a)(5) and 5th Cir. R. 29.3 because, excluding the parts of the documents exempted by Fed. R. Appl. P. 32, it contains 3,548 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally-spaced typeface, including serifs, using Word in Times New Roman 14 font, except for the footnotes, which are in proportionally-spaced typeface, including serifs, using Word in Times New Roman 12-point font.

Dated: November 6, 2019

/s/ Ashley Kissinger
Counsel for *amicus curiae*

## <u>STATEMENT OF RELATED CASES</u>

*Amicus Curiae* is not aware of any related cases pending before the Court.

Dated: November 6, 2019.

/s/ Ashley Kissinger
Counsel for *amicus curiae*

## **CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing to be filed electronically with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on November 6, 2019.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

November 6, 2019

/s/  J. Sakai
An employee of BALLARD SPAHR LLP