# In the United States Court of Appeals for the Fifth Circuit

### No. 19-60662

DENNIS HOPKINS, individually and on behalf of a class of all others similarly situated; HERMAN PARKER, JR., individually and on behalf of a class of all others similarly situated; WALTER WAYNE KUHN, JR., individually and on behalf of a class of all others similarly situated; BYRON DEMOND COLEMAN, individually and on behalf of a class of all others similarly situated; JON O'NEAL, individually and on behalf of a class of all others similarly situated; EARNEST WILLHITE, individually and on behalf of a class of all others similarly situated,

*Plaintiffs-Appellees,*

v.

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

*Defendant-Appellant.*

*(For Continuation of Caption See Reverse Side of Cover)*

On appeal from the United States District Court
for the Southern District of Mississippi, Northern Division
District Court Case No. 3:18-CV-188-DPJ-FKB

## BRIEF OF THE CATO INSTITUTE, THE DKT LIBERTY PROJECT, AND THE DUE PROCESS INSTITUTE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND REVERSAL

Clark M. Neily III
Jay R. Schweikert
CATO INSTITUTE
1000 Mass. Ave., NW
Washington, DC 20001
(202) 842-0200
cneily@cato.org

Shana-Tara O'Toole
700 Pennsylvania Avenue SE #560
Washington, DC 20003
(202) 558-6683
shana@idueprocess.org

David J. Weiner
Andrew T. Tutt
Kyle Lyons-Burke
ARNOLD & PORTER
    KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
andrew.tutt@arnoldporter.com

Avishai D. Don
ARNOLD & PORTER
    KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
avishai.don@arnoldporter.com

*Counsel for Amici Curiae*

November 6, 2019

---

**Consolidated with 19-60678**

DENNIS HOPKINS, individually and on behalf of a class of all others similarly situated; HERMAN PARKER, JR., individually and on behalf of a class of all others similarly situated; WALTER WAYNE KUHN, JR., individually and on behalf of a class of all others similarly situated; JON O'NEAL, individually and on behalf of a class of all others similarly situated; EARNEST WILLHITE, individually and on behalf of a class of all others similarly situated; BYRON DEMOND COLEMAN, individually and on behalf of a class of all others similarly situated,

*Plaintiffs-Appellees Cross-Appellants,*

– v. –

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

*Defendant-Appellant Cross-Appellee.*

---

## CERTIFICATE OF INTERESTED PERSONS

*Hopkins v. Hosemann*, No. 19-60662

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### AMICI:

The Amici are the Cato Institute, DKT Liberty Project, and the Due Process Institute.

### ATTORNEYS FOR AMICI:

Clark M. Neily III
Jay R. Schweikert
CATO INSTITUTE
1000 Mass. Ave., NW
Washington, DC 20001
(202) 842-0200
cneily@cato.org

Shana-Tara O'Toole
700 Pennsylvania Avenue SE #560
Washington, DC 20003
(202) 558-6683
shana@idueprocess.org

David J. Weiner
Andrew T. Tutt
Kyle Lyons-Burke
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
andrew.tutt@arnoldporter.com

Avishai D. Don
ARNOLD & PORTER KAYE
SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
avishai.don@arnoldporter.com

APPELLEES:

The Appellees are Dennis Hopkins, Herman Parker, Jr., Walter Wayne Kuhn Jr., Byron Demond Coleman, Jon O'Neal, and Earnest Willhite.

ATTORNEYS FOR APPELLEES:

Paloma Wu
SOUTHERN POVERTY LAW
CENTER
111 East Capitol Street, Suite 280
Jackson, Mississippi 39201
(601) 948-8882
Paloma.Wu@splcenter.org

Lisa Graybill
SOUTHERN POVERTY LAW
CENTER
1055 St. Charles Avenue
New Orleans, Louisiana 70130
(504) 486-8982
Lisa.Graybill@splcenter.org

Nancy G. Abudu
Caren E. Short
SOUTHERN POVERTY LAW
CENTER
P.O. Box 1287
Decatur, Georgia 30031
(404) 521-6700
Nancy.Abudu@splcenter.org
Caren.Short@splcenter.org

Jonathan K. Youngwood
Janet A. Gochman
Isaac M. Rethy
Nihara K. Choudhri
Tyler Anger
SIMPSON THACHER &
BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
irethy@stblaw.com
nchoudhri@stblaw.com
tyler.anger@stblaw.com

**APPELLANT:**

The Appellant is Delbert Hosemann, in his official capacity as the Secretary of State of Mississippi.

**ATTORNEYS FOR APPELLANT:**

Justin L. Matheny
Krissy C. Nobile
OFFICE OF THE ATTORNEY
GENERAL
P.O. Box 220
Jackson, MS 39205

Telephone: (601) 359-3680
Facsimile: (601) 359-2003
jmath@ago.state.ms.us
knobi@ago.state.ms.us

s/ Andrew T. Tutt
Attorney of Record, Amici Curiae

## STATEMENT REGARDING ORAL ARGUMENT

In light of the importance of this case to the citizens of Mississippi, amici respectfully submit that oral argument would aid the Court's resolution of the appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ...........................................i

STATEMENT REGARDING ORAL ARGUMENT ...................................iv

INTEREST OF AMICI ...............................................................................1

INTRODUCTION ......................................................................................3

ARGUMENT .............................................................................................6

I.  THE FRAMERS OF THE FOURTEENTH AMENDMENT
    INTENDED TO ALLOW STATES TO DISENFRANCHISE
    CITIZENS ONLY FOR CRIMES SIMILAR IN MAGNITUDE
    TO "PARTICIPATION IN REBELLION".........................................6

    A.  Basic Principles of Textual Interpretation Show that
        "Other Crime" Encompasses Only Crimes of Similar
        Seriousness to "Participation in Rebellion"..............................7

    B.  The Enacting History of § 2 of the Fourteenth Amendment
        Shows that its Framers Intended Only the Most Serious
        Crimes to Result in Disenfranchisement .............................15

II. THE NEED TO HONOR THE ORIGINAL UNDERSTANDING
    OF THE FOURTEENTH AMENDMENT IS MORE URGENT
    NOW THAN EVER BECAUSE OF THE SOCIAL AND
    ECONOMIC COSTS OF MASS DISENFRANCHISEMENT IN
    AN ERA OF OVERCRIMINALIZATION .......................................19

    A.  Overcriminalization Leads to Mass Disenfranchisement....20

    B.  Disenfranchisement Prevents Ex-Offenders from Fully
        Rejoining Society, Harms Families and Communities, and
        Hurts Public Safety...............................................................24

