No. 19-60662

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

DENNIS HOPKINS, individually and on behalf of a class of all others similarly situated; HERMAN PARKER, JR., individually and on behalf of a class of all others similarly situated; WALTER WAYNE KUHN, JR., individually and on behalf of a class of all others similarly situated; BYRON DEMOND COLEMAN, individually and on behalf of a class of all others similarly situated; JON O'NEAL, individually and on behalf of a class of all others similarly situated; EARNEST WILLHITE, individually and on behalf of a class of all others similarly situated,

*Plaintiffs-Appellees*

V.

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

*Defendant-Appellant*

*(Continuation of Caption on Following Page)*

_____

**On Appeal from the United States District Court**
**for the Southern District of Mississippi**

_____

# RESPONSE AND REPLY BRIEF OF DEFENDANT-APPELLANT CROSS-APPELLEE SECRETARY OF STATE HOSEMANN

Krissy C. Nobile, MSB # 103577
Justin L. Matheny, MSB # 100754
STATE OF MISSISSIPPI
ATTORNEY GENERAL'S OFFICE
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3824
knobi@ago.ms.gov
justinmatheny@ago.ms.gov

*Counsel for Defendant-Appellant Cross-Appellee Secretary of State Delbert Hosemann*

_____

**Consolidated with No. 19-60678**

DENNIS HOPKINS, individually and on behalf of a class of all others similarly situated; HERMAN PARKER, JR., individually and on behalf of a class of all others similarly situated; WALTER WAYNE KUHN, JR., individually and on behalf of a class of all others similarly situated; JON O'NEAL, individually and on behalf of a class of all others similarly situated; EARNEST WILLHITE, individually and on behalf of a class of all others similarly situated; BYRON DEMOND COLEMAN, individually and on behalf of a class of all others similarly situated,

*Plaintiffs-Appellees Cross-Appellants*

V.

SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity,

*Defendant-Appellant Cross-Appellee*

_____

ii

# CERTIFICATE OF INTERESTED PARTIES

### *Case No. 19-60662 consolidated with No. 19-60678*

Undersigned counsel certifies that the following listed persons have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1.  Dennis Hopkins, Herman Parker, Jr., Walter Wayne Kuhn Jr., Byron Demond Coleman, Jon O'Neal, and Earnest Willhite, Plaintiffs-Appellees Cross-Appellants;

2.  Janet A. Gochman, Isaac Rethy, Jonathan K. Youngwood, Nihara Karim Choudhri, Tyler A. Anger, Simpson, Thacher & Bartlett, LLP, Attorneys for Plaintiffs-Appellees Cross-Appellants;

3.  Paloma Wu, Lisa S. Graybill, Caren E. Short, Nancy G. Abudu, The Southern Poverty Law Center, Attorneys for Plaintiffs-Appellees Cross-Appellants;

4.  Secretary of State Delbert Hosemann, in his official capacity, Defendant-Appellant Cross-Appellee;

5.  Justin L. Matheny, Krissy C. Nobile, Mississippi Office of the Attorney General Attorney, Attorneys for Defendant-Appellant Cross-Appellee.

SO CERTIFIED, this the 8th day of November, 2019.

/s/ *Krissy C. Nobile*
Krissy C. Nobile

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES ........................................................ iii

TABLE OF CONTENTS........................................................................................ iv

TABLE OF AUTHORITIES ................................................................................. vi

RE-STATEMENT OF THE ISSUES ......................................................................1

SUMMARY OF THE RESPONSE AND REPLY ARGUMENT...........................2

ARGUMENT ..........................................................................................................4

   I.   PLAINTIFFS LACK ARTICLE III STANDING FOR THEIR
       CONSTITUTIONAL CHALLENGES TO SECTION 253, AND THE
       ELEVENTH AMENDMENT BARS THEIR CLAIMS.................................4

   II.  PLAINTIFFS' RACE-BASED EQUAL PROTECTION CHALLENGE TO
       SECTION 253 FAILS AS A MATTER OF LAW. ........................................8

   III. SECTION 253 IS NOT FACIALLY UNCONSTITUTIONAL UNDER THE
       EQUAL PROTECTION CLAUSE. ..............................................................14

   IV. SECTION 253'S REENFRANCHISEMENT REGIME IS NOT FACIALLY
       INVALID UNDER THE FIRST AMENDMENT.......................................24

   V.  PLAINTIFFS LACK ARTICLE III STANDING, AND THE ELEVENTH
       AMENDMENT BARS THEIR SECTION 241 CLAIMS............................30

   VI. *RICHARDSON V. RAMIREZ* FORECLOSES PLAINTIFFS' NON-RACIAL
       EQUAL PROTECTION CHALLENGE TO SECTION 241, AND THE
       CLAIM OTHERWISE FAILS ON ITS OWN TERMS. ..............................32

     A.  *Richardson's* holding is squarely on point...............................................32

     B.  As *Richardson* held, the "express language" of Section 2 of the Fourteenth
       Amendment provides an "affirmative sanction" for the "exclusion of felons
       from the vote." .............................................................................................34

VII. PLAINTIFFS' FACIAL CHALLENGE UNDER THE EIGHTH
      AMENDMENT TO SECTION 241 FAILS....................................................41

   A. Because States may permanently disenfranchise felons under the Fourteenth
      Amendment, the Eighth Amendment does not prohibit States from
      permanently disenfranchising felons. ...........................................................41

   B. Plaintiffs' Eighth Amendment challenge to Section 241 separately fails on
      its own terms. .................................................................................................43

   C. The district court otherwise correctly dismissed plaintiffs' Eighth
      Amendment claim. ...........................................................................................50


VIII. EVEN IF PLAINTIFFS WERE ENTITLED TO SUMMARY
      JUDGMENT, WHICH THEY ARE NOT, THE REQUESTED RELIEF
      STILL MUST BE DENIED. ......................................................................56


CONCLUSION ........................................................................................................57

CERTIFICATE OF SERVICE ...............................................................................59

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ...........60

# TABLE OF AUTHORITIES

## FEDERAL CASES:

*Atkins v. Virginia*
  536 U.S. 304 (2002) .................................................................................51

*Barnhart v. Thomas*
  540 U.S. 20 (2003) ......................................................................... 36, 37

*Beacham v. Braterman*
  300 F. Supp. 182 (S.D. Fla. 1969) .................................................. 2, 3, 15, 16, 17

*Bernard v. Gulf Oil Co.*
  619 F.2d 459 (5th Cir. 1980) ..................................................................28

*Bridges v. Wixon*
  326 U.S. 135 (1945) ...............................................................................29

*Browning Ferris Industries of Alabama, Inc. v. Pegues*
  710 F. Supp. 313 (M.D. Ala. 1987) ............................................... 19, 20

*Burton v. City of Belle Glade*
  178 F.3d 1175 (11th Cir. 1999) ..................................................... 25, 26

*Chisom v. Roemer*
  853 F.2d 1186 (5th Cir. 1988) ..............................................................56

*City of Lakewood v. Plain Dealer Publ'g Co.*
  486 U.S. 750 (1988) ...............................................................................27

*Conn. Bd. of Pardons v. Dumschat*
  452 U.S. 458 (1981) .................................................................... 10, 15

*Cotton v. Fordice*
  157 F.3d 388 (5th Cir. 1998) ................................................................42

*County. of Sacramento v. Lewis*
   523 U.S. 833 (1998)..............................................................................26

*Davis v. Schnell*
   81 F. Supp. 872 (S.D. Ala. 1949) ................................................. 20, 21

*El-Amin v. McDonnell*,
No. 3:12-cv-00538, 2013 WL 1193357, at \*5–6 (E.D. Va. Mar. 22, 2013). ... 41, 42

*Ewing v. California*
538 U.S. 11 (2003)..................................................................................50

*Ex Parte Young*
   209 U.S. 123 (1908)................................................................................7

*Farrakhan v. Locke*
   987 F. Supp. 1304 (E.D. Wash. 1997).................................... 41, 43, 47

*Fincher v. Scott*
   352 F. Supp. 117 (M.D.N.C. 1972) .......................................................47

*Forsyth County v. Nationalist Movement*
   505 U.S. 123 (1992)....................................................... 27, 28

*Graham v. Connor*
   490 U.S. 386 (1989)................................................................................26

*Greater L.A. Council on Deafness, Inc. v. Cmty. Television of S. Cal.*
   719 F.2d 1017 (9th Cir. 1983) ...............................................................57

*Green v. Board of Elections*
   380 F.2d 445 (2d Cir. 1967) ............................................. 24, 43, 47, 50

*Hand v. Scott*
   888 F.3d 1206 (11th Cir. 2018) ................................................... passim

*Harvey v. Brewer*
  605 F.3d 1067 (9th Cir. 2010) ..................................................... passim

*Hayden v. Pataki*
  449 F.3d 305 (2d Cir. 2006) ................................................................38

*Hayden v. Pataki*, No.-00-Civ.-8586
  2004 WL 1335921 (S.D.N.Y. 2004)..................................................27

*Hayden v. Paterson*
  594 F.3d 150 (2d Cir. 2010) ...........................................................9, 13

*Heckler v. Rosebud Hosp. Dist.*
  473 U.S. 1308 (1985)........................................................................57

*Herrera v. Collins*
  506 U.S. 390 (1993)............................................................................8

*Hinds v. Lynch*
  790 F.3d 259 (1st Cir. 2015)..............................................................48

*Hope For Families & Community Service, Inc. v. Warren*
  721 F. Supp. 2d 1079 (M.D. Ala. 2010)............................................20

*Hornsby v. Allen*
  326 F.2d 605 (5th Cir. 1964) .............................................................19

*Howard v. Gilmore*
  205 F.3d 1333, 2000 WL 203984 (4th Cir. 2000).............................26

*Hunter v. Underwood*
  471 U.S. 222 (1985)..................................................................... 13, 26

*INS v. Legalization Assistance Project*
  510 U.S. 1301 (1993)........................................................................57

*Johnson v. Bredesen*
　624 F.3d 742 (6th Cir. 2010) ....................................................... 47, 48

*Johnson v. Bush*
　214 F. Supp. 2d 1333 (S.D. Fla. 2002) ......................................... 25, 27

*Johnson v. Governor of State of Fla*.
　405 F.3d 1214 (11th Cir. 2005) .........................................................38

*Johnson v. Rodriguez*
　110 F.3d 299 (5th Cir. 1997) ....................................................... 18, 20

*Johnson v. Sayre*
　158 U.S. 109 (1895) ..................................................................... 37, 38

*Jones v. White*
　992 F.2d 1548 (11th Cir. 1993) .........................................................11

*Kansas v. Hendricks*
　521 U.S 346 (1997) ............................................................................46

*K.P. v. LeBlanc*
　627 F.3d 115 (5th Cir. 2010) .............................................................14

*K.P. v. LeBlanc*
　729 F.3d 427 (5th Cir. 2013) ...................................................... passim

*Kennedy v. Mendoza-Martinez*
　372 U.S. 144 (1963) ...........................................................................44

*King v. City of Boston*, CIV.A.04-10156-RWZ
　2004 WL 1070573 (D. Mass. May 13, 2004) ......................................47

*Kronlund v. Honstein*
　327 F. Supp. 71 (N.D. Ga. 1971) ................................................. 43, 47

*Leib v. Hillsborough County Public Transp. Com'n*
    558 F.3d 1301 (11th Cir. 2009) ............................................................19

*Lockhart v. United States*
    136 S.Ct. 958 (2016).............................................................. 35, 36, 37

*Lovell v. City of Griffin, Ga.*
    303 U.S. 444 (1938).............................................................................26

*Maher v. City of New Orleans*
    516 F.2d 1051 (5th Cir. 1975) .............................................................19

*McCleskey v. Kemp*
    481 U.S. 279 (1987)..............................................................................11

*McIntyre v. Ohio Elections Comm'n*
    514 U.S. 334 (1995)..............................................................................29

*McLaughlin v. City of Canton, Miss.*
    947 F. Supp. 954 (S.D. Miss. 1995) .....................................................49

*McLemore v. Hosemann*, 3:19-CV-383-DPJ-FKB
    2019 WL 5684512 (S.D. Miss. Nov. 1, 2019).....................................31

