**Nos. 19-60662 c/w 19-60678**

# In the United States Court of Appeals for the Fifth Circuit

DENNIS HOPKINS, *individually and on behalf of a class of all others similarly situated*; HERMAN PARKER, JR., *individually and on behalf of a class of all others similarly situated*; WALTER WAYNE KUHN, JR., *individually and on behalf of a class of all others similarly situated*; BRYON DEMOND COLEMAN, *individually and on behalf of a class of all others similarly situated*; JON O'NEAL, *individually and on behalf of a class of all others similarly situated*; EARNEST WILLHITE, *individually and on behalf of a class of all others similarly situated*,
PLAINTIFFS-APPELLEES

*v.*

SECRETARY OF STATE DELBERT HOSEMANN, *in his official capacity*,
DEFENDANT-APPELLANT

On Appeal from the United States District Court
for the Southern District of Mississippi, No. 3:18-cv-188

***AMICUS CURIAE* BRIEF OF SEPARATION OF POWERS CLINIC IN SUPPORT OF REHEARING *EN BANC***

R. TRENT MCCOTTER*
  *Counsel of Record
Separation of Powers Clinic
Gray Center for the Study of the
  Administrative State
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
(202) 706-5488
rmccotte@gmu.edu
Counsel for *Amicus Curiae*

# SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

## No. 18-60662 Hopkins v. Hosemann

Pursuant to Fifth Circuit Rule 29.2, undersigned counsel of record provides the following supplemental list of persons and entities that have an interest in the outcome of this case.

R. Trent McCotter

Separation of Powers Clinic, Antonin Scalia Law School

/s/ R. Trent McCotter

R. Trent McCotter

# **TABLE OF CONTENTS**

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ....... C-1

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST AND IDENTITY OF THE *AMICUS CURIAE* ...................... 1

SUMMARY OF THE ARGUMENT ....................................................... 1

ARGUMENT ................................................................................................ 3

I.    The Readmission Provision Is Unconstitutional Under Longstanding Supreme Court Precedent ........................................ 3

    A.    Precedent on Congress's Power over Ongoing Terms of Admission ................................................................................. 3

    B.    Application of *Coyle* to Mississippi's Readmission Provision ................................................................................... 7

II.    Analyzing "Punishment" Under the Correct Framework ............. 10

CONCLUSION ............................................................................................. 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Branson Sch. Dist. RE-82 v. Romer*,
  161 F.3d 619 (10th Cir. 1998) ............................................................. 5

*Coyle v. Smith*, 221 U.S. 559 (1911) ............................... 4, 5, 6, 7, 8, 9, 10

*Hawkins v. Bleakly*, 243 U.S. 210 (1917) ................................................. 6

*Lassiter v. Northampton Cnty. Bd. of Elections*,
  360 U.S. 45 (1959) ............................................................................. 9

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ........................................................................... 7

*Norton v. Shelby Cnty.*, 118 U.S. 425 (1886) ......................................... 10

*Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) .................................... 7

*Reno v. Condon*, 528 U.S. 141 (2000) ..................................................... 5

*Richardson v. Ramirez*, 418 U.S. 24 (1974) ............................................. 8

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ........................................ 6, 8

*Smith v. Doe*, 538 U.S. 84 (2003) .................................................... 11, 13

*Ex parte Webb*, 225 U.S. 663 (1912) ....................................................... 5

**Statutes**

Act of February 23, 1870, 16 Stat. 68 (1870) ....................................... 2, 9

**INTEREST AND IDENTITY OF THE *AMICUS CURIAE*[1]**

The Separation of Powers Clinic at the Gray Center for the Study of the Administrative State, located within the Antonin Scalia Law School at George Mason University, was established during the 2021–22 academic year for the purpose of studying, researching, and raising awareness of the proper application of the U.S. Constitution's separation of powers constraints on the exercise of federal government power, including via federalism principles. The Clinic provides students an opportunity to discuss, research, and write about separation of powers issues in ongoing litigation.

