# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 18, 2024

Lyle W. Cayce
Clerk

No. 19-60662

Dennis Hopkins, *individually and on behalf of a class of all others similarly situated*; Herman Parker, Jr., *individually and on behalf of a class of all others similarly situated*; Walter Wayne Kuhn, Jr., *individually and on behalf of a class of all others similarly situated*; Bryon Demond Coleman, *individually and on behalf of a class of all others similarly situated*; Jon O'Neal, *individually and on behalf of a class of all others similarly situated*; Earnest Willhite, *individually and on behalf of a class of all others similarly situated*,

*Plaintiffs—Appellees,*

*versus*

Secretary of State Michael Watson, *in his official capacity,*

*Defendant—Appellant,*

CONSOLIDATED WITH

No. 19-60678

Dennis Hopkins, *individually and on behalf of a class of all others similarly situated*; Herman Parker, Jr., *individually and on behalf of a class of all others similarly situated*; Walter Wayne Kuhn, Jr., *individually and on behalf of a class of all others similarly situated*; Jon O'Neal, *individually and on behalf of a class of all others similarly situated*; Earnest Willhite, *individually and on behalf of a class of all others*

*similarly situated*; BRYON DEMOND COLEMAN, *individually and on behalf of a class of all others similarly situated*,

*Plaintiffs—Appellees Cross-Appellants*,

*versus*

SECRETARY OF STATE MICHAEL WATSON, *in his official capacity*,

*Defendant—Appellant Cross-Appellee*.

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:18-CV-188

---

ON PETITION FOR REHEARING EN BANC

Before RICHMAN, *Chief Judge*, KING, JONES, SMITH, STEWART, DENNIS, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge,* joined by RICHMAN, *Chief Judge*, and SMITH, ELROD, SOUTHWICK, HAYNES[*], WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, and RAMIREZ[†] *Circuit Judges*

    This en banc court convened to reconsider a panel decision holding that Section 241 of the Mississippi Constitution, which disenfranchises those convicted of certain felony offenses,[1] fails the test of the Eighth Amendment,

---

[*] JUDGE HAYNES concurs in the judgment only.

[†] JUDGE RAMIREZ concurs in the judgment only.

[1] This court recently upheld the same provision against another constitutional challenge predicated on racial discrimination in *Harness v. Watson*, 47 F.4th 296, 311 (5th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 2426 (2023).

19-60662
c/w No. 19-60678

as incorporated by the Fourteenth Amendment's Due Process Clause.[2]  We reject that result because the United States Constitution cannot properly be so interpreted.  The Supreme Court, in *Richardson v. Ramirez*, 418 U.S. 24, 94 S. Ct. 2655 (1974), reaffirmed a body of constitutional law expressly permitting States to enact felon disenfranchisement.  And even if modern jurisprudence under the Eighth Amendment is applicable, which it is not, the case law cannot be stretched to outlaw Section 241.

Mississippi, like all States, imposes various restrictions on who may vote.  These include mental competency, residency, age, citizenship, registration, and criminal history qualifications, all of which are laid out in Section 241 of the Mississippi Constitution:

> Every inhabitant of this state, except idiots and insane persons, who is a citizen of the United States of America, eighteen (18) years old and upward, who has been a resident of this state for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector, except that he shall be qualified to vote for President

---

[2] *Hopkins v. Hosemann*, 76 F.4th 378 (5th Cir. 2023), *reh'g en banc granted, opinion vacated Hopkins v. Hosemann*, 83 F.4th 312 (5th Cir. 2023).  The panel, however, rejected Plaintiffs' claim that Section 241 violates the Equal Protection Clause on a non-racial basis because that challenge is foreclosed by *Richardson v. Ramirez,* 18 U.S. 24, 94 S. Ct. 2655 (1974).  76 F.4th at 396–98.  The panel also held that Plaintiffs have constitutional standing to challenge Section 241 but lack standing to challenge a companion State constitutional provision, Section 253, which authorizes the State legislature to re-enfranchise felons.  *Id.* at 393–95.  And the panel held it unnecessary to separately evaluate a First Amendment challenge to Section 253, which is inextricably bound to the Eighth Amendment arguments. *Id.* at 392.  The en banc court agrees with each of these dispositions.

19-60662
c/w No. 19-60678

and Vice President of the United States if he meets the requirements established by Congress therefor and is otherwise a qualified elector.

MISS. CONST. ART. XII, § 241.  Mississippi disenfranchises these felons for life, though voting rights may be restored by a two-thirds vote of the State legislature under Section 253 of the Mississippi Constitution.[3]

Laws like Mississippi's Section 241 have faced many unsuccessful constitutional challenges in the past.  When the Supreme Court ruled that the Equal Protection Clause does not bar States from permanently disenfranchising felons, it dispensed some advice to the losing parties:

> We would by no means discount these arguments if addressed to the legislative forum which may properly weigh and balance them. . . . But it is not for us to choose one set of values over the other.  If respondents are correct, and the view which they advocate is indeed the more enlightened and sensible one, presumably the people . . . . will ultimately come around to that view.  And if they do not do so, their failure is some evidence, at least, of the fact that there are two sides to the argument.

*Richardson v. Ramirez*, 418 U.S. at 55, 94 S. Ct. at 2671.  In other words: go and convince the State legislatures.  Do the hard work of persuading your fellow citizens that the law should change.  The paramount lesson of the Constitution and *Richardson* is that the changes sought by Plaintiffs here can and must be achieved through public consensus effectuated in the legislative process, not by judicial fiat.

---

[3] In addition to Section 253, gubernatorial pardons can restore voting rights, and there is limited restoration available for WWI and II veterans.  *See* 76 F.4th at 389.

19-60662
c/w No. 19-60678

## **BACKGROUND**

This case was filed in 2018 by six Mississippi citizens who have been permanently disenfranchised pursuant to Section 241.  *See Hopkins v. Hosemann*, 76 F.4th 378, 391 (5th Cir. 2023), *reh'g en banc granted, opinion vacated Hopkins v. Hosemann*, 83 F.4th 312 (5th Cir. 2023).  Among them, Dennis Hopkins, disenfranchised since 1998, was convicted of grand larceny. Herman Parker Jr., a public employee for the Vicksburg Housing Authority, is disenfranchised because of a grand larceny conviction when he was nineteen.  Byron Demond Coleman became disenfranchised in 1997 because of a conviction for receiving stolen property.  These plaintiffs have completed all terms of their sentences.  The district court certified a class comprising similar plaintiffs.  They sued the Mississippi Secretary of State in his official capacity, challenging Sections 241 and 253 and requesting declaratory and injunctive relief for alleged violations of the First, Eighth and Fourteenth Amendments to the United States Constitution.  Plaintiffs claimed, more precisely, that Section 241 inflicts a cruel and unusual punishment of permanent disenfranchisement, while it also violates the Equal Protection clause by impermissibly burdening their right to vote.

The parties filed cross-motions for summary judgment.  The district court rejected the Secretary's arguments that Plaintiffs lacked Article III standing and that *Ex Parte Young* equitable relief is unavailable against the Secretary.  On the merits, however, the district court upheld Section 241 and certified its order for interlocutory appeal.  The appeal was decided by the panel adversely to the Secretary, to the extent that the panel declared Section 241 in violation of the Eighth Amendment's cruel and unusual punishment clause.  This court vacated the panel opinion for en banc rehearing.

Before this en banc court, the Plaintiffs contend that Section 241 violates the Eighth Amendment, as cruel and unusual punishment, and it is

not saved by the Fourteenth Amendment's Section 2 proviso that States may disenfranchise a citizen convicted of an "other crime." To succeed in these positions, the Plaintiffs must overcome the formidable obstacle of the Supreme Court's decision in *Richardson v. Ramirez*, 418 U.S. at 54–56, 94 S. Ct. 2670–72.

The following analysis responds to Plaintiffs' position by examining first, the Constitution; and second, *Richardson* and a wealth of corroborating authorities. But, assuming arguendo that the "evolving standards" test for the Eighth Amendment may apply, we demonstrate that Section 241 still survives.

## I. The Constitution

Section One of the Fourteenth Amendment guarantees "due process" and "equal protection of the laws." U.S. Const. Amend. XIV, § 1. After a long process of exegesis, it is settled that the Due Process Clause incorporates much of the Bill of Rights, and State governments must respect protections like the Eighth Amendment's prohibition of cruel and unusual punishment. *See McDonald v. Chicago*, 561 U.S. 742, 763, 130 S. Ct. 3020, 3034 (2010); *see also* U.S. Const. Amend. VIII.

Section Two of the Fourteenth Amendment is less familiar but more specific. It reduces the number of representatives in Congress to which a State is entitled if that State disenfranchises any of its male, non-Indian citizens over the age of 21. But there is a single exception: States may not be penalized for disenfranchising a citizen "for participation in rebellion, *or other crime*." U.S. Const. Amend. XIV, § 2 (emphasis added). The carve-out reflects a long tradition in this country, and before that, in British law,

19-60662
c/w No. 19-60678

and before that, in the Western world.[4]  This tradition can be summed up in Lockean terms: if a person breaks the laws, he has forfeited the right to participate in making them.  *See Green v. Bd. of Elections of N.Y.C.*, 380 F.2d 445, 451 (2d Cir. 1967) (Friendly, J.).

In *Richardson v. Ramirez*, discussed further below, the Supreme Court explained the relationship between Sections One and Two against the background of an Equal Protection claim brought by plaintiffs concerning their voting rights.  418 U.S. at 41–55, 94 S. Ct. at 2665–71.  The Court's holding did not distinguish between the Equal Protection and Due Process components of Section One, but rested "on the demonstrably sound proposition that [Section One], in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which [Section Two] imposed for other forms of disenfranchisement."  *Id.* at 55, 94 S. Ct. at 2671.  On this logic, it is irrelevant that Plaintiffs here make a Due Process argument (*i.e.*, via incorporation of the Eighth Amendment) rather than one founded on the Equal Protection clause, which *Richardson* expressly dealt with.  None of the Section One provisions, according to *Richardson*, can be understood to bar what Section Two plainly allows.

Even if the Eighth Amendment right were considered on its own terms, we are bound, as interpreters of the Constitution, to seek "a fair construction of the whole instrument."  *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 406 (1819).  All of its provisions "should be interpreted in a way that renders them compatible, not contradictory."  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 180 (2012) [hereinafter "READING LAW"].  It is useless

---

[4] For a brief summary of that tradition, *see* George Brooks, *Felon Disenfranchisement: Law, History, Policy, and Politics*, 32 FORDHAM URB. L.J. 851, 852–61 (2005).

for the Fourteenth Amendment to authorize felon disenfranchisement if the practice is made illegal by the Eighth. The canon against surplusage warns against such unnatural readings. *Id.* at 174.

Thus, the Cruel and Unusual Punishments Clause should not be understood to prohibit what "the explicit language of the Constitution affirmatively acknowledges" elsewhere as legitimate. *Furman v. Georgia*, 408 U.S. 238, 380, 92 S. Ct. 2726, 2799 (1972) (Burger, C.J., dissenting); *see also Gregg v. Georgia*, 428 U.S. 153, 177, 96 S. Ct. 2909, 2927 (1976) (approving capital punishment under certain circumstances). *Cf. Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51, 79 S. Ct. 985, 990 (1959) (stating that a "criminal record" is one of the "factors which a State may take into consideration in determining the qualifications of voters"); *Romer v. Evans*, 517 U.S. 620, 634, 116 S. Ct. 1620, 1628 (1996) ("that a convicted felon may be denied the right to vote" is an "unexceptionable" proposition).