        1.  Disenfranchisement Stigmatizes Ex-Offenders,
            Preventing Them From Fully Rejoining Society .........24

2.    Disenfranchisement Negatively Impacts Public Safety ..................................................................... 27

3.    Disenfranchisement Hurts Families and Communities ................................................................. 30

C.    Mass Disenfranchisement, Resulting from the Combination of Disenfranchisement for Comparatively Minor Crimes and Overcriminalization, Magnifies the Social and Economic Costs of Disenfranchisement .............. 31

CONCLUSION ........................................................................ 33

CERTIFICATE OF COMPLIANCE ........................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Begay v. United States,*
    553 U.S. 137 (2008) ................................................................ 12

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................. 7

*Duncan v. Louisiana,*
    391 U.S. 145 (1968) ................................................................ 10

*Gamble v. United States,*
    139 S. Ct. 1960 (2019) .............................................................. 7

*Johnson v. United States,*
    135 S. Ct. 2551 (2015) ............................................................ 12

*Kentucky v. Dennison,*
    65 U.S. 66 (1860) ................................................................... 10

*Lafler v. Cooper,*
    132 S. Ct. 1376 (2012) ...................................................... 21, 22

*Life Techs. Corp. v. Promega Corp.,*
    137 S. Ct. 734 (2017) .............................................................. 10

*Mackin v. United States,*
    117 U.S. 348 (1886) ................................................................ 14

*Magyar v. State,*
    18 So. 3d 851 (Miss. Ct. App. 2008) ...................................... 23

*McLaughlin v. City of Canton,*
    947 F. Supp. 954 (S.D. Miss. 1995) ....................................... 26

*Paroline v. United States,*
    572 U.S. 434 (2014) ................................................................ 11

*Perrin v. United States,*
   444 U.S. 37 (1979) ................................................................. 9

*Puerto Rico v. Branstad,*
   483 U.S. 219 (1987) ............................................................. 10

*Richardson v. Ramirez,*
   418 U.S. 24 (1974) ................................................................. 7

*Schick v. United States,*
   195 U.S. 65 (1904) ................................................................. 9

*Trop v. Dulles,*
   356 U.S. 86 (1958) ............................................................... 27

*Wesberry v. Sanders,*
   376 U.S. 1 (1964) ................................................................. 27

*Wharton v. Wise,*
   153 U.S. 155 (1894) ............................................................. 10

*Wisconsin Cent. Ltd. v. United States,*
   138 S. Ct. 2067 (2018) .......................................................... 9

*Wright v. United States,*
   302 U.S. 583 (1938) ............................................................. 11

*Yates v. United States,*
   135 S. Ct. 1074 (2015) ............................................. 10, 11, 12

## Statutes

18 U.S.C. § 924 ....................................................................... 12

Miss. Code. Ann. § 97-17-59 ..................................................... 3

Miss. Code. Ann. § 97-19-55 ..................................................... 3

Miss. Code. Ann. § 97-23-93 ..................................................... 3

## Other Authorities

1 *Wharton's Criminal Law* § 17 (15th ed. 2019) ...................... 10

Abigail M. Hinchcliff, *The "Other" Side of* Richardson v. Ramirez*: A Textual Challenge to Felon Disenfranchisement*, 121 Yale L.J. 194 (2011) .................10, 12, 13, 14

Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747 (1999)............................................................................. 13, 15

Albert W. Alschuler, *The Prosecutor's Role in Plea Bargaining*, 36 U. Chi. L. Rev. 50 (1968) ........................... 21

Alec C. Ewald, *"Civil Death": The Ideological Paradox of Criminal Disenfranchisement Law in the United States*, 2002 Wis. L. Rev. 1045........................................................ 25

Aman McLeod et al., *The Locked Ballot Box: The Impact of State Criminal Disenfranchisement Laws on African American Voting Behavior and Implications for Reform*, 11 Va. J. Soc. Pol'y & L. 66 (2003) ....................................... 31

Amy Heath, *Cruel and Unusual Punishment: Denying Ex-Felons the Right to Vote after Serving Their Sentences*, 25 Am. U. J. Gender Soc. Pol'y & L. 327 (2017)...................... 29

Carrie Leonetti, *When the Emperor Has No Clothes III: Personnel Policies and Conflicts of Interest in Prosecutors' Offices*, 22 Cornell J. L. & Pub. Pol'y 53 (2012) ................. 20

Christopher Uggen & Jeff Manza, *Voting and Subsequent Crime and Arrest: Evidence from a Community Sample*, 36 Colum. Hum. Rts. L. Rev. 193 (2004) ........................... 28

39th Cong., 1st Sess. 431 (Jan. 25, 1866)................................ 18

39th Cong., 1st Sess. 792 (Feb. 10, 1866)............................... 18

39th Cong., 1st Sess. 2535 (May 10, 1866).............................. 17

39th Cong., 1st Sess. 3029 (June 8, 1866)............................... 17

39th Cong., 2d Sess. 40 (Dec. 10, 1866).................................. 17

40th Cong., 3d Sess. 862 (Feb. 4, 1869).................................. 17

Daniel S. Medwed, *The Zeal Deal: Prosecutorial Resistance to Post-Conviction Claims of Innocence*, 84 B.U. L. Rev. 125 (2004) ...................................................................... 22

Eric Plutzer, *Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood*, 96 Am. Pol. Sci. Rev. 41 (2002)................................................................................ 30

Erik Luna, *The Overcriminalization Phenomenon*, 54 Am. U. L. Rev. 703 (2005)................................................... 20

Erika Wood, *Restoring the Right to Vote*, Brennan Ctr. for Just. (2009) ..................................................................... 30

*Fact Sheet: Trends in U.S. Corrections*, The Sentencing Project (June 2019) ............................................................ 19

Guy Padraic Hamilton-Smith & Matthew Vogel, *The Ballot as a Bulwark: The Impact of Felony Disenfranchisement on Recidivism* (2011) ................................................... 29

Guy Padraic Hamilton-Smith & Matt Vogel, *The Violence of Voicelessness: The Impact of Felony Disenfranchisement on Recidivism*, 22 Berkeley La Raza L.J. 407 (2012) ................. 25, 28

Hon. Alex Kozinski, *Criminal Law 2.0*, 44 Geo. L.J. Ann. Rev. Crim. Proc. iii (2015) .......................................... 20

Howard Itzkowitz & Lauren Oldak, *Restoring the Ex-Offender's Right to Vote: Background and Developments*, 11 Am. Crim. L. Rev. 721 (1973) ...................................... 28