*Murphy v. Nat'l Collegiate Athletic Ass'n*
    138 S.Ct. 1461 (U.S. May 14, 2018) ...................................................57

*OCA-Greater Houston v. Texas*
    867 F.3d 604 (5th Cir. 2017) ...................................................... 30, 31

*Okpalobi v. Foster*
    244 F.3d 405 (5th Cir. 2001) ....................................................... passim

*Perry-Bey v. Holder*, 2:14-cv-359
    2015 WL 11120509 (E.D. Va. Mar. 24, 2015)....................................48

*Richardson v. Ramirez*
    418 U.S. 24 (1974)........................................................................ passim

*Robinson v. State of California*
    370 U.S. 660 (1962)..........................................................................42

*Sailors v. Board of Educ. of Kent County*
    387 U.S. 105 (1967)..........................................................................30

*Schick v. Reed*
    419 U.S. 256 (1974)..........................................................................10

*Shelby County v. Holder*
    133 S.Ct. 2612 (2013)........................................................................45

*Shepherd v. Trevino*
    575 F.2d 1110 (5th Cir. 1978) ....................................................... passim

*Simmons v. Galvin*
    575 F.3d 24 (1st Cir. 2009).................................................... 43, 47, 49

*Simmons v. Galvin*
    652 F. Supp. 2d 83 (D. Mass. 2007)...................................................47

*Smith v. Doe*
    538 U.S. 84 (2003).......................................................................... passim

*Smith v. Snow*
    722 F.2d 630 (11th Cir. 1983) ..................................................... 24, 28

*Sobranes Recovery Pool I, LLC v. Todd & Hughes Const. Corp*.
    509 F.3d 216 (5th Cir. 2007) ............................................................35

*Stepnowski v. Commissioner*
    456 F.3d 320 (3d Cir. 2006) .............................................................35

*Thiess v. State, Admin*
    387 F. Supp. 1038 (D. Md. 1974) .........................................................................47

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*
    393 U.S. 503 (1969) ...............................................................................................29

*Trop v. Dulles*
    356 U.S. 86 (1958) .......................................................................................... 43, 47

*United States v. Gurule*
    461 F.3d 1238 (10th Cir. 2006) ...........................................................................50

*United States v. Johnson*
    451 F.3d 1239 (11th Cir. 2006) ...........................................................................50

*United States v. Salerno*
    481 U.S. 739 (1987) ........................................................................................ 51, 52

*United States v. Under Seal*
    709 F.3d 257 (4th Cir. 2013) ...............................................................................43

*United States v. Ursery*
    518 U.S. 267 (1996) ...............................................................................................47

*Voices for Int'l Business and Education, Inc. v. NLRB*
    905 F.3d 770 (5th Cir. 2018) ...............................................................................39

*Washington v. Harper*
    494 U.S. 210 (1990) ...............................................................................................30

*Wesley v. Collins*
    791 F.2d 1255 (6th Cir. 1986) .............................................................................50

*Williams v. Taylor*
    677 F.2d 510 (5th Cir. 1982) ................................................................... 2, 15, 18

*Women's Med. Ctr. of Nw. Houston v. Bell*
   248 F.3d 411 (5th Cir. 2001) ...............................................................19

*Yick Wo v. Hopkins*
   118 U.S. 356 (1886)................................................................ 9, 18, 21

## STATE CASES:

*Foley v. Beshear*
   462 S.W.3d 389 (Ky. 2015)...............................................................15

*Madison v. State*
   163 P.3d 757 (Wash. 2007) ...............................................................28

*State v. Petersen-Beard*
   377 P.3d 1127 (Kan. 2016).................................................................43

## FEDERAL STATUTES:

18 U.S.C. § 922(d)(1), (g)(1) ...............................................................11

18 U.S.C. § 2252(b)(2).................................................................. 35, 36

28 U.S.C. § 1865(b)(5).......................................................................11

U.S. CONST. amend. V .................................................................. 35, 37

U.S. CONST. amend. XIV, § 2........................................................ passim

U.S. CONST. amends. XV (race); XIX (sex); XXVI (age) .....................32

U.S. CONST. Art. I, § 2, cl. 1 ..............................................................32

U.S. CONST. Art. I, § 4, cl. 1 ..............................................................32

## STATE STATUTES:

MISS. CODE ANN. § 23-15-11.............................................................46

Miss. Code Ann. § 23-15-19.....................................................................46

Miss. Code Ann. § 23-15-21.....................................................................46

Miss. Code Ann. § 37-7-203.....................................................................49

Miss. Const. Art. 5, § 124 ................................................................. 13, 14

Miss. Const. art. 12, § 241.............................................................. passim

Miss. Const. art. 12, § 253.............................................................. passim

## **FEDERAL RULES:**

Federal Rule of Civil Procedure 23(c)(3)(A)...........................................58

## **OTHER AUTHORITIES:**

82 C.J.S. Statutes § 443 ........................................................................35

Br. of ABA Amicus, *Richardson v. Ramirez*
1973 WL 172333 (Dec. 28, 1973) ........................................................40

Br. of United States, *Lockhart v. United States*
2015 WL 5302535 (2015)......................................................................46

*Richardson v. Ramirez*, Oral Argument, (Dec. 28, 1973)
*Available at* https://www.oyez.org/cases/1973/72-1589 ........................40

Robert J. Martineau & Michael B. Salerno,
*Legal, Legislative, and Rule Drafting in Plain English* 68 (2005)..........35

## <u>RE-STATEMENT OF THE ISSUES</u>

**I.**      **Article 12, Section 253**:

1.      Do plaintiffs lack Article III standing and/or does the Eleventh Amendment bar their claims when the Secretary of State is powerless to remedy plaintiffs' alleged injury because he does not enforce Section 253 or have any role whatsoever in Section 253's legislative process?

2.      Does plaintiffs' race-based equal protection challenge fail when: (i) plaintiffs failed to prove that Section 253 has any present-day unconstitutional effects or that the law is discriminatory in application, and (ii) Section 253, while enacted in 1890, is not self-enforcing, and the Mississippi Legislature not only endorsed the law in the 1980s, but a two-thirds majority of the Legislature endorses the substance and procedure of Section 253 each time present-day legislators pass a suffrage bill?

3.      Does a discretionary vote restoration regime for convicted felons, like Section 253, facially violate the Equal Protection Clause simply because it does not contain specific standards?

4.      Do convicted felons who have already lost the right to vote pursuant to a State's valid exercise of the affirmative sanction in Section 2 of the Fourteenth Amendment still have a constitutionally protected "right to vote" under the more

1

general terms of the First Amendment, and does Section 253's reenfranchisement scheme facially violate the First Amendment?

## II.    Article 12, Section 241:

1.    Does Article III and/or the Eleventh Amendment bar plaintiffs' Section 241 claims when the Secretary lacks authority to register voters and/or compel local election officials to register voters?

2.    Does binding precedent foreclose plaintiffs' non-racial equal protection challenge to Section 241, and does the claim otherwise fail because plaintiffs' novel construction of Section 2 of the Fourteenth Amendment is erroneous?

3.    Does plaintiffs' Eighth Amendment facial challenge to felon disenfranchisement fail when the exclusion of felons from the vote has an affirmative sanction in Section 2 of the Fourteenth Amendment?

## <u>SUMMARY OF THE RESPONSE AND REPLY ARGUMENT</u>

Over the course of 68 pages, plaintiffs do not cite—much less develop a legal theory consistent with—binding felon disenfranchisement and reenfranchisement cases. Rather than actually grapple with precedent like *Richardson v. Ramirez*, 418 U.S. 24 (1974), *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla. 1969), *aff'd* 396 U.S. 12 (1969), *Shepherd v. Trevino*, 575 F.2d 1110 (5th Cir. 1978), and/or *Williams v. Taylor*, 677 F.2d 510 (5th Cir. 1982), plaintiffs simply contend those cases don't mean what they say.

Because there is no case that supports plaintiffs' propositions of law, plaintiffs pluck words from their defining context in pertinent authority, and transport those words to a more expansive, more pliable, and more favorable setting—while ignoring the defining context.  For example, plaintiffs borrow language from First Amendment "prior restraint" cases to argue that convicted felons who have *already lost* the right to vote pursuant to Section 2 of the Fourteenth Amendment *still have* a First Amendment "right to vote."

Neither logic nor caselaw supports the proposition that the First Amendment gives back what the Fourteenth Amendment affirmatively sanctions a State to take away. "[O]nce a felon is properly disenfranchised a state is at liberty to keep him in that status indefinitely and never revisit that determination." *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (O'Connor, J., sitting by designation).

Indeed, binding authority establishes that a state need not automatically restore voting rights when felons complete their sentence, *Richardson*, 418 U.S. 24, nor must a state's discretionary vote restoration regime employ specific standards susceptible of mechanical application under the Equal Protection Clause, *Beacham*, 300 F. Supp. at 182-84, *aff'd* 396 U.S. 12.

All of plaintiffs' constitutional challenges to Article 12, Sections 253 and 241 of the Mississippi Constitution fail. Their claims are not justiciable against the Mississippi Secretary of State and, even if so, they are invalid.

# **ARGUMENT**

## I.     PLAINTIFFS LACK ARTICLE III STANDING FOR THEIR CONSTITUTIONAL CHALLENGES TO SECTION 253, AND THE ELEVENTH AMENDMENT BARS THEIR CLAIMS.

**Article III Standing.**     Plaintiffs recognize that only the Mississippi Legislature enforces Section 253. That is why plaintiffs' constitutional challenges to Section 253 center on the law's "legislative process." Hopkins Br. at 49, 53, 54; *see also* Hopkins Br. at 56 (claiming that Section 253 needs additional "criteria for *the Mississippi Legislature to apply*") (emphasis supplied).

Nevertheless, plaintiffs try to circumvent their traceability and redressability problems by reformulating their claimed injury. Indeed, despite that the complaint's requested relief targets Section 253's "legislative process," ROA.19-60662.60,[1] plaintiffs now claim that their injury is not the process—it is the "burden" of having to "obtain the passage of a suffrage bill in order to regain the right to vote[.]" Hopkins Br. at 23. But this newly-formulated injury only underscores why plaintiffs lack standing.

---

[1] Plaintiffs' complaint only seeks the following relief to remedy their alleged Section 253 injury:

> [A] class-wide judgment declaring that the inherently arbitrary and racially discriminatory *legislative process* for the restoration of voting rights *established by the suffrage bill provision* of the Mississippi Constitution violates the Equal Protection Clause of the Fourteenth Amendment, as well as the First Amendment.

ROA.19-60662.60 (emphasis supplied).

The Secretary of State can do nothing to alleviate the purported "burden" imposed by Section 253. And, most certainly, the Secretary cannot enact a legislative suffrage bill. The Secretary consequently has no "definite responsibilities relating to *the application of the challenged law*." Hopkins Br. at 17 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (*K.P. I*) (emphasis supplied)); *see also Okpalobi v. Foster,* 244 F.3d 405, 426-27 (5th Cir. 2001) (en banc); *K.P. v. LeBlanc*, 729 F.3d 427, 436-37 (5th Cir. 2013) (*K.P. II*). Indeed, *Okpalobi*, *K.P. I*, and *K.P. II* demonstrate as much.

By way of background, Louisiana passed its Medical Malpractice Act of 1975, and created the Louisiana Patient's Compensation Fund. In 1997, Louisiana passed Act 825—the legislation at issue in *Okpalobi* and *K.P.* Subsection (A) of that Act provides a cause of action arising from the performance of an abortion. Subsection (C)(2), by contrast, indicates that the section falls outside the protections of the Malpractice Act. *K.P. II*, 729 F.3d at 432, 436.

In *Okpalobi*, healthcare providers sued the Attorney General and Governor to enjoin Act 825. The en banc Fifth Circuit dismissed the case for lack of standing on both traceability and redressability grounds. *Okpalobi*, 244 F.3d at 426-29. The Court did so because, like the Secretary here, the *Okpalobi* defendants lacked authority under state law to redress the injuries alleged. *Id.*

Thereafter, a provider's ("K.P.") abortion patient sued him in state court. A group of providers again sued over Act 825—but this time they sued the executive director of the Louisiana Patient's Compensation Fund Oversight Board.