**SUMMARY OF THE ARGUMENT**

The text, structure, and contemporaneous legislative evidence of Section 241, adopted at Mississippi's 1890 Constitutional Convention, uniformly demonstrate that it is civil in nature, not punitive. The majority opinion, however, discarded that evidence for one reason: Congress's 1870 Readmission Act stated that Mississippi was forever

---

[1] No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

precluded from depriving adult citizens of the right to vote except "as a punishment for such crimes as are now felonies at common law," Act of February 23, 1870, ch. 19, 16 Stat. 68 (1870) (hereinafter, the "Readmission Provision"), and the majority reasoned that if Section 241 were *not* punitive, it would violate the Readmission Provision's use of the word "punishment."

"Faced with the choice between reading Section 241 to comply with applicable federal law or reading it to violate the Readmission Act, we should choose the interpretation that has a chance of avoiding federal preemption." *Hopkins v. Hosemann*, Slip.Op.30–31 (cleaned up). It was an extreme form of avoidance: all contrary evidence of actual legislative intent was sacrificed to maintain Section 241's compliance with the Readmission Provision, even though that ultimately led the panel to conclude that Section 241 itself violated the Eighth Amendment.

There are numerous flaws with that approach, as the Petition for Rehearing En Banc explains. But from a separation of powers perspective, perhaps the most critical problem is that the Readmission Provision itself is unconstitutional under longstanding Supreme Court caselaw prohibiting Congress from imposing conditions for statehood

that extend beyond the date of a state's admission to the Union. *See* Part I, *infra*.

There was no reason to give overweening preference to construing Section 241 to comply with a federal statute that *itself* is unconstitutional. To determine whether Section 241 is punitive, therefore, the Court should do what it normally would: look to contemporaneous evidence of what the Convention *actually* intended Section 241 to do, as best demonstrated by its text and structure. On that score, even the majority opinion seems to acknowledge the evidence is uniformly in favor of Section 241 being a civil regulation, not punishment. Section 241 thus never should have triggered Eighth Amendment analysis in the first place. *See* Part II, *infra*.

## ARGUMENT

**I.  The Readmission Provision Is Unconstitutional Under Longstanding Supreme Court Precedent.**

### A.  Precedent on Congress's Power over Ongoing Terms of Admission.

Under Article IV of the Constitution, Congress has authority to admit states into the Union. But the Supreme Court has long held that Congress generally cannot condition admission on the new state

complying with Congress's wishes *after* the state is formally admitted, even when the future state agreed beforehand to bind itself.

The seminal case is *Coyle v. Smith*, 221 U.S. 559 (1911), which addressed Congress's attempt to control the location of Oklahoma's state capital. In 1906, Congress approved the Territory of Oklahoma's request for admission into the United States but with conditions, one of which was that Oklahoma could not move the location of its state capital from Guthrie before the year 1913. *Id.* at 563–64. But after Oklahoma gained statehood, it moved the capital to Oklahoma City before 1913.

The Supreme Court held that the admission clause restricting the location of Oklahoma's capital became void as soon as Oklahoma joined the Union. The *Territory* of Oklahoma had promised not to move the capital, but the *State* of Oklahoma could move its capital wherever it wanted. The Court's reasoning was that "when a new state is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original states." *Id.* at 573. The Nation "was and is a union of states, equal in power, dignity, and authority." *Id.* at 567. But if Congress could dictate what a state did after its admission, even if the future state had agreed to restrict itself before it was

admitted, then the new state would no longer be sovereign and equal. It would be under Congress's control, perhaps in perpetuity, which would interfere with "the harmonious operation of the scheme upon which the Republic was organized." *Id.* at 580.

Thus, when a future state agrees to bind itself after admission, that ongoing restriction is valid only if it falls "within the scope of the conceded powers of Congress." *Id.* at 568, 574. "In other words, a limitation imposed through the admissions process is valid if Congress could otherwise impose it on a state that already had been admitted to the Union." *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 635 (10th Cir. 1998). This is less an exception to *Coyle* and more a recognition of Congress's independent powers under Article I. This led, for example, the Supreme Court to uphold a clause in Oklahoma's terms of admission that prohibited certain transportation of liquor that Congress could have regulated in *any* state under the Commerce and Indian Commerce Clauses. *Ex parte Webb*, 225 U.S. 663, 691 (1912).

But outside of those areas where Congress has separate authority to regulate the fifty states, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern

according to Congress' instructions," even as an agreed-upon term of admission to the Union. *Reno v. Condon*, 528 U.S. 141, 149 (2000).