Reinforcing this postulate, Section Two provides that States will not have their Congressional representation curtailed if they strip the franchise from those who "*participat[ed]* in rebellion, or other crime." U.S. CONST. AMEND. XIV § 2 (emphasis added). Logically, Section Two would not penalize States for disenfranchising the *narrower group* of those who were actually *convicted* of a serious crime. Yet if the Eighth Amendment were to operate to totally proscribe felon disenfranchisement, that would be the result.[5]

---

[5] The dissent, echoing the Plaintiffs, tries to elide this problem by asserting that "only" "lifelong felon disenfranchisement" after "completion of a person's criminal sentence" is unconstitutionally cruel and unusual. But, as will be explained, there is no logical stopping point for judicial repudiation of Section Two felon disenfranchisement once judges wander into the subjective realm of "independent judgment" concerning the relative importance of the "fundamental right" of voting versus "legitimate penological goals" of disenfranchisement. That the dissent here finds no legitimate penological goals foreshadows future rulings. Equally disturbing, the dissent's unprecedented extension of the "evolving standards" theory of the Eighth Amendment to this novel subject of post-

19-60662
c/w No. 19-60678

It is true that "provisions that grant Congress or the States specific power to legislate in certain areas . . . are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29, 89 S. Ct. 5, 9 (1968). For example, a State may not disenfranchise felons with racially discriminatory intent. *Hunter v. Underwood*, 471 U.S. 222, 233, 105 S. Ct. 1916, 1922 (1985).[6] Likewise, the Thirteenth Amendment bars involuntary servitude "except as a punishment for crime." U.S. Const. Amend. XIII. Nevertheless, certain involuntary work requirements imposed on convicted criminals may violate the Cruel and Unusual Punishments Clause. *Williams v. Henagan*, 595 F.3d 610, 622 n. 18 (5th Cir. 2010).

Although these decisions place a "limitation" on the "exercise" of a legitimate power, they cannot void the power entirely. *Williams*, 393 U.S. at 29, 89 S. Ct. at 9. The correct interpretive question is how to reconcile the Fourteenth Amendment's provisions with the Eighth Amendment as construed in case law. This is no different from the task undertaken to reconcile other provisions of the Constitution that seem to point in different directions. *See, e.g.*, *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 375–378, 126 S. Ct. 990, 1003–05 (2006) (reconciling the Bankruptcy Clause with the Eleventh Amendment); *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 528–33, 139 S. Ct. 2449, 2467–2470 (2019) (reconciling the Dormant Commerce Clause with the Twenty-first Amendment); *United*

---

conviction disabilities lays the groundwork for wholesale judicial revision of criminal punishments.

[6] To clarify a point for confused readers: this is not an issue in today's case. Sitting *en banc*, this court has already held that the current version of Section 241 was not enacted with discriminatory intent. *See Harness*, 47 F.4th at 311.

19-60662
c/w No. 19-60678

*States v. Vaello Madero*, 596 U.S. 159, 161–62, 142 S. Ct. 1539, 1541 (2022) (reconciling the Territories Clause with the Fifth Amendment's Due Process Clause). Thus, *Hunter* placed a narrow limitation on Section Two's disenfranchisement power, aligning the Equal Protection Clause with Section Two; *Hunter* certainly did not void the power entirely. Ultimately, the "proper question" is "not which Amendment controls but whether either Amendment is violated." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 50, 114 S. Ct. 492, 499 (1993). Here, the answer is that neither Amendment is violated.

Moreover, even if this court were to find a conflict between the Eighth Amendment and Section Two of the Fourteenth, the established canons of interpretation dictate that Section Two should be given effect. It is both more specific and later in time than the Eighth Amendment. If "there is a conflict between a general provision and a specific provision, the specific provision prevails." Reading Law at 183. "While the implication of a later enactment will rarely be strong enough to repeal a prior provision, it will often change the meaning that would otherwise be given to an earlier provision that is ambiguous." *Id.* at 330. And a "provision that flatly contradicts an earlier-enacted provision repeals it." *Id.* at 327. This court may not "careen[] past all these standard interpretive guardrails" to essentially eviscerate Section Two. *Hopkins*, 76 F.4th at 420 (Jones, J. dissenting).

## II. Richardson

In *Richardson*, the Supreme Court held that California's felon disenfranchisement law did not run afoul of the Equal Protection Clause. 418 U.S. at 56, 94 S. Ct. 2671. In so holding, the Court rested

> on the demonstrably sound proposition that [Section 1], in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which [Section 2] imposed for other forms of

19-60662
c/w No. 19-60678

disenfranchisement. . . . [Section 2] is as much a part of the
amendment as any of the other sections, and how it became a
part of the Amendment is less important than what it says and
what it means.

*Id.* at 55, 94 S. Ct. at 2671.  There is no equivocation here.  Yet the Plaintiffs
and the dissent attempt to minimize *Richardson*, principally by asserting that
the Court decided only against a *per se* Equal Protection violation challenge
to felon disenfranchisement.  They recognize that if *Richardson* interprets
Section One as a whole, their position is untenable.  A careful reading of
*Richardson*, however, leaves no doubt that *Richardson*, like the Amendment,
means what it says.

Then-Justice Rehnquist's opinion commences its discussion by
describing the State's arguments that

those who framed and adopted the Fourteenth Amendment
could not have intended to prohibit outright in [Section] 1 of
that Amendment that which was expressly exempted from the
lesser sanction of reduced representation imposed by [Section]
2 of the Amendment. *This argument seems to us a persuasive one
unless it can be shown that the language of [Section] 2, "except for
participation in rebellion, or other crime," was intended to have a
different meaning than would appear from its face.*

*Id.* at 43, 94 S. Ct. at 2665 (emphasis added).  The opinion then discusses at
length what legislative history there was, which "indicates that this language
was intended by Congress to mean what it says."  *Id.* at 43, 94 S. Ct. at 2666.
Further light was shed, the Court states, from the fact that at the time Section
2 was adopted, "29 States . . . prohibited, or authorized the legislature to
prohibit, exercise of the franchise by persons convicted of felonies or
infamous crimes."  *Id.* at 48, 94 S. Ct. at 2668 (footnote with citations
omitted).

"More impressive," the Court observes, is the history surrounding
the Reconstruction Act of 1867, which preceded the admission of former

11

19-60662
c/w No. 19-60678

rebellious States to the Union except upon certain conditions. *Id.* That Act required new State constitutions "in conformity with the Constitution of the United States in all respects" to be framed by a convention whose delegates were male citizens subject to certain qualifications "*except such as may be disenfranchised for participation in the rebellion or for felony at common law. . . .* " *Id.* at 49, 94 S. Ct. at 2668. The Court adds to this history a description of the Act by Sen. Henderson of Missouri, whose explanation of the bill included the following:

> It provided that when the rebel States should adopt universal suffrage, regardless of color or race, excluding none, white or black, except for treason or such crimes as were felony at the common law, the regulation of exclusion to be left to the States themselves. . .

*Id.* at 50, 94 S. Ct. at 2669 (internal citation omitted). Following the Reconstruction Act, and building on its provisions, the Readmission Acts were passed, each one in substantively the same language as to disenfranchisement. The first of these, enacted in June 1868 for Arkansas, provided a "fundamental condition" for the State's readmission:

> That the constitution of Arkansas shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote…except as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted. . . .

*Id.* at 51, 94 S. Ct. at 2669. The Court then notes that "[t]he same 'fundamental condition' . . . was imposed" on all the former Confederate States in their Readmission Acts, "with only slight variations in language." *Id.* at 52, 94 S. Ct. at 2670.

The Court goes on to support the "convincing evidence of the historical understanding of the Fourteenth Amendment" with a series of its decisions that "have indicated approval of such exclusions [of felons] on a

19-60662
c/w No. 19-60678

number of occasions." *Id.* at 53, 94 S. Ct. at 2670. *See Murphy v. Ramsey*, 114 U.S. 15, 5 S. Ct. 747 (1885) (excluding bigamists and polygamists from franchise under territorial law of Utah); *Davis v. Beason*, 133 U.S. 333, 10 S. Ct. 299 (1890) (same in Idaho territory). The Court quotes a then-recent decision that explicitly noted a "criminal record" as an "obvious example[] indicating [a] factor[] which a State may take into consideration in determining the qualifications of voters." *Richardson*, 418 U.S. at 53, 94 S. Ct. at 2670 (quoting *Lassiter*, 360 U.S. at 51, 79 S. Ct. at 990). The Court cites two three-judge court decisions that rejected felon disenfranchisement challenges and were summarily affirmed by the Court. *See id.* (citing *Fincher v. Scott*, 352 F. Supp. 117 (M.D.N.C 1972), *aff'd* 411 U.S. 961, 93 S. Ct. 2151 (1973); *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla. 1969), *aff'd* 396 U.S. 12, 90 S. Ct. 153 (1969)). Both of those decisions relied on Judge Henry Friendly's opinion for the Second Circuit, which held that a challenge to New York's felon disenfranchisement did not require the convening of a three-judge court. *Green*, 380 F.2d at 445, *cert. denied,* 389 U.S. 1048, 88 S. Ct. 768 (1968).[7]

After all this history, the Court explains that felon disenfranchisement does not run afoul of the Equal Protection Clause, which had been applied to other voter qualifications (*e.g.*, residency requirements). *Richardson*, 418 U.S. at 54-55, 94 S. Ct. at 2671. The Court's discussion thus moved from demonstrating that Section Two plainly authorized States' felon disenfranchisement laws to rejecting the general claims against disenfranchisement founded on the Equal Protection clause of Section One. The Court's reasoning ineluctably supports the conclusion that the

---

[7] To *Richardson*'s list should be added the more recent decision in *Romer v. Evans*, 517 U.S. 620, 634, 116 S. Ct. at 1628 (1996) ("that a convicted felon may be denied the right to vote. . . is" an "unexceptionable" proposition).

19-60662
c/w No. 19-60678

Fourteenth Amendment's framers could not have intended to prohibit outright in Section One what was expressly exempted in Section Two.

To date, other circuit courts have faithfully applied *Richardson*, and none have rejected it. *See Jones v. Governor of Fla.*, 950 F.3d 795, 801 (11th Cir. 2020) ("Regardless of the political trend toward re-enfranchisement, there is nothing unconstitutional about disenfranchising felons—even all felons, even for life." (citing *Richardson*, 418 U.S. at 56, 94 S. Ct. at 2671)); *Hayden v. Pataki*, 449 F.3d 305, 316 (2d Cir. 2006) (en banc) ("The Supreme Court has ruled that, as a result of th[e] language [of Section 2], felon disenfranchisement provisions are presumptively constitutional." (citing *Richardson*, 418 U.S. at 24, 94 S. Ct. at 2655)).

In the face of the Court's reasoning and subsequent caselaw, the Plaintiffs' and the dissent's arguments to limit or minimize *Richardson* are feeble. Broadly, they argue that *Richardson* does not *per se* exclude other constitutional challenges to felon disenfranchisement. First, they note that the Court remanded the *Richardson* plaintiffs' case to examine their "alternative contention" under the Equal Protection Clause. 418 U.S. at 56, 94 S. Ct. at 2671. That is correct, but misleading. That contention concerned unequal application of the *concededly applicable* California disenfranchisement provisions. *Id.*

Further, Plaintiffs' reliance on *Hunter* to demonstrate that Section Two does not *per se* authorize felon disenfranchisement does nothing to elevate their claims founded on a broad interpretation of the Eighth Amendment. *Hunter*, as shown, crafted a narrow and clear limit on the otherwise expansive power retained by the States in Section Two. But these Plaintiffs' position is exactly like that of the *Richardson* plaintiffs, who had fully completed their felony incarcerations and parole and were nonetheless subjected to permanent disenfranchisement in California. *Id.* at 32-33, 94 S. Ct. at 2660. Plaintiffs cannot circumvent *Richardson* while standing in

the shoes of the plaintiffs in that case. Their pretended distinction is neither narrow nor clear and, if adopted, renders Section Two effectively meaningless—contrary to the Court's holding.

Finally, the Plaintiffs' creative reading of *Richardson* contradicts the dissent's understanding of the case. Justice Marshall, dissenting in *Richardson*, put it plainly: "The Court construes [Section] 2 of the Fourteenth Amendment as an express authorization for the States to disenfranchise former felons." 418 U.S. at 72, 94 S. Ct. at 2680. There is no daylight between the majority's upholding Section Two against claims predicated on Section One (no matter the basis) and the dissent's apt description of the majority holding. *Richardson* cannot be minimized by these Plaintiffs and controls this case.