John Stuart Mill, *Thoughts on Parliamentary Reform* (1859), *in* Essays on Politics and Society (J. M. Robson Ed. 1977)............... 26

Ludwig Von Bar, *A History of Continental Criminal Law* (1916)........................................................................... 24

Mississippi Department of Corrections, *Mission*, https://www.mdoc.ms.gov/About/Pages/Mission.aspx .................. 27, 29

Opinion No. 2009-00210, Miss. A.G., 2009 WL 2517257
     (2009)...................................................................................... 23

Richard M. Re & Christopher M. Re, *Voting and Vice:*
     *Criminal Disenfranchisement and the Reconstruction*
     *Amendments*, 121 Yale L.J. 1584 (2012) ..................................... *passim*

Suja A. Thomas, *What Happened to the American Jury?*,
     *Litigation*, Spring 2017 ......................................................... 22

*Webster's American Dictionary of the English Language,* 283
     (George and Charles Merriam 1854 ed.) ............................................. 8

William Blackstone, *Commentaries on the Laws of England*
     (1769)................................................................................ 8, 9

William J. Stuntz, *The Pathological Politics of Criminal*
     *Law*, 100 Mich. L. Rev. 505 (2001)....................................... 21

William Walton Liles, *Challenges to Felony*
     *Disenfranchisement Laws: Past, Present, and Future*, 58
     Ala. L. Rev. 615 (2007).................................................. 24, 25

## INTEREST OF AMICI

The Cato Institute is a nonpartisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and free government.*  The Cato Institute's Project on Criminal Justice was founded in 1999, and focuses on the scope of substantive criminal liability, the proper and effective role of police in their communities, the protection of constitutional and statutory safeguards for criminal suspects and defendants, citizen participation in the criminal justice system, and accountability for law enforcement officers.

The DKT Liberty Project was founded in 1997 to promote individual liberty against encroachment by all levels of government.  This not-for-profit organization advocates vigilance over regulations of all kinds, especially restrictions of individual civil liberties that threaten the reservation of power to the citizenry that underlies our constitutional system.

---

* No party's counsel authored this brief in whole or in part.  Nor did any party or party's counsel, or any other person other than *amici curiae*, their members, and their counsel, contribute money that was intended to fund preparing or submitting this brief.

The Due Process Institute is a nonprofit, bipartisan, public interest organization that works to honor, preserve, and restore procedural fairness in the criminal justice system. Founded in 2018 and guided by a bipartisan Board of Directors and supported by bipartisan staff, the Due Process Institute creates and supports achievable bipartisan solutions for challenging criminal legal policy concerns through advocacy, litigation, and education.

*Amici* are concerned that sweeping criminal disenfranchisement, even for substantively minor crimes, is inconsistent with the Fourteenth Amendment's narrow exception to its general prohibition on disenfranchisement. *Amici* are also concerned about the tremendous social, political, and economic costs that accompany mass disenfranchisement resulting from the toxic combination of overcriminalization and disenfranchisement for comparatively minor crimes.

The State of Mississippi has disenfranchised a substantial proportion of its citizens. That is not because Mississippi's citizens are unusually depraved, but because the laws for which it permits disenfranchisement are unusually minor. This is a serious matter

warranting this Court's most careful scrutiny. The Court should hold that Mississippi's system of disenfranchisement—to the extent that it punishes with lifelong disenfranchisement even substantively minor crimes—is inconsistent with the Fourteenth Amendment and unconstitutional.

Accordingly, *amici* respectfully submit this amicus curiae brief in support of Appellees, urging this Court to reverse.

## INTRODUCTION

In Mississippi, conviction of numerous crimes means the lifelong loss of the right to vote. Murder and rape are on the list. But so is passing a "bad check" (i.e. writing a check you know will bounce). Miss. Code. Ann. § 97-19-55(1)(a). As is timber larceny (i.e. taking "from the lands of another" more than $250 in "merchantable timber"). Miss. Code. Ann. § 97-17-59(2). And felony shoplifting (i.e. shoplifting three or more times). Miss. Code. Ann. § 97-23-93.

And for every crime on the list there is a similar or even worse crime not on the list.[1] Check fraud means permanent disenfranchisement. But

---

[1] Available at: https://mississippitoday.org/2018/11/01/not-all-ex-felons-are-barred-from-voting-in-mississippi-but-no-one-is-telling-them-that/.

credit card fraud carries no similar penalty.  Robbery (yes); burglary (no); statutory rape (yes); sexual battery (no); bribery (yes); aggravated assault (no); perjury (yes); controlled substance offenses (no).  By disenfranchising individuals for minor crimes, Mississippi drastically departs from the States that understand permanent disenfranchisement for what it is—among the most severe penalties our society can inflict. And Mississippi rubs salt in the wound by choosing those crimes arbitrarily as well.

Mississippi has limited power to disenfranchise its people because § 2 of the Fourteenth Amendment authorizes States to restrict citizens' right to vote "for participation in rebellion, or other crime."  But Mississippi's system has ventured far beyond the bounds of that limited authority.  To the Framers of that Amendment, and for generations thereafter, the meaning of "other crime" was absolutely clear.  It meant a crime of similar wrongfulness to the act of engaging in rebellion. Lifelong disenfranchisement is proportionate only for commission of the most serious crimes.  Indeed, the entire premise of permanent disenfranchisement is that an offender's actions are so egregious that he deserves to be permanently severed from the political process.

Over the last century, however, Mississippi has lost sight of that fundamental Fourteenth Amendment requirement and has been disenfranchising people for minor crimes. Mississippi's system of disfranchisement has now resulted in mass disenfranchisement. And Mississippi's approach is particularly punitive. Mississippi is one of the few States that disenfranchises *for life*. It offers only a handful of people the opportunity for re-enfranchisement through an arcane legislative procedure that is functionally unavailable to most of its citizens. Less than 1 percent of the people disenfranchised in Mississippi have been re-enfranchised in the last 20 years.

The harm of mass disenfranchisement is not just that it violates the original understanding of the Fourteenth Amendment (although it certainly does). It also has tremendous economic and political costs. For many ex-felons, the restoration of the right to vote provides a clear marker of civic reintegration and is a key component of changing the former offender's identity and self-image. The refusal of the state to restore voting rights can stand as a major impediment to ex-felons who yearn to lead an upstanding life. Failing to re-enfranchise former offenders also increases recidivism rates, leading to a perverse and

vicious cycle wherein disfranchisement leads to even more disenfranchisement. Disenfranchisement also erodes faith in the legitimacy of our democracy and its institutions. It is difficult to say that the government is "of, by, and for 'the People'" when a substantial proportion of "the People" are legally ineligible to vote for the remainder of their lives on Earth.