In *K.P. I*, cited on pages 17-18 of plaintiffs' brief, this Court reviewed "a district court decision that dismissed the Providers' *entire suit* on grounds of immunity" at the motion to dismiss stage. *See K.P. II*, 729 F.3d at 437 (explaining *K.P. I*) (emphasis in original). Then, in *K.P. II*, this Court clarified that although the Board has responsibilities under Act 825, each subsection of the law, and each form of relief sought, must separately be analyzed for standing purposes. *Id.* at 436-37 and n.49.

The plaintiffs in *K.P. II* had standing to challenge subsection (C)(2) of the Act because *the Board* has the responsibility *of deciding* whether or not an abortion provider receives coverage for a claim. *Id.* at 437. In contrast, here, the Secretary of State has no responsibility or ability *to decide* whether plaintiffs receive a suffrage bill.

Separately, the plaintiffs in *K.P. II* did *not* have standing as to subsection (A) of the Act because the Board is not "charged under state law with enforcing" that provision. *Id.* Similarly, here, the Secretary of State is not "charged under state law with enforcing" Section 253. Therefore, as in *K.P. II*, "relief directed at the [Secretary] will not readdress [plaintiffs'] injury." *Id.*

Thus, under *Okpalobi*, *K.P. I*, and *K.P. II*, *even if* state officials have responsibilities under portions of a challenged law—that doesn't create plaintiffs' standing to challenge the entire law. And, in this case, the Secretary has *no* responsibilities under *any* portion of the challenged law (Section 253). Enjoining the Secretary to enforce or not enforce Section 253, or to enforce that law differently, will not affect whether plaintiffs obtain a suffrage bill. Nor will it alter plaintiffs' so-called "burden to obtain the passage of a suffrage bill." Hopkins Br. at 23.

In short, plaintiffs lack Article III standing because they seek relief that the Secretary cannot provide for an alleged injury the Secretary did not cause.

**Eleventh Amendment**. Plaintiffs' Section 253 claims also fail the "some enforcement connection" test. Because the Secretary of State is an *executive branch* official, he *cannot* enforce Section 253. State law constitutionally commits the enforcement of Section 253 *to the legislative branch*. MISS. CONST. art. 12, § 253 ("The Legislature may…."); art. 1, §§ 1, 2 (Mississippi's separation of powers provisions).

Further, although the phrase "some connection" comes from *Ex Parte Young*, plaintiffs ignore the operative verb that completes the rule. The required connection is "some connection with the *enforcement of* the act," not just "some connection" with the law generally. *Ex Parte Young*, 209 U.S. 123, 157 (1908) (emphasis supplied).

7

Indeed, plaintiffs cite four cases on page 26 of their brief for the proposition that standing exists simply because the Secretary is the State's "chief election officer." But, in all of plaintiffs' cases, the challenged laws required a Secretary of State to *actually implement the law at issue*. The Eleventh Amendment thus wasn't satisfied just because the defendants were the "chief election officer," or just because they had some connection to the law generally.

Along the same lines, plaintiffs incorrectly contend that "*Okpalobi* has no relevance here" because the Secretary is the "chief election officer." Hopkins Br. at 21. *Okpalobi* and its progeny reiterate the Article III and Eleventh Amendment standards—and those standards are not satisfied here.

## II.   PLAINTIFFS' RACE-BASED EQUAL PROTECTION CHALLENGE TO SECTION 253 FAILS AS A MATTER OF LAW.

Section 253 provides one of the State's discretionary mechanisms for felons *to regain* suffrage; it does not operate *to deny* plaintiffs the right to vote. Instead, Section 253, like the gubernatorial pardon, is only the "power to extend mercy." *Herrera v. Collins*, 506 U.S. 390, 412 (1993).

Further, Section 253 is facially-neutral, and it simply *authorizes* (but does not mandate) present-day Mississippi legislators to exercise their authority to pass suffrage bills. Because Section 253 is not self-enforcing, the constitutional provision does not, on its own, do anything. As a result, and especially absent any evidence of disproportionate effects, how present-day legislators exercise their discretionary

authority to issue suffrage bills is critical for equal protection purposes. *See Yick Wo v. Hopkins,* 118 U.S. 356, 373-74 (1886).

While plaintiffs argue that they need not prove discriminatory application of the law, their argument misses the point. Hopkins Br. at 67-68. Plaintiffs' problem is that they have failed to prove ***either*** discriminatory effects of Section 253 ***or*** that Section 253 is discriminatory in application.

Turning first to discriminatory effects, plaintiffs admit they have no proof that Section 253, in present day, disproportionately impacts minorities. Instead, their only proof of disproportionate effect is that, as convicted felons, they are "subject to" Section 253 in the first instance. Hopkins Br. at 67. That gets the effects analysis all wrong.

Under plaintiffs' view of equal protection, the pardon power also would be unconstitutional since plaintiffs are "subject to" it too. In fact, _all_ vote restoration regimes in most states could be unconstitutional because convicted felons are subject to those laws as well, and disenfranchisement laws in other states also allegedly have a "disparate impact on Blacks and Latinos." *Hayden v. Paterson*, 594 F.3d 150, 159-160 (2d Cir. 2010).

If convicted felons were *not* subject to a state's vote restoration laws, they would never have the opportunity to regain suffrage under those laws. So, plaintiffs' argument is actually counterintuitive. If vote restoration laws are unconstitutional

because convicted felons are "subject to" them, there simply will be no vote restoration laws—and plaintiffs will remain disenfranchised.

Plus, plaintiffs have not brought a race-based equal protection challenge to *dis*enfranchisement; they assert a facial challenge to *re*enfranchisement. Thus, the claim plaintiffs brought is the one they must prove. But plaintiffs never bothered to analyze the purported "unconstitutional effects" of Section 253. And, had they done so, the analysis might not fit the narrative plaintiffs want to advance.

In fact, the present-day Mississippi Legislature may provide *more* suffrage bills to African-Americans than to Caucasians. Or maybe minorities and non-minorities proportionately receive the same quantity of suffrage bills. Under plaintiffs' flawed equal protection theory, though, none of that matters.

Additionally, Section 253 requires present-day legislators to exercise their discretionary authority to grant a suffrage bill for the law to have any effects at all. Therefore, how state officials exercise their discretionary authority to restore suffrage matters here. Indeed, "[i]ndividual acts of clemency inherently call for discriminating choices because no two cases are the same." *Schick v. Reed*, 419 U.S. 256, 268 (1974); *Hand v. Scott*, 888 F.3d 1206, 1209 (11th Cir. 2018) (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464-66 (1981)).

A similar analysis, in fact, applies in the criminal sentencing context, where different outcomes frequently result between defendants who might appear, in some

ways, to be similarly situated. Nevertheless, sentencing disparities alone do not establish an equal-protection claim. *Jones v. White*, 992 F.2d 1548, 1571-75 (11th Cir. 1993). The Supreme Court has reached the same conclusion in rejecting Eighth Amendment challenges to death sentences in *McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987).

Despite this, the plaintiffs here never attempted to prove any present-day disproportionate effects of Section 253—let alone did they compare any similarly-situated convicted felons, or otherwise prove discriminatory application of the law. In fact, the allegations concerning plaintiff Herman Parker *not* receiving a suffrage bill only prove *why* plaintiffs' facial challenge fails. Plaintiffs contend that there is no "rational basis for the Mississippi Legislature's failure to pass a proposed suffrage bill" to plaintiff Parker. Hopkins Br. at 53. However, this is a facial challenge to reenfranchisement, and plaintiffs otherwise get the constitutional paradigm backwards.

The law doesn't entitle any convicted felon to a suffrage bill. Nor does the law entitle a felon to a pardon or to have rights under the Second Amendment restored.[2] Correspondingly, plaintiff Parker *does not* allege (much less prove) that

---

[2] Federal law prohibits the possession of a firearm for anyone indicted for or convicted of a felony punishable by imprisonment for one year or more. 18 U.S.C. § 922(d)(1), (g)(1). Federal law also bars those who have a "charge pending" or have been convicted of a crime punishable by imprisonment for one year or more from serving on a jury.  28 U.S.C. § 1865(b)(5).

11

present-day legislators refused to exercise their discretionary authority based on any impermissible motives such as race. Nor does plaintiff Parker even attempt to compare his situation with any other similarly-situated convicted felon.

As a result, plaintiffs' equal protection claim fails for lack of proof that Section 253 has any present-day discriminatory effects *or* that the law has been applied in a discriminatory fashion.

Plaintiffs' claim also fails for other reasons. They contend that Section 253 is unconstitutional solely because it was enacted in 1890. However, plaintiffs now concede that there is (and was) a "race-neutral justification for Section 253." Hopkins Br. at 61. No matter: plaintiffs also now contend that the Court should determine whether race-neutral statements from state officials 129 years ago were "pretextual" under the framework for *Batson* challenges. Hopkins Br. at 61. But plaintiffs' new pretext angle is just another way of saying that Section 253 is unconstitutional solely because it was enacted in 1890.

Many provisions in Mississippi law read the same today as they did in 1890, including Mississippi's separation of powers doctrine and the executive's pardon power. So, while it is a truism that a few long-ago (and long-since invalidated) laws were enacted with discriminatory intent in 1890—that doesn't mean all laws were, especially absent proof of such.

More importantly, though, plaintiffs still refuse to grapple with the fact that Section 253 is not self-enforcing. But this is critical to an analysis of "the enactment and operation" of the law. *Hunter v. Underwood*, 471 U.S. 222, 233 (1985). Plaintiffs incorrectly claim that the Secretary asserted that argument for the first time on appeal. But the Secretary has always contended that "Section 253 is a device that requires the action of a decision-making body (*i.e.*, the legislature) to be implicated at all." *E.g.*, ROA.19-60662.4299.

Present-day legislators' endorsement of Section 253, and the present-day exercise of their authority to pass suffrage bills, is a critical part of the analysis. *See, e.g.*, *Hayden*, 594 F.3d at 168-69 ("The 1894 constitutional provision…simply authorize[s] the New York legislature to enact felon disenfranchisement laws. That is, the constitutional provision does not operate to deny plaintiffs the right to vote, rather *the statutory enactment pursuant to the constitutional provision does*.") (emphasis supplied).

Comparing the executive pardon power is illustrative. Similar to the Federal Constitution, the Mississippi Constitution provides the Governor with the "power to grant…pardons." Miss. Const. Art. 5, § 124. However, because Section 124 is also not self-enforcing, a challenge to the exercise of the pardon power can only hinge on the present-day executive's exercise of his authority to grant or deny a pardon.

13

So, hypothetically speaking, if the Governor expressly refused to grant a pardon solely for racial reasons, Section 124 would not be unconstitutional. Instead, the constitutional challenge would be to the executive's implementation of a facially-neutral law in a discriminatory fashion. The same is true as to Section 253.

Indeed, as the district court recognized, plaintiffs must demonstrate that Section 253 is "applied in a discriminatory way," ROA.19-60662.4882, or at least prove that the law "continues to have [an unconstitutional] effect," ROA.19-60662.4866. But because plaintiffs failed to prove these elements as a matter of law, the district court erred in not granting summary judgment to the Secretary.

## III. SECTION 253 IS NOT FACIALLY UNCONSTITUTIONAL UNDER THE EQUAL PROTECTION CLAUSE.

A discretionary vote restoration process is not violative of equal protection simply because it lacks specific standards. ROA.19-60662.4880-4882 (District Court Opinion) (collecting cases). Of course, though, state officials making reenfranchisement determinations are still subject to generally applicable laws prohibiting various kinds of malfeasance, including laws barring invidious discrimination.

Equal protection constrains reenfranchisement authority—such as when a reenfranchisement system *on its face* draws a classification, like the one upheld in *Shepherd*, 575 F.2d at 1114-1115; or when a plaintiff proves that officials have

"administer[ed] a statute, fair on its face, with an unequal hand," as in *Williams*, 677 F.2d at 516.