Restricting Congress's power to impose ongoing conditions after the time of admission to the Union is therefore a core aspect of the "equal sovereignty" doctrine, which is "a fundamental principle" of the Constitution, as long recognized by the Supreme Court. *Shelby Cnty. v. Holder*, 570 U.S. 529, 543–44 (2013).

The Supreme Court has cited *Coyle* favorably for over a century. In 1917, the Court held that Iowa could eliminate its right to a jury trial in certain instances even though Congress's acts admitting Iowa as a state had apparently dictated that Iowans would keep their pre-existing right to a jury trial. *Hawkins v. Bleakly*, 243 U.S. 210, 217 (1917). "The regulation [dictating Iowa's admission as a state], although embracing provisions of the [Northwest Ordinance] declared to be unalterable unless by common consent, had no further force in Iowa after its admission as a state," at which point Iowa was "as much at liberty as any other state to abolish or limit the right of trial by jury." *Id.*[2]

---

[2] *Hawkins* was decided before the Court incorporated the Sixth Amendment's jury trial right against the states via the Fourteenth Amendment.

In 1999, the Court again cited *Coyle* as "prevent[ing] the Federal Government from impairing fundamental attributes of state sovereignty when it admits new States into the Union." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 203–04 (1999).

And in 2016, the Court cited *Coyle* when emphasizing "that a new State, upon entry, necessarily becomes vested with all the legal characteristics and capabilities of the first 13." *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 n.4 (2016). This "principle of 'equal footing,' we have held, is essential to ensure that the nation remains 'a union of States alike in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States.'" *Id.* (alteration omitted). Thus, a later-admitted state exercises its authority to enact laws "by virtue not of congressional grace, but of the independent powers that its earliest counterparts both brought to the Union and chose to maintain." *Id.*

### B. Application of *Coyle* to Mississippi's Readmission Provision.

The majority opinion only briefly addressed the concept of "equal sovereignty" at the very end of its analysis about whether Section 241 is

punitive. Slip.Op.32. The majority concluded that Congress can pass "a law imposing burdens and limitations on some states and not others." *Id.*

But that bland recitation is not what Congress did here. Congress expressly barred Mississippi from *ever* amending its state constitution to do something that it otherwise had a sovereign right to do upon admission into the Union. The Readmission Provision applied not just at the moment of admission but into the future, as well. That makes it like *Coyle*. Actually, it is worse than *Coyle* because the Readmission Provision purports to apply forever, rather than for only a few years after admission as in *Coyle*.

As noted above, Congress can impose such a continuing condition of admission *only* when it falls "within the scope of the conceded powers of Congress." *Coyle*, 221 U.S. at 568, 574. But deciding who is entitled to the franchise—outside of the Constitution's limitations based on, e.g., race, sex, and age—is a matter of core state sovereignty under Supreme Court precedent. "[T]he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections," and thus "States have broad powers to determine the conditions under which the right of suffrage may be exercised."

8

*Shelby Cnty.*, 570 U.S. at 543–44 (cleaned up); *see Richardson v. Ramirez*, 418 U.S. 24, 53 (1974); *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 50–51 (1959); Pet. for Rehearing En Banc 10–12.

Congress could not impose a law on all fifty states constricting their power to disenfranchise felons, least of all by limiting them to a list of crimes that were "felonies at common law" in 1870, as the Readmission Provision does. 16 Stat. 68. Such a law would, for example, prohibit states from disenfranchising felons convicted of crimes that did not even exist in 1870. That would violate the states' sovereign right to determine who obtains the franchise and in particular the longstanding state right to disenfranchise some or all felons, subject only to the U.S. Constitution's restrictions regarding race, sex, and age.

Because Congress could not impose the Readmission Provision on an existing state, it could not impose it as a continuing obligation after Mississippi gained statehood. The Court need not explore the full contours of the "equal sovereignty" doctrine but instead need only follow *Coyle*, which involved the application of that doctrine to the specific instance of Congress imposing a condition on a state that continued after its admission and interfered with its sovereign rights.

## II. Analyzing "Punishment" Under the Correct Framework.

The majority opinion gave overweening priority to construing Section 241 to comply with the Readmission Provision. The Convention *must have* intended Section 241 to be punishment, the majority concluded, because if it were not, it "would require us to also conclude that Mississippi has been, and continues to be, in violation of the Readmission Act." Slip.Op.30. All contrary evidence of the Convention's *actual* intent was sacrificed to satisfy the *assumption* that the Readmission Provision must be upheld at all costs.