The dissent, preoccupied with its (incorrect) Eighth Amendment analysis, does not engage with this discussion at all and instead tries to write *Richardson* off. The dissent claims not to see the relevance of a case "decided nearly half a century ago, nor the 19th century history of Section 2 of the Fourteenth Amendment that *Richardson* recounted" in the face of the "evolving standards of decency" in "today's" Eighth Amendment. With due respect, we are bound by the understanding of constitutional text evinced in precedents, even those that are a half century old. We are also bound by the original understanding of constitutional provisions as explained in *Richardson*. Just a few weeks ago, the Supreme Court re-emphasized the importance of constitutional text, history and precedent in evaluating cases. *See United States v. Rahimi*, 602 U.S. ___, No. 22-915, 2024 WL 3074728, at *6 (U.S. June 21, 2024) (noting that the Court's Second Amendment jurisprudence looks at "constitutional text and history" as well as "our historical tradition of firearm regulation"), *id.* at *17–28 (Kavanaugh, J., concurring) (describing the "proper roles of text, history, and precedent in constitutional interpretation" and noting that "history, not policy, is the

19-60662
c/w No. 19-60678

proper guide" for courts), *id.* at *29 (Barrett, J., concurring) (stating that "for an originalist, the history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law"); *see also Sec. & Exch. Comm'n v. Jarkesy*, No. 22-859, 2024 WL 3187811, at *7–*10 (U.S. June 27, 2024) (analyzing the relationship between common law fraud and federal securities fraud, as well as the history of the Seventh Amendment jury trial right, and holding that the similarities between the two implicated the Seventh Amendment right to a jury trial). The dissent also fails even to cite, much less distinguish, overwhelming pre- and post-*Richardson* precedents that buttressed or follow *Richardson*'s holding: pursuant to Section Two, albeit with a narrow exception, States may in fact disenfranchise citizens for "other crime[s]." The dissent's Eighth Amendment reasoning, in contrast, finds no support in text or precedent, and its logic is at war with *Richardson*.

## III. The Eighth Amendment

Even if *Richardson* had never been decided, the Plaintiffs' Eighth Amendment contention must fail because felon disenfranchisement is not a punishment, much less cruel or unusual.[8]

### A.

The Supreme Court has articulated a two-part test for determining whether something is a "punishment" within the meaning of the Constitution. *See Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 1147 (2003).

---

[8] The dissent's Eighth Amendment analysis is reminiscent of the Ninth Circuit's experiment in *Martin v. Boise*, which held that the Eighth Amendment bars cities from enforcing public-camping ordinances against homeless individuals whenever the number of homeless individuals in a jurisdiction exceeds the number of "practically available" shelter beds. 920 F.3d 584, 617 (9th Cir. 2019). The Supreme Court has now squarely rejected that avant-garde interpretation of the Eighth Amendment in *City of Grants Pass v. Johnson*, No. 23-175, 2024 WL 3208072 (U.S. June 28, 2024).

19-60662
c/w No. 19-60678

Courts initially ascertain whether "the intention of the legislature was to impose punishment." *Id.* at 92, 123 S. Ct. at 1147. If so, "that ends the inquiry." *Id.* "If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention to deem it 'civil.'" *Id.* (quotation marks and citation omitted).

The dissent acknowledges, though it downplays, that the Supreme Court has already signaled that felon disenfranchisement is not a punishment. In *Trop v. Dulles*, the plurality wrote the following:

> A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But *because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.*

356 U.S. 86, 96–97, 78 S. Ct. 590, 596 (1958) (emphasis added).[9] On the strength of this language, three other circuits have categorically held that felon disenfranchisement is nonpenal.[10] Only the Eleventh Circuit has

---

[9] *Trop* was decided in the context of the Ex Post Facto Clause. But because we assume the Constitution uses the word "punishment" consistently, the test for identifying constitutional "punishments" is the same for the Ex Post Facto Clause, the Eighth Amendment, and the Double Jeopardy Clause. *Does 1-7 v. Abbott*, 945 F.3d 307, 313 (5th Cir. 2019).

[10] *Simmons v. Galvin*, 575 F.3d 24, 43 (1st Cir. 2009) ("The Supreme Court has stated that felon disenfranchisement provisions are considered regulatory rather than punitive."); *Johnson v. Bredesen*, 624 F.3d 742, 753 (6th Cir. 2010) ("Moreover, in *Trop v. Dulles*, the Supreme Court expressly stated that felon disenfranchisement laws serve a regulatory, non-penal purpose. . . . Accordingly, as a matter of federal law, disenfranchisement statutes do not violate the Ex Post Facto Clause of the U.S. Constitution.") (citation omitted); *Green*, 380 F.2d at 450 ("Depriving convicted felons of

19-60662
c/w No. 19-60678

departed from this categorical holding. *See Thompson v. Alabama*, 65 F.4th 1288, 1304 (11th Cir. 2023) (charging the other circuits with "a misreading of *Trop*."). Irrespective of its analysis of *Trop*, however, the Eleventh Circuit still concluded that Alabama's disenfranchisement law, which has a history and structure very similar to that of Mississippi, was nonpenal. *Id.* at 1308.

In no way do the text and structure of Section 241 indicate that it was intended as a penal measure. These considerations are the primary focus of the intent inquiry. *Smith*, 538 U.S. at 92, 123 S. Ct. at 1147. To reiterate, the constitutional provision states that a mentally capable person

> who is a citizen of the United States of America, eighteen (18) years old and upward, who has been a resident of this state for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector.

Miss. Const. Art. XII, § 241. Article XII outlines the procedures for elections in Mississippi, not criminal punishments. Thus, this provision evidences no punitive intent toward felons any more than it implies an intent to punish non-citizens, short-term residents of Mississippi, those unregistered to vote, or those under the age of eighteen. Instead of singling out felons for disqualification from the franchise, the provision merely defines the franchise in such a way as to exclude them.[11] *Smith* provides a

---

the franchise is not a punishment but rather is a 'nonpenal exercise of the power to regulate the franchise.'" (quoting *Trop*, 356 U.S. at 97, 78 S. Ct. at 596)).

[11] Compare Mississippi's Section 241 with a portion of the Alabama Constitution recently upheld as a nonpenal regulation of the franchise: "No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until

19-60662
c/w No. 19-60678

useful contrast, as Alaska's sex offender registration requirement was placed within the State's criminal procedure code, but all the statutory indicia still led the Supreme Court to find no intent to inflict criminal punishment under the Eighth Amendment. 538 U.S. at 95–106, 123 S. Ct. at 1148–1154. On its face, Section 241 displays a civil rather than criminal statutory intent. *See id.*; *cf. Thompson*, 65 F.4th at 1303–08.[12]

Because the constitutional provision does not bespeak an intent to punish, the other *Smith* factors must be considered below. But the dissent posits another argument based on statutory construction. The dissent contents that the Readmission Act, in defining the terms under which Mississippi could be readmitted to the Union following the Civil War, barred the State from depriving "any citizen or class of citizens" of the right to vote "except as a punishment." Act of February 23, 1870, Ch. 19, 16 Stat. 67.[13]

---

restoration of civil and political rights or removal of disability." Ala. Const. Art. VIII, § 177. The Eleventh Circuit found this text sufficient to indicate "a preference that [Alabama's] felon disenfranchisement provision be considered civil instead of criminal." *Thompson*, 65 F.4th at 1305.

[12] The dissent characterizes felon disenfranchisement as intentionally punitive in part because of dicta from *Packingham v. North Carolina,* in which the Supreme Court set aside a state law that made it a felony for a registered sex offender to access social media. 582 U.S. 98, 107, 137 S.Ct. 1730, 1737 (2017). On the contrary, *Packingham* noted that the law's impact on individuals who had served their sentences was "not an issue before the Court." *Id.* Moreover, the Court decided that case using the completely different First Amendment intermediate scrutiny standard of review, *id.* at 105-06, 137 S.Ct. at 1736. Eighth Amendment analysis proceeds along an entirely different track, far more solicitous of legislative choices and federalism principles.

[13] The odd implication of this argument seems to be that, if disenfranchisement in Mississippi is not "punishment," it would call into question whether Mississippi was properly readmitted to the Union. Theoretically, Mississippi would be depriving a class of citizens of the right to vote for a reason other than punishment. That implication, of course,

19-60662
c/w No. 19-60678

The Plaintiffs, as well as the dissent, also contend that any felon disenfranchisement that occurs in Mississippi is *per se* punitive for Eighth Amendment purposes. This argument is too clever by half. It initially requires equating "punishment" as used in the Readmission Act with "punishment" in the Mississippi Constitution, and then requires equating "punishment" in both one hundred fifty-year old enactments with the Supreme Court's late-twentieth century adoption of the "evolving standards of decency" test for punishment under the Eighth Amendment. *See Trop*, 356 U.S. at 101, 78 S. Ct. at 598. Timing is everything. Plaintiffs' argument, echoed by the dissent, fails without a conclusion that "punishment" meant the same thing in 1870 as Eighth Amendment "punishment" has evolved to mean in recent decades.

Unlike our obligation to use the same definition for the Ex Post Facto Clause and the Eighth Amendment in the U.S. Constitution, the canons of interpretation do not oblige us to attach the same meaning to "punishment" in the Readmission Act and the Eighth Amendment.[14] In the end, this

---

is far from the same as concluding that Section 241 is preempted by the Eighth Amendment. *See Hopkins*, 76 F.4th at 403.

Additionally, one of Mississippi's *amici*, The Separation of Powers Clinic at the Gray Center for the Study of the Administrative State at Scalia Law School, argues that enforcing the Readmission Provision against Mississippi at this date would violate the "fundamental principle of equal sovereignty among the States." *Shelby County. v. Holder*, 570 U.S. 529, 544, 133 S. Ct. 2612, 2623 (2013) (quotation marks and citations omitted); *see also Coyle v. Smith*, 221 U.S. 559, 31 S. Ct. 668 (1911). We do not address this argument, which the parties did not raise or brief.

[14] The parties offer conflicting interpretations of the Readmission Act, but there is a strong argument that "punishment" as used in the 1870 Readmission provision referred to the "consequence of a crime," and not "punishment" as used by the Supreme Court in its post-*Trop* Eighth Amendment cases. *Hopkins*, 76 F.4th at 422 (Jones, J., dissenting). The strongest indication that "punishment" in the Readmission provision refers to "the consequence of a crime" is the parallel nature of the Readmission Acts with the Reconstruction Act, as the latter provided that States could exclude as electors persons who

19-60662
c/w No. 19-60678

argument is a distraction. The ultimate interpretation of the Readmission Act is not before us. All this court must do is apply the post-*Smith* tests of "punishment" for Eighth Amendment purposes to Section 241.

When the provision's text and structure are considered, and in light of precedent, it becomes obvious that Section 241 was not intended as a punishment. The Plaintiffs' and dissent's reliance on the text of the Readmission Act is not only wrong, but entirely backward, because the Readmission Act was meant to acknowledge the very State power that the Plaintiffs and the dissent would repudiate. Punitive intent cannot be found on the face of Section 241.

## B.

According to the second part of the *Smith* test, courts consider seven factors from *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S. Ct. 554, 567–68 (1963), to determine whether a sanction is punitive in effect though not facially. Although the *Mendoza-Martinez* factors are "neither exhaustive nor dispositive," they are "useful guideposts." *Smith,* 538 U.S. at 97, 123 S. Ct. at 1149. Courts therefore evaluate whether a sanction (1) "involves an affirmative disability or restraint;" (2) "has historically been regarded as a punishment;" (3) "comes into play only on a finding of scienter;" (4) "will promote the traditional aims of punishment—retribution

---

were "disenfranchised. . . for felony at common law" and treated that and other eligibility features as "qualifications" for "the elective franchise." Act of Mar. 2, 1867, ch. 153, 14 Stat. 428, 429. *See Richardson*, 418 U.S. at 49, 94 S. Ct. at 2668.