Mass disenfranchisement for minor crimes is inconsistent with the original understanding of the Fourteenth Amendment. It imposes severe costs on our society and threatens our democracy. The Court should reverse the decision below.

## ARGUMENT

## I.  THE FRAMERS OF THE FOURTEENTH AMENDMENT INTENDED TO ALLOW STATES TO DISENFRANCHISE CITIZENS ONLY FOR CRIMES SIMILAR IN MAGNITUDE TO "PARTICIPATION IN REBELLION"

Mississippi's disenfranchisement scheme extends far beyond the original understanding of the Fourteenth Amendment. The Framers of this Amendment considered only wrongdoers who committed *serious* crimes, on par with "participation in rebellion," to be worthy of disenfranchisement. Acts like murder and piracy were viewed as forms of insurrection against the established political order—and individuals

who committed such crimes were believed to have forfeited their places in society.  The Fourteenth Amendment's text and drafting history make clear that the Framers intended for disenfranchisement to apply *only* to individuals who committed these kinds of severe crimes.

A.    **Basic Principles of Textual Interpretation Show that "Other Crime" Encompasses Only Crimes of Similar Seriousness to "Participation in Rebellion"**

The interpretation of a Constitutional Amendment, like the interpretation of a statute, begins with the text.  *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1965 (2019).  As noted above, Section 2 of the Fourteenth Amendment authorizes states to abridge citizens' voting rights "for participation in rebellion, or *other crime* . . . ."  U.S. Const. amend. XIV, § 2 (emphasis added).  Interpretation of the phrase "other crime" in this Amendment must be "guided by the principle that the Constitution was written to be understood by the voters," and that its words should be read in accordance with "their normal and ordinary as distinguished from technical meaning."  *District of Columbia v. Heller*, 554 U.S. 570, 576–77 (2008) (cleaned up).  Section 2 of the Fourteenth Amendment, that is, "was intended by Congress to mean what it says." *Richardson v. Ramirez*, 418 U.S. 24, 43 (1974).

At the time of the Fourteenth Amendment's passage, the word "crime" had two distinct meanings: a legal, technical meaning of "any offense," and a common and popular meaning of "a *grave* offense." *See* Richard M. Re & Christopher M. Re, *Voting and Vice: Criminal Disenfranchisement and the Reconstruction Amendments*, 121 Yale L.J. 1584, 1651–52 (2012). For example, Webster's Dictionary in 1854 defined "crime" as "[a]n act which violates a law, divine or human; . . . *But in a more common or restricted sense*, a crime denotes violation of a public law, of a deeper and more atrocious nature; a public wrong." *Webster's American Dictionary of the English Language,* 283 (George and Charles Merriam 1854 ed.) (emphasis added). *Webster's* therefore contrasted "crime" with "misdemeanors," which it defined as "minor wrongs against public rights." *Id.* Blackstone's *Commentaries* similarly noted that although the "general definition" of "crime" "comprehends both crimes and misdemeanors," "*in common usage*[,] the word 'crimes' is made to denote such offenses as are of a deeper and more atrocious dye." William Blackstone, 4 *Commentaries on the Laws of England* *5 (1769) (emphasis added). "[S]maller faults and omissions of less consequence," Blackstone

noted, are more commonly grouped "under the gentler name of 'misdemeanors' only." *Id.*

In line with its admonition that the words of a provision should be "interpreted as taking their ordinary, contemporary . . . meaning,"[2] the Supreme Court has used the more common meaning of "crime" to interpret the Constitution's Criminal Jury Clause, U.S. Const. art. III, § 2. Under this Clause, "the Trial of *all Crimes*, except in Cases of Impeachment[,] shall be by Jury." *Id.* (emphasis added). In *Schick v. United States*, 195 U.S. 65 (1904), the Supreme Court held that the phrase "all Crimes" refers only to serious, non-petty offenses. *Id.* at 69–72. The Court concluded that the Framers drafted the clause "in the light of the popular understanding of the meaning of the word 'crimes,' as stated by Blackstone," and thus, "it is obvious that the intent was to exclude from the constitutional requirement of a jury the trial of petty criminal offenses." *Id.* at 70. For this reason, it is black-letter law today that one must "draw a line in the spectrum of crime" for purposes of the

---

[2] *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

Criminal Jury Clause, "separating petty from serious infractions." *Duncan v. Louisiana*, 391 U.S. 145, 160–61 (1968).[3]

Traditional tools of statutory construction, which are "applicable to all written instruments," including the Federal Constitution, *Wharton v. Wise*, 153 U.S. 155, 169 (1894), also indicate that the phrase "other crime" in Section 2 of the Fourteenth Amendment must be given its common (rather than technical) meaning. Two canons are particularly instructive here. First, according to the canon of *noscitur a sociis*, "a word is known by the company it keeps," *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015)—that is, a "word is given more precise content by the neighboring words with which it is associated," *Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 740 (2017). The purpose of this canon is

---

[3] To be sure, in *Kentucky v. Dennison*, 65 U.S. 66 (1860) (Taney, C.J.), *abandoned by Puerto Rico v. Branstad*, 483 U.S. 219 (1987), the Supreme Court interpreted the phrase "Treason, Felony, *or other Crime*" in Article IV, Section 2 of the Constitution to include *all* offenses, not merely serious offenses. *See id.* at 99. Such an interpretation made unique sense in the context of that clause, however, because "the categories that precede[d] 'other Crime' named two of the three recognized classes of offenses at common law. So it [was] logically consistent to interpret 'other Crime'" in that clause "as synonymous with misdemeanor." Note, Abigail M. Hinchcliff, *The "Other" Side of* Richardson v. Ramirez*: A Textual Challenge to Felon Disenfranchisement*, 121 Yale L.J. 194, 219 (2011); *see also* 1 *Wharton's Criminal Law* § 17 (15th ed. 2019) ("At common law, there were three kinds of offenses: treason, felony, and misdemeanor.").

to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates*, 135 S. Ct. at 1085. Second, under the canon of *ejusdem generis*, "catchall clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated." *Paroline v. United States*, 572 U.S. 434, 447 (2014). The rationale is that Congress would not have included a specific example of a general category unless the specific example served a purpose; otherwise, the specific example would be "misleading surplusage." *Yates*, 135 S. Ct. at 1087.