Section 253, however, draws no classification on its face, and plaintiffs never proved that legislators selectively and arbitrarily implemented Section 253. Although plaintiffs allege that Section 253 creates a "risk" of discrimination, this is insufficient. That same "risk" of disparate treatment was present in cases in which the Supreme Court *approved* discretionary clemency decisions. *E.g., Dumschat*, 452 U.S. at 463-67; *Beacham*, 300 F. Supp. at 184, *aff'd* 396 U.S. 12.

Further, plaintiffs' deeply-flawed position incorrectly presumes that state officials will exercise their discretionary constitutional authority arbitrarily. But courts never presume that state officials will exercise their constitutional authority in violation of the Equal Protection Clause. *E.g., Foley v. Beshear*, 462 S.W.3d 389, 395 (Ky. 2015).

Similarly, plaintiffs wrongly maintain that the district court erred by relying on *Beacham* and *Hand* because those decisions involved executive branch officials exercising their authority under state law—as opposed to legislative branch officials exercising their authority. Hopkins Br. at 49-51. The distinction plaintiffs attempt to draw is an artificial one, as Section 253 is indistinguishable from other vote restoration regimes in that it is discretionary and not required by federal law.

15

What's more, the upshot of plaintiffs' argument is that reenfranchisement authority may only be vested in the executive. This proves too much though. Plaintiffs are correct that the U.S. Constitution gives the President the power to grant reprieves and pardons. But the U.S. Constitution does not vest *state officials* with any *state-law* vote restoration authority—instead, Mississippi law does.

In Mississippi, the State Constitution separately vests both executive and legislative officials with discretionary authority to restore suffrage to convicted felons. Nothing in the U.S. Constitution prohibits that. As far as federal law is concerned, the State need not have *any* vote restoration regime.

Further, plaintiffs' contention that this Court in *Shepherd* "confirmed" that "*Beacham* and *Hand* do not apply to reenfranchisement laws" is illogical. Hopkins Br. at 50. For starters, *Beacham* and *Hand* both *rejected* equal protection challenges to reenfranchisement laws, and *Hand* was decided 40 years after *Shepherd*. As to *Beacham*, though, plaintiffs contend that because this Court in *Shepherd* didn't cite to *Beacham*, that case somehow is inapplicable. Plaintiffs overlook the law at issue in *Shepherd* and otherwise miss the point.

The reenfranchisement system in *Shepherd* drew a classification *on the face of the law*: applicants sentenced by state judges, but not those sentenced by federal judges, could petition the governor or their sentencing judge for reenfranchisement.

*Shepherd*, 575 F.2d at 1112. Although the Texas law drew such a classification on the face of the law, this Court upheld it. *Id*. at 1115.

In contrast to Texas's law, Section 253 is facially neutral, and it does not provide for the reenfranchisement of some convicted felons and not others. It provides for the reenfranchisement of any convicted felon who has been disenfranchised under state law—at the Legislature's discretion.

Plaintiffs' equal protection challenge here is thus much weaker than in *Shepherd* because Mississippi's law facially draws *no* classification among applicants. And, in this regard, *Beacham* and *Hand* are directly on point. *Hand*, 888 F.3d at 1210; *Beacham*, 300 F. Supp. at 184.

Moreover, *Shepherd* instructs that the thrust of plaintiffs' challenge to Section 253—*i.e.*, the case-by-case nature of Mississippi's reenfranchisement regime—is an equal-protection-honoring feature, not an equal-protection-violating problem. *Shepherd*, 575 F.2d at 1115. In fact, unless States are outright barred from disenfranchising convicted felons, there <u>*always*</u> will be some convicted felons who regain suffrage and others who do not—including felons who are incarcerated and those who are not.

In a similar vein, plaintiffs are wrong to contend that Section 253 is "inherently arbitrary" because it "establishes no standards for distinguishing between" felons who should be reenfranchised and those who remain

disenfranchised. Hopkins Br. at 54-55. If anything, that argument admits that Section 253 *does not* itself draw any classifications or make any distinctions between groups of disenfranchised felons—which undermines plaintiffs' facial challenge.

It also is inaccurate to say that a standardless process for determining which felons should be reenfranchised necessarily results in arbitrary or discriminatory decision-making. At most, Section 253 creates a risk of disparate treatment. But the "'risk' that standardless determinations 'could' lead to impermissible discrimination…is not enough to show a discriminatory purpose or effect." *Hand*, 888 F.3d at 1210. This Court's *Williams* decision is instructive on this point.

In *Williams*, this Court found that an Election Board's failure to comply with the statutory procedure for disenfranchising felons may have resulted in "selective enforcement," and therefore remanded the case for the plaintiff to have an opportunity "to prove his claim of selective and arbitrary enforcement of the disenfranchisement procedure." 677 F.2d at 516-17. This Court reasoned that a state may not make "a completely arbitrary distinction between groups of felons so as to work a denial of equal protection with respect to the right to vote *when it administers a statute*, fair on its face, *with an unequal hand*." *Williams*, 677 F.2d at 516 (emphasis supplied) (citing *Yick Wo*).[3]

---

[3] *See also Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997) ("State actors may create classifications facially, when such categorization *appears in the language of legislation*. .

Thus, the law in *Williams* did not violate equal protection for lack of objective standards. Instead, as the district court correctly put it, *Williams* "asked whether the plaintiff had been treated differently[.]" ROA.19-60662.4881.

Next, plaintiffs stray even further afield by relying on *Browning Ferris Industries of Alabama, Inc. v. Pegues*, 710 F. Supp. 313 (M.D. Ala. 1987). Hopkins Br. at 54. That case involved a commercial regulatory statute related to hazardous waste treatment facilities, and a suit was brought challenging the statute as unconstitutional under the Due Process, Equal Protection, and Commerce Clauses.

In citing to *Browning-Ferris*, the plaintiffs here rely exclusively on the court's discussion of *due process*. *Id.* at 315-16 ("Commercial regulatory statutes are impermissibly vague if they provide no rule or standard at all[.]") (internal citation omitted). And, for its analysis, *Browning-Ferris* relied on this Court's due process decision in *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964). *See Maher v. City of New Orleans,* 516 F.2d 1051, 1063 n.60 (5th Cir. 1975) (noting that in *Hornsby,* a successful attack was "mounted on the denial of [a] liquor permit[ ], because "the unfettered, unreviewable power granted the agency in th[at] situation[ ] offended due process"); *Leib v. Hillsborough County Public Transp. Com'n*, 558 F.3d 1301, 1309 (11th Cir. 2009) (explaining "the gravamen of a void-for-vagueness claim");

---

.or *de facto,* through *the enforcement of* a facially neutral law in a manner so as to disparately impact a discernible group.") (emphasis supplied).

*Women's Med. Ctr. of Nw. Houston v. Bell,* 248 F.3d 411, 421 (5th Cir. 2001) ("'[A] state's legislative enactment is void for vagueness *under the due process clause*…if it 'is inherently standardless[.]'" (emphasis supplied, citation omitted)).

Here, plaintiffs have no *due process* claim challenging Section 253 as being standardless or void-for-vagueness.[4] And plaintiffs are wrong in cross-pollinating the standards for due process with equal protection. *See Hope For Families & Community Service, Inc. v. Warren*, 721 F. Supp. 2d 1079, 1143–44 (M.D. Ala. 2010) (rejecting an attempt to conflate due process and equal protection and reasoning that "Plaintiffs' argument is grounded in the wrong provision of the Fourteenth Amendment"). In fact, even though the statute in *Browning-Ferris* was "complete[ly] absen[t] of standards," the court held that it ***did not*** violate equal protection. 710 F. Supp. at 314, 316-17.

The decision in *Davis v. Schnell*, 81 F. Supp. 872 (S.D. Ala. 1949), while generally instructive, doesn't improve plaintiffs' claim here. *See* Hopkins Br. at 55. In *Davis*, African-American plaintiffs challenged the constitutionality of the "Boswell Amendment," which amended Alabama's literacy test for voter registration. *Id.* at 874.

---

[4] Plaintiffs don't bring such a claim because they don't have a cognizable due process claim to bring. *Johnson*, 110 F.3d at 308 ("The protections of the Due Process Clause are only invoked when State procedures…imperil ***a protected liberty or property interest***.") (emphasis supplied).

Unlike in this case, the *Davis* plaintiffs demonstrated that the law had a racial intent *and* that its provisions were "*being administered* so as to prevent the plaintiffs and others, *because of their race*, from exercising their right to vote." *Id.* at 874; *id.* at 874-75 ("[D]efendants *refused to register* plaintiffs…while at the same time defendants *were registering white applicants with less qualifications*[.]") (emphasis supplied); *id.* at 877-78 (relying on *Yick Wo*).

Additionally, plaintiffs' arguments would make a mess of the law and spawn serious anomalies. For example, all states but two generally forbid incarcerated felons from voting. Only Maine and Vermont, marked in green in the map below, allow felons to vote while in prison. The other 48 states, marked in red, generally don't allow incarcerated felons to vote *unless* they regain suffrage under a discretionary vote restoration regime while in prison. ROA.19-60662.4092-4143, 4144-4247.

Thus, if it is facially unconstitutional for a state legislature to have discretion when deciding whether to pass a bill that would restore suffrage, then most—if not all—of the 48 states that deny the vote to some or all convicted felons have unconstitutional vote restoration systems.

**Map 1: Voting Rights Suspended During Incarceration—Subject to Restoration Through Discretionary Vote Restoration Process**



Plus, at least as of October 2018, nearly every state allows for discretion not only in the restoration of the right to vote before and/or after incarceration—but also for other forms of official clemency. ROA.19-60662.4144-4247.[5] The following map illustrates as much:

---

[5] ROA.19-60662.4144-4247 is the addendum to the amicus brief filed by the States of Missouri, Alabama, Kansas, Louisiana, Michigan, South Carolina, Texas, and Utah in litigation in concerning Florida's reenfranchisement scheme. The amicus brief was filed in mid-2018, and the Secretary's summary judgment memoranda in this case was filed in October 2018.

**Map 2: Discretionary Restoration of Full Rights for Felons**



If the absence of a codified and mechanical test renders Section 253 facially invalid, why would it not also prove fatal for other kinds of clemency decisions, including whether to commute a death sentence, grant a liberty-conferring pardon, or restore a convicted felon's Second Amendment right? Any equal-protection analysis of such rights-restoration regimes would follow the same contours as an equal-protection analysis here.

But "section 2 of the fourteenth amendment blunts the full force of section 1's equal protection clause with respect to the voting rights of felons." *Shepherd*, 575 F.2d at 1114. Further, the State "properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws

of the state or of the nation by violating those laws sufficiently important to be classed as felonies." *Id*.

As Judge Friendly put it, someone "who breaks the laws" may "fairly have been thought to have abandoned the right to participate" in making them. *Green v. Board of Elections,* 380 F.2d 445, 451 (2d Cir. 1967). The idea "could well have rested on Locke's concept" of the social compact, "so influential at the time." *Id*. Put differently, those who would make the laws for others and participate in self-government should be willing to follow those laws themselves. Mississippi's case-by-case approach to vote restoration is rationally related to those interests. *Shepherd*, 575 F.2d at 1115.

Accordingly, it is not and cannot be irrational for a vote restoration system to be discretionary. Well-settled caselaw holds that discretion is a defining characteristics of such a system—be it executive clemency or a legislative suffrage bill.[6]

## IV.   SECTION 253'S REENFRANCHISEMENT REGIME IS NOT FACIALLY INVALID UNDER THE FIRST AMENDMENT.

Plaintiffs' invocation of the First Amendment does nothing to improve their constitutional challenge to Section 253. Indeed, because "the exclusion of felons

---

[6] *Smith v. Snow*, 722 F.2d 630, 632 (11th Cir. 1983) ("If one has no right to procedures, the purpose of which is to prevent arbitrariness and curb discretion, then one clearly has no right to challenge the fact that the decision is discretionary.").

from the vote has an affirmative sanction in § 2 of the Fourteenth
Amendment," *Richardson*, 418 U.S. at 54, "[i]t is clear that the First
Amendment *does not guarantee* felons the right to vote," *Johnson*, 214 F. Supp. 2d
1333, 1338 (S.D. Fla. 2002) (emphasis supplied), *aff'd* 405 F.3d 1214 (en banc). Nor
does the First Amendment guarantee convicted felons any opportunity to apply for—
much less receive—an executive pardon or a suffrage bill from the Legislature.