But because the Readmission Provision itself is unconstitutional under *Coyle*, there was no reason for the Court to put such a strong thumb on the scale in favor of assuming that Section 241 must be "punishment," just to avoid running afoul of the Readmission Provision.[3]

To be clear, the unconstitutionality of the Readmission Provision does not automatically mean Section 241 was *not* intended to be punishment, but rather means only that any such evidence must come

---

[3] *See also Norton v. Shelby Cnty.*, 118 U.S. 425, 442 (1886) ("An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.").

from the standard sources the Court would consider—i.e., the contemporaneous text and structure of Section 241.

The majority opinion seemed to acknowledge that—aside from the Readmission Provision's mere existence—there is no evidence Section 241 was intended to be punitive. Quite the opposite, in fact. The majority opinion seemed to agree Section 241 "evinces no intention to punish and appears alongside nonpunitive regulations like age, competency, and residency requirements." Slip.Op.31; *see* Pet. for Rehearing En Banc 7–8. That should have been the end of the matter.

The majority opinion claimed that "there is no evidence that the Convention viewed" the Readmission Provision "as invalid." Slip.Op.30. But that is asking the wrong question. The relevant Eighth Amendment inquiry under current precedent isn't whether there is evidence that the Convention wanted to thumb its nose at Congress, but whether the Convention *affirmatively* intended Section 241 to be "punishment" under the Eighth Amendment, *Smith v. Doe*, 538 U.S. 84, 92 (2003)—and on that latter score there is no debate, once the mere mention of "punishment" in the invalid Readmission Provision is set aside. Perhaps it would be relevant if there were evidence the Convention affirmatively

11

relied on the Readmission Provision (despite its unconstitutionality) to proclaim or otherwise indicate that Section 241 is punitive. But there is no evidence of that. As mentioned above, there is agreement that the actual evidence, as opposed to inferences premised on the Readmission Provision, demonstrates the Convention intended Section 241 to be a civil regulation.[4]

\* \* \*

On the question of whether Section 241 is punitive, the majority opinion staked everything on the mere mention of the word "punishment" in a federal law that is unconstitutional. All other textual, structural, and legislative evidence was eschewed, even though this approach subsequently led the Court to find (albeit erroneously) that Section 241 itself violated the Eighth Amendment.

---

[4] Even on its own terms, the majority opinion was flawed in this regard. It acknowledged there was in fact "historical evidence that some members of the 1890 Mississippi Constitutional Convention viewed the Mississippi Readmission Act generally as an unconstitutional intrusion into Mississippi's power to regulate elections." Slip.Op.30.

There is no basis for this newly minted "statutory avoidance" doctrine that favors upholding a federal statute at the cost of ignoring one constitutional violation and creating another.[5]

Considering the *actual* evidence of the Convention's intention, Section 241 is not punitive, and therefore it should never have triggered Eighth Amendment analysis in the first instance.[6]

## CONCLUSION

The Court should grant rehearing *en banc*.

August 18, 2023                    Respectfully submitted,

/s/ R. Trent McCotter
R. TRENT MCCOTTER*
  *Counsel of Record*
Separation of Powers Clinic
Gray Center for the Study of
  the Administrative State
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.

---

[5] This is especially true when, as Judge Jones explained, the Eighth Amendment issue can be resolved simply by construing "punishment" in the Readmission Provision to mean as a "consequence of." Slip.Op.62 (Jones, J., dissenting).

[6] To be sure, a statute can sometimes be so egregious in its effect that it will be deemed punishment for Eighth Amendment purposes despite the legislature's intent, *Smith*, 538 U.S. at 97, but apparently not even the majority opinion believed that high threshold was satisfied here, *see also* Pet. for Rehearing En Banc 8–9.

13

Arlington, VA 22201
(202) 706-5488
rmccotte@gmu.edu
Counsel for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2023, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

/s/ R. Trent McCotter

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word. Fed. R. App. P. 29(a), 32(g)(1). This brief complies with the type-volume limitation of Rule 29 because it contains 2,531 words, excluding the parts exempted under Rule 32(f).

/s/ R. Trent McCotter