There are other indications that Congress did not use "punishment" solely when discussing imprisonment or fines. *See, e.g.*, 12 Stat. 394, 402 (1862) (describing student "expulsion" from school in the District of Columbia as "punishment"); and various military statutes prescribing "punishments" ranging from reduction of rating and extra duties (Navy), 12 Stat. 600, 603 (1862), to dismissal from the service (Army), *e.g.*, 12 Stat. 820, 821 (1863) (taking abandoned property), 17 Stat. 117, 118 (1872) (knowingly enlisting minors), 17 Stat. 582, 584 (1873) (allowing escape from military prison).

and deterrence;" (5) "applies [to underlying behavior that] is already a crime;" (6) has "an alternative purpose to which it may rationally be connected;" and (7) "appears excessive in relation to the alternative purpose assigned." *Mendoza-Martinez*, 372 U.S. at 168–69, 83 S. Ct. at 567–68. Only if these factors indicate that Section 241 is "punishment" would a provision even be subject to an analysis of whether it is "cruel and unusual" under the Eighth Amendment. Further, "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson v. United States*, 522 U.S. 93, 100, 118 S. Ct. 488, 493 (1997) (internal quotation marks omitted).

Plaintiffs have not made the stringent showing that under the above factors, Section 241 is so punitive in its effect as to demand Eighth Amendment scrutiny.

First, "disenfranchisement is not an affirmative disability or restraint as that term is normally understood." *Thompson*, 65 F.4th at 1306 (internal quotation omitted)[15]; *see also Smith*, 538 U.S. at 97, 123 S. Ct. at 1149. Like Alaska's sex offender registration and notification law, which the Supreme Court upheld in *Smith*, Section 241 "imposes no physical restraint, and so does not resemble imprisonment, the paradigmatic affirmative disability or restraint." 538 U.S. at 100, 123 S. Ct. at 1151 (citing *Hudson*, 522 U.S. at 104, 118 S. Ct. at 496). Indeed, Section 241 is less suspect under this factor than the Alaska statute because that law imposed affirmative duties on sex

---

[15] Puzzlingly, the dissent does not discuss the Eleventh Circuit's interpretation of Alabama's very similar felon disenfranchisement provision at all, despite its striking similarities to Section 241.

19-60662
c/w No. 19-60678

offenders, while no affirmative duties exist for felons disenfranchised under Section 241. *See id.* at 101–02.[16]

An apt comparison may be drawn between disenfranchisement and occupational disbarment, which the Supreme Court has repeatedly upheld as a nonpunitive consequence of criminal convictions. *See Thompson*, 65 F.4th at 1306 (citing *Hudson*, 522 U.S. at 105, 118 S. Ct. at 496 (banking industry)); *see also De Veau v. Braisted*, 363 U.S. 144, 160, 80 S. Ct. 1146, 1155 (1960) (union offices); *Hawker v. People of New York*, 170 U.S. 189, 190–93, 200, 18 S. Ct. 573, 574–75, 577–78 (1898) (medical practice). Notably, the Supreme Court has even held that civil confinements carrying potentially indefinite physical restraint may be nonpunitive. *See Kansas v. Hendricks*, 521 U.S. 346, 369, 117 S. Ct. 2072, 2085 (1997). As *Thompson* observed, "felon disenfranchisement and occupational disbarment are similar in many ways. Both remove the civil rights of individuals due to their criminal behavior as part of the State's regulatory power." *Thompson*, 65 F.4th at 1306 (citation omitted). Moreover, describing the right to vote as "fundamental" does not enhance the argument for an unconstitutional "disability," because this court has found the interests of felons in retaining the right to vote "constitutionally distinguishable" from non-felons' right-to-vote claims. *Williams v. Taylor*, 677 F.2d 510, 514 (5th Cir. 1982).

To the extent that the Plaintiffs attempt to recast this factor concerning "restraints" from an objective test to a subjective experience of the disenfranchised, they misread *Smith's* instruction for courts to examine "how the effects of" a law "are felt by those subject to it." 538 U.S. at 99–100, 123 S. Ct. at 1151. The Supreme Court analyzed both physical restraints

---

[16] *But cf. Does 1-5 v. Snyder*, 834 F.3d 696, 703-04 (6th Cir. 2016) ( holding that a statute regulating where sex offenders may live, work and loiter imposed "direct restraints on personal conduct" that were "far more onerous than those considered in *Smith*.")

19-60662
c/w No. 19-60678

and "substantial occupational or housing disadvantages . . . that would not have otherwise occurred." *Id.*, 538 U.S. at 100, 123 S. Ct. at 1151. The Court did not allude to the subjective feelings of disenfranchised felons.

Second, as we have already noted, the disenfranchisement of felons has long been regarded as serving a nonpenal, regulatory purpose. This tradition substantially predates *Trop*'s description of felon disenfranchisement as "nonpenal." *See* 356 U.S. at 97, 78 S. Ct. at 596. For instance, in 1898, the Supreme Court described felon disenfranchisement laws as a type of measure designed to protect the public, and not punish for past offenses. *Hawker*, 170 U.S. at 197, 18 S. Ct. at 576.

The Plaintiffs' argument to the contrary has little support. They rely on a footnote in an out-of-circuit opinion, *see Johnson v. Governor of Fla.*, 405 F.3d 1214, 1218 n.5 (11th Cir. 2005), which the same circuit recently dismissed as "non-binding dicta." *See Thompson*, 65 F.4th at 1302 ("Our two off-hand references to felon disenfranchisement as historically a 'punitive device' were thus non-binding dicta.") (discussing *Johnson* and *Jones v. Governor of Fla.*, 950 F.3d 795, 819 (2020)). They also cite dicta from a Second Circuit case that was later vacated. *See Muntaqim v. Coombe*, 366 F.3d 102, 104 (2d Cir. 2004), *opinion vacated on reh'g en banc*, 449 F.3d 371 (2d Cir. 2006) (dism'd on other grounds). And in any case, the panel in *Muntaqim* unanimously *upheld* New York's felon disenfranchisement law in the face of a Voting Rights Act challenge. 366 F.3d at 130.

The third and fifth *Mendoza-Martinez* factors also weigh in favor of Section 241 being nonpunitive.[17] Disenfranchisement under Section 241 has no scienter requirement and addresses only conduct that was "already a

---

[17] Both the Eleventh and First Circuits analyzed these two factors together when upholding, respectively, Alabama's and Massachusetts's felon disenfranchisement laws. *See Thompson*, 65 F.4th at 1307; *Simmons*, 575 F.3d at 45.

19-60662
c/w No. 19-60678

crime." *Smith*, 538 U.S. at 105, 123 S. Ct. at 1154. Plaintiffs attempt to bootstrap the fact that the crimes listed in Section 241 have scienter requirements into an argument that Section 241 *itself* has a scienter requirement—and may be punitive according to these *Mendoza-Martinez* factors. We concur in the Eleventh Circuit's refutation of this argument in *Thompson*:

> There is no scienter requirement for felon disenfranchisement; it is sufficient that the person be convicted of a disqualifying felony. Likewise, felon disenfranchisement only sanctions behavior that is already criminal. That felon disenfranchisement laws are "tied to criminal activity . . . is insufficient to render the [laws] punitive."

65 F.4th at 1307 (quoting *United States v. Ursery*, 518 U.S. 267, 292, 116 S. Ct. 2135, 2149 (1996)). In the same way that Congress or the states "may impose both a criminal and a civil sanction in respect to the same act or omission," *Ursery*, 518 U.S. at 292, 116 S. Ct. at 2149, Section 241 relies on a criminal conviction to implement the public's judgment about the appropriate relationship between moral character and voting. "It is not open to doubt that the commission of crime—the violation of the penal laws of a state—has some relation to the question of character." *Hawker*, 170 U.S. at 196, 18 S. Ct. at 576. Underscoring the regulatory nature of Section 241, Judge Gee also described the State's nonpenal interest in an opinion for this court:

> A state properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies. As Judge Friendly noted in *Green* . . . such persons have breached the social contract and, like insane persons, have raised questions about their ability to vote responsibly.

*Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978).

19-60662
c/w No. 19-60678

Looking to the fourth factor, we conclude that Section 241's operation does not "promote the traditional aims of punishment—retribution and deterrence." *Mendoza-Martinez*, 372 U.S. at 168, 83 S. Ct. at 567. Plaintiffs do not argue that the provision's potential consequence of disenfranchisement is a deterrent to crime, but instead that it exhibits unvarnished retribution for criminal conduct. We disagree. Taking away certain felons' right to vote is more reflective of a collective judgment about the character traits that should be possessed by citizens who participate in Mississippi's democratic process. In this way, it is no different from Section 241's mental competency, residency, age, citizenship, and registration requirements, which are ubiquitous among the United States and in democratic societies around the world.

On the final *Mendoza-Martinez* factors, we conclude that Section 241 "has a rational connection to a nonpunitive purpose [and] is [not] excessive with respect to this purpose." *Smith*, 538 U.S. at 97, 123 S. Ct. at 1149. As Judge Friendly explained, a State can rationally conclude, for completely nonpenal reasons, that "[a] man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact." *Green*, 380 F.2d at 451. Each of Section 241's disenfranchising crimes is serious and probative of dishonesty or lack of civic virtue, or is a common-law crime whose gravity has long been recognized. Mississippi, "which could lawfully disenfranchise all felons permanently . . . has not exceeded its interest per the seventh factor by choosing only to disenfranchise individuals who commit felonies [Mississippi] considers especially heinous." *Thompson*, 65 F.4th at 1307 (citing *Richardson*, 418 U.S. at 56, 94 S. Ct. at 2671).

In *Hawker*, the Supreme Court accepted that States may "make a rule of universal application" concerning former felons, and that such a rule would be nonpenal despite the fact that "this test of character is not in all

19-60662
c/w No. 19-60678

cases absolutely certain, and that sometimes it works harshly." 170 U.S. at 197, 18 S. Ct. at 576. By analogy, at common law, a person convicted of a crime was incompetent as a witness regardless of how much time had passed since the conviction and notwithstanding any "proof of a complete reformation." *Id.* *Hawker* compared this "absolute test" to felon disenfranchisement law "in many states." *Id.* Against this background, Plaintiffs' insistence that Section 241 lacks a rational, nonpunitive, and non-excessive purpose is unpersuasive.

Plaintiffs have failed to carry their burden of demonstrating, with "the clearest proof," a punitive or otherwise excessive purpose for what is otherwise facially a nonpenal regulation. *Hudson*, 522 U.S. at 100, 118 S. Ct. at 493.

## C.

Even if Plaintiffs were to get past *Richardson* and the *Mendoza-Martinez* factors to show that Section 241 should be subjected to an Eighth Amendment analysis, the provision readily survives that scrutiny because it does not inflict cruel and unusual punishment.

The Plaintiffs fundamentally err in advocating a categorical rule that permanent felon disenfranchisement amounts to cruel and unusual punishment. They attempt to limit their claim to "Plaintiffs and their class," *i.e.*, to felons who have been disenfranchised for life after completing all conditions of their sentences (except possibly felons who committed crimes involving election integrity).[18] The dissent takes them up on this invitation. Nonetheless, the Plaintiffs must rely on the test created by the Supreme Court to determine whether a punishment is *categorically* cruel and unusual under the Eighth Amendment. *See United States v. Farrar*, 876 F.3d 702, 717

---

[18] Plaintiffs' counsel appeared to concede this additional exception to their proposed categorical rule at oral argument before the en banc court.

(5th Cir. 2017). The reasoning embraced by the Plaintiffs and the dissent cannot be limited to the facts of this case and is categorically wrong.