These canons lead to the conclusion that the phrase "other crime" should be narrowed by the clause's use of the word "rebellion." Simply put, if "other crime" truly meant *all* crimes, then the word "rebellion" would be surplusage; the clause could have simply sanctioned disenfranchisement for "all crimes." This is despite the fact that, "[i]n expounding the Constitution of the United States, . . . every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added." *Wright v. United States*, 302 U.S. 583, 588 (1938) (cleaned up).

"Rebellion," then, must be read "as paradigmatic of the sort of offense that justifies disenfranchisement," and any crime of dissimilar gravity to "rebellion" should not suffice.    Hinchcliff, *supra*, at 229.    Any other interpretation of "other crime" would risk "giving unintended breadth to the Acts of Congress."  *Yates*, 135 S. Ct. at 1085.

The Supreme Court recently applied similar logic in a case involving a statute that covered "any crime" that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii); *see Begay v. United States*, 553 U.S. 137, 142 (2008), *abrogated on other grounds by Johnson v. United States*, 135 S. Ct. 2551 (2015).  The Court concluded that the statute did not cover "*every* crime that 'presents a serious potential risk of physical injury to another,'" because if it did, "it is hard to see why [Congress] would have needed to include the [specific] examples at all."  *Id.* at 142 (emphasis in original). The Court therefore held that the statute covered "only *similar* crimes" to "burglary, arson, extortion, or crimes involving the use of explosives." *Id.* (emphasis in original).  A similar logic would apply to the phrase "participation in rebellion, *or other crime*" in Section 2—that is, only

12

crimes comparably grave to "rebellion" should suffice for disenfranchisement.

Finally, understanding "rebellion" as narrowing the phrase "other crime" is consistent with how the Supreme Court has interpreted similar phrases in the Constitution. *See* Hinchcliff, *supra*, at 217; *see also* Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 792–93 (1999) (explaining that the Constitution often functions "as a special kind of concordance, enabling and encouraging us to place nonadjoining clauses alongside each other for analysis because they use the same (or very similar) words and phrases"). The Constitution uses a similar "other crime" formulation in three locations: (1) The Extradition Clause of Article IV, Section 2;[4] (2) the Impeachment Clause of Article II, Section

---

[4] "A Person charged in any State with *Treason, Felony, or other Crime*, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up . . . ." U.S. Const., art. IV, § 2 (emphasis added).

4;[5] and (3) the Grand Jury Clause of the Fifth Amendment.[6]  For all three of these clauses, the "other crime" phrase "is consistently interpreted with reference to the enumerated offense, or paradigm case."  Hinchcliff, *supra*, at 217.  For the Extradition Clause, the phrase "other crime" is construed alongside "treason" and "felony" to mean "all crimes less serious than felony."  *Id.* at 219.  For the Impeachment Clause, lawmakers have interpreted the phrase "high Crimes and misdemeanors" with reference to treason and bribery.  *Id.* at 226.  And for the Grand Jury Clause, the Supreme Court has interpreted the phrase "otherwise infamous crime" with reference to the word "capital." *Id.* at 221 (citing *Mackin v. United States*, 117 U.S. 348, 350–51 (1886)). In other words, "the scope of the 'other crime' category in any given clause is framed by the leading examples or categories that precede it."  *Id.*  This Court should read the "other crime" phrase in Section 2 of the Fourteenth

---

[5] "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, *Treason, Bribery, or other high Crimes and Misdemeanors . . . .*"  U.S. Const., art. II, § 4 (emphasis added).

[6]  "No person shall be held to answer for *a capital, or otherwise infamous crime*, unless on a presentment or indictment of a Grand Jury . . . ."  U.S. Const., amend. V (emphasis added).

Amendment similarly. *See, e.g.*, Amar, *supra*, at 749–78 (describing how the Supreme Court has used this sort of "intratextual" analysis in some of its most canonical cases).

In short, the Fourteenth Amendment's text strongly indicates that "other crime" should be interpreted with reference to "rebellion," and should be limited solely to crimes of similar severity to rebellion. Crimes of this caliber are those that constitute an insurrection against the social order, such as murder, rape, and kidnapping. Not timber larceny or passing a bad check.

### B. The Enacting History of § 2 of the Fourteenth Amendment Shows that its Framers Intended Only the Most Serious Crimes to Result in Disenfranchisement

The politicians responsible for the Reconstruction Amendments—known as the radical Republicans—justified enfranchising black Americans by espousing a "philosophy of formal equality." Re & Re, *supra*, at 1590. This philosophy stated that a person should be judged by his actions and not by his station. *Id.* Thus, a black American should not be disenfranchised merely because of his race—but, by the same token, a rebel or criminal *could* be disenfranchised. *Id.* By "violat[ing] the law's evenhanded commands," these individuals "were thought to have cast

themselves beneath the equal dignity afforded by law," and were thus worthy of being treated as "enemies and outsiders." *Id.* at 1590, 1595–96.

Section 2 of the Fourteenth Amendment is a "textual expression of [this] deep political principle." *Id.* at 1590. According to the radical Republican view, an individual's decision to commit a grave criminal violation constituted a deliberate choice to separate from civil society. For this reason, the Fourteenth Amendment lists "rebellion" as the paradigm act that justifies disenfranchisement. The politicians responsible for the Fourteenth Amendment's passage, that is, believed that "participation in . . . crime" was itself a form of "rebellion." *Id.* at 1654.

As a result, the criminal disenfranchisement sanctioned in Section 2 "was limited to offenses of sufficient gravity to constitute forfeiture of political rights." *Id.* The Fourteenth Amendment's Framers understood that permanent, lifelong disenfranchisement is a life sentence of excommunication and ostracization from the political community. Only crimes with "sufficient moral gravity to constitute renunciation of one's political allegiance to the state" should therefore suffice, as "[o]nly

serious crimes replicated in miniature the Confederacy's 'rebellion' against legitimate government." *Id.* at 1591, 1655.