Nonetheless, plaintiffs contend that the district court erred in dismissing their
claim because plaintiffs are not "challenging a *dis*enfranchisement law on First
Amendment grounds." Hopkins Br. at 55. That just proves the whole point.
Convicted felons who have *already lost* the "right to vote" pursuant to a State's valid
exercise of the affirmative sanction in Section 2 of the Fourteenth Amendment *do
not still have* a constitutionally protected "right to vote" under the more general
terms of the First Amendment.

As the district court aptly reasoned, the First Amendment "provides no greater
protection for voting rights than is otherwise found in the Fourteenth Amendment."
ROA.19-60662.4879; *Hand*, 888 F.3d at 1207, 1209; *id*. at 1112 (noting that it is
"pretty clear that, in a reenfranchisement case, the specific language of the
Fourteenth Amendment controls over the First Amendment's more general terms");

*Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 n.9 (11th Cir. 1999).[7] In fact, the

Fourteenth Amendment is the only reason the First Amendment applies to the States.

*Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 450 (1938).

Relying on this Court's decision in *Shepherd*, the Eleventh Circuit recently

explained:

> While a discretionary felon-reenfranchisement scheme that was facially
> or intentionally *designed to discriminate* based on viewpoint—say, for
> example, *by barring Democrats, Republicans, or socialists from
> reenfranchisement on account of their political affiliation—might*
> violate the First Amendment, *cf. Hunter*, 471 U.S. at 227–28; *Shepherd
> v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978), no such showing has
> been made in this case.

*Hand*, 888 F.3d at 1211-12 (emphasis supplied).[8]  Plaintiffs made no such showing

here either. Yet a party seeking relief for alleged discrimination must plead and

prove such a claim—not invoke the mere "risk" of discrimination as cause for

striking down presumptively valid state laws.

No court has held that convicted felons who have lost the right to vote still

have a right to vote under the First Amendment. *See, e.g., Howard v. Gilmore*, 205

F.3d 1333, 2000 WL 203984, at *1 (4th Cir. 2000) (unpublished table) ("The First

---

[7] *Cf. Graham v. Connor*, 490 U.S. 386, 395 (1989); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).

[8] Plaintiffs wrongly say the *Hand* decision is "inapposite." Hopkins Br. at 55. Yet, in the district court, plaintiffs cited that decision *in support of* their claim. When citing to *Hand*, however, plaintiffs *omitted* key parts of the decision. As the district court noted: "Plaintiffs' use of an ellipses is at best suspect, and they never acknowledge that the *Hand* court rejected their argument." ROA.19-60662.4879.

Amendment creates no private right of action for seeking reinstatement of previously canceled voting rights."); *Johnson*, 214 F. Supp. 2d at 1338; *Hayden v. Pataki*, No.-00-Civ.-8586, 2004 WL 1335921, at *6 (S.D.N.Y. 2004) ("[T]he case law is clear that the First Amendment does not guarantee felons the right to vote.").

It is thus no answer to cite inapposite First Amendment cases disapproving of rules that make the peaceful enjoyment of freedoms *which the Constitution guarantees* contingent upon the uncontrolled will of an official. For instance, on pages 56-57 of their brief, plaintiffs turn to cases such as *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) and *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988). Those cases simply establish the longstanding, but here unremarkable, point that a state cannot vest officials with unlimited discretion to grant or deny licenses as a condition of engaging in protected First Amendment activity.

For instance, *Forsyth County* discussed an ordinance that granted officials with boundless authority to authorize or forbid, and assess fees on, "public speaking, parades, or assemblies in the archetype of a *traditional public forum*," which the Supreme Court deemed a "prior restraint on speech." 505 U.S. at 130 (emphasis supplied, quotation omitted). Likewise, *City of Lakewood* involved a licensing statute that reposed in the government the unbridled power to permit or deny the

placement of newspaper-dispensing devices *on public sidewalks*. 486 U.S. at 753. There too, the Court struck down the statute as a "prior restraint." *Id.* at 757.

But a vote restoration process for convicted felons to potentially regain suffrage is *not* a "prior restraint" on "fragile First Amendment rights [that can be] lost or prejudiced by delay." *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 467-69 (5th Cir. 1980) (en banc). Indeed, under plaintiffs' theory, pardons also would constitute a prior restraint.

However, granting a discretionary suffrage bill, like a pardon, only can have the effect *of restoring* rights lost due to a state's valid exercise of the affirmative sanction in Section 2 of the Fourteenth Amendment. Consequently, granting a suffrage bill that has the effect *of restoring* a convicted felon's rights is not a "permit" or "license" for purposes of pertinent First Amendment jurisprudence— just as a liberty-conferring pardon is not a "permit" or "license" to attend a protest outside a prison's walls or to run for political office.[9]

Indeed, even if properly-sued state officials were enjoined from enforcing Section 253, plaintiffs still would not have the right to vote. If this Court enjoined

---

[9] A convicted felon who has lost the right to vote is not operating under a "prior restraint." Yet even if the law were otherwise, any such "prior restraint" would be attributable to the loss of voting rights to which convicted felons are permissibly subject, not to the absence of a subsequent and discretionary pardon or suffrage bill. *Snow*, 722 F.2d at 632; *Madison v. State*, 163 P.3d 757, 771 (Wash. 2007) ("[I]t is not Washington's *re-enfranchisement* statute that denies felons the right to vote[.]").

28

the enforcement of Section 253, there simply wouldn't be a legislative reenfranchisement process for convicted felons *at all*.

Because a state is not required to have *any* vote restoration process for convicted felons, *Harvey*, 605 F.3d at 1079, plaintiffs' reliance on cases addressing prior restraints on speech is fundamentally flawed. A right lawfully removed cannot be unlawfully restrained.[10]

Furthermore, if the First Amendment protects felons' rights to vote, on the theory that everyone has a "First Amendment right to vote," many other voting restrictions could be subject to First Amendment attack. After all, the First Amendment arguably protects the rights of expression and association for children, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("First Amendment rights…are available to teachers and students."); for non-citizens, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."); for people acting anonymously, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341 (1995) ("[A]n author's decision to remain anonymous…is an aspect of the freedom of speech protected by the First

---

[10] Mississippi's disenfranchisement and reenfranchisement laws do not prevent plaintiffs from engaging in any kind of protected speech. For example, plaintiffs are free to speak their minds, publish articles, petition policymakers for a redress of grievances, and otherwise express their views on matters of public concern. What they may not do, the only thing they may not do, is engage in certain conduct—*i.e.*, voting—that is, as to them, constitutionally unprotected. *Richardson*, 418 U.S. at 54-55; *accord Harvey*, 605 F.3d at 1079.

Amendment."); and (possibly) for the mentally incompetent, *Washington v. Harper*, 494 U.S. 210, 218 n.5 (1990) (reserving issue).

But, under precedent, none of these groups has the right to vote,[11] just as, under the Fourteenth Amendment, a lawfully convicted felon has no voting rights. *Richardson*, 418 U.S. at 54.

## V.    PLAINTIFFS LACK ARTICLE III STANDING, AND THE ELEVENTH AMENDMENT BARS THEIR SECTION 241 CLAIMS.

Plaintiffs' standing and Eleventh Amendment arguments for purposes of Section 241 boil down to whether the Secretary is a proper defendant because of his designation as Mississippi's "chief election officer." For that proposition, plaintiffs rely on *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017). However, the Texas law at issue in *OCA-Greater Houston* differs materially from Mississippi law.

Under pertinent Texas state law, the Texas Secretary of State "is instructed by statute to 'obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code.'" *Id.* at 613-14. In this case, plaintiffs have not identified any similar directive under Mississippi law

---

[11] Indeed, a convicted felon who has lost the right the vote is no more subject to a "prior restraint" than a minor who has not yet gained the right to vote. Other examples exist as well. For instance, one-person-one-vote isn't implicated with respect to appointed school boards. *Sailors v. Board of Educ. of Kent County*, 387 U.S. 105 (1967).

as to Section 241. Moreover, *OCA-Greater Houston* involved a VRA claim—thus, the Eleventh Amendment posed no barrier. *Id.* at 614.

Plaintiffs also cite to *K.P. I* where the Louisiana Board was a proper defendant because the Louisiana law "require[d] the Board to differentiate between claims allowable and not allowable under the statute." Hopkins Br. at 27. According to plaintiffs, the Secretary is required "to differentiate between previously disenfranchised individuals who have regained the right to vote, and other individuals convicted of disenfranchising felonies who remain ineligible to vote, in the state's voter registration application and the Secretary's instructions to county election commissioners." Hopkins Br. at 27.

But this is an inapt comparison for purposes of Section 241.[12] Indeed, the Secretary simply *repeating* what the law is on the registration application, and/or *telling* local officials what the law is, does not equate to *deciding* whether or not an abortion doctor gets coverage from a med-mal fund for a claim, as in the *K.P.* decisions.

---

[12] In contrast, the Secretary of State is actually "named in [Article V, Section 140 of the Mississippi Constitution] and ha[s] specific…duties related to [that provision]." *McLemore v. Hosemann*, 3:19-CV-383-DPJ-FKB, 2019 WL 5684512, at *5 (S.D. Miss. Nov. 1, 2019).

## VI.   *RICHARDSON V. RAMIREZ* FORECLOSES PLAINTIFFS' NON-RACIAL EQUAL PROTECTION CHALLENGE TO SECTION 241, AND THE CLAIM OTHERWISE FAILS ON ITS OWN TERMS.

The Constitution generally commits voting regulation to the States. *See* U.S. CONST. Art. I, § 4, cl. 1; U.S. CONST. Art. I, § 2, cl.1 (Qualifications). Although the Constitution forbids the exclusion of voters on specific grounds, such as race, sex, and age, *see* U.S. CONST. amends. XV (race); XIX (sex); XXVI (age), Section 2 of the Fourteenth Amendment *expressly recognizes* the States' power to disenfranchise felons.

For at least two reasons, the district court correctly rejected plaintiffs' contention that permanent disenfranchisement is impermissible under any circumstances and for any felony. First, as the district court reasoned, *Richardson*'s "holding is squarely on point." ROA.19-60662.4876-4877. Second, plaintiffs' construction of Section 2 of the Fourteenth Amendment is otherwise flawed.

### A.   *Richardson's* holding is squarely on point.

Plaintiffs contend that Section 241 is unconstitutional because states only may "temporarily abridge[ ]" a convicted felon's right to vote. Hopkins Br. at 48. According to plaintiffs, permanent disenfranchisement isn't permissible for any felony, and "[s]trict scrutiny review therefore applies." Hopkins Br. at 48.

Yet, as the district court put it, "[t]he plaintiffs in *Richardson* [ ] said the same thing." ROA.19-60662.4875. *Richardson* involved a group of convicted felons who

had served the entirety of their sentences but were barred from voting under California law. *Id.* at 27. Further, the *Richardson* plaintiffs, like the plaintiffs here, claimed that California's constitution failed the strict-scrutiny test. *Id.*

In *Richardson,* the Supreme Court rejected that claim. The Court held that Section 1's Equal Protection Clause could not be read to prohibit the disenfranchisement of felons because Section 2 approves of such disenfranchisement by removing any electoral penalty for it. *Richardson,* 418 U.S. at 54. Importantly, too, *Richardson* framed the issue as one presenting the "*denial* of franchise" to felons who had "completed their sentence." *Id.* at 33, 56 (emphasis supplied).

The Court held that "the *exclusion* of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment." *Id.* at 54 (emphasis supplied). Moreover, that holding was "reflected *in the express language* of [Section] 2." *Id.* at 54 (emphasis supplied).

Indeed, as this Court has recognized, "the specific holding of [*Richardson*] was that a state may deny the franchise to that group of 'convicted felons who have completed their sentences and paroles.'" *Shepherd*, 575 F.2d at 1114 (quoting *Richardson*, 418 U.S. at 56). *Richardson* and *Shepherd* are binding. Accordingly, the district court appropriately rejected plaintiffs' efforts to overrule them.

### B.    As *Richardson* held, the "express language" of Section 2 of the Fourteenth Amendment provides an "affirmative sanction" for the "exclusion of felons from the vote."