If courts were allowed to interpret "cruel and unusual" according to the original meaning of those terms, there is no question that felon disenfranchisement would be neither cruel nor unusual. *Baze v. Rees*, 553 U.S. 35, 101, 128 S. Ct. 1520, 1560 (2008) (Thomas, J., joined by Scalia., J., concurring in judgment (stating that the Cruel and Unusual Punishments Clause, as originally understood, only forbids "purposefully torturous punishments"); *Graham v. Florida*, 560 U.S. 48, 99, 130 S. Ct. 2011, 2044 (2010), as modified (July 6, 2010) (Thomas, J., dissenting) ("It is by now well established that the Cruel and Unusual Punishments Clause was originally understood as prohibiting torturous methods of punishment." (quotation marks and citation omitted)); *Bucklew v. Precythe*, 587 U.S. 119, 151, 139 S. Ct. 1112, 1135 (2019) (Thomas, J., concurring) ("The evil the Eighth Amendment targets is intentional infliction of gratuitous pain . . . . The historical evidence shows that the Framers sought to disable Congress from imposing various kinds of torturous punishments, such as gibbeting, burning at the stake, and embowelling alive, beheading, and quartering." (quotation marks and citation omitted)); *Grants Pass*, 2024 WL 3208072, at *11 (Gorsuch, J., joined by Roberts, C.J., Thomas, J., Alito, J., Kavanaugh, J., and Barrett, J.) (holding that the "Cruel and Unusual Punishments Clause was adopted to ensure that the new Nation would never resort to punishments . . . [that] were 'cruel' because they were calculated to 'superadd . . . terror, pain, or disgrace,' [and] 'unusual' because, by the time of the Amendment's adoption, they had 'long fallen out of use.'" (citations omitted)).

But we are bound by *Trop*, in which the Supreme Court held that the "[Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. at 101,

19-60662
c/w No. 19-60678

78 S. Ct. at 598. In cases challenging a type of punishment, this involves two steps. First, courts consider "objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the sentencing practice at issue." *Graham*, 560 U.S. at 61, 130 S. Ct. at 2022, *as modified* (July 6, 2010) (quotation marks omitted). Second, courts "determine, in the exercise of our own independent judgment, whether [the practice] is a disproportionate punishment." *Roper v. Simmons*, 543 U.S. 551, 564, 125 S. Ct. 1183, 1192 (2005). This assessment includes consideration of "the severity of the punishment in question," "the culpability of the offenders at issue in light of their crimes and characteristics," and "whether the challenged . . . practice serves legitimate penological goals." *Graham*, 560 U.S. at 67, 130 S. Ct. at 2026.

In applying this line of cases, the dissent "stretches precedent beyond the breaking point." *Hopkins*, 76 F.4th at 423 (Jones, J., dissenting). Critically, the categorical analysis so far has been applied only in cases that involve the death penalty or juvenile offenders sentenced to life in prison. *Farrar*, 876 F.3d at 717. The Supreme Court "has never established a categorical rule prohibiting a terms-of-years sentence," and has emphasized that cases involving death-penalty and juvenile offenders are "different," *id.* (citing *Miller v. Alabama*, 567 U.S. 460, 471, 132 S. Ct. 2455, 2464 (2012) ("children are constitutionally different"), *Gregg*, 428 U.S. at 188, 96 S. Ct. at 2932 ("penalty of death is different in kind")). Nor has the Court ever established a categorical rule relating to felon disenfranchisement.[19] Every circuit court that has had the chance to invalidate felon disenfranchisement

---

[19] If anything, in *Richardson*, the Supreme Court relied on "settled historical and judicial understanding" in upholding California's permanent disenfranchisement of felons. 418 U.S. at 54, 94 S. Ct. at 2670.

19-60662
c/w No. 19-60678

has rejected the opportunity. We should not be the first to break new ground. The ability to vote, though assuredly important, is in no way analogous to death or a minor's life imprisonment.

In any event, neither prong of the categorical analysis test is satisfied for felon disenfranchisement statutes. To begin with, no two States share the same voting laws even though nearly every State disenfranchises *some* felons. *Id.* at 424.[20] Hence, trying to identify any "national consensus" against permanent felon disenfranchisement using the "objective indicia" of State laws is an enterprise doomed to failure. *Graham*, 560 U.S. at 61, 130 S. Ct. at 2022. It is not the business of courts to spar over the appropriate level of generality to apply when counting the noses of fifty different State laws and State constitutional provisions.[21] *See Rummel v. Estelle*, 445 U.S. 263, 275–76, 100 S. Ct. 1133, 1140 (1980) ("[T]he lines to be drawn are indeed subjective and therefore properly within the province of legislatures, not courts." (quotation marks omitted)).

The unsuitability of categorical analysis becomes even clearer when judges try to apply their "independent judgment" to determine the

---

[20] "[A] few states always or usually allow voting during incarceration. Some states allow felons to vote after their release. Some allow voting after they complete a prison term, probation, and parole. Some require felons to first pay all owed fines and restitution. Some have statutorily defined waiting periods. And some, like Mississippi, permanently disenfranchise felons. Moreover, this list does not even begin to delve into the intricacies of these laws, such as which felonies they cover and the procedures for the restoration of voting rights. A reasonably clever lawyer could find a dozen ways to divvy up states and find a national consensus against any particular practice." *Hopkins*, 76 F.4th at 424 (Jones, J., dissenting).

[21] Further, "[a]bsent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State." *Rummel v. Estelle*, 445 U.S. 263, 282, 100 S. Ct. 1133, 1143 (1980). Trying to neatly partition this broad spectrum of State laws as they exist at a fixed point in time also runs headlong into the fact that some States that have relaxed their restrictions may later want to change course.

19-60662
c/w No. 19-60678

constitutionality of Section 241. This is an improper invitation to precisely the type of judicial legislating that the Constitution's separation of powers prohibits, because, among other reasons, "independent judgment" has no defensible limiting principle. Plaintiffs prove this very point in asking us to pick and choose within Section 241, limiting re-enfranchisement to only those felons who have served their full terms and completed all other requirements like supervised release and payment of fines and restitution. But if these Plaintiffs prevail, it is difficult to conceive how the remainder of Section 241 or other State laws disenfranchising some felons, even during imprisonment, would be insulated from conflict with the Eighth Amendment.

The logical incoherence becomes even more profound when, as the vacated panel opinion admitted, the death penalty has largely escaped categorical Eighth Amendment challenges. Moreover, most States imprison some felons for life, thereby also disenfranchising them for life. Yet these punishments are not cruel and unusual. Put another way, a State can execute murderers, but according to the dissent, it may not keep murderers from voting if they are released from prison.

Another set of anomalies would arise, if felon disenfranchisement is unconstitutional, between that result and other onerous collateral consequences of committing felony offenses. Felons' right to travel, to practice a lawful occupation, run for public office, serve on juries, and possess firearms are impaired by a litany of federal and State laws. *Id.*; *see also* 28 U.S.C. § 1865(b)(5) (disqualifying from jury service anyone who "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year" and has not had "his civil rights. . . restored"). The right to serve on a jury is especially significant, as the Supreme Court holds that "with the exception of voting, for most citizens the honor and privilege

of jury duty is their most significant opportunity to participate in the democratic process." *Powers v. Ohio*, 499 U.S. 400, 407, 111 S. Ct. 1364, 1369 (1991). But it is difficult to imagine the Supreme Court deeming the Section 1865 statutory disqualification to be "punitive," much less cruel and unusual under the Eighth Amendment. Finally, sex offenders are also often required to register for the protection of those around them. *Cf. Smith v. Doe*, 538 U.S. at 105–06, 123 S. Ct. at 1154 (finding such requirements non-penal). In all these respects, "[c]ompleting a prison sentence does not entitle felons to all the rights they previously possessed." *Hopkins*, 76 F.4th at 424 (Jones, J., dissenting). In short, "cruel and unusual" is not the same as "harmful and unfair," *id.* at 424, n.11, and it is only that limited type of criminal statute that violates the Eighth Amendment.

## IV.

Holding Art. XII, Section 241 of the Mississippi Constitution categorically unconstitutional, even as to a limited set of offenders, is at odds with the Supreme Court's and other courts' decisions, would thwart the ability of the State's legislature and citizens to determine their voting qualifications, and would require federal courts overtly to make legislative choices that, in our federal system, belong at the State level. The district court's judgment denying relief to the Plaintiffs is AFFIRMED.

19-60662
c/w No. 19-60678

James L. Dennis, *Circuit Judge*, joined by King, Stewart, Graves, Higginson, and Douglas, *Circuit Judges*, dissenting:

The right to vote is the essence of a democratic society and "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Yet Article XII, Section 241, of the Mississippi Constitution of 1890 mandates permanent, lifetime disenfranchisement of a person convicted of "murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy."[1] Disenfranchisement extends to free people who have completed all terms of their sentences. The Plaintiffs, representing a class of persons who have been convicted of Section 241's crimes and have completed the terms of their sentences, challenge the constitutionality of Section 241. The Plaintiffs are both Black and White, and their Eighth Amendment argument is independent of the "invidious" discrimination that originated Section 241.[2] Rather, the Plaintiffs argue

---

[1] The Mississippi Secretary of State is required by statute to treat additional crimes that the Mississippi Attorney General deems to be a species of the common law as crimes listed in Section 241. *See* Miss. Code § 23-15-151. For instance, timber larceny, armed robbery, and larceny under a lease agreement are all deemed by the Attorney General as disenfranchising crimes though they are not expressly listed in Section 241.

[2] Mississippi's lifetime disenfranchisement statute stands alone in its "invidious" origin, as both our court and the Mississippi Supreme Court confirm, conceived "by a desire to discriminate against" Black people. *Harness v. Watson*, 47 F.4th 296, 300 (5th Cir. 2022) (en banc); *see also Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998) ("[Section] 241 was enacted in an era when southern states discriminated against [B]lack[] [people] by disenfranchising convicts for crimes that, it was thought, were committed primarily by [B]lack[] [people]."); *Ratliff v Beale*, 74 Miss. 247, 20 So. 865, 868 (1896) ("[The] consistent, controlling[,] directing purpose governing the [1890] convention[:] . . . to obstruct the exercise of the franchise by [Black people]."). And although our divided, full court recently held that subsequent reenactments "purged" Section 241 of its original discriminatory intent, those reenactments have no rhyme or reason (like disqualifying for vote crimes, or exempting first offenders), so their addition only compounds animus with arbitrariness.

19-60662
c/w No. 19-60678

permanent disenfranchisement of free persons who have completed all terms of their sentences constitutes cruel and unusual punishment in violation of the Eighth Amendment. Under well-settled principles of Eighth Amendment jurisprudence, the Plaintiffs have met their burden. A national consensus to this effect has now formed among a large majority of the states.

To dodge this conclusion, the majority largely conflates the Plaintiffs' challenge to the punishment at issue in this case—permanent disenfranchisement of free persons who have completed all terms of their sentences—with a challenge to felon disenfranchisement in general. Where the majority does reach the issue before us, it picks and chooses among precedents, ignoring well-established Eighth Amendment principles, while stretching the Supreme Court's Equal Protection decision in *Richardson v. Ramirez*, 418 U.S. 24 (1974), beyond all recognition. What is even worse, the majority finds the Eighth and Fourteenth Amendments mutually exclusive, flouting Supreme Court precedent that "provisions [granting] Congress or the States specific power to legislate in certain areas . . . are always subject to the limitation that they must not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29 (1968).

I respectfully dissent.

\*    \*    \*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." To run afoul of that Amendment, the challenged action must constitute "punishment." We must then determine whether a punishment is cruel and unusual using the so-called "categorical approach." To do so, courts "look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society.'" *Graham v. Florida*, 560 U.S. 48, 58 (2010) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

19-60662
c/w No. 19-60678

This determination involves first looking to whether "there is a national consensus" against permanent felon disenfranchisement after completion of sentence. *Id.* at 61. Second, we are required to "determine, in the exercise of our own independent judgment, whether the [permanent disenfranchisement of a free person under Section 241] is a disproportionate punishment for" those Mississippians who have fulfilled their sentences and returned to society but remain permanently disenfranchised. *Roper v. Simmons*, 543 U.S. 551, 564 (2005).