Reconstruction-era legislators assumed that the disenfranchisement sanctioned by the Fourteenth Amendment would be only for severe crimes. One lawmaker, for example, described the individuals contemplated by Section 2 as "*pirates, counterfeiters,* [and] other criminals," and argued that the Amendment would allow states to prevent these individuals from "land[ing] their piratical crafts and com[ing] on shore to assist in the election of a president or members of Congress." Cong. Globe, 39th Cong., 1st Sess. 2535 (May 10, 1866) (Statement of Rep. Ephraim Eckley) (emphasis added). Another legislator described these individuals as "*[m]urderers, robbers, house-burners, [and] counterfeiters* . . . ." Cong. Globe, 39th Cong., 1st Sess. 3029 (June 8, 1866) (Statement of Sen. Reverdy Johnson) (emphasis added). The Congressional Record is replete with similar statements. *See, e.g.,* Cong. Globe, 40th Cong., 3d Sess. 862 (Feb. 4, 1869) (statement of Sen. Willard Warner) ("I am in favor of giving equally to all citizens of the Republic of sound mind and unstained by *great* crimes the right to vote and hold office." (emphasis added)); Cong. Globe, 39th Cong., 2d

Sess. 40 (Dec. 10, 1866) (statement of Sen. Lot M. Morrill) ("The exceptions to the rule [of suffrage] are . . . persons deemed infamous from treason, felony, *or other high crimes* . . . ." (emphasis added)); Cong. Globe, 39th Cong., 1st Sess. 792 (Feb. 10, 1866) (statement of Rep. Thomas Williams) (arguing that a legitimate government "might well disfranchise individuals, such as the traitors themselves, for an *enormous* crime" (emphasis added)); Cong. Globe, 39th Cong., 1st Sess. 431 (Jan. 25, 1866) (statement of Rep. John Bingham) (supporting "a constitutional amendment which will declare . . . that no State in this Union shall make any distinction in the right of voting . . . save in the case of persons convicted of *infamous* crimes" (emphasis added)).

It is difficult to believe that these legislators would have supported Mississippi's current felon disenfranchisement scheme. There is simply no comparison between murderers and pirates, on the one hand, and timber larcenists on the other. Minor crimes, though important to address, do not evince the same sort of "rebellion" against the political order as do the common-law felonies contemplated by the Fourteenth Amendment's Framers. *See* Re & Re, *supra*, at 1654 ("One might doubt . . . that drug addicts and negligent regulatory offenders should be put in

the same category as the rebels and common-law felons discussed by Reconstruction legislators."). There is thus serious tension between the disenfranchisement scheme at issue and the original understanding of Section 2 of the Fourteenth Amendment.

## II. THE NEED TO HONOR THE ORIGINAL UNDERSTANDING OF THE FOURTEENTH AMENDMENT IS MORE URGENT NOW THAN EVER BECAUSE OF THE SOCIAL AND ECONOMIC COSTS OF MASS DISENFRANCHISEMENT IN AN ERA OF OVERCRIMINALIZATION

As described above, the original understanding of Section 2 of the Fourteenth Amendment was that only serious crimes, such as treason and murder, would result in permanent disenfranchisement. Over the intervening 150 years, the definition of "felony" has expanded, and the number of felonies has proliferated. The result has been an era of overcriminalization, where America has the highest rate of incarceration in the world, ahead of countries such as El Salvador, Russia, and Rwanda. *See Fact Sheet: Trends in U.S. Corrections*, The Sentencing Project (June 2019), *available at:* https://www.sentencingproject.org/wp-content/uploads/2016/01/Trends-in-US-Corrections.pdf.

Overcriminalization in states, like Mississippi, that disenfranchise felons after release from prison, causes mass disenfranchisement.

19

Further, disenfranchisement negatively affects ex-offenders, their family and community, and the public at large.  Finally, when combined with overcriminalization, the negative effects of disenfranchisement are magnified; mass disenfranchisement distorts our democracy and harms society as a whole.

### A.    Overcriminalization Leads to Mass Disenfranchisement

Overcriminalization "is the abuse of the supreme force of a criminal justice system."  Erik Luna, *The Overcriminalization Phenomenon*, 54 Am. U. L. Rev. 703, 716 (2005).  This abuse takes two forms.  First, duplicative and overly broad statutes result in "the overcriminalization of virtually every aspect of American life."  Hon. Alex Kozinski, *Criminal Law 2.0*, 44 Geo. L.J. Ann. Rev. Crim. Proc. iii, xi (2015).  Second, prosecutors can utilize these broad and duplicative statutes to overcharge defendants, thereby increasing the probability that defendants accept plea deals or are convicted if they go to trial.  *See* Carrie Leonetti, *When the Emperor Has No Clothes III: Personnel Policies and Conflicts of Interest in Prosecutors' Offices*, 22 Cornell J. L. & Pub. Pol'y 53, 60 (2012) (explaining that the effectiveness of prosecutors is normally "judged on the basis of their conviction and plea-

bargain rates," so they are incentivized to pursue convictions at the expense of other considerations).

With respect to disenfranchisement, overcriminalization has the greatest impact through plea bargaining. The proliferation of criminal statutes, and felonies in general, provides ammunition for prosecutors wishing to induce a defendant to plead guilty rather than go to trial. By charging multiple crimes, or by choosing which crimes to charge, "prosecutors can, even in discretionary sentencing systems, significantly raise the defendant's maximum sentence, and often raise the minimum sentence as well." William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 506 (2001). "Prosecutors throw everything into an indictment they can think of, down to and including spitting on the sidewalk. They then permit the defendant to plead guilty to one or two offenses, and he is supposed to think it's a victory." Albert W. Alschuler, *The Prosecutor's Role in Plea Bargaining*, 36 U. Chi. L. Rev. 50, 86 (1968). Plea bargaining "presents grave risks of prosecutorial overcharging that effectively compels an innocent defendant to avoid massive risk by pleading guilty to a lesser offense." *Lafler v. Cooper*, 132

S. Ct. 1376, 1397 (2012) (Scalia, J., dissenting). This can result in innocent defendants losing the franchise for life.

The effect of overcriminalization is to present criminal defendants with a difficult choice: either take a plea deal for less jail time or roll the dice at trial, where they face long odds and a longer sentence. Not surprisingly, given the power that prosecutors possess, very few criminal cases go to trial. *See Lafler*, 566 U.S. at 170 (in 2012, pleas made up "[n]inety-seven percent of federal convictions and ninety-four percent of state convictions"); Suja A. Thomas, *What Happened to the American Jury?*, *Litigation*, Spring 2017, at 25 ("[J]uries today decide only 1-4 percent of criminal cases filed in federal and state court."). Instead, defendants accept a plea, and the prosecutor pads his stats with another conviction. *See* Daniel S. Medwed, *The Zeal Deal: Prosecutorial Resistance to Post-Conviction Claims of Innocence*, 84 B.U. L. Rev. 125, 134–35 (2004) ("Prosecutors with the highest conviction rates . . . stand the greatest chance of advancement internally.")