As recognized by the district court, plaintiffs "know *Richardson* is a problem." ROA.19-60662.4876; *see also* ROA.19-60662.55 (plaintiffs' complaint) (conceding that their Fourteenth Amendment claim is asserted "for preservation purposes"). Because of this, plaintiffs contend that *Richardson* incorrectly read Section 2 of the Fourteenth Amendment, and then plaintiffs self-proclaim (*over and over*) that they have a "novel" construction of that 150-year-old constitutional provision. ROA.19-60662.459, 463, 465, 469, 470.

But novel or not, plaintiffs' reading of the law is wrong—which is why no court has accepted it. Section 2 provides in relevant part:

> [W]hen the right to vote . . . is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, *except for participation in rebellion, or other crime*, the basis of representation therein shall be reduced . . . .

U.S. CONST. amend. XIV, § 2 (emphasis supplied).  As the district court put it, *Richardson* "held that because Section 2 'affirmative[ly] sanction[ed]' a state's right to deny the franchise based on a criminal conviction, doing so cannot violate Section 1 of that same amendment." ROA.19-60662.4876 (quoting *Richardson*).

According to plaintiffs, though, the Supreme Court's construction of Section 2 was mistaken. Plaintiffs maintain that the phrase "except for participation in rebellion, or other crime" modifies *only* the word "abridged" and not the word

"denied." Hopkins Br. at 47. But it is plaintiffs' reading of the law that is erroneous—not the Supreme Court's.

For starters, the modifying phrase "except for" is set off by a comma. Because of this, it modifies all preceding phrases. *See, e.g., Sobranes Recovery Pool I, LLC v. Todd & Hughes Const. Corp*., 509 F.3d 216, 221–23 (5th Cir. 2007) (noting that when modifying language is "set off from the last item in the list by a comma, this suggests that the modification applies to the whole list and not only the last item.").

For instance, the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The comma before "without due process of law" indicates that the phrase modifies life, liberty, and property. *Todd*, 509 F.3d at 223 n.19; *see also* 82 C.J.S. STATUTES § 443; Robert J. Martineau & Michael B. Salerno, *Legal, Legislative, and Rule Drafting in Plain English* 68 (2005); *Stepnowski v. Commissioner,* 456 F.3d 320, 324 n.7 (3d Cir. 2006).

To be sure, plaintiffs' cited cases also demonstrate why their construction of the law is erroneous. Hopkins Br. at 47. For instance, at issue in *Lockhart v. United States*, 136 S.Ct. 958 (2016) was 18 U.S.C. § 2252(b)(2). That law imposes a ten-year mandatory minimum sentence on a defendant convicted of possessing child pornography if the defendant has a prior conviction "relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward." 18

U.S.C. § 2252(b)(2). Under an application of the last-antecedent rule, the Court determined that the modifier "involving a minor or ward" applies only to the term that immediately precedes it. *Id*. at 965-66.

Unlike Section 2 of the Fourteenth Amendment, though, the statute in *Lockhart* does not contain a comma before the modifier "involving a minor or ward." In fact, the absence of a comma was one of the government's primary arguments in that case. *See* Br. of United States, 2015 WL 5302535, at *20 (2015) ("Congress has given no textual clue, such as a comma before the modifier, indicating that the modifier applies to all three of the preceding terms.").

Moreover, the Court in *Lockhart* reasoned that the modifier *had to* apply only to the last phrase—any other reading of the statue would run "headlong into the rule against superfluity by transforming a list of separate predicates into a set of synonyms describing the same predicate." *Lockhart*, 136 S.Ct. at 965-66. But only the opposite is true with respect to Section 2 of the Fourteenth Amendment. Further, in Section 2, there is only one "is," and it joins "denied" and "abridged." U.S. CONST. amend. XIV, § 2 ("[W]hen the right to vote . . . *is* denied . . ., or in any way abridged, except for participation in rebellion, or other crime,. . . .") (emphasis supplied).

Likewise, the authors of *Reading Law*, cited on page 47 of plaintiffs' brief, rely on the Supreme Court's decision in *Barnhart v. Thomas*, 540 U.S. 20 (2003). *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* § 18, p. 145

(2012). In *Barnhart*, the Court considered a statute providing that an individual qualifies as disabled if "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at 21-22. Like in *Lockhart*, there was no comma setting off the phrase "which exists."

Lastly, *Johnson v. Sayre*, 158 U.S. 109 (1895) does not produce a different result. That case construed the first clause of the Fifth Amendment: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger[.]." U.S. CONST. amend. V.

*Johnson* considered whether the final modifying phrase was applicable only to its immediate antecedent phrase, or whether it was equally applicable to "land and naval forces." If it were the former, then all cases arising in the land or naval forces could be prosecuted without grand jury action; if the latter, such cases would require presentment or indictment except in time of war or public danger.

The Court first determined that either reading of the law was "grammatically possible." *Johnson*, 158 U.S. at 113-14. However, in deciding that the phrase was applicable only to the immediate antecedent phrase, the Court turned to context— noting that the purpose of the "provision in question is to prevent persons not subject

to the military law from being held to answer for a capital or otherwise infamous crime without presentment or indictment by a grand jury." *Id*. at 114.

The Supreme Court in *Richardson* undertook a similar inquiry. That is, the Court examined not only the "express language" of Section 2, but also looked to the "understanding of those who adopted the Fourteenth Amendment," including "the historical and judicial interpretation of the Amendment's applicability to state laws disenfranchising felons[.]" *Richardson*, 418 U.S. at 54.

The Court explained that "[f]urther light is shed…on the meaning of [Section] 2[ ] by the fact that at the time of the adoption of the Amendment, 29 States had provisions in their constitutions which ***prohibited***, or authorized the legislature ***to prohibit***, exercise of the franchise by persons convicted of felonies or infamous crimes." *Id.* at 48 (emphasis supplied); *id.* at 46 (quoting Representative Eckley); *see also Harvey*, 605 F.3d at 1076 ("It would be remarkable if the many states ratifying the Fourteenth Amendment intended to nullify their own constitutional provisions[.]"); *Hayden v. Pataki*, 449 F.3d 305, 316 (2d Cir. 2006) (en banc) ("[D]isenfranchising those convicted of crimes is of ancient origin."); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1234 (11th Cir. 2005) (noting the "prevalence of felon disenfranchisement [provisions] in every region of the country since the Founding."); *Romer v. Evans*, 517 U.S. 620, 634 (1996) ("that a convicted felon may be denied the right to vote" remains "unexceptionable").

Accordingly, while the holding in *Richardson* alone disposes of plaintiffs' non-racial equal protection challenge to Section 241, plaintiffs' textual argument fails as well.

Moreover, the arguments in the proposed amicus briefs also don't improve plaintiffs' claim. Just two days before this brief was due, three amici moved for leave to file briefs in this expedited appeal. Two of the three briefs—the American Probation and Parole Association ("APPA") and the Cato Institute—raise *new* arguments that plaintiffs *have never asserted*.[13]

Unlike plaintiffs, the Cato amici maintains that states *can* exclude felons from suffrage—but only for "the most serious crimes."[14] Cato Br. at 4. This argument fails under binding precedent.

*Richardson* held that Section 2 provides an affirmative sanction for states to disenfranchise *all* felons. *Shepherd*, 575 F.2d at 1114 (*Richardson* focused on "a state's power to disenfranchise persons convicted of a felony[.]"). Nevertheless, the

---

[13] For this reason, and others, the Secretary will file oppositions to the amici's motions. *See, e.g., Voices for Int'l Business and Education, Inc. v. NLRB*, 905 F.3d 770, 775 n.6 (5th Cir. 2018) ("[W]e do not consider arguments raised by an amicus that the party it is supporting never made.").

[14] Cato amici also complains that Mississippi (like some other states) only disenfranchises for some, but not all, felonies. This is an argument plaintiffs never asserted. In any event, as this Court in *Shepherd* held: "We do not read *Richardson* to hold that the realm of state discretion in disenfranchising persons convicted of felonies is limited to the disenfranchisement of all felons or none." 575 F.2d at 1114; *see also Harvey*, 605 F.3d at 1074 ("[A] far better reference point for determining whether a crime is serious is to look at how the crime is designated by the modern-day legislature[.]"); *id.* at 1075 ("The judiciary should not substitute its judgment as to [the] seriousness [of a crime] for that of a legislature[.]") (citations and quotations omitted).

Cato amici says that Section 2's "other crime" language means only "a crime of similar wrongfulness to the act of engaging in rebellion." Cato Br. at 4.

According to the Cato amici, "the phrase 'other crime' should be narrowed by the clause's use of the word 'rebellion.'" Cato Br. at 11. But an amicus and the respondent at oral argument in *Richardson* said the same thing. *See* Br. of ABA Amicus, 1973 WL 172333, at *5 (Dec. 28, 1973) ("other crime" was "coupl[ed] with participation in rebellion'"); *id*. at *19-20 ("other crime" "outlawed political activities related to the rebellion"); *Richardson v. Ramirez* Oral Argument at 37:17-38-18; 41:44-42:38 (respondent arguing that, in the "context" of Section 2, "other crimes" means "other crimes related to the rebellion") (January 15, 1974).[15] Simply put, the *Richardson* Court expressly *rejected* the Cato amici's construction of Section 2.

Next, the APPA's brief is riddled with misstatements. For instance, the APPA incorrectly asserts that the Hopkins plaintiffs "do not object to automatic disenfranchisement based on rape or murder[.]" APPA Br. at 6. Yes, the Hopkins plaintiffs do. They contend that states may *only* "temporarily abridge" suffrage of any felon, and their claim under the Eighth Amendment is a class action *facial*

---

[15] *Available at* https://www.oyez.org/cases/1973/72-1589 (last visited Nov. 7, 2019).

*challenge* to felon disenfranchisement *vel non*. And those claims that plaintiffs

actually do bring fail.[16]

## VII. PLAINTIFFS' FACIAL CHALLENGE UNDER THE EIGHTH AMENDMENT TO SECTION 241 FAILS.

Lastly, plaintiffs maintain that Section 241 facially violates the Eighth

Amendment. For many reasons, this is not so.

### A. Because States may permanently disenfranchise felons under the Fourteenth Amendment, the Eighth Amendment does not prohibit States from permanently disenfranchising felons.

Because "the exclusion of felons from the vote has an affirmative sanction in

§ 2 of the Fourteenth Amendment," *Richardson*, 418 U.S. at 54, the Eighth

Amendment cannot be said to prohibit the exclusion of felons from the vote. The

district court correctly held that plaintiffs' Eighth Amendment argument "conflicts

with [Section] 2 of the Fourteenth Amendment. Simply put, it would be internally

inconsistent for the Eighth Amendment to prohibit criminal disenfranchisement

while [Section] 2 of the Fourteenth Amendment permits it." ROA.19-60662.4878

(citing *Farrakhan v. Locke*, 987 F. Supp. 1304, 1314 (E.D. Wash. 1997); *see also*

---

[16] What's worse, the APPA also wrongly argues that Section 241 is "premised on the intent of the 1890 state legislature to disenfranchise black male voters." APPA Br. at 6. However, plaintiffs *have never asserted* a race-based equal protection challenge to *dis*enfranchisement under Section 241—and the APPA can't raise that claim for plaintiffs on appeal. The APPA makes other misstatements as well. For instance, they incorrectly claim that there are 161,159 disenfranchised felons who have completed their sentence. APPA Br. at 7. That number is neither in the record nor accurate—which is why plaintiffs don't rely on it. Hopkins Br. at 8 ("Nearly 50,000 individuals were convicted of disenfranchising offenses…More than 29,000 of these individuals have completed their sentences.").

*El-Amin v. McDonnell*, No. 3:12-cv-00538, 2013 WL 1193357, at *5–6 (E.D. Va. Mar. 22, 2013).