## I

The first question is whether Section 241 imposes punishment. As the majority explains, we employ "an intents-effects test" to help determine whether a statute constitutes punishment under various constitutional provisions, including the Eighth Amendment. *Does 1-7 v. Abbott*, 945 F.3d 307, 314 (5th Cir. 2019). Under this test, "[i]f the intention of the legislature was to impose punishment, that ends the inquiry." *Id.* Key here, the Supreme Court has stated that "the manner of [a law's] codification . . . [is] probative of the legislature's intent." *Smith v. Doe*, 538 U.S. 84, 94 (2003).

Even a cursory review of Section 241's legislative history reveals that the delegates of the Mississippi Constitutional Convention of 1890 intended Section 241 to be nothing else but punitive. As one of the "fundamental conditions" of Mississippi's reentry to the Union following the Civil War, Congress forbade "the constitution of Mississippi" from ever being "amended or changed [so] as to deprive any citizen or class of citizens of the United States of the right to vote . . . *except as a punishment* for such crimes as are now felonies at common law, whereof they shall have been duly convicted." Act of February 23, 1870, ch. 19, 16 Stat. 67 ("Readmission Act") (emphasis added). Under the plain language of the Readmission Act, Mississippi may only alter its Constitution to authorize disenfranchisement

if it does so *as a punishment* for a common law felony offense. When interpreting a state law, we should "choose the interpretation . . . that has a chance of avoiding federal preemption." *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 342 (5th Cir. 2005); *see also Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020) (allowing a claim that Mississippi violated the education provisions of the Readmission Act to proceed). Section 241 of Mississippi's 1890 Constitution—a post-Readmission Act felon disenfranchisement provision—must be construed as a punitive measure for felony convictions in order for the provision to comply with binding federal law. The Eleventh Circuit has come to the same conclusion, holding Florida's felon disenfranchisement scheme was "punishment," in part because "the Readmission Act of Florida authorized felon disenfranchisement *only* as punishment." *Jones v. Governor of Fla.*, 950 F.3d 795, 819 (11th Cir. 2020).

The majority strains to disregard this reality, theorizing that "punishment" as used in the Readmission Act cannot mean "punishment" as it is used in the Eighth Amendment but instead likely means "consequence"—in other words "punishment" does not mean "punishment." *Ante*, at 17–21. But we must interpret the language of a statute "according to its 'ordinary, contemporary, common meaning.'" *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014)). It is a wonder the majority cannot give the word "punishment" its ordinary meaning when the majority itself recounts the Supreme Court's decision in *Richardson* to give the language of Section 2 of the Fourteenth Amendment the "meaning tha[t] would appear from its face." *Richardson*, 418 U.S. at 43; *Ante*, at 11.[3]

---

[3] To bolster its rationale, the majority also posits a problem where there is none, supposing that if Mississippi does disenfranchise people for a reason other than punishment,

19-60662
c/w No. 19-60678

Despite this strong evidence of intent, the majority mistakenly relies on the disenfranchisement provision's mere placement alongside regulatory franchise provisions. "The location and labels of a statutory provision do not by themselves transform a [criminal] remedy into a [civil] one." *See Smith*, 538 U.S. at 94; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 702 (1995) (noting legislators can intend one provision of a law to have "a character of its own not to be submerged by its association" with neighboring provisions).

Importantly, in *Trop v. Dulles*, 356 U.S. 86, 96–97 (1958), the Supreme Court did not hold that felon disenfranchisement provisions are nonpunitive, as the majority claims. In *Trop*, the Supreme Court used a hypothetical to illustrate that courts must determine whether a statute is penal or nonpenal. *Id.* The hypothetical was: "A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote." *Id.* at 96. The Court stated we must look to the "purpose" or intent of the statute to determine its quality. *Id.* The Court recognized that disenfranchisement could be penal if it had that purpose, stating if "both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal." *Id.* But, the Court explained, if "the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the

---

it would call into question whether Mississippi was properly readmitted to the Union. *Ante*, at 20 n.13. As stated, when interpreting a state law, we should "choose the interpretation . . . that has a chance of avoiding federal preemption." *Planned Parenthood of Hous. & Se. Tex.*, 403 F.3d at 342. If reading "punishment" to mean "consequence" raises preemption problems, our rules of interpretation tell us to read "punishment" as "punishment." In any event, even if there were a conflict, the commonsense remedy would not be to invalidate Mississippi's place in the Union but would be to declare that Section 241 is preempted. *See Williams*, 954 F.3d at 739 (5th Cir. 2020).

19-60662
c/w No. 19-60678

franchise." *Id.* at 96–97. As *Trop* instructs, we must look to the intent behind the statute, and here the Readmission Act shows the intent behind Section 241 was to be penal. As the Eleventh Circuit recently held, to expand *Trop*'s hypothetical to "the conclusion that felon disenfranchisement is always nonpenal" is a "misreading of *Trop*." *Thompson v. Sec'y of State for the State of Ala.*, 65 F.4th 1288, 1304 (11th Cir. 2023).

The Readmission Act shows the intent behind enactment of Section 241, and the majority offers no rebuttal. With the intent behind Section 241 clear, there is no need to examine its purpose and effect. *See Smith*, 538 U.S. at 92.

## II

Having determined that Section 241 inflicts punishment, we must determine whether its permanent denial of the franchise for conviction of an enumerated crime is "cruel and unusual" punishment under the Eighth Amendment as applied to the Plaintiffs and their class—Mississippians who cannot vote even though they have fulfilled all terms of their sentences. As noted, the categorical approach to Eighth Amendment challenges requires courts to "look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society.'" *Graham*, 560 U.S. at 58 (quoting *Estelle*, 429 U.S. at 102).

Before the initial panel, no party disputed that the categorical approach provides the correct legal framework in this case, but on rehearing the State and the majority inexplicably question its applicability, suggesting that the categorical approach is limited to death-penalty and juvenile-offender cases. *Ante*, at 29. The Supreme Court has never taken such a cramped view. The Court has employed the categorical approach when a "case implicates a particular type of [punishment] as it applies to an entire class of offenders who have committed a range of crimes." *Graham*, 560 U.S.

19-60662
c/w No. 19-60678

at 60–62. By contrast, in cases where the Court considers "a gross proportionality challenge to a particular defendant's sentence," its analysis "begin[s] by comparing the gravity of the offense and the severity of the sentence." *Id.* at 60–61.

Here, it is not a particular defendant's sentence but rather a punishment "itself [that] is in question." *Id.* at 61. In other words, this case involves a "particular type of [punishment]"—permanent disenfranchisement—"as it applies to an entire class of offenders who have committed a range of crimes"—felons convicted of Section 241 disenfranchising offenses who have completed all terms of their court-imposed sentences. *Id.* Because the Plaintiffs' challenge squarely fits the mold of the categorical approach, this long-standing Supreme Court test provides the relevant inquiry.

## III

Under the first prong of the categorical approach, we consider whether "there is a national consensus" against the challenged punishment. *Id.* The Supreme Court has instructed that this determination "should be informed by objective factors to the maximum possible extent." *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (internal quotation marks omitted). The "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Id.* (internal quotation marks omitted); *see also Graham*, 560 U.S. at 61 ("The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice,' to determine whether there is a national consensus against the . . . practice at issue." (quoting *Roper*, 543 U.S. at 572)). To assess whether there is a "national consensus" against the challenged punishment, we consider "objective indicia of society's standards" as embodied in legislation, including not only the aggregate number of

19-60662
c/w No. 19-60678

jurisdictions rejecting the punishment but also any consistent legislative trends in that direction. *Graham*, 560 U.S. at 61–62; *see also Roper*, 543 U.S. at 566–67 (explaining that, besides the sheer number of states rejecting a practice, the "consistency of the direction of change" is a significant factor in determining whether there is a national consensus against a practice).

Beginning with the aggregate number of jurisdictions, in *Atkins v. Virginia*, 536 U.S. at 316, 321, the Supreme Court determined that a "national consensus ha[d] developed against" executing people with intellectual disabilities when thirty states had legislatively proscribed the practice. The same number of states, thirty, had opposed the death penalty for juvenile offenders—either by "express provision [in legislation] or judicial interpretation"—when the Court held that practice to be cruel and unusual in *Roper v. Simmons*, 543 U.S. at 564. And in *Enmund v. Florida*, 458 U.S. 782, 793 (1982), the Court emphasized that the fact that only eight jurisdictions authorized the death penalty for participation in a robbery during which an accomplice commits murder "weigh[ed] on the side of rejecting capital punishment" for that offense.

In this case, an exhaustive review of state laws substantiates that the overwhelming majority of states oppose punishing felons by permanently denying them the right to vote. Currently, thirty-five states and the District of Columbia—including Louisiana and Texas—do not permanently disenfranchise former felons who have completed all terms of their sentences. *See* Appendix *infra*. And four states only permit permanent disenfranchisement for corrupt practices in elections or governance. *Id.* For example, Maryland permanently disenfranchises felons convicted for buying or selling votes, while Missouri does so only as a result of a conviction for an offense "connected with right of suffrage." Md. Code, Elec. Law § 3-102(b); Mo. Rev. Stat. § 115.133.2. Mississippi is one of only eleven states that still permanently disenfranchise felons for offenses other than

those pertaining to elections. Put another way, thirty-nine states plus the District of Columbia do not impose lifetime disenfranchisement as a punishment for offenses unrelated to protecting the honest administration of elections, while only a minority of eleven still do. Even more staggering, Mississippi is one of only two states that permanently disenfranchise first-time offenders who have completed their sentences and who were convicted of non-violent and non-voting-related felonies. These statistics closely mirror those that the Supreme Court has found significant—the thirty who had abandoned the challenged practice in *Atkins* and *Roper* and the mere eight states who retained the challenged practice in *Enmund*.

Turning to the consistency of the direction of change, in *Penry v. Lynaugh*, 492 U.S. 302, 335 (1989), the Court held that the execution of people with intellectual disabilities did not violate the Eighth Amendment at that time. The Court noted that the laws of only sixteen states and the federal government precluding the execution of this vulnerable class of persons were insufficient to show a national consensus against the practice. *Id.* at 334. Thirteen years after *Penry*, the Court revisited that decision in *Atkins* and held that "a national consensus ha[d] developed" against the challenged practice not only due to "the [total] number of these States" that had acted since *Penry* to ban executing members of this class of offenders—sixteen had done so—"but [also] the consistency of the direction of change." 536 U.S. at 314–16.

Similarly, in *Roper*, 543 U.S. at 566, 568, in which the Supreme Court struck down the juvenile-crime death penalty, the Court stressed the consistency of the direction of change in rejecting that practice. Though only five states had abandoned juvenile-crime executions in the fifteen years since the Court upheld the punishment in *Stanford v. Kentucky*, 492 U.S. 361, 370–71 (1989), the *Roper* Court followed *Atkins*'s admonition that what matters under the Eighth Amendment is "not so much" the absolute number of

19-60662
c/w No. 19-60678

states that have abandoned a particular practice or the pace of that abandonment, but instead the "consistency of the direction of change." *Roper*, 543 U.S. at 566.

As to permanent, lifetime disenfranchisement of free persons, in 1974, when the Court decided *Richardson*, twenty-seven states permitted the practice as applied to felons whose offenses were unrelated to elections or good governance and who had completed all terms of their sentences. *See* Appendix, *infra*. Currently, only eleven do. *Id.* Between 1974 and 2020, sixteen states (for a total of thirty-five) have stopped the practice of imposing lifetime disenfranchisement on felons who have served their sentences for offenses unrelated to elections or governance. *Id.* Sixteen is the exact number of states that changed their laws to reject the execution of people with intellectual disabilities between *Penry* and *Atkins*. *Atkins*, 536 U.S. at 314–16. And it is more than threefold the total number of states that abolished the juvenile-crime death penalty in the timespan between *Stanford* and *Roper*. *Roper*, 543 U.S. at 566. The evidence here clearly demonstrates "consistency [in] the direction of change" and a repudiation of the permanent felon disenfranchisement of free persons. *Id.* (quoting *Atkins*, 536 U.S. at 315). That a trend in abandoning a punishment has proven so durable and long-lasting demonstrates that society has turned away from that punishment. In this way, the steady rejection of permanent felon disenfranchisement over nearly half a century is as much, or even more, consistent than the change in the punishment laws considered in *Atkins* and *Roper*.