Faced with the long odds of trial, as Justice Scalia noted, even innocent defendants may plead guilty to avoid a long prison sentence. *Lafler*, 132 S. Ct. at 1397 (Scalia, J., dissenting). Moreover, these lesser

sentences may result in permanent disenfranchisement. In Mississippi, among the 22 identified crimes that lead to disenfranchisement are Bribery, Embezzlement, Extortion, Felony Bad Check, Felony Shoplifting, Forgery, Larceny, Obtaining Money or Goods under False Pretense, Receiving Stolen Property, Theft, Timber Larceny, Unlawful Taking of Motor Vehicle, Statutory Rape, Carjacking, and Larceny Under Lease or Rental Agreement. *See* Opinion No. 2009-00210, Miss. A.G., 2009 WL 2517257 (2009). Any one of these crimes could be a "lesser crime" offered to a defendant as an alternative to a more serious crime and longer sentence. Moreover, because disenfranchisement is not a "direct" consequence of conviction, there is no requirement that defendants be informed that a conviction will result in disenfranchisement. *Magyar v. State*, 18 So. 3d 851, 854 (Miss. Ct. App. 2008) ("Direct consequences are those ramifications that have a definite, immediate and largely automatic effect on the range of the defendant's punishment."). Defendants may not even be aware that, by pleading guilty, they are permanently surrendering their right to the franchise.

B.     **Disenfranchisement Prevents Ex-Offenders from Fully Rejoining Society, Harms Families and Communities, and Hurts Public Safety**

Disenfranchisement has a long historical pedigree; it was originally designed as an aspect of "civil death."  Civil death, simply put,

> sunders completely every bond between society and the man who has incurred it; he has ceased to be a citizen, but cannot be looked upon as an alien, as he is without a country; he does not exist save as a human being, and this, by a sort of commiseration which has no source in the law.

Ludwig Von Bar, *A History of Continental Criminal Law* 272 (1916).

In accord with its historical origins in "civil death," disenfranchisement stifles attempts to rebuild the relationship between ex-offenders and society in three distinct ways.  First, the disenfranchised are stigmatized, branded with a scarlet letter that keeps them from fully rejoining society.  Second, disenfranchisement increases the risk of recidivism by ex-offenders, thereby harming the safety of the public.  Third, disenfranchisement harms both the family and community of the disenfranchised in concrete, identifiable ways.

1.     *Disenfranchisement Stigmatizes Ex-Offenders, Preventing Them From Fully Rejoining Society*

As noted above, felon disenfranchisement derives from the ancient Greek and Roman concept of "civil death."  William Walton Liles,

*Challenges to Felony Disenfranchisement Laws: Past, Present, and Future*, 58 Ala. L. Rev. 615, 616 (2007). In fact with "civil death," felons lost most of their rights; "criminals were prohibited from appearing in court, making speeches, attending assemblies, serving in the army, and voting." *Id.* Later, in Germany, criminals were subjected to a process of "outlawry," whereby they would "lose all the benefits and protections that society could offer." Guy Padraic Hamilton-Smith & Matt Vogel, *The Violence of Voicelessness: The Impact of Felony Disenfranchisement on Recidivism*, 22 Berkeley La Raza L.J. 407, 409 (2012). Similarly, England instituted a system called "attainder, wherein those convicted of certain crimes would have three different penalties imposed on them: forfeiture of property, corruption of the blood (relating to a prohibition on passing property to heirs through inheritance), and a loss of civil rights," including the right to vote. *Id.*

Because of the severity of civil death, these "early European penalties seem to have been limited to very serious crimes, and were implemented only upon judicial pronouncement in individual cases." Alec C. Ewald, *"Civil Death": The Ideological Paradox of Criminal*

*Disenfranchisement Law in the United States*, 2002 Wis. L. Rev. 1045, 1061.

In the United States, the Founding Generation abolished most aspects of civil death, including bills of attainder and corruption of blood. Liles, *supra*, at 617. The only vestige of civil death that survives is disenfranchisement. This is not to say that disenfranchisement does not perpetuate the effects of civil death; it does. The severity of lifetime disenfranchisement is well-known:

> [T]he disenfranchised is severed from the body politic and condemned to the lowest form of citizenship, where voiceless at the ballot box . . . disinherited [, he] must sit idly by while others elect his civil leaders and while others choose the fiscal and governmental policies which will govern him and his family. Such a shadowy form of citizenship must not be imposed lightly . . . .

*McLaughlin v. City of Canton*, 947 F. Supp. 954, 971 (S.D. Miss. 1995).

Not only is disenfranchisement a form of civil death, the franchise is one of the most important benefits of citizenship. "To take an active interest in politics," John Stuart Mill wrote, "is, in modern times, the first thing which elevates the mind . . . the first step out of the narrow bounds of individual and family selfishness." John Stuart Mill, *Thoughts on*

*Parliamentary Reform* (1859), *in* Essays on Politics and Society 322–23
(J. M. Robson Ed. 1977).

The Supreme Court agrees. In *Trop v. Dulles*, 356 U.S. 86 (1958),
Justice Brennan explained that depriving civil rights to those with prior
convictions "constitutes the very antithesis of rehabilitation, for instead
of guiding the offender back into the useful paths of society it
excommunicates him and makes him, literally, an outcast." *Id.* at 111
(Brennan, J., concurring). In fact, "[n]o right is more precious in a free
country than that of having a voice in the election of those who make the
laws." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Without this most
precious right, ex-offenders live with "the stigma of the derelict,
uncertain of many of [their] basic rights." *Dulles*, 356 U.S. at 111
(Brennan, J., concurring).

### 2.    *Disenfranchisement Negatively Impacts Public Safety*

The criminal justice system is designed, above almost every other
concern, to promote public safety. In fact, the "mission of the Mississippi
Department of Corrections is to enhance public safety." Mississippi
Department of Corrections, *Mission*, https://www.mdoc.ms.gov/About/
Pages/Mission.aspx. However, disenfranchisement works at cross

purposes to this goal.  As noted above, disenfranchisement poses an additional barrier to ex-offenders' integration back into society. Permanent disenfranchisement implicitly informs the offender that "total rehabilitation is impossible."  Hamilton-Smith & Vogel, *supra*, at 413.  "If one has no stake in his or her community, then one has little incentive to behave in a pro-social manner." *Id.*

This common-sense proposition is backed up by empirical research.[7] A recent study found that former arrestees who voted were less than half as likely to be re-arrested, as compared to their non-voting counterparts. Christopher Uggen & Jeff Manza, *Voting and Subsequent Crime and Arrest: Evidence from a Community Sample*, 36 Colum. Hum. Rts. L. Rev. 193, 205 (2004).  That same study further found a strong correlation between voting rights and education among felons; education is a factor strongly tied to reducing recidivism.  *Id.* at 208.  This is not just an isolated study.  "Research has shown that felons in states who are given