In so holding, the district court did not "mistakenly assume[ ] that the Eighth Amendment's standards are unchanging." Hopkins Br. at 32-33. The Eighth Amendment, and its corresponding standards, simply does not bar felony disenfranchisement because the Fourteenth Amendment expressly sanctions it.[17]

Felony disenfranchisement is not a transitory consequence that may become constitutionally suspect simply by change in use or varying usage across the states. Rather, disenfranchisement is sanctioned by Section 2 of the Fourteenth Amendment. And the Eighth Amendment's proscription of cruel and unusual punishment is only applicable to the states by the Fourteenth Amendment. *Robinson v. State of California*, 370 U.S. 660, 667 (1962).

From the outset, then, whatever may be said of passing mores, and evolving standards, the Constitution recognizes that states may disenfranchise persons convicted of felonies. *Richardson*, 418 U.S. at 54; *see also Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998).

---

[17] In footnote 6 of their brief, plaintiffs allege that the Secretary "acknowledges that Section 241 might be cruel and unusual punishment for certain disenfranchising felonies." This is disingenuous. The Secretary's position always has been that plaintiffs' *facial challenge* under the Eighth Amendment is a non-starter—*even if* their claim wasn't otherwise barred.

## B.    Plaintiffs' Eighth Amendment challenge to Section 241 separately fails on its own terms.

Plaintiffs' Eighth Amendment claim additionally is precluded because felon disenfranchisement is not "punishment" under the Eighth Amendment. *See, e.g.*, *Simmons v. Galvin*, 575 F.3d 24, 43 (1st Cir. 2009) ("The Supreme Court has stated that felon disenfranchisement provisions are considered regulatory rather than punitive."). Because disenfranchisement is not punishment, it cannot be cruel and unusual punishment.

In fact, in *Trop v. Dulles*, 356 U.S. 86 (1958), the plurality opinion used felon disenfranchisement as an example of a restriction that is *not* punitive and would not violate the Ex Post Facto Clause. *Id.* at 96-97; *see also Smith v. Doe*, 538 U.S. 84, 92 (2003); *United States v. Salerno*, 481 U.S. 739 (1987); *Green*, 380 F.2d at 450; *Farrakhan*, 987 F. Supp. at 1314; *Kronlund v. Honstein*, 327 F. Supp. 71, 74 (N.D. Ga. 1971) (three-judge court).

The Supreme Court has identified several guideposts to evaluate whether a particular law is punitive. *Smith*, 538 U.S. at 92; *United States v. Under Seal*, 709 F.3d 257, 263 (4th Cir. 2013). The test for whether a law imposes a "punishment" for purposes of the Eighth Amendment proceeds in two steps.[18]

---

[18] The test for "punishment" under the Eighth Amendment appears similar to the test for "punishment" under the Ex Post Facto Clause. *State v. Petersen-Beard*, 377 P.3d 1127, 1130–31 (Kan. 2016); *U.S. v. Under Seal*, 709 F.3d 257, 263-66 (4th Cir. 2013).

The test first looks to the legislature's espoused intent: did the legislature intend to impose punishment? *Smith*, 538 U.S. at 92. The second step is to determine "whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention to deem it 'civil.'" *Id.* (citation omitted) (alterations in *Smith*). This "effects" analysis is governed by a range of considerations, often called the "*Mendoza-Martinez*" factors. *Smith*, 538 U.S. at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

Importantly, out of deference to state legislatures, "*only the **clearest proof** will suffice* to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 92 (citation omitted) (emphasis supplied). Here, plaintiffs cannot satisfy the "clearest proof" burden—in fact, they don't even mention that burden in their brief.

**(i)    Step One: Did the legislature intend to impose punishment?**

Neither Section 241 nor the related statutes were intended by the Mississippi Legislature to be "punishment" for purposes of the Eighth Amendment. Plaintiffs do not actually contend otherwise. Instead, plaintiffs divert the focus to the congressional acts that seated representatives from the former confederate states to Congress in 1867-1870 after the Civil War. *See* Hopkins Br. at 34-35.

Ten states, including Mississippi, have so-called Readmission Acts. In nearly identical language, the Acts provided that, as a congressional term to readmission to

Congress, state constitutions should not be "so amended or changed" as to deprive citizens "of the right to vote who are entitled to vote" by the respective state constitutions, "except as a punishment for such crimes as are now felonies at common law[.]" *See* 16 Stat. 67 (1870) (Mississippi).

Plaintiffs contend that this Act prohibits "Mississippi from enacting a criminal disenfranchisement provision in its state constitution for any purpose other than punishment." Hopkins Br. at 34. Yet this contention misses the legal mark for at least three reasons.

First, plaintiffs' argument is self-defeating because the Readmission Acts provide that States ___***can***___ disenfranchise convicted felons. In fact, that is what the *Richardson* Court said when referencing the Reconstruction/Readmission Acts. *Richardson*, 418 U.S. at 49-53; *Harvey*, 605 F.3d at 1075-1078.

Second, plaintiffs' argument is illogical. According to plaintiffs, because Congress utilized the word "punishment" in the Readmission Acts, the Eighth Amendment prohibits what Section 2 of the Fourteenth Amendment *and* the Readmission Acts affirmatively sanction. Worse still, accepting plaintiffs' theory would mean that the Eighth Amendment precludes for some states (*i.e.*, states with Readmission Acts) what Section 2 expressly sanctions for other states.[19]

---

[19] Not only is this a plainly nonsensical and never-accepted interpretation, but it also falls out of step with the principle of equal sovereignty. *Shelby County v. Holder*, 133 S.Ct. 2612 (2013).

Third, the inquiry is _not_ the intent of the 1870 federal congressional delegation. The determinative question is whether a state legislature intended to impose punishment in passing the operative law. _Smith_, 538 U.S. at 92. And, under this analysis, plaintiffs' claim fails.

Whether a statutory scheme is civil or criminal "is first of all a question of statutory construction," based on "the statute's text and its structure." _Id._ "Other formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes, are [also] probative of the legislature's intent." _Id._ at 94; _accord Kansas v. Hendricks,_ 521 U.S. 346, 361 (1997).

Section 241 of the Mississippi Constitution deals with qualifications for electors. MISS. CONST. art. 12, § 241. Nothing in the text or structure indicates that it is designed to punish. Instead, the text addresses the qualifications of voters generally, and it treats felons the same way as those who are not competent, not of age, and not U.S. citizens.

Additionally, Section 241's related statutory provisions are not in the criminal code, they are in the part of the Mississippi Code that regulates elections—Title 23. _See_ MISS. CODE ANN. § 23-15-11 (qualification of electors); § 23-15-19 (persons convicted of disenfranchising crimes); § 23-15-21 (noncitizens). In short, then, the Legislature did not intend the challenged laws to punish for purposes of the Eighth Amendment.

**(ii)    Step two:    Is the statutory scheme so punitive either in purpose or effect as to negate the State's intention to deem it civil?**

In the rare case, a regulatory scheme that is not intended as punishment may be so restrictive and harsh as to impose punishment in fact. Here, a court considers whether the regulatory scheme: "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*, 538 U.S. at 97.[20] Under this test, disenfranchisement is non-punitive.

*History and traditions*. Historically and traditionally, felon disenfranchisement is a nonpunitive restriction. As discussed, the plurality opinion in *Trop* used felon disenfranchisement as an example of a restriction that is not punitive. 356 U.S. at 96-97; *Simmons*, 575 F.3d at 45.

Further, no court has found disenfranchisement laws violate the Eighth Amendment. *Green*, 380 F.2d at 450; *Kronlund*, 327 F. Supp. at 74; *Thiess v. State Admin*, 387 F. Supp. 1038 (D. Md. 1974); *Fincher v. Scott*, 352 F. Supp. 117 (M.D.N.C. 1972); *Farrakhan*, 987 F. Supp. at 1314; *King v. City of Boston*,

---

[20] Two final factors—which receive "little weight"—ask whether the regulation is triggered only upon a finding of scienter and whether the behavior to which the regulation applies is already a crime. *Smith*, 538 U.S. at 105. Plaintiffs concede that Section 241 is effective regardless of a finding of scienter. ROA.19-60662.3126 (noting though that "most" of the offenses require scienter). That Section 241 may be "tied to criminal activity" is "insufficient to render the statut[e] punitive." *United States v. Ursery*, 518 U.S. 267, 291 (1996); *Simmons*, 575 F.3d at 45.

CIV.A.04-10156-RWZ, 2004 WL 1070573, at *1 (D. Mass. May 13, 2004); *Simmons v. Galvin*, 652 F. Supp. 2d 83, 93 (D. Mass. 2007); *Johnson v. Bredesen*, 624 F.3d 742, 753–54 (6th Cir. 2010); *Perry-Bey v. Holder*, 2:14-cv-359, 2015 WL 11120509, at *2 (E.D. Va. Mar. 24, 2015).

*Imposition of affirmative disability or restraint*. Felon disenfranchisement imposes "no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Smith*, 538 U.S. at 100.

In fact, Mississippi's challenged constitutional section and related statutes impose no affirmative obligation at all—much less any physical restraint. *See id.* "[T]here is a critical distinction between recognizing that a particular consequence might follow—nearly automatically—*from* a criminal conviction and classifying that consequence as a sanction intended to punish a noncitizen *for* that criminal activity." *Hinds v. Lynch*, 790 F.3d 259, 265–66 (1st Cir. 2015).

Indeed, as discussed, a host of non-penal consequences flow indelibly from a felony conviction. "The mere fact that a criminal conviction triggers a consequence has never been the operative test to determine whether that consequence is punitive or otherwise implicates the cruel and unusual punishment clause, the double jeopardy clause, the ex post facto clause, or any other constitutional protection." *Hinds*, 790 F.3d at 265-66.

Lastly, the Mississippi ACLU and NAACP also have moved for leave to file an amicus brief and contend that disenfranchisement is an "affirmative disability." They cite to the Southern District of Mississippi's decision in *McLaughlin v. City of Canton, Miss.*, 947 F. Supp. 954 (S.D. Miss. 1995). ACLU Br. at 4. Yet while finding disenfranchisement to be "harsh[ ]," the *McLaughlin* court also found it to be a "civil sanction." *Id.* at 971.

The ACLU amicus brief also largely makes policy arguments concerning felony disenfranchisement.[21] These policy arguments are addressed to the wrong forum. *See Richardson*, 418 U.S. at 55 (explaining that the Court "would by no means discount these [policy] arguments if addressed to the legislative forum which may properly weigh and balance them").

*Traditional aims of punishment*. Felon disenfranchisement does not promote the traditional aims of punishment. As the Supreme Court stated, "[a]ny number of governmental programs might deter crime without imposing punishment." *Smith*, 538 U.S. at 102.

---

[21]   Additionally, the ACLU makes an argument regarding the right to vote for administrative bodies, such as "school boards." ACLU Br. at 4, 7. As noted in footnote 11, there is *no* fundamental right to elect an administrative body such as a school board. For example, in Mississippi, municipal school districts generally have appointed school boards. MISS. CODE ANN. § 37-7-203.

Thus, that a statute may have a deterrent effect does not necessarily mean it amounts to criminal punishment. *Id.*; *Simmons*, 575 F.3d at 45. And, as explained below, disenfranchisement is rationally connected to a nonpunitive purpose.

*Nonpunitive purpose*. Felon disenfranchisement is rationally connected to a nonpunitive purpose, which is the "'most significant' factor in our determination that the statute's effects are not punitive." *Smith*, 538 U.S. at 102; *id.* at 87.

As this Court put it, "[a] state properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies." *Shepherd*, 575 F.2d at 1115. Indeed, felon disenfranchisement is based on the philosophy of republican government and theory of social compact. *Green*, 380 F.2d at 451-52; *Wesley v. Collins,* 791 F.2d 1255 (6th Cir. 1986). All in all, then, even if plaintiffs' Eighth Amendment claim wasn't barred for other reasons, felon disenfranchisement does not constitute cruel and unusual punishment for Eighth Amendment purposes.

## C.    The district court otherwise correctly dismissed plaintiffs' Eighth Amendment claim.

Plaintiffs' facial challenge brought under the Eighth Amendment fails for other reasons as well. The Eighth Amendment proscribes only "inherently barbaric punishments" such as torture and punishments that are "grossly disproportionate." *United States v. Gurule*, 461 F.3d 1238, 1247 (10th Cir. 2006); *United States v.*

*Johnson*, 451 F.3d 1239, 1243 (11th Cir. 2006); *Ewing v. California*, 538 U.S. 11, 20 (2003). Here, there are many reasons why plaintiffs' claim of "cruel and unusual" punishment fails.