The majority and the State contend that there can be no national consensus because states disenfranchise felons in diverse ways. *Ante*, at 30. Specifically, the majority argues "no two States share the same voting laws even though nearly every State disenfranchises *some* felons," and citing to *Rummel v. Estelle*, 445 U.S. 263, 275–76 (1980)—a case not utilizing the categorical approach but instead evaluating a specific defendant's

sentence—the majority states that "[i]t is not the business of courts to spar over the appropriate level of generality to apply when counting the noses of fifty different State laws and State constitutional provisions." *Ante*, at 30–31 (emphasis in original). However, this case does not concern the validity of temporary felon disenfranchisement laws, or the disenfranchisement of the incarcerated, or any other mode of disenfranchisement not contained in Section 241. We are concerned solely with Mississippi's practice of punishing *felons who have completed all terms of their sentences* by *permanently disenfranchising* them for life. The Supreme Court regularly examines how many states authorize a specific punishment for a specific class. *See Atkins*, 536 U.S. at 314–16 (examining how many states authorized the *death penalty* for people with *intellectual disabilities*); *Roper*, 543 U.S. at 566 (examining how many states authorized the *death penalty* for *juvenile crimes*). It is in fact quite simple to count the state laws that do not permit permanent disenfranchisement of former felons, and we have done so in a thorough Appendix, *infra*. This objective evidence makes clear that a supermajority of states rejects permanent disenfranchisement, especially as it is practiced in Mississippi.

## IV

We must also "determine, in the exercise of our own independent judgment, whether [permanent disenfranchisement under Section 241] is a disproportionate punishment for" those Mississippians who have completed their sentences but remain permanently disenfranchised. *Roper*, 543 U.S. at 564. This assessment requires us to consider the severity of the punishment in question, the culpability of the offenders at issue considering their crimes and characteristics, and whether the challenged practice serves legitimate penological goals. *Graham*, 560 U.S. at 67.

19-60662
c/w No. 19-60678

To determine whether permanent disenfranchisement is proportional to the Plaintiffs' offenses, it is first necessary to assess the importance of the denied right. As the Supreme Court has held, "[i]t is a precept of justice that punishment for crime should be graduated and proportioned to the offense." *See Atkins*, 563 U.S. at 311 (cleaned up) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). The right to vote is "a right at the heart of our democracy." *Burson v. Freeman*, 504 U.S. 191, 198 (1992) (plurality opinion). "No right is more precious in a free country" than the right to vote. *Reynolds v. Sims*, 377 U.S. 533, 560 (1964). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Id.* "A citizen without a vote is to a large extent one without a voice in decisions which may profoundly affect him and his family." *Rosario v. Rockefeller*, 410 U.S. 752, 764 (1973) (Powell, J., dissenting).

Voting is the lifeblood of our democracy and the deprivation of the right to vote saps citizens of the ability to have a say in how and by whom they are governed. Permanent denial of the franchise, then, is an exceptionally severe penalty, constituting nothing short of the denial of the democratic core of American citizenship. It is an especially cruel penalty as applied to those whom the legal system has already deemed to have completed all terms of their sentences. These individuals, despite having satisfied their debt to society, are precluded from ever fully participating in civic life.[4] To be sure,

---

[4] This view has support from the Supreme Court. In *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017), which was a First Amendment challenge to a state law that made it a felony for a registered sex offender to access social media, the Court, in striking down the law, noted "the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system." While *Packingham* was decided under the First Amendment, not the Eighth Amendment, it shows the Court's conscientiousness toward the rights of those who have served their debt to society and now "seek to reform and to pursue lawful and rewarding lives." *Id.* at 108. If it was troubling to permanently deny access to social media,

19-60662
c/w No. 19-60678

they are excluded from the most essential feature and expression of citizenship in a democracy—voting.[5]

With respect to *Graham*'s second consideration—the culpability of the Plaintiffs' class—we observe that Section 241's punishment applies equally to all members of the class, regardless of their underlying crime or the class member's individual mental state during the commission of the crime. Section 241 permanently disenfranchises murderers and timber thieves alike; it does not distinguish between mature adults and juveniles, accomplices, or the intellectually disabled—the latter three being classes of persons the Supreme Court has recognized as categorically less culpable. *Roper*, 543 U.S. at 570; *Enmund*, 458 U.S. at 800–01; *Atkins*, 536 U.S. at 317–18. It is clear, then, that Section 241 does not reflect society's measured response to a felon's moral guilt.

We next consider whether the punishment of permanent disenfranchisement advances any legitimate penological goals. *Graham*, 560 U.S. at 67. A punishment that "lack[s] any legitimate penological justification is by its nature disproportionate to the offense." *Id.* at 71. The

---

it is even more troubling to permanently deny the right to vote, the most precious right we enjoy.

[5] The right that began our Revolution fits uniquely with the Supreme Court's rare but distinctive use of the Eighth Amendment as an amplifier. The right to vote inexorably has expanded to include those who once were excluded. Pamela S. Karlan, *Ballots & Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L. Rev. 1345, 1345 (2003). As one scholar of America's common venture put it, "[t]he Colonists rebelling against English rule, the [W]hite males disenfranchised by property and tax qualifications, the freedmen after the Civil War, and finally women all protested that they were reduced to the level of slaves if they did not have the vote and equal representation." Judith N. Shklar, American Citizenship: The Quest for Inclusion 16 (Harvard Univ. Press 2001). Correspondingly, more than a quarter of our constitutional amendments pertain to and expand the right to vote.

19-60662
c/w No. 19-60678

traditional justifications for punishment are incapacitation, rehabilitation, deterrence, and retribution. *Id.* at 71–74.

Taking these justifications in turn, incapacitation cannot support Section 241's punishment because it does not incapacitate a convict from committing crimes; it only prevents him from voting. While felon disenfranchisement could potentially prevent recidivism if it were applied specifically to those convicted of voting-related offenses, Section 241, as discussed, applies to broad categories that are unrelated to elections crimes. And as to these categories of crimes, Section 241 does nothing to thwart a former felon from reoffending. Rather, the only conduct it prevents is voting. Further, there is evidence that disenfranchisement may actually *increase* recidivism. One comparative study found that "individuals who are released in states that permanently disenfranchise are roughly nineteen percent more likely to be rearrested than those released in states that restore the franchise post-release." Guy Padraic Hamilton-Smith & Matt Vogel, *The Violence of Voicelessness: The Impact of Felony Disenfranchisement on Recidivism*, 22 Berkeley La Raza L.J. 407, 426 (2012).

Section 241 does not further the goal of rehabilitation either. Lifetime disenfranchisement does not contribute to reforming an offender. Quite to the contrary, it hinders reintegration into society by denying the right to vote, a cherished marker and right of citizenship. *See Reynolds*, 377 U.S. at 560. The State has not argued otherwise, claiming that felon disenfranchisement's precise purpose is to exclude a former felon from participation in this aspect of our society. There is "no more certain way in which to make a man in whom, perhaps, rest the seeds of serious antisocial behavior more likely to pursue further a career of unlawful activity than to place on him the stigma of the derelict, uncertain of many of his basic rights." *Trop*, 356 U.S. at 111 (Brennan, J., concurring). This exclusion is not rehabilitative. It only reinforces the stigma that the disenfranchised are "beyond redemption."

19-60662
c/w No. 19-60678

Pamela S. Karlan, *Convictions and Doubts: Retribution, Representation, and the Debate over Felon Disenfranchisement*, 56 STAN. L. REV. 1147, 1166 (2004); *see also* Alec C. Ewald, *"Civil Death": The Ideological Paradox of Criminal Disenfranchisement Law in the United States*, 2002 WIS. L. REV. 1045, 1112–16 (2002) (discussing why disenfranchisement is anti-rehabilitative).

For its part, deterrence only works if an individual is aware that a particular punishment attends a particular offense. It is questionable—and we have been presented with no evidence to suggest otherwise—to what extent Mississippians, and specifically those who would consider committing a crime listed in Section 241, are aware they could permanently lose the right to vote by virtue of a conviction. We have also been presented with no evidence to suggest that the prospect of losing the franchise has even a marginal additional deterrent effect when a person committing a felony already faces the more immediate sanction of criminal confinement. Similarly, there is no reason to believe that the punishment of disenfranchisement will deter recidivism because the felon who has lost the franchise under Section 241 has lost it forever, regardless of his future conduct.

That leaves retribution. While retribution is a "legitimate reason to punish," *Graham*, 560 U.S. at 71, "the severity of the appropriate punishment necessarily depends on the culpability of the offender." *Atkins*, 536 U.S. at 319. We have explained that the continuing—in fact, unending—punishment Section 241 inflicts is wholly unrelated to the moral culpability of the diverse class of felons that it applies. Moreover, because the sentences imposed on the Plaintiffs are necessarily ones that are capable of being completed, the criminal legal system has determined that the Plaintiffs who served their sentences are capable of being returned to a position within society. To permanently remove from them the most precious right of citizenship is thus disproportionate to their offenses and cannot stand as a

permissible exercise of retribution. *See Roper*, 543 U.S. at 564; *Reynolds*, 377 U.S. at 561.

Our nation has a tradition of fixing punishment to meet the crime. After a sentence is complete, the individual is said to have paid his debt to society. But for those adjudicated to have committed a crime enumerated in Section 241 and whose judicially imposed sentences have been completed, the provision tacks on an exceptionally severe penalty that is not visited on citizens who violate many other crimes not listed in Section 241. Because it is an arbitrary, lifelong punishment, permanent disenfranchisement of a felon who has served his sentence is much different and more severe than permanent disenfranchisement of a felon serving life behind bars. The majority fails to acknowledge this difference. *See ante*, at 30–32. While some disabilities that attach to a felony conviction do persist beyond the criminal sentence, in a democracy, to deny the right to vote is to render one without a say in the manifold ways the government touches his life. That Mississippi denies this most precious right permanently, despite a felon having served his sentence, is disproportionate and inconsistent with the consensus against permanent disenfranchisement among our nation's state legislatures. The punishment of permanent disenfranchisement also contravenes the Eighth Amendment's proportionality principle because it lacks a nexus with any legitimate penological justification. *See Miller v. Alabama*, 567 U.S. 460, 489 (2012); *Graham*, 560 U.S. at 71. Thus, insofar as it applies to otherwise free individuals who have fulfilled all terms of their sentences, Section 241 is proscribed by the Eighth Amendment's advancing standards of decency under the Constitution.

V

Finally, the majority incorrectly concludes that *Richardson* controls this case. In *Richardson*, former felons argued that California laws that

19-60662
c/w No. 19-60678

permanently disenfranchised any person convicted of an "infamous crime" unless the person obtained a court order or executive pardon that restored the franchise violated the Equal Protection Clause. 418 U.S. at 26–27. In considering the plaintiffs' claim, the Supreme Court looked not only to Section 1 of the Fourteenth Amendment, where the Equal Protection Clause is located, but also to the "less familiar" Section 2 of that Amendment, which imposes a penalty of reduced congressional representation on states that deny or abridge the right to vote for reasons other than "participation in rebellion, or other crime." *Id.* at 42. Relying on Section 2, the Court rejected the plaintiffs' challenge. The Court pointed out that the phrase "except for participation in rebellion, or other crime" exempted states with felon disenfranchisement laws from the amendment's sanction of reduced representation in Congress. *Id.* at 55. From this observation, the Court held that "those who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in [the Equal Protection Clause of Section 1] of that Amendment, that which was expressly exempted from the lesser sanction of reduced representation by [Section 2] of the Amendment." *Id.* at 43.