---

[7] *See* Howard Itzkowitz & Lauren Oldak, *Restoring the Ex-Offender's Right to Vote: Background and Developments*, 11 Am. Crim. L. Rev. 721, 734 n.96 (1973) ("[A] comparison of the crime statistics of three states without disenfranchisement provisions with those of near-by states with disenfranchisement provisions reveals that the crime rate per 100,000 population for 1970 was actually higher in the latter states.").

back their right to vote after being released from prison within a reasonable time frame are far less likely to become repeat offenders." Amy Heath, *Cruel and Unusual Punishment: Denying Ex-Felons the Right to Vote after Serving Their Sentences*, 25 Am. U. J. Gender Soc. Pol'y & L. 327, 356 (2017). A nationwide study looked at data on recidivism provided through the *Department of Justice Recidivism of Prisoners Released in 1994* study. *See* Guy Padraic Hamilton-Smith & Matthew Vogel, *The Ballot as a Bulwark: The Impact of Felony Disenfranchisement on Recidivism* (2011).[8] Hamilton-Smith and Vogel found that "individuals who are released in states that permanently disenfranchise are roughly 19% more likely to be rearrested than those released in states that restore the franchise post-release." *Id.* at 19.

Instead of increasing public safety, strict disenfranchisement laws have the opposite effect. Mississippi's Department of Corrections' "vision" is "[t]o actively address reducing recidivism and meet offenders' reintegration needs through re-entry, rehabilitation, and support programs, thereby decreasing future victimization." Mississippi

---

[8] *Available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1919617.

Department of Corrections, *supra*. Ex-offenders who have been deprived the franchise are more likely to commit further crimes and thus be re-arrested. States with stricter disenfranchisement laws face higher crime rates. Disenfranchisement does not protect Mississippi; it endangers it.

### 3.    *Disenfranchisement Hurts Families and Communities*

The negative effects of disenfranchisement extend beyond the disenfranchised. Evidence "suggests that disenfranchisement of the head of a household discourages his or her entire family from civic participation." Erika Wood, *Restoring the Right to Vote*, Brennan Ctr. for Just. 12 (2009).[9] Young people often learn "such mundane information as how to register and where to vote" from their parents. Eric Plutzer, *Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood*, 96 Am. Pol. Sci. Rev. 41, 43 (2002). In fact, one study found the single biggest factor in a child's decision to vote is the parent's political participation. *Id.* at 48.

Disenfranchisement robs the children of ex-offenders of this example of civic participation. Instead, the families of ex-offenders are

---

[9] *Available at* https://www.brennancenter.org/sites/default/files/legacy/Democracy/Restoring%20the%20Right%20to%20Vote.pdf.

presented with an example of civic disengagement. Rather than learning how to vote, the families of the disenfranchised learn the opposite. Disenfranchisement can cause a generational effect of non-voting, further harming the democratic process.

The pernicious effects of disenfranchisement spread into the community as well. One study found that "in states with more restrictive criminal disenfranchisement laws, the overall voter turnout is lower than in states with less restrictive criminal disenfranchisement laws" among those eligible to vote. Aman McLeod et al., *The Locked Ballot Box: The Impact of State Criminal Disenfranchisement Laws on African American Voting Behavior and Implications for Reform*, 11 Va. J. Soc. Pol'y & L. 66, 80 (2003). This impact occurs because voting is "a communal experience, and limitations on some members of the community have been shown to translate into lower overall participation." Wood, *supra*, at 12.

### C. Mass Disenfranchisement, Resulting from the Combination of Disenfranchisement for Comparatively Minor Crimes and Overcriminalization, Magnifies the Social and Economic Costs of Disenfranchisement

The large number of disenfranchised Mississippi citizens magnifies the severity of the increased risk of recidivism associated with

disenfranchisement.  Every Mississippi citizen who is disenfranchised is more likely to commit a crime because of it.  And increased risks of recidivism means increased costs to the public, not to mention the impact on public safety.

The negative effect of disenfranchisement on community voting is exacerbated by the sheer volume of disenfranchised citizens.  For one thing, given the relationship between disenfranchised citizens and depressed voting in the community, each and every community throughout Mississippi in which these disenfranchised citizens live faces a depressed voting rate.  Moreover, ex-offenders are more likely to be poor, and tend to live in low income communities.  The dampening effect of disenfranchised citizens on community voting is magnified by the concentration of ex-offenders in low income areas.

This dampening effect in a community lessens the voting power of that community.  Communities that vote less lose their voice in governance.  Politicians can safely ignore these communities and focus on areas with higher voter participation and turnout.  It disserves democracy for communities to be ignored by the process, and it disserves Mississippi when these voices are absent from public discourse.

Disenfranchisement was intended as a rare punishment for serious offenses. Overcriminalization, combined with disenfranchisement to minor crimes, imposes costs on the public, distorts our public sphere, and threatens our democracy.

## CONCLUSION

For the foregoing reasons, and those presented by Plaintiffs-Appellees, the district court's judgment should be reversed.

November 6, 2019                    Respectfully submitted,

                                                 s/ *Andrew Tutt*

Clark M. Neily III                          David J. Weiner
Jay R. Schweikert                           Andrew T. Tutt
CATO INSTITUTE                              Kyle Lyons-Burke
1000 Mass. Ave., NW                         ARNOLD & PORTER
Washington, DC 20001                           KAYE SCHOLER LLP
(202) 842-0200                              601 Massachusetts Ave., NW
cneily@cato.org                             Washington, D.C. 20001
                                            (202) 942-5000
Shana-Tara O'Toole                          andrew.tutt@arnoldporter.com
700 Pennsylvania Avenue SE #560
Washington, DC 20003                        Avishai D. Don
(202) 558-6683                              ARNOLD & PORTER
shana@idueprocess.org                          KAYE SCHOLER LLP
                                            250 West 55th Street
                                            New York, NY 10019
                                            (212) 836-8000
                                            avishai.don@arnoldporter.com

*Counsel for Amici Curiae*

33

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing brief of *amici curiae* was filed electronically on November 6, 2019 and will, therefore, be served electronically upon all counsel.

s/ *Andrew Tutt*
Andrew T. Tutt

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that

1,      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 5th Cir. R. 32 because this brief contains 6,208 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. Rule 32.2.

2,      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word and is set in Century font in a size equivalent to 14 points or larger.

s/ *Andrew Tutt*
Andrew T. Tutt