First, plaintiffs attempt to analytically link felon disenfranchisement laws to the "punishment" inflicted by the death penalty. Hopkins Br. at 42. That is an unfitting comparison. Take *Atkins v. Virginia*, 536 U.S. 304 (2002) for example—cited on page 42 of plaintiffs' brief. In that case, the Court held that the execution of a "mentally retarded offender" is an unconstitutional excessive punishment. But, as is clear from *Atkins* and others, it is not the death penalty *vel non* that constitutes cruel and unusual punishment—it is the manner in which it is exercised or to whom it is applied (*e.g.*, mentally retarded offenders, juveniles).

Felon disenfranchisement has an affirmative sanction in Section 2 of the Fourteenth Amendment. So, the question in the death penalty context should and does differ greatly from that of disenfranchisement. As for the death penalty, it is "punishment" that the Constitution does not expressly authorize or preclude—the question then being does the Eighth Amendment prevent the manner in which the punishment is exercised. With disenfranchisement, even if it was punishment per the Eighth Amendment (which it is not), the Constitution expressly sanctions it.

Relatedly, plaintiffs bring a facial challenge to Section 241. However, to bring a successful facial challenge, plaintiffs must prove that the law could be valid "under

no set of circumstances." *Salerno*, 481 U.S. at 745. Yet it cannot legitimately be argued that disenfranchisement is so grossly disproportionate so as to violate the Eighth Amendment as to violent offenses, such as murder and rape. Indeed, that wouldn't make any sense at all, as individuals may be executed and/or serve life sentences for those types of offenses.

Thus, even under plaintiffs' otherwise incorrect theory, it is axiomatic that the offense would matter for purposes of a *facial challenge*. Yet plaintiffs wrongly conjoin all disqualifying felony offenses, even though the class members in this class action will have committed a wide range of disenfranchising felonies—or multiple of them. Consequently, plaintiffs fall woefully short of satisfying *Salerno*'s "no set of circumstances" burden.

Worse still, plaintiffs evaluate felony disenfranchisement as if it is a "one size fits all" regime. But it is not. The manner in which states draw the line on disenfranchisement and reenfranchisement vary in a number of respects. The following chart, which was updated as of October 2018 and provided in the Secretary's summary judgment memoranda, provides a basic synopsis:

| | |
|---|---|
| **States that do not prohibit inmates from voting while incarcerated for any offense** | Vermont |
| **States that generally do not prohibit felons from voting while incarcerated** | Vermont; Maine (except for disenfranchisement only for individuals convicted of certain election-related offenses, and only "for a term not exceeding 10 years") |
| **Prohibition only until prison term is complete** | California; District of Columbia; Hawaii; Illinois; Indiana; Maryland; Massachusetts; Michigan; Montana; New Hampshire; North Dakota; Ohio; Oregon; Pennsylvania; Rhode Island; Utah |
| **Prohibition during incarceration and during parole** | California; Colorado; Connecticut (in state convictions); New York (Automatically restored for probationers, but parolees must finish sentence or be pardoned.) |
| **Prohibition during incarceration and until completion of full sentence (including prison term, probation, parole)** | Alaska; Arizona (for first time offenders/one felony); Arkansas; Delaware (limited offenses); Georgia; Idaho; Kansas; Louisiana; Minnesota; Missouri; Nebraska; Nevada (for non-violent and first time offenders); New Jersey; New Mexico; North Carolina; Oklahoma; South Carolina; South Dakota; Texas; Virginia (per current executive order for non-violent crimes, but not per statute); Washington; West Virginia; Wisconsin |
| **Prohibition during incarceration and until completion of full sentence (including prison term, probation, parole, and all fines and restoration)** | Iowa (streamlined process; prior executive order)[12]; Tennessee (for certain crimes); Arizona (Automatic voting restoration upon completion of sentence and payment of all fines for first-time, single-felony offenders); Connecticut (for out of state/federal convictions); Washington (rights can be revoked by court- *see* addendum) |
| **Lifetime voting prohibition contemplated for all or at least one crime**[13] | Alabama; Arizona (for repeat offenders)[14]; Delaware (certain offenses); Florida; Iowa; Kentucky; Mississippi; Nebraska (treason, and otherwise 2 year waiting period); Nevada; Tennessee; Virginia; Wyoming<br>*See also*: California (limited to certain bribery offense); Maryland (limited to bribery/buying or selling votes); Massachusetts (limited to certain election related offenses); Missouri (limited to suffrage related offenses); New Hampshire (treason, bribery, election related); New Jersey (election related); Ohio (certain election related offenses) |
| **States with waiting periods or recently removed waiting periods** | Delaware (10 year waiting period for certain election misdemeanors); Delaware (recently removed other 5 year wait period); Florida (5 years or 10 years—depending); Nebraska (2 years) |

ROA.19-60662.4277, 4092-4143, 4144-4247.[22]

States thus vary significantly with felon disenfranchisement laws:

* Some states do not prohibit voting during incarceration.

* Some prohibit voting during the period of incarceration and during parole or probation.

---

[22] After this chart was updated in October 2018, Florida passed a constitutional amendment to restore suffrage to *some* felons after completion of their sentences. Those convicted of murder or a felony sexual offense must still apply to the governor for voting rights restoration on a case-by-case basis. Further, it appears that Colorado restores voting rights to individuals on parole, and Nevada restores voting rights to those released from prison and discharged from probation.

* Some permanently prohibit some or all convicted felons from voting, absent a pardon or an individual restoration of rights.

* Some laws apply different restrictions depending on the crime of conviction.

* And some states apply different restrictions depending on the defendant's criminal history.

Further, not all states fit into a single category because the state has a mixed process, such as distinguishing between first-felony offenders and repeat offenders or between offenses or waiting periods for some offenses. ROA.19-60662.4277-4278, 4092-4143, 4144-4247. To add another layer to the mix, Mississippi only disenfranchises for certain felonies—not all felonies. Therefore, in Mississippi, some individuals who commit non-disqualifying felonies *never* lose the right to vote—during incarceration or otherwise.

All told, then, felon disenfranchisement laws across the states do not fit into a single category or consensus. There is no "national consensus"—let alone enough of a consensus to somehow conclude that the Eighth Amendment overrides Section 2 of the Fourteenth Amendment. Indeed, even if the Eighth Amendment were implicated, where would the Court draw the line?

For example:

* Is it cruel and unusual to permanently disenfranchise for the most violent crimes, such as murder and/or rape?

* Is it cruel and unusual to permanently disenfranchise for election or voter related offenses or embezzling public funds?

* Is it cruel and unusual to disenfranchise *all* felony convictions while incarcerated and/or during incarceration and the term of the sentence? Does the state need to classify only certain felonies, as Mississippi has done? If so, which ones?

* Is it cruel and unusual to not permanently disenfranchise for first time offenders, but to permanently disenfranchise for repeat offenders?

* Is it cruel and unusual to disenfranchise beyond the term of the sentence by having a waiting period? How long may a waiting period be?

* Is it cruel and unusual to disenfranchise until completion of the sentence— if the completion of the sentence includes requiring the convicted felon to be current on all obligations to victims, legal fees, and child support, such as in Tennessee?

What's more, plaintiffs' Eighth Amendment theory inevitably calls into question other disabilities due to felony convictions—such as firearm rights and jury rights. ROA.19-60662.4144-4247. That is, if disenfranchisement is barred despite Section 2 of the Fourteenth Amendment sanctioning it, then why wouldn't other disabilities due to felony convictions also be prohibited—such as the loss of firearm rights that are *protected by* the Second Amendment?

Because plaintiffs' Eighth Amendment claim fails at earlier stages in the analysis, this Court need not answer—or even ask—such questions. But the questions further illustrate why plaintiffs' Eighth Amendment claim is inherently flawed and fails from the start.

## VIII. EVEN IF PLAINTIFFS WERE ENTITLED TO SUMMARY JUDGMENT, WHICH THEY ARE NOT, THE REQUESTED RELIEF STILL MUST BE DENIED.

For their Section 241 claims, plaintiffs' complaint seeks to "enjoin the Defendant from denying any Mississippi citizen the right to register to vote[.]" ROA.19-60662.60. However, even if plaintiffs had proven an entitlement to summary judgment, plaintiffs still would not be automatically entitled to their broad-based and immediate relief request. *See* ROA.19-60662.4303-4306.

One reason is, in voting-related cases, this Court has noted that courts should proceed with "caution" when exercising "injunctive powers before trial on the merits." *Chisom v. Roemer*, 853 F.2d 1186, 1192 (5th Cir. 1988). This Court explained that states should be given an opportunity to fix defective laws: "It is now established beyond challenge that upon finding a particular standard, practice, or procedure to be contrary to either a federal constitutional or statutory requirement, the federal court must grant the appropriate state or local authorities an opportunity to correct the deficiencies." *Id.*

Relatedly, even if plaintiffs were to prevail on summary judgment as to Section 253, they are not entitled to any immediate relief. Indeed, the State's greater power to *permanently* discontinue vote-restoration processes includes the lesser power to *temporarily* discontinue vote-restoration processes—until the State determines whether, when, and how to put a new vote-restoration system in place.

A federal court order commanding a State Legislature to promulgate a discretionary state policy as to vote restoration—*i.e.*, a policy not required by federal law—would contravene horizontal and vertical separation-of-powers principles. That is, a federal court may not direct federal policymakers to promulgate a discretionary federal policy—*i.e.*, a policy not required by federal law. *See, e.g.*, *Greater L.A. Council on Deafness, Inc. v. Cmty. Television of S. Cal.*, 719 F.2d 1017, 1023 (9th Cir. 1983); *accord INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers); *Heckler v. Rosebud Hosp. Dist.*, 473 U.S. 1308, 1313 (1985) (Rehnquist, J., in chambers).  *A fortiori*, federal courts may not require state policymakers to promulgate a discretionary state policy. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1479 (U.S. May 14, 2018).

While the Court should never reach the issue of what remedy plaintiffs may be entitled to, if the Court ever must address that issue, it should defer to the Mississippi Legislature to modify the State's felon disenfranchisement and reenfranchisement laws.

## CONCLUSION

The Fifth Circuit should affirm the district court's dismissal of plaintiffs' constitutional challenges to Article 12, Section 241 of the Mississippi Constitution, it should affirm the district court's dismissal of plaintiffs' non-racial equal protection and First Amendment challenges to Article 12, Section 253.

However, the plaintiffs' race-based equal protection challenge to Section 253 fails as a matter of law. This Court should thus reverse and remand the district court's decision as to plaintiffs' race-based equal protection challenge to Section 253, with instructions to dismiss plaintiffs' lawsuit in its entirety and enter a judgment in conformity with Federal Rule of Civil Procedure 23(c)(3)(A).

Respectfully submitted,

**SECRETARY OF STATE DELBERT HOSEMANN, in his official capacity**

**BY:  JIM HOOD, ATTORNEY GENERAL**

By:     /s/ *Krissy C. Nobile*
Justin L. Matheny (Bar No. 100754)
Krissy C. Nobile (Bar No. 103577)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (601) 359-3824
justinmatheny@ago.ms.gov
knobi@ago.ms.gov

*Counsel for Secretary of State Delbert Hosemann, in his official capacity*

## **<u>CERTIFICATE OF SERVICE</u>**

I, Krissy C. Nobile, certify that I electronically filed this brief with the Clerk of the Court, using the electronic filing system, which sent notification of such filing to all counsel of record.

Dated: November 12, 2019.

*/s/ Krissy C. Nobile*
Krissy C. Nobile
Counsel for the Secretary of State

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS</u>

This brief complies with word limitations of Fed. R. App. P. 28.1 because, excluding the parts of the document exempted by Fed. R. App. P. 32, it contains 12,946 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally-spaced typeface, including serifs, using Word, in Times New Roman 14-point font, except for the footnotes, which are in proportionally-spaced typeface, including serifs, using Word in Times New Roman 12-point font.

Respectfully submitted,

*/s/ Krissy C. Nobile*
Krissy C. Nobile
Counsel for the Secretary of State