In the present case, the State and the majority argue that *Richardson* forecloses all constitutional challenges to felon disenfranchisement. The argument goes: Because the Eighth Amendment's protection from cruel and unusual punishment is incorporated against the states through the Due Process Clause in Section 1 of the Fourteenth Amendment, and because *Richardson* held that California's permanent felon disenfranchisement did not violate Section 1's Equal Protection Clause (a different clause than the Due Process Clause in Section 1), Mississippi's law cannot violate the Eighth Amendment through its incorporation by Section 1's Due Process Clause. That argument is deeply wrong.

19-60662
c/w No. 19-60678

First and foremost, *Richardson* decided an Equal Protection challenge to permanent felon disenfranchisement, not a challenge based on a substantive right of the Eighth Amendment incorporated through the Due Process Clause. The Supreme Court has made clear that the substantive rights contained in the Bill of Rights—including those of the Eighth Amendment—are not diluted or somehow lesser in content by virtue of their being incorporated through the Fourteenth Amendment. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) ("[I]ncorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'"); *Timbs v. Indiana*, 586 U.S. 146, 150 (2019) ("Thus, if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."). Thus, although an Eighth Amendment claim is brought against a state like Mississippi through the Fourteenth Amendment, it is evaluated under Eighth Amendment standards. *See Robinson v. California*, 370 U.S. 660 (1962) (incorporating the Eighth Amendment). *Richardson* did not examine permanent felon disenfranchisement of free persons under Eighth Amendment standards. Whether a punishment is "cruel and unusual" within the meaning of the Eighth Amendment requires ascertaining society's "evolving standards of decency," which, in turn, are determined by "evidence of contemporary values." *Graham*, 560 U.S. at 58, 62. Neither *Richardson*, which was decided nearly half a century ago, nor the nineteenth century history of Section 2 of the Fourteenth Amendment that *Richardson* recounted appear relevant to the "evolving standards of decency" of today that the Eighth Amendment embodies. *Id.* at 58.[6]

---

[6] Separately, the majority's "incorporation argument flies in the face of decades of settled and effective practice" by the Supreme Court of how constitutional rights

19-60662
c/w No. 19-60678

The majority's construction of *Richardson* also disregards the precept that "provisions that grant Congress or the States specific power to legislate in certain areas . . . are always subject to the limitation that they must not be exercised in a way that violates other specific provisions of the Constitution." *Williams*, 393 U.S. at 29. The Supreme Court has "rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another. . . . The proper question is not which Amendment controls but whether either Amendment is violated." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49–50 (1993). Take, for example, the death penalty. There, the Fourteenth Amendment only limits imposition of the death penalty by requiring states to afford a defendant due process. Presumably, the majority would not argue that it is permissible to execute an intellectually disabled person or a child—as long as she has been afforded due process— because the Fourteenth Amendment trumps the Eighth Amendment. *Atkins*, 536 U.S. at 321; *Roper*, 543 U.S. at 568. Yet that is the logic of the majority's view of *Richardson*. The independent limits that the Fourteenth Amendment place on disenfranchisement do not stand in the way of the irrefutable conclusion we draw from our faithful application of well-settled Eighth Amendment jurisprudence: it is cruel and unusual to punish individuals for life by permanently disenfranchising them after they have fulfilled all terms of their sentences.

---

incorporated against the states operate. Recent Case, *Constitutional Law – Eighth Amendment – Fifth Circuit Holds that Disenfranchisement of Incarcerated People Is Cruel and Unusual Punishment — Hopkins v. Hosemann, 76 F.4th 378 (5th Cir.),* vacated and reh'g en banc granted, *83 F.4th 312 (5th Cir. 2023) (per curiam)*, 137 Harv. L. Rev. 1002, 1005 (2024). The majority's "reading risks creating daylight between federal and state claims," whereby "a state-based claim [must] go through an analysis of substantive limits on the Fourteenth Amendment before going to Eighth Amendment case law, whereas a federal claim would go straight to the case law." *Id.* at 1009.

19-60662
c/w No. 19-60678

\*      \*      \*

Denying released offenders the right to vote takes away their full dignity as citizens, separates them from the rest of their community, and reduces them to "other" status. I respectfully dissent.

19-60662
c/w No. 19-60678

## APPENDIX

*States with permanent criminal disenfranchisement penalties*

| 1974 | 2000 | 2020 |
| --- | --- | --- |
| Alabama | Alabama | Alabama |
| Alaska | Arizona | Arizona |
| Arizona | California | Delaware |
| Arkansas | Delaware | Florida |
| California | Florida | Iowa |
| Connecticut | Iowa | Kentucky |
| Florida* | Kentucky | Maryland* |
| Georgia | Maryland | Massachusetts* |
| Idaho | Massachusetts* | Mississippi |
| Iowa | Mississippi | Missouri* |
| Kentucky | Missouri | Nebraska |
| Louisiana | Nebraska | New Jersey* |
| Maryland* | New Hampshire | Tennessee |
| Massachusetts* | New Jersey* | Virginia |
| Mississippi | New Mexico | Wyoming |
| Missouri | New York | |
| Nebraska | Ohio* | |
| Nevada | Tennessee | |
| New Hampshire | Virginia | |
| New Jersey* | Washington | |
| New Mexico | Wyoming | |
| New York | | |
| North Dakota | | |

19-60662
c/w No. 19-60678

Oklahoma

Rhode Island

South Carolina

Tennessee

Texas

Utah*

Virginia

Washington

Wyoming

*Permanent disenfranchisement for election-related offenses only.*

*States with permanent disenfranchisement penalties (with citations)*

|  | **1974** | **2000** | **2020** |
|---|---|---|---|
| Alabama | *Ala. Const. art. VIII, § 182; Ala. Code tit. 17 § 15 (1958)* | *Ala. Const. art. VIII, §177 (see also Amendment 579 (1996)); Ala. Code. § 17-3-10 (2000)* | *Ala. Const. art. VIII, § 177; Ala. Code. § 15-22-36.1* |
| Alaska | *Ak. Const. art. V, § 2; Ak. Code § 15.05.030 (1960)* |  |  |
| Arizona | *Ariz. Const. art. VII, § 2; Ariz. Rev. Stat. § 16-101(5)* | *Ariz. Const. art. VII, § 2; Ariz. Rev. Stat. §§ 13-905, 13-909-12 (2000)* | *Ariz. Rev. Stat. §§ 13-908(A), 13-907(A)* |
| Arkansas | *Ark. Const. art. III, § 6 (1947)* |  |  |
| California | *Cal. Const. art. II, § 3 (1972); Cal. Elec. Code §§ 310, 321, 383, 389, 390; Ramirez v. Brown,* | *Cal. Const. art. II, § 4; Cal. Penal Code §§ 4852.01, 4852.17, 4853 (2000)* |  |

19-60662
c/w No. 19-60678

| | | | |
|---|---|---|---|
| | *507 P.2d 1345, 1347 (Cal. 1973)* | | |
| Connecticut | *Conn. Rev. Stat. § 9-46 (1973)* | | |
| Delaware | | *Del. Const. art. V, §§ 2, 7; 15 Del. Code §§ 1701, 5104 (2000)* | *Del. Const. art. V, § 2* |
| Florida | *Fla. Const. art. VI, § 4 (1973); Fla. Code § 97.041(5)\** | *Fla. Const. art. VI, § 4 (2000); Fla. Stat. §§ 97.041, 944.292, 944.293* | *Fla. Const. art. VI, § 4; Fla. Stat. § 944.292(1); Fla. Const. art. IV, § 8 (a), (c)* |
| Georgia | *Ga. Const. art. II, § 2-701 (1945)* | | |
| Idaho | *Idaho Const. art. VI, § 3 (1947); Idaho Code § 34-402 (1949)* | | |
| Iowa | *Iowa Const. art. II, § 2* | *Iowa Const. art. II, § 5; Iowa Code § 48A.6 (2000)* | *Iowa Const. art. II, § 5* |
| Kentucky | *Ky. Const. § 145 (1955)* | *Ky. Const. § 145; Ky. Stat. § 116.025 (2000)* | *Ky. Const. § 145* |
| Louisiana | *La. Const. art. VIII, § 6 (1968)* | | |
| Maryland | *Md. Const. art. I, § 2 (1972); Md. Code. Art. 33 ¶ 3-4 (1974)\** | *Md. Const. art. I, § 4; Md. Code art. 33, § 3-102 (2000)* | *Md. Elec. Code § 3-102\** |
| Massachusetts | *Mass. Gen. Laws ch. 51 § 1 (1972)\** | *Ma. Const. art. III; Ma. Gen. L. 51 § 1 (2000)\** | *Ma. Const. art. III; Ma. Gen. L. 51 § 1\** |
| Mississippi | *Miss. Const. art. XII, § 241; Miss. Code § 23-5-35 (1972)* | *Miss. Const. art. XII, § 241; Miss. Code § 23-5-35 (1972)* | *Miss. Const. art. XII, § 241* |
| Missouri | *Mo. Rev. Stat. § 111.021 (1969)* | *Mo. Rev. Stat. § 115.113 (2000)* | *Mo. Rev. Stat. § 115.133.2\** |
| Nebraska | *Neb. Const. art. VI, § 2; Neb. Rev. Stat.* | *Neb. Rev. Stat. § 32-313 (2000); Ways v.* | *Neb. Rev. Stat. §§ 29-112, 32-313* |

19-60662
c/w No. 19-60678

| | | | |
|---|---|---|---|
| | *§§ 29-112, 29-113 (1974)* | *Shively, 264 Neb. 250 (2002)* | |
| Nevada | *Nev. Const. art. II, § 1; Nev. Rev. Stat. §§ 213.090, 213.155* | | |
| New Hampshire | *N.H. Const. art. XI (1970); N.H. Rev. Stat. § 607-A-2 (1974)* | *N.H. Const. art. XI (2000)* | |
| New Jersey | *N.J. Rev. Stat. § 19:4-1 (1971)\** | *N.J. Stat. § 19:4-1 (2000)\** | *N.J. Stat. § 19:4-1\** |
| New Mexico | *N.M. Const. art. VII, § 1 (1973)* | *N.M. Stat. § 31-13-1 (2000)* | |
| New York | *N.Y. Elec. Law § 152 (1964)* | *N.Y. Const. art. II, § 3; N.Y. Code § 5-106 (2000)* | |
| North Dakota | *N.D. Const. art. V, § 127 (1960)* | | |
| Ohio | | *Ohio Stat. §§ 2961.01, 3599.39 (2000)\** | |
| Oklahoma | *Okla. Const. art. III, § 1 (1974)* | | |
| Rhode Island | *R.I. Const. art. Am. XXXVIII (1973)* | | |
| South Carolina | *S.C. Const. art. II, § 7; S.C. Code § 23-62 (1962, 1975 Supp.)* | | |
| Tennessee | *Tenn. Const. art. IV, §2; Tenn. Code § 2-205 (1971)* | *Tenn. Code § 40-29-105 (2000)* | *Tenn. Code Ann. § 40-29-204* |
| Texas | *Tex. Const. art. XVI, § 2; Tex. Rev. Stat. art. 5.01 (1967)* | | |
| Utah | *Utah Const. art. IV, § 8 (1971)\** | | |
| Virginia | *Va. Const. art. II, § 2; Va. Code § 24.1-42 (1973)* | *Va. Const. art. II, § 1; Va. Code § 53.1-231.2 (2000)* | *Va. Const. art. II, § 1; art. V, § 12* |
| Washington | *Wash. Const. art. VI, § 3 (1974)* | *Wash. Const. art. VI, § 3; Rev. Code* | |

19-60662
c/w No. 19-60678

| | | Wash. § 9.94A.637 (2000); Madison v. State, 161 Wash. 2d 85 (2007) | |
|---|---|---|---|
| Wyoming | Wyo. Const. art. VI, § 6 (1957); Wyo. Stat. §§ 6-4, 7-311 (1957) | Wyo. Stat. §§ 6-10-106, 7-13-105 (2000) | Wyo. Const. art. IV, § 5; Wyo. Stat. Ann. §§ 6-10-106, 7-13-105(a), (b) |

*\* Permanent disenfranchisement for election-related offenses